**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SiFi Networks America, LLC, | Case No. 26-10912 (___) |
| Debtor.[1] | |

**DECLARATION OF JACEN DINOFF,**
**AS CHIEF RESTRUCTURING OFFICER OF THE DEBTOR,**
**IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Jacen Dinoff, being duly sworn, depose and say:

1.      I am the Chief Restructuring Officer ("CRO") of SiFi Networks America, LLC, the debtor and debtor in possession in the above-captioned case (the "Debtor" or the "Company"). I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtor.

2.      I am the founder and Chief Executive Officer of KCP Advisory Group LLC ("KCP"), a leading business advisory firm specializing in providing creative solutions to rehabilitate businesses. I have several decades of experience as a corporate restructuring and turnaround management advisor, with a background in accounting, finance, management, and operations. My career has included engagements in financial and operational restructurings, asset divestitures through sales and liquidations, and senior debtor/creditor advisor roles for many well-known companies, both publicly and privately held. I received a bachelor's degree in business administration from the University of New Hampshire and a master's degree in business administration from Bentley College. I also am a Certified Turnaround Professional.

---

[1]      The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990). The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

3.    I, along with my team at KCP, am deeply familiar with the Company's business, financial affairs, and capital structure.  Since KCP's engagement by the Company, my team and I have been working closely with the Company's management and other professionals, and I have developed significant relevant experience and expertise regarding the Debtor, its operations, day-to-day business affairs, books and records, and the circumstances leading to the commencement of this chapter 11 case  (the "Chapter 11 Case").[2]

4.    Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtor's senior management and advisors, my review of relevant documents or, based on my experience and knowledge of the Debtor's operations and financial conditions, my opinion.  In making this Declaration, I have relied, in part, on information and materials that the Debtor's personnel and advisors have gathered, prepared, verified, and provided to me in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

5.    To minimize any disruption to the Debtor's operations and to ensure a smooth transition into chapter 11, the Debtor intends to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with this Chapter 11 Case.  I submit this Declaration in support of the Debtor's (i) voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (ii) First Day Pleadings.

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

6.  This Declaration is divided into two parts.  Part I provides background information about the Debtor, its business operations, its corporate and capital structure, and the circumstances surrounding the commencement of the Chapter 11 Case.  Part II sets forth the relevant facts in support of each of the First Day Pleadings.

## PART I - BACKGROUND

### A.  The Chapter 11 Filing

7.  On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### B.  The Business and Assets

8.  The Debtor is a specialized telecommunications infrastructure project management and deployment services provider that is the United States-based subsidiary of SiFi Networks America Ltd. ("SNA Ltd." or "Parent," and together with its affiliates and the Debtor, "SiFi"), a United Kingdom private limited company.  Debtor originates contracts with municipalities and local governments, which it operationally executes through its U.S.-based employees.

#### i.  *SiFi*

9.  Established in 2013 by Roland Pickstock and Mike Harris, SiFi is an open-access developer, operator, and wholesaler of fiber-to-the-premises ("FTTP") networks in California and the mid-West region of the United States.  SiFi constructs citywide open access networks under its FiberCity® brand (the "Networks") through long term access agreements to municipal public rights-of-way for the private finance, construction, operation, and maintenance of citywide FTTP Networks.  The Networks are then leased to internet service providers, creating an expedited route to mass-market expansion without the associated capital cost of entry.

10.    SiFi has secured substantial funding from institutional investors that provide financial backing for delivery of the Networks.  The investments are funded through non-recourse, special purpose vehicles or "City LLCs" (the "Project Companies") that are owned by the investors themselves.  The investors have committed approximately $1 billion to date, primarily through Future Fiber Networks LLC and the Smart City Infrastructure Fund ("SCIF"), which is controlled by Europe's largest pension fund, APG.  The Debtor secures contracts and analysis in readiness to present to the investors for approval.  If approved, the investor forms the Project Company and provides the equity required to build a Network.

11.    The Networks are constructed in urban and suburban communities of approximately 20,000 to 75,000 homes that generally lack comparable high-speed service offerings and typically are served by a single telephone company and cable company.

12.    A chart showing the structure of SiFi's business (prior to today's sale of SNA Ltd., as discussed below) is attached hereto as Exhibit A.

**ii.    *The Debtor's Role***

13.    The Debtor primarily supports fiber network deployment initiatives within SiFi's business through network deployment planning, tracking permitting processes, jurisdictional coordination, vendor and subcontractor management, construction management, program management, delivery coordination, stakeholder reporting, and compliance support.  As a result, the Debtor has developed substantial expertise in managing complex, multi-phase telecommunications infrastructure development projects.

14.    The Debtor has a skilled workforce of approximately thirty-three (33) individuals (collectively, the "Employees"), consisting of project managers, coordinators, and operational leadership personnel.  These individuals have expertise in, among other things, network pre-

4

construction management, fiber deployment project management, construction management, project coordination, and operational leadership.

15.     The Debtor, in conjunction with its Parent, provides project management services for the ten (10) Networks: (i) two (2) that are complete in Placentia, California and Kenosha, Wisconsin; (ii) five (5) that are operational but still under construction in Farmington, Michigan; Rockford, Illinois; Simi Valley, California; Oceanside, California; and Palmdale, California; (iii) one (1) under construction in Fullerton, California; and (iv) one (1) due to become operational shortly in Escondido, California.  SiFi previously developed projects in East Hartford, Connecticut and Saratoga Springs, New York that were abandoned and a project in Rancho Cordova, CA that currently is suspended.

### iii.     *The Debtor's Revenue*

16.     The Debtor generates approximately $10 million in annualized revenue, primarily through management fees that are earned for developing and managing the Networks. Management fees are fixed, with some variability based on targets, and paid monthly by the Project Companies based on the size of the applicable project.  Due to increased resources and complexity, management fees are higher during construction than during operations.  The Debtor also has the potential to earn development fees, subject to meeting key milestones, which are paid at a rate of two percent (2%) of CapEx.

### C.     The Debtor's Corporate Structure

17.     The Debtor is a Delaware limited liability company that is a wholly owned subsidiary of its Parent. The Debtor is manager-managed, and the current independent manager is Michael Wyse of Wyse Advisors, LLC (the "Manager").  The Debtor's Chief Executive Officer is Ian Wade and, as noted above, I am the CRO.  In April 2026, SNA Ltd. was acquired by PATRIZIA, a German infrastructure investment manager, and APG/SCIF.

5

**D.      The Debtor's Prepetition Capital Structure**

18.      The following description of the Debtor's capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

**i.      *Prepetition Term Loan***

19.      On May 6, 2026, ArcLink Fiber LLC ("ArcLink" or the "Prepetition Secured Noteholder"), an affiliate of PATRIZIA, provided a $2.2 million loan (the "Prepetition Loan") to the Debtor pursuant to that certain Secured Promissory Term Note (the "Prepetition Note"). Interest on the Prepetition Note accrues at thirteen percent (13%) per annum, which is increased by five percent (5%) upon the occurrence and during the continuance of an event of default. Pursuant to the Prepetition Note and the related documents entered into in connection therewith, the Lender has a first priority lien on substantially all of the Debtor's assets.  The Note matures on August 6, 2026.  Prior to the Debtor securing the Loan, all of the Debtor's working capital was funded by SNA Ltd.

**ii.      *Unsecured Debt***

20.      As of April 30, 2026, the Debtor had approximately $26.4 million in unsecured debt in the form of accounts payable, accrued liabilities, and other liabilities.

**iii.      *Equity***

21.      All of the Debtor's equity is held and owned by SNA Ltd.

**iv.      *Cash Position***

22.      As of the Petition Date, the Debtor has approximately $206,000 in cash and cash equivalents, which does not include professional retainer amounts paid by the Debtor to assist in preparing and prosecuting this Chapter 11 Case.

6

**E.    The Debtor's Litigation**

23.    <u>Generate</u>.  In December 2023, Generate Saratoga Springs Fiber Member, LLC and Generate East Hartford Fiber Member, LLC (collectively, "<u>Generate</u>") filed a complaint against the Debtor, SNA Ltd., and certain of their affiliates in the Court of Chancery of the State of Delaware (the "<u>Delaware Chancery Court</u>") seeking, among other things, specific performance with respect to certain agreements relating to fiber optic networks in Saratoga Springs, New York and East Hartford, Connecticut (the "<u>Generate Litigation</u>").  The Generate Litigation later was moved to arbitration before the American Arbitration Association/International Centre for Dispute Resolution (the "<u>Arbitration Panel</u>"), which issued a Partial Final Award on January 22, 2026 (the "<u>Partial Final Award</u>") and a Second Partial Final Award on May 1, 2026, finding the Debtor jointly and severally liable to Generate in the amount of approximately $16.3 million, plus attorneys' fees in the amount of approximately $1.2 million.  On April 27, 2026, the defendants in the Generate Litigation filed with the Delaware Chancery Court a motion for summary judgment to vacate the Partial Final Award.

24.    <u>Berkshire Hathaway</u>.  The Debtor is a third-party defendant in a lawsuit filed by Berkshire Hathaway Specialty Insurance Company in the United States District Court for the Central District of California alleging breach of a National Multi-City Agreement entered into between Corbel Communications Industries LLC ("<u>Corbel</u>") and the Debtor in 2018, which granted Corbel a right of first refusal with respect to certain microtrenching projects (the "<u>Berkshire Litigation</u>").  A jury trial is scheduled to commence in the Berkshire Litigation on August 25, 2026.

25.    <u>Peter Neda</u>. On January 21, 2025, Peter Neda, the Debtor's former general counsel, filed a complaint against the Debtor and SNA Ltd. in the Superior Court of the State of California

alleging, among other things, breach of contract (the "Neda Litigation").  The parties to the Neda Litigation currently are engaging in discovery.

26.    Cablevision Lightpath.    On May 6, 2026, Cablevision Lightpath LLC filed a complaint against the Debtor in the Superior Court for the State of Delaware alleging, among other things, breach of contract (the "Lightpath Litigation").  Upon information and belief, the Debtor has not been served with the complaint in the Lightpath Litigation.

**F.    Events Leading to the Chapter 11 Case and Decision to Restructure**

27.    Although the Debtor's business model has enormous monetary potential, as evidenced by the confidence placed in the Company by its investors and various contract counterparties, the Debtor has faced a series of financial and operational difficulties placing its continued existence at risk.  As further described below, these challenges relate to, among other things: (i) SNA Ltd. discontinuing funding to the Debtor, taking steps to sell substantially all of its own assets, and commencing its own insolvency proceeding in the United Kingdom (the "UK Proceeding"); (ii) adverse litigation results paired with an inability to continue paying its professional advisors; and (iii) vendors and servicers threatening to commence legal action and/or discontinue doing business with the Debtor.

28.    Faced with SNA Ltd. ceasing to provide working capital and no third-party financing being available, on May 6, 2026, the Debtor successfully obtained the Prepetition Loan. The underlying Note, however, matures in approximately two (2) months, and the Debtor does not have sufficient liquidity to satisfy the underlying obligations.

29.    Around the same time that the Debtor's cash position became tenuous, the Debtor learned that the Arbitration Panel might be issuing a final award, potentially exposing the Debtor, on a joint and several basis, to an ultimate judgment of approximately $17.5 million that it has no ability to satisfy.  The Debtor also is facing upcoming deadlines in the Berkshire Litigation and

does not have the financial wherewithal to pay attorneys to defend that matter or the other litigation matters referenced above. Indeed, the law firm representing the Debtor in the Generate Litigation is owed hundreds of thousands of dollars and the law firm representing the Debtor in the Berkshire Litigation and the Neda Litigation is owed tens of thousands of dollars.

30.     Given the foregoing dynamics, SNA Ltd. came to the inevitable conclusion that a restructuring of the Debtor's business would be necessary. Accordingly, on April 22, 2026, SNA Ltd. appointed Mr. Wyse as the sole Manager of the Debtor to, among other things, assess the financial position of, and develop a comprehensive restructuring plan for, the Debtor. Following Mr. Wyse's appointment, he moved swiftly to understand the Debtor's business and to determine what course of action to take given the financial and operational difficulties described above. As part of that strategy, the Debtor retained the law firm of Cole Schotz P.C., the financial advisory firm of KCP, and sales agent Sherwood Partners, Inc. to assist the Debtor with its overall restructuring strategy and contingency planning.

31.     The Debtor also undertook steps to closely coordinate the filing of this Chapter 11 Case with the commencement of the UK Proceeding. To that end, and to ensure that the Debtor is able to continue operating in the ordinary course notwithstanding the respective insolvency proceedings, the Debtor and SNA Ltd. entered into a detailed pre-petition Master Services Agreement governing the ongoing provision of services to one another. Additionally, the Debtor's professionals and SNA Ltd.'s professionals have been in constant communications to ensure that following the filing by SNA Ltd. of a notice of intention to appoint administrators (which occurred last night) and the closing of SNA Ltd.'s asset sale (which will occur today), this Chapter 11 Case would be commenced.

9

32.     After carefully considering all alternatives, the Manager made the difficult decision to file for chapter 11 protection in order to preserve the Debtor's assets and conduct a bankruptcy sales process, all in an effort to maximize value for the benefit of the Debtor's creditors. Indeed, early in the case the Debtor intends to file a motion seeking approval of, among other things, certain sale and bidding procedures and a stalking horse asset purchase agreement with ArcLink or its designee.

## PART II - FIRST DAY PLEADINGS

i.      *Debtor's Application for Appointment of Stretto, Inc. as Claims and Noticing Agent*

33.     Stretto, Inc.'s ("Stretto") retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Case and of other developments in the Chapter 11 Case. I am informed that Stretto has acted as the claims and noticing agent in numerous cases of comparable size. Stretto's retention to act as an agent of the Court, as an independent third party with significant experience in this role, is in the best interests of the Debtor as well as its estate and creditors.

ii.     *Debtor's Motion for Entry of an Order Authorizing the Debtor to Redact (A) Certain Personally Identifiable Information and (B) Certain Transaction Party Information, and (II) Granting Related Relief*

34.     The Debtor submits that it is appropriate to authorize the Debtor to redact from any paper filed or to be filed with the Court in the Chapter 11 Case the personally identifiable information—including home addresses—of the Debtor's individual creditors and interest holders—including the Debtor's current and former employees, contract workers, debtholders, and other creditors—because such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking. Additionally, the Debtor submits that it is appropriate to redact information related to potential transaction parties given the existence of

10

non-disclosure agreements with these parties.  The Debtor believes that authorizing the redaction

of their identities is the best method to ensure transparency with respect to information disclosure,

while still preventing the negative implications of public disclosure.

> ### iii. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continued (A) Use of Bank Accounts and Business Forms and Payment of Related Prepetition Obligations and (B) Performance of Intercompany Transactions in the Ordinary Course of Business, (II) Granting a Limited Waiver of Section 345(B) Deposit and Investment Requirements, and (IIII) Granting Related Relief*

35.     As of the Petition Date, the Debtor has three bank accounts (each, a "Bank

Account" and, collectively, the "Bank Accounts").  In particular, the Debtor maintains a checking

account (Account No. *****9032) at HSBC Bank USA N.A. ("HSBC"), which it uses for all its

transactions, operational expenses, and disbursements, including payroll.  In addition, the Debtor

maintains a credit card collateral account (Account No. *****0039) at HSBC, which is uses to

collateralize its obligations with respect to certain corporate credit cards issued by HSBC to the

Debtor and a handful of its key employees (the "Corporate Cards").  The Corporate Cards are used

by the Debtor and its employees to pay certain business expenses, such as business travel and

accommodations, and required subscriptions (*e.g.*, Adobe and Microsoft Office licenses).  Lastly,

the Debtor recently opened an operating account (Account No. ******7462) at East West Bank

("EWB", and together with HSBC, the "Banks"), which it intends to use as its main operating

account during the Chapter 11 Case.  The Debtor intends to substitute and transition its HSBC

checking account to its EWB operating account, and transfer all funds from the former to the latter

prior to or soon after the Petition Date.

36.     The Debtor incurs periodic service charges and other fees related to the Bank

Accounts (collectively, the "Bank Fees").  On average, the Debtor pays approximately $900.00

per month in Bank Fees with respect to the Bank Accounts.

37.     Given the critical functions the Bank Accounts serve with respect to the Debtor's business, the Debtor must maintain its Bank Accounts to ensure collections and disbursements occur and to continue its operations in the ordinary course.  While the Chapter 11 Case is pending, the Debtor will continue to maintain detailed records reflecting all transfers of funds.  Requiring the Debtor to open new bank accounts with new banking institutions that strictly adhere to the restrictions established by section 345(b) of the Bankruptcy Code will only distract management, slow the Debtor's momentum, and cause the estate to unnecessarily incur potentially substantial costs to the detriment of creditors.  I believe that permitting the Debtor to maintain and continue to operate utilizing its current Bank Accounts, and to pay any associated Bank Fees which may have accrued prepetition, is in the best interest of the estate because it would preserve the Debtor's ability to satisfy postpetition obligations and maintain its relationships with its lender and customers, thereby preserving value for the benefit of the Debtor's estate and all its stakeholders.

38.     The Debtor also uses various Business Forms, such as checks, invoices and letterhead, in the ordinary course of business.  Because the Business Forms with HSBC were used prepetition, they do not reference the Debtor's status as debtor in possession.  Nonetheless, most parties doing business with the Debtor will be aware of the Debtor's status as debtor in possession as a result of the publicity surrounding the Chapter 11 Case and the notice of commencement served on parties-in-interest.  Moreover, the Debtor will ensure that its new Business Forms with EWB will reflect its status as debtor-in-possession.  Modifying existing Business Forms would be burdensome and expensive and would confer no corresponding benefit upon those dealing with the Debtor, most of whom, as noted above, will be aware of the commencement of the Chapter 11 Case.  For this reason, the Debtor requests that it be authorized to use existing checks, deposit

12

slips, and related forms without placing the label "debtor-in-possession" on each such form until such a time as its existing stock is depleted and/or the Debtor completes its transition to EWB.

> iv. ***Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "<u>Employee Wages Motion</u>")**

### 1.    Debtor's Employees

39.    As described more fully in the Employee Wages Motion, the continuation of compensation and benefits during the Chapter 11 Case for the Debtor's Employees is critical to the Debtor's continued operations and restructuring strategy.  The Employees perform a variety of critical functions including service delivery, construction, client service, community relations, legal, marketing, technology, and management-related tasks.  The skills and experience of the Employees, as well as their relationships with customers and vendors and knowledge of the Debtor's infrastructure, are essential to the Debtor's ongoing operations and ability to effectively operate during the Chapter 11 Case.  Without the continued, uninterrupted services of the Employees, the Debtor's business operations will be halted, and the administration of the Debtor's estate will be materially impaired.

40.    The Employees will be materially harmed if the Debtor is not permitted to continue paying compensation and providing health and other benefits during the Chapter 11 Case. Furthermore, the Debtor and its estate may be harmed if it is unable to provide compensation and benefits consistent with past practice.  Consequently, the relief requested in the Employee Wages Motion is necessary and appropriate under the facts and circumstances of the Chapter 11 Case.

### 2.    Compensation and Benefits

41.    To minimize the personal hardship that Employees would suffer if prepetition Employee-related obligations remain unpaid during the Chapter 11 Case, subject to the limitations

set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, the Debtor is seeking authority, but not direction, to: (a) pay and honor certain prepetition claims relating to, among other things, Unpaid Compensation, Withholding Obligations, Unpaid Payroll Processing Fees, Reimbursable Expenses, Health and Welfare Coverage and Benefits, the Workers' Compensation Program, the 401(k) Plan and other retiree benefits, Paid Leave and Unpaid Leave (each as defined in the Employee Wages Motion, and collectively, the "Compensation and Benefits"); and (b) pay all costs related to or on account of the Compensation and Benefits, as further detailed in the Employee Wages Motion.

42.     Subject to the Court's approval, the Debtor intends to continue its prepetition Compensation and Benefits in the ordinary course of business.  Out of an abundance of caution, the Debtor is requesting confirmation of its right to modify, change, and/or discontinue any of its Compensation and Benefits and/or to implement new programs, policies, and benefits in the Debtor's sole discretion and in the ordinary course during the Chapter 11 Case and without the need for further Court approval, subject to applicable law.

43.     Additionally, as described in the Employee Wages Motion, the Debtor is seeking authority, but not direction, to make payments related to prepetition amounts owed on account of the Compensation and Benefits.  As of the Petition Date, the Debtor believes $103,350 on account of unpaid prepetition Compensation and Benefits is outstanding and will become due and owing within the first twenty-one (21) days of the Chapter 11 Case.  As such, the Debtor requests authority to pay, in an aggregate amount not to exceed $103,350, any unpaid prepetition Compensation and Benefits.

44.     I believe that the total amount sought to be paid by the Employee Wages Motion is modest compared to the magnitude of the Debtor's overall business.  Furthermore, the Debtor has

sufficient funds to pay the Compensation and Benefits in the ordinary course. Accordingly, I believe the relief requested in the Employee Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtor, its estate, and all parties in interest.

> **v.** ***Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Its Obligations Under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Maintain Its Surety Bond Program, and (II) Granting Related Relief* (the "<u>Insurance Motion</u>")**

45.     By the Insurance Motion, the Debtor seeks entry of interim and final orders: (i) authorizing, but not directing, the Debtor to: (a) pay its obligations under prepetition insurance policies, (b) continue to pay certain brokerage fees, and (c) renew, supplement, modify, or purchase insurance coverage in the ordinary course, and (ii) granting related relief.

46.     With the assistance of its insurance broker, McGriff (the "<u>Broker</u>"), the Debtor procured thirty (30) insurance programs and related insurance policies that are administered by several third-party insurance carriers.  The Insurance Programs provide coverage for, among other things, general liability, directors' and officers' liability, employment practices liability, criminal liability, commercial general liability, cyber liability, workers' compensation, energy liability, and umbrella or excess liability insurance programs.  On an annual basis, the Debtor pays approximately $305,706.00 on account of Insurance Premiums.  The Debtor generally pays the Insurance Premiums, as a combination of full payments and/or down payment with monthly payments.  While the Debtor believes it is current on its obligations, it is anticipated that certain Insurance Premiums will become due and owing during the Chapter 11 Case

47.     The nature of the Debtor's business and this Chapter 11 Case render it essential for the Debtor to maintain its Insurance Programs on an ongoing and uninterrupted basis.  The non-payment of any premiums or related fees under the Insurance Programs could result in one or more

15

of the Insurance Carriers terminating or declining to renew the Insurance Programs or refusing to enter into new insurance policies with the Debtor.  If any of the Insurance Programs lapse, the Debtor could be exposed to substantial liability or property damages, to the detriment of all parties in interest.

48.     In addition, the risk that eligible claimants under the Workers' Compensation Program will not receive timely payments for prepetition employment-related injuries could have a negative impact on the financial well-being and morale of the Debtor's employees and lead to the departure of certain employees.  Such departures by employees at this critical time may result in the disruption of the Debtor's business with a substantially adverse impact on the Debtor, the value of its assets, and the Chapter 11 Case.  Moreover, in many instances, the coverage provided under the Insurance Programs is required by the regulations, laws, and contracts that govern the Debtor's commercial activities.

49.     Accordingly, for the reasons set forth herein and in the Insurance Motion, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtor, its estate, and all parties-in-interest and will enable the Debtor to continue to operate its business and preserve the value of its estate.  Absent the relief requested, the Debtor and its estate would suffer immediate and irreparable harm.

> **vi.**     ***Debtor's Motion for Entry of an Interim Order and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees And (II) Granting Related Relief (*the "Taxes Motion"*)***

50.     I understand that the taxes the Debtor typically incurs generally falls into the following categories: Income and Franchise Taxes and Business Licenses, Permits and Other Fees (each as defined in the Taxes Motion and collectively, the "Taxes").

16

### 1.    Income and Franchise Taxes

51.    In the ordinary course of operating its business, the Debtor is required to pay various federal, state and local income taxes, franchise taxes, and franchise fees (collectively, the "Income and Franchise Taxes").  The Debtor typically pays most Income and Franchise Taxes on an annual basis, and some on a quarterly basis.  In the twelve-month period preceding the Petition Date, the Debtor paid approximately $2,406.00 in Income and Franchise Taxes in connection with 2025 extension filings.  The Debtor's final liability for prepetition Income and Franchise Taxes has not yet been determined, and these amounts will be determined upon the filing of the Debtor's 2025 tax returns and subsequent assessments by applicable taxing authorities.  Through its motion, the Debtor seeks to pay these Income and Franchise as such amounts become due and payable.  I believe that failure to timely remit payment of Franchise Taxes may subject the Debtor to penalties or interest.

### 2.    Business Licenses, Permits and Other Fees

52.    In the ordinary course of business, the Debtor is required to pay various taxes and fees for business licenses, annual reports, various permits, and other similar types of taxes and fees (the "Business Fees").  The Debtor does not believe that any Business Fees are due and owing as of the Petition Date.  I believe that failure to timely remit payment of Franchise Taxes may subject the Debtor to penalties or interest.

> **vii.    *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Pay Prepetition Claims of Certain Critical Vendors and 503(B)(9) Claimants and (II) Granting Related Relief* (the "Critical Vendor Motion")**

53.    Prior to this Chapter 11 Case, the Debtor considered the factors set forth in the Critical Vendor Motion and identified a limited number of vendors whose goods and services are

17

needed to continue to operate, maintain, and preserve the going-concern value of the Debtor's business (collectively, the "Critical Vendors").

54.    As more fully set forth in the Critical Vendor Motion, to develop and operate the Networks, the Debtor facilitates access to fiber optic network infrastructure.  Certain of the Critical Vendors provide, among other things, dark fiber leases, operation systems that monitor and support a Network's functionality, and data center access to house key hardware such as routers, switches, and servers (collectively, the "Backhaul and Colocation Vendors").  For SiFi's citywide open access networks to reach end users, they must be linked to regional networks through backhaul connections and cross-connects offered by the Backhaul and Colocation Vendors.  The failure to pay the Backhaul and Colocation Vendors could result in the termination or suspension of these services, eliminating the Debtor's ability to maintain SiFi's network and deliver connectivity to ISPs. Not only would this damage SiFi's reputation with its clientele, but it would also jeopardize the Debtor's entitlement to its management and development streams (which are its primary sources of income).  Even though alternatives exist, I believe migrating to new providers would be expensive, time consuming, and would run the risk that the Debtor cannot secure comparable dark fiber leases or colocation services. Undertaking a systems overhaul amidst ongoing construction projects and significant litigation exposure is both ill-advised and avoidable.

55.    The Debtor estimates that, as of the Petition Date, there is approximately $35,000 in the aggregate amount due and owing, or that will become due and owing within the first twenty-one (21) days of the case, on account of prepetition services provided by the Backhaul and Colocation Vendors ("Backhaul and Colocation Claims").  I believe the value of the Debtor's estate will be maximized by preserving the Debtor's existing relationships through payment of these claims.

56.     The Debtor also relies upon relationships with specialized vendors who provide network monitoring, optimization, and maintenance; testing of fiber infrastructure and network equipment; subscriber data and database management; incident management and documentation; design and assembly of router cabinets and other physical components; customer interfacing and hiring support (collectively, the "Management Vendors").  Many of these services are tailored to the Backhaul and Colocation Vendors, meaning that continuation of the Debtor's business in chapter 11 requires payment for both network infrastructure and the related support services of the Management Vendors. I believe any disruption in the provision of these services would have far-reaching and adverse economic and operational consequences on the Debtor's business, rendering the Management Vendors all but irreplaceable.

57.     Further, some of the Management Vendors are companies domiciled outside the United States. The Debtor believes there is a significant and material risk that the nonpayment of even a single invoice could cause one of these foreign Management Vendors to cease their services to the Debtor, especially since they may be unfamiliar with the chapter 11 process and react skeptically to its debtor protections. The Debtor cannot afford interruptions of this nature.

58.     The Debtor estimates that, as of the Petition Date, there is approximately $25,000 in the aggregate amount due and owing, or that will become due and owing within the first twenty-one (21) days of the case, on account of prepetition services provided by the Management Vendors (the "Management Claims").  I believe the value of the Debtor's estate will be maximized by preserving the Debtor's existing relationships through payment of these claims.  The Management Claims, as well as the Backhaul and Colocation Claims, represent the Debtor's best estimate as to what aggregate amounts must be paid to the Critical Vendors for the Debtor and SiFi to supply uninterrupted services to their customers.

19

59. In the ordinary course of business, the Debtor purchases and replaces certain equipment like switches, splitters, and splice trays to keep the Networks functional. Accordingly, the Debtor may have received goods from various vendors within the twenty-one (21) day period immediately preceding the Petition Date (the "503(b)(9) Claimants"). Because these goods are obtained on an order-by-order basis, the 503(b)(9) Claimants may refuse to supply new orders if they do not receive payment. I believe this could impair the function of the Networks and could risk violating certain colocation agreements, which require the Debtor to maintain its equipment in good operating condition. It is my understanding that, as of the Petition Date, the Debtor does not believe any amount is due on account of goods delivered within the twenty-one days immediately preceding the Petition Date. However, to the extent such claims arise, the best interests of the estate will be served by paying 503(b)(9) Claimants, *provided* that (a) such payments do not exceed the aggregate amount of $50,000 and (b) such claimants make commercially reasonable efforts to maintain or restore Customary Trade Terms (as defined in the Critical Vendor Motion).

60. The Debtor has sufficient funds to pay the amounts owed to Critical Vendors in the ordinary course of business by virtue of access to cash on hand and anticipated access to debtor-in-possession financing. The Debtor is able to identify whether checks or wire transfers relate to payment authorized with respect to the Critical Vendor Motion, and does not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored. Thus, the Debtor's financial institutions should be authorized to honor all checks or wire transfer requests with respect to payment of the Critical Vendors.

**viii.** *Debtor's First Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts, and (II) Granting Related Relief (the "Rejection Motion")*

61. The Debtor is party to various agreements related to operations in including, but not limited to, Massachusetts and Connecticut (together, to the extent applicable, with all exhibits, appendices, supplements, documents, and agreements ancillary thereto, in each case as amended, modified, or supplemented from time to time, the "Agreements"). The Debtor has determined that the Agreements are burdensome to the Debtor's estate and unnecessary for the Debtor's continued operation during the case and the completion of the Debtor's sale efforts. The Debtor believes that continuing its obligations under the Agreements post-petition would be burdensome and materially harmful to the Debtor's estate.

62. The Debtor submits that the rejection of the Agreements is an appropriate exercise of the Debtor's business judgment that will reduce financial, administrative, and other burdens on the Debtor's estate. I believe that the Agreements are financially burdensome to the Debtor and have no marketable value that could be generated through assumption and assignment. Accordingly, the Debtor's continued performance under the Agreements would constitute an unnecessary depletion of value of the Debtor's estate.

**ix.** *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Noteholder, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief (the "DIP Motion")*

63. The Debtor requires debtor-in-possession financing to operate its business and administer its estate during the Chapter 11 Case. KCP undertook an analysis of the Debtor's near-term weekly and long-term cash flow forecasts and prepared a 13-week cash flow budget (the "Budget") commencing as of the Petition Date. These forecasts take into account anticipated

21

disbursements during the projected periods. I understand that the Budget provides an accurate reflection of the Debtor's funding requirements over the identified period and is reasonable and appropriate under the circumstances. As reflected and projected in the Budget, by the second week of the Chapter 11 Case (*i.e.*, as the week of June 14), the Debtor will run out of its own cash and require funding to continue operations. The Debtor estimates that it requires approximately $3.13 million in DIP financing to fund the Chapter 11 Case through conclusion of a sale process and emergence from chapter 11. Absent financing, the Debtor has insufficient cash to fund its operations during the Chapter 11 Case.

64.    In the weeks leading up to the Petition Date, the Debtor, through its proposed sales agent, conducted a marketing process to determine the availability of third-party financing sources that were willing to provide financing to the Debtor in its current financial situation. That marketing process revealed that there were no lenders willing to provide the Debtor with DIP financing outside of the Debtor's capital structure.

65.    After extensive, good faith and arm's-length negotiations with ArcLink, led by myself, the Debtor's independent manager, and its professionals, the Debtor's Prepetition Secured Noteholder, the Debtor was able to secure the proposed DIP Facility with ArcLink as DIP Lender, which consists of a new money loan in the amount of $3.13 million and a "roll-up" of the Debtor's outstanding indebtedness to the Prepetition Secured Noteholder under the Prepetition Note. ArcLink required the "roll-up" of the prepetition secured indebtedness in the context of its commitment to provide the DIP Facility. Without the Roll-Up, the DIP Lender would not have agreed to provide debtor-in-possession financing. Ultimately, following good faith negotiations, ArcLink was willing to provide liquidity solely on the terms provided in the DIP Note Documents

22

and the Orders.  Under the circumstances of this case, I believe the terms of the DIP Facility are reasonable, appropriate, and well within market.

66.    The DIP Facility and access to cash collateral is critical to the Debtor's ability to pay the administrative costs of this Chapter 11 Case, and should provide the Debtor with sufficient liquidity to operate its business without creating a "priming" dispute at the outset of the Chapter 11 Case.  Access to the DIP Facility will (a) provide the Debtor with critical working capital for its business; (b) fund other general corporate purposes; (c) fund the payments authorized by the Court pursuant to the "first-day motions" filed contemporaneously herewith; (d) satisfy administrative costs and expenses incurred in the Chapter 11 Case, and, notably; (e) provide the Debtor with runway necessary to consummate a value-maximizing sale transaction under section 363 of the Bankruptcy Code.  Absent access to the DIP Facility, the Debtor would be without funds to operate its business and pursue the proposed bankruptcy sale process, which would cause irreparable harm to the Debtor and its stakeholders.

67.    At bottom, the DIP Facility is the best, and indeed the only, source of financing available to the Debtor following a marketing process that revealed no viable alternatives.  I believe the Debtor's entry into the DIP Facility is reasonable, fair, and in the best interests of the Debtor and its estate and, therefore, should be approved.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

68.     The above describes the Debtor's business and capital structure, the factors that precipitated the commencement of the Chapter 11 Case, and the proposed path for the Debtor's restructuring.  The provisions of the Bankruptcy Code will assist the Debtor in implementing this strategy, with the goal of maximizing value for their constituents.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: June 5, 2026
        Billerica, Massachusetts

By:     */s/ Jacen Dinoff*
Name: Jacen Dinoff
Title: Chief Restructuring Officer
        SiFi Networks America, LLC

**EXHIBIT A**

**SIFI BUSINESS STRUCTURE CHART**

