**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>SiFi Networks America, LLC,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 26-10912 (___) |

**DECLARATION OF**
**SHAREEF EL ATTAR IN SUPPORT**
**OF DEBTOR'S MOTION FOR ENTRY OF INTERIM**
**AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO**
**(A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH**
**COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO**
**THE PREPETITION SECURED NOTEHOLDER, (III) MODIFYING**
**THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF**

I, Shareef El Attar, being duly sworn, depose and say:

1.      I am a Managing Director at Sherwood Partners, Inc. ("Sherwood"), the proposed sales agent for the debtor and debtor in possession (the "Debtor") in the above-captioned case (the "Chapter 11 Case").  Sherwood's practice consists of financial and management consultants and other professionals who specialize in providing financial, business, and strategic assistance typical in distressed business settings. I personally have over fifteen (15) years of experience advising distressed businesses, lenders, fiduciaries, and stakeholders through complex restructuring and turnaround situations.  I specialize in middle market transactions, including lender advisory engagements, liquidity and cash flow management, contingency planning, operational stabilization, creditor negotiations, and distressed asset sale processes.

---

[1]     The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990).  The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

2.     I submit this declaration (the "Declaration") in support of the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Noteholder, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 10] (the "DIP Motion"), filed contemporaneously herewith.[2]  In particular, I submit this Declaration in support of my view that the proposed DIP Facility (i) is the best and only available postpetition financing option currently available to the Debtor, (ii) is the product of an arm's-length, good-faith negotiation process, and (iii) contains reasonable terms and conditions under the circumstances.

3.     The statements in this Declaration are, except where specifically noted, based upon either my personal knowledge or opinion, on information that I have received from the Debtor's employees or advisors, employees of Sherwood working directly with me, or from the Debtor's records maintained in the ordinary course of its business.  I am not being specifically compensated for this Declaration or any testimony I might provide in connection with this Declaration other than as an employee of Sherwood.  If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis. I am over the age of eighteen (18) years and authorized to submit this Declaration in support of the DIP Motion.  I also have reviewed, relied upon, and considered the (i) DIP Motion; and (ii) *Declaration of Jacen Dinoff, as Chief Restructuring Officer of the Debtor, in Support of Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration").

## SHERWOOD'S RETENTION

4.     Sherwood was engaged by the Debtor on or about May 13, 2026.  Since then,

---

[2]    Capitalized terms used but not defined herein have the meanings assigned to them in the DIP Motion.

Sherwood has provided extensive services for the Debtor. Most salient to this Declaration, Sherwood conducted a marketing process prior to the Debtor's bankruptcy filing to determine the availability of third-party financing sources that were willing to provide post-petition financing to the Debtor in its current financial situation. I was the point person in connection with the DIP financing marketing process. Additionally, Sherwood has provided substantial services in connection with the Debtor's asset marketing efforts, working closely with the Debtor and its professionals to identify buyers that might be interested in acquiring the Debtor's assets. As a result of these services, I have gained a detailed understanding of the Debtor's business and the unique circumstances of this case.

## THE DEBTOR'S LIQUIDITY NEEDS

5.     As of the Petition Date, I am advised the Debtor has only approximately $206,000 of available cash on hand with which to operate its business and fund the Chapter 11 Case. The Debtor and its advisors undertook an analysis of the Debtor's near-term weekly and long-term cash flow forecasts and prepared a 13-week cash flow budget (the "Budget"), assuming a bankruptcy filing on or about June 5, 2026. I understand that the Budget provides an accurate reflection of the Debtor's funding requirements over the identified period and is reasonable and appropriate under the circumstances. As reflected and projected in the Budget, by the second week of the Chapter 11 Case (*i.e.*, as the week of June 14), the Debtor will run out of cash and require funding to continue operations. As reflected in the Budget, the Debtor estimates that it requires approximately $3,130,000 in DIP financing to fund the Chapter 11 Case through conclusion of a sale process and emergence from chapter 11. Thus, as further discussed in the First Day Declaration, access to the DIP Facility is necessary for the Debtor to operate its business (including the funding of payroll for its employees) during the Chapter 11 Case and to fund administrative expenses. Absent access to the DIP Facility, the Debtor would be without funds to operate its

3

business and pursue the proposed bankruptcy sale process, which would cause irreparable harm to the Debtor and its stakeholders.

**THE DEBTOR'S EFFORTS TO OBTAIN POSTPETITION FINANCING**

6.      In the weeks leading to the Debtor's bankruptcy filing, Sherwood solicited potential DIP financing lenders, directing its outreach toward alternative lenders focused on distressed and special situations financing.

7.      On or about May 18, 2026, Sherwood solicited ten (10) potential lenders DIP financing lenders providing high-level background information on the DIP Financing opportunity without disclosing the Debtor's name.  It is my understanding that the Prepetition Secured Noteholder would not agree to be primed by a third-party lender and, thus, we inquired whether the prospective lenders would be willing to extend financing on an unsecured or junior secured basis.  After their respective review of the information provided and further correspondence seven (7) of those prospective lenders declined the opportunity for various reasons, including:

(a)   that the project management nature of the business did not align with their investment criteria;

(b)   that positive EBITDA was required for financing opportunities of this nature;

(c)   the inability to obtain a senior secured position;

(d)   the lack of sufficient downside collateral coverage;

(e)   concerns regarding the level of cash burn required to reach the conclusion of a sale process; and

(f)   that the DIP financing amount requested was too small.

8.      Another prospective lender executed a non-disclosure agreement and conducted further review of due diligence materials regarding the opportunity.  Ultimately, that lender declined to present a DIP financing proposal, citing, among other reasons, the inability to obtain a

senior secured position, the lack of physical assets, and uncertainty regarding whether the proceeds of the contemplated sale of the Debtor's assets would be sufficient to repay the DIP loan. In sum, none of the prospective lenders that responded to our solicitations were willing to extend financing to the Debtor on an unsecured or junior secured basis. And two (2) of the prospective lenders did not respond to Sherwood's outreach efforts after multiple attempts.

9. In parallel to Sherwood's DIP financing outreach process, the Debtor, through its professionals and advisors, engaged with ArcLink Fiber LLC ("ArcLink"), the Debtor's Prepetition Secured Noteholder, regarding terms of potential DIP financing for the Debtor. The negotiations were conducted on an arm's-length basis, were iterative, and proceeded in good faith, with each party agreeing to certain concessions that resulted in the terms of the DIP Facility. The DIP Lender was willing to provide liquidity solely on the terms provided in the DIP Loan Documents and the Orders. In other words, the DIP Lender was unwilling to provide postpetition financing to the Debtor in connection with the Chapter 11 Case without all the terms afforded to it under the DIP Loan Documents, including, for example, the Roll-Up, the Debtor's stipulations regarding the ArcLink's prepetition claims and liens, and the adequate protection package. That said, I believe the terms of the DIP Facility are customary, reasonable, and consistent with similar DIP financings under the circumstances of this case. The DIP Facility and access to Cash Collateral is critical to the Debtor's ability to pay the administrative costs of this Chapter 11 Case, and should provide the Debtor with sufficient liquidity to operate its business without creating a "priming" dispute at the outset of the Chapter 11 Case.

10. Based on the financing outreach processes and negotiations with the Prepetition Lender, the Debtor, in conjunction with its advisors, believes the DIP Facility is the best (and indeed the only) postpetition financing option available to the Debtor under the circumstances.

Accordingly, I believe that the DIP Facility is in the best interests of the Debtor's estate and should be approved.

**THE DEBTOR'S SELECT THE PROPOSED DIP FACILITY**

11.     Based on the foregoing, it is my belief that the DIP Facility represents the best and only postpetition financing option available to address the Debtor's immediate liquidity needs, and that the terms and conditions of the DIP Loan Documents are reasonable and appropriate under the circumstances.  The proposed DIP Facility will provide the Debtor with immediate access to liquidity that is necessary to fund the Debtor's continued operations during the Chapter 11 Case and sufficient runway to conduct a value maximizing sale transaction for the benefit of the Debtor's estate and all of its stakeholders.  Accordingly, I believe the DIP Facility should be approved on the terms and conditions reflected in the DIP Loan Documents, as described in the DIP Motion.

**CONCLUSION**

12.     Based on my experience, I believe that, given the circumstances, the terms of the DIP Facility are reasonable and appropriate.  I also believe that, based on the Debtor's projections, the proposed DIP Facility will provide the Debtor with the necessary liquidity to effectively run its chapter 11 process.

[*Remainder of Page Intentionally Left Blank*]

6

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: June 5, 2026
       Orlando, Florida

By: */s/ Shareef El Attar*
Name: Shareef El Attar

7