**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SiFi Networks America, LLC, | Case No. 26-10912 (___) |
| Debtor.[1] | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER
(I) APPROVING THE BIDDING PROCEDURES, (II) SCHEDULING
CERTAIN DATES AND DEADLINES WITH RESPECT THERETO,
(III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(IV) APPROVING THE STALKING HORSE AGREEMENT, (V) APPROVING
THE PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (VI) APPROVING THE
SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (VII) AUTHORIZING
THE DEBTOR'S ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (VIII) GRANTING RELATED RELIEF**

SiFi Networks America, LLC ("SiFi" or the "Debtor"), the debtor and debtor in possession in the above-captioned case (the "Chapter 11 Case"), respectfully states as follows in support of this motion (the "Motion"):[2]

**INTRODUCTION**

1.      In the weeks leading up to the Petition Date, the Debtor commenced a comprehensive marketing process in pursuit of a value-maximizing transaction for potential sale of all, substantially all, or a portion of the Debtor's business.  As described more fully in the First Day Declaration,

---

[1]     The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990).  The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

[2]     The factual background regarding the Debtor, including its business operations, its capital and debt structures, and the events leading to the filing of this Chapter 11 Case, is set forth in the *Declaration of Jacen Dinoff, as Chief Restructuring Officer, in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 11] (the "First Day Declaration") filed contemporaneously herewith and incorporated by reference herein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the DIP Order (as defined below), the Bidding Procedures (as defined below), and the Stalking Horse Agreement (as defined below), as applicable.

although SiFi's business model has enormous monetary potential, SiFi has faced a series of financial and operational difficulties placing its continued existence at risk, including but not limited to: (i) parent company discontinuing funding; (ii) adverse litigation results paired with an inability to continue paying its professional advisors; and (iii) vendors and servicers threatening to commence legal action and/or discontinue doing business with SiFi.  Accordingly, SiFi, with the assistance of Sherwood Partners, Inc. ("Sherwood"), commenced a marketing process to enter into one or more Sale Transactions (as defined below) that would maximize the value of the Debtor's assets beyond their liquidation value.

2.      These efforts were successful.  The Debtor entered into an asset purchase agreement (the "Stalking Horse Agreement") with ArcLink Fiber LLC[3] (or its designee, the "Stalking Horse Bidder," its bid, the "Stalking Horse Bid"), subject to the solicitation of higher or otherwise better offers for substantially all of the Debtor's Assets (as defined below).  However, this proposal has not yet been tested through the crucible of a robust and competitive market check within the protections of the bankruptcy process.  The Debtor plans to utilize the chapter 11 process to continue its comprehensive, strategic, marketing process to solicit higher and better offers than the Stalking Horse Bid.

3.      Accordingly, pursuant to this Motion, the Debtor seeks to formalize Bidding Procedures (as defined below) to continue its ongoing third-party marketing process and enter into one or more Sale Transactions, whether that be the Stalking Horse Bid or any other bid or combination of bids that provides greater value to the Debtor's stakeholders.  This path forward will also require the Debtor to complete the Sale with certain milestones negotiated with the

---

[3]    The Stalking Horse Bidder is the Debtor's (i) DIP Lender and (ii) prepetition secured lender.  SiFi Networks America Ltd. ("SNA Ltd") is the parent of the Debtor.  In April 2026, SNA Ltd was acquired by PATRIZIA, a German infrastructure investment manager.  The Stalking Horse Bidder is an affiliate of PATRIZIA.

Debtor's prepetition and DIP Lender, as required by the DIP Order and as more fully described herein.[4]

4.      The Debtor will continue pursuing and considering all actionable options in accordance with the Bidding Procedures.  The Debtor is seeking to sell all of its assets through one or multiple transactions, to the bidder(s) that present the greatest value maximizing alternative in aggregate on a going concern or liquidation basis.  These assets include, SiFi's contracts related to SiFi's specialized telecommunications infrastructure project management and deployment services, in each case, free and clear of all liens, claims, interests, or other encumbrances (collectively, the "Assets").  The Bidding Procedures provide significant flexibility to market the Debtor's Assets in one or multiple transactions.  If approved, the Bidding Procedures will provide sufficient time for the Debtor to continue marketing its Assets, receive and evaluate bids, and, at the Debtor's discretion, hold an auction or auctions to determine the highest or otherwise best bids for the Assets as a whole or in component pieces.

5.      The Debtor commenced the Chapter 11 Case with proposed debtor in possession financing and consensual use of cash collateral, granting the Debtor the runway to pursue value-maximizing sale(s) of the Debtor's Assets.  Under the terms of the proposed DIP Order, the Debtor must satisfy certain milestones for the sale of its Assets, including:

   a.      no later than twenty-seven (27) days after the Petition Date, the Debtor shall obtain entry by the Court of an order approving the Bidding Procedures; and

   b.      no later than fifty-four (54) days after the Petition Date, the Debtor shall have obtained from the Court an order approving the sale of substantially all of the Debtor's assets and/or equity.

---

[4]    "DIP Order" means the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Noteholder, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* filed concurrently with the Motion and any final version of such order.

6.      Time is of the essence.  As set forth in the First Day Declaration, the Debtor faces significant liquidity constraints which are best addressed through a swift but robust marketing and sale process, in turn avoiding the value-destructive consequences of a protracted chapter 11 case.  A thorough yet expedited bidding process and consummation of one or more Sale Transactions are vitally important to the Debtor's efforts to maximize value.  Conversely, if the Bidding Procedures are not approved or there is any material delay to the proposed sale timeline, then the Debtor's ability to maximize value for the benefit of all stakeholders will be jeopardized and certain municipalities will potentially be left with abandoned, partially constructed networks in their public right of way for which the municipalities would then become fiscally responsible.

7.      The Debtor believes it is critical that the sale process be consummated on the timeline set forth below, which is (a) consistent with the milestones in the DIP Order and (b) provides the Debtor with sufficient runway to continue its prepetition marketing process to secure the highest or otherwise best purchase price possible for some or all of the Debtor's Assets. The Bidding Procedures and the related relief requested in this Motion are in the best interests of the Debtor's estate and its stakeholders.  Accordingly, the Debtor respectfully requests that the Court grant this Motion.

**RELIEF REQUESTED**

8.      By this Motion, the Debtor seeks entry of two orders pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 6007, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").  First, the Debtor seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), (i) authorizing and approving sale and bidding procedures (the "Bidding Procedures") attached as **Exhibit 1** to the

Bidding Procedures Order, pursuant to which the Debtor will solicit and select the highest or otherwise best offer for the sale (the "Sale" or "Sale Transaction") of all or substantially all of the Debtor's Assets, (ii) scheduling certain dates and deadlines in connection with the Sale, including the Bid Deadline, Auction, Sale Hearing, (iii) approving the form and manner of (1) notice of the Auction and Sale Hearing (the "Sale Notice") attached as **Exhibit 2** to the Bidding Procedures Order, (2) notice of the Assumption Procedures (the "Assumption Notice") attached as **Exhibit 3** to the Bidding Procedures Order, and (3) notice of Successful Bidder and Back-Up Bidder (the "Notice of Successful Bidder") attached as **Exhibit 4** to the Bidding Procedures Order, (iv) approving procedures for assuming and assigning executory contracts and unexpired leases and certain related notices, including notice of proposed cure amounts, (v) approving the terms of the Stalking Horse Agreement attached as **Exhibit 5** to the Bidding Procedures Order, including the bid protections, and (vi) granting related relief.

9.    Second, by this Motion, the Debtor further requests that, at the Sale Hearing, this Court enter one or more orders (each, a "Sale Order"), as applicable, (i) approving the Sale to the Successful Bidder free and clear of all liens, claims, interests and encumbrances; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief.

**JURISDICTION AND VENUE**

10.    The United States District Court for the District of Delaware has jurisdiction to consider this Motion under 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b). Pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final order by the Court in connection with this

Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

11.     Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

12.     The statutory and legal predicates for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014 and Local Rules 2002-1, 6004-1, and 9013-1.

## BACKGROUND

13.     On the date hereof (the "Petition Date"), the Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to manage and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

14.     To date, no creditors' committee has been appointed in the Chapter 11 Case by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").  No trustee or examiner has been appointed in the Chapter 11 Case.

## THE PROPOSED SALE AND BIDDING PROCEDURES

**I.      The Proposed Schedule.**

15.     Pursuant to the Bidding Procedures and consistent with the Debtor's need to consummate a Sale as efficiently as possible, the Debtor proposes the following key dates and deadlines for the sale process, subject to Court approval and availability:[5]

---

[5]     The Debtor, consistent with its fiduciary duties and in the exercise of its business judgment reserves the right to modify these dates consistent with the DIP Order to achieve a value-maximizing Sale.

| Event or Deadline | Proposed Date and Time (all times in the prevailing Eastern Time) |
|---|---|
| Deadline to File and Serve Sale Notice | July 2, 2026 |
| Deadline to Publish Sale Notice | July 2, 2026 |
| Deadline to File and Serve Assumption Notice | July 2, 2026 |
| Contract Objections Deadline | 4:00 p.m. (ET) on the date that is 14 days after the service of the Assumption Notice |
| Bid Deadline | July 14, 2026 |
| Notice of Successful Bidder and Cancellation of Auction (if no Auction) | July 15, 2026 |
| Auction (if Qualified Bids received) | July 17, 2026 at 10:00 a.m. (ET) |
| Deadline to File Notice of Successful Bidder and Back-Up Bidder | July 20, 2026 |
| Sale Objection Deadline | July 22, 2026 at 4:00 p.m. (ET) |
| Debtor's Response to Objections, if any | July 24, 2026 at 4:00 p.m. (ET) |
| Sale Hearing | July 29, 2026 |

16. In addition, as listed in the key dates above and set forth in more detail below, the Debtor seeks to establish certain procedures relating to the assumption, assumption and assignment, or transfer of executory contracts and unexpired leases in connection with the Sale.

17. In addition to the time spent marketing the Assets prepetition, this timeline would provide the Debtor with an opportunity to conduct a thorough but swift process to market test the Stalking Horse Bid and solicit additional bids for all Assets, ultimately maximizing the value of its Assets for the recovery of all stakeholders. The Debtor will utilize the time prior to, and after, entry of the Bidding Procedures Order to actively market the Assets to expedite the solicitation of bids for the Assets in advance of the Bid Deadline. In light of the foregoing, the Debtor has determined that the proposed schedule is in the best interests of the Debtor's estate, will assist in establishing whether and to what extent a market exists for the Assets, provide interested parties with sufficient opportunity to participate in the Sale Transactions, and ultimately will result in the highest and best

bid for the Assets under the circumstances.  Moreover, the timeline avoids a protracted Chapter 11 Case that would be detrimental to maximizing the value of the Assets.

18.     Accordingly, as discussed in detail herein, the Debtor respectfully requests entry of the Bidding Procedures Order and, after the Sale Hearing, the Sale Order.

**II.     Summary of Key Terms of the Stalking Horse Bid.**

19.     The Debtor is requesting approval of the designation of the Stalking Horse Bidder and Stalking Horse Bid on the terms provided in the Stalking Horse Agreement.  The Debtor also seeks approval of reasonable and customary Expense Reimbursement.  Specifically, the Expense Reimbursement of $200,000 in reasonable and documented out-of-pocket fees will be payable from the proceeds of a Sale to a higher or better bidder (if any) in the event that the Stalking Horse Bid is not selected as the winning bidder.

20.     In accordance with Local Rule 6004-1(b), the pertinent terms of the Stalking Horse Agreement are summarized in the following table.[6]  The Debtor respectfully submits that all terms of the Stalking Horse Agreement, including those required to be highlighted under Local Rule 6004-1(b), are fair, reasonable, and appropriate under the circumstances in light of the parties' good faith, arm's-length negotiation of the Stalking Horse Bid, the support of the Debtor's key creditor constituencies for the Debtor's entry into such agreement, and the substantial benefits the Debtor and its estate will realize as a result thereof, including the establishment of a baseline price for the Debtor's Assets.

---

[6]     This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse Agreement, the latter governs in all respects.  Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Stalking Horse Agreement.

| SUMMARY OF STALKING HORSE AGREEMENT | |
|---|---|
| **Parties** | Seller: SiFi Networks America, LLC |
| | Stalking Horse Bidder: ArcLink Fiber LLC |
| **Purchase Price** | The aggregate consideration to be paid by Buyer for the purchase of the Purchased Assets (the "Purchase Price") shall be a credit bid pursuant to section 363(k) of the Bankruptcy Code (the "Credit Bid") of obligations equal to (i) all or a portion of the DIP Obligations *plus* (ii) the aggregate principal amount of the Prepetition Note as of the Closing, the aggregate amount of subclauses (i) and (ii) equaling Four Million Six Hundred and Three Thousand and Thiry Nine dollars ($4,603,039.00), *plus* (iii) the Assumed Liabilities, *plus* (iv) the Cure Amounts.<br><br>**Stalking Horse Agreement, § 2.1(a).** |
| **Purchased Assets** | The "Purchased Assets" means all of the following assets of Seller, other than the Excluded Assets (defined below)<br><br>a) all equipment, furniture and fixtures listed on Schedule 1.1(a)<br><br>b) all Assumed Contracts or other rights that have been assumed by and assigned to Buyer pursuant to Section 1.5;<br><br>c) all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, entitlements, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) in each case related to any other Purchased Asset or any of the Assumed Liabilities, all Avoidance Actions, and all claims and causes of action of Seller as of the Closing Date related to any other Purchased Asset or any of the Assumed Liabilities, including rights of set-off and rights of recoupment, refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Seller against any equityholders or officers, managers, directors or employees of Seller;<br><br>d) all Accounts Receivable as of the Closing Date;<br><br>e) all documents (whether written or electronic) primarily related to any of the other Purchased Assets, including all books and records, financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, customer lists, information and records, data, plans, engineering, reports and recorded knowledge;<br><br>f) all goodwill and going concern value associated with any of the other Purchased Assets, including all rights under any confidentiality agreements executed by any third party for the benefit of Seller to |

9

| SUMMARY OF STALKING HORSE AGREEMENT | |
|---|---|
| | the extent relating to the Purchased Assets or the Assumed Liabilities (or any portion thereof); |
| | g) all personnel files for those Current Employees who are hired or retained by Buyer, except as prohibited by applicable Law; |
| | h) all rights of Seller under any non-disclosure and confidentiality, invention assignment, non-compete, non-solicitation, and other restrictive covenant agreements with Current Employees and Former Employees, directors, consultants, independent contractors and agents of Seller, and other third parties to the extent relating to the Purchased Assets or the Assumed Liabilities (or any portion thereof); |
| | i) all rights under or pursuant to all warranties, representations, and guarantees made by suppliers, manufacturers, contractors, and any other Person to the extent relating to equipment purchased, products sold, or services provided to Seller and related to any other Purchased Asset or any of the Assumed Liabilities; |
| | j) all deposits (including deposits in transit, customer deposits and security deposits (whether maintained in trust, escrow or otherwise) for rent, electricity, telephone, utilities or otherwise, and other prepaid charges and expenses of Seller); |
| | k) subject to Section 363(b)(1)(A) of the Bankruptcy Code, all of Seller's telephone numbers, fax numbers, e-mail addresses, websites, URLs, social media accounts and internet domain names, along with all required login information, set forth on Schedule 1.1(k); |
| | l) Seller's interest in any existing manufacturer's warranties or guarantees and other similar warranties and guarantees with respect to the Purchased Assets, which by their terms may be transferable to Buyer; |
| | m) all other rights (including any Intellectual Property rights in the foregoing), demands, claims, credits, allowances, rebates, or other refunds and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature, and all advances and prepayments, in each case related to any other Purchased Asset or any of the Assumed Liabilities; and |
| | n) all rights to any Tax deposits, credits, refunds, drawbacks or rebates of any Seller or any of their Subsidiaries or that any Seller or any of their Subsidiaries may qualify for with respect to the Purchased Assets (except to the extent that any such items relating to Taxes that are treated as Excluded Liabilities are actually applied by Seller in full or partial satisfaction of such Liabilities). |
| | **Stalking Horse Agreement, § 1.1.** |
| **Excluded Assets** | "Excluded Assets" means all assets that do not constitute a Purchased Asset, including the following assets, properties and rights: |

| SUMMARY OF STALKING HORSE AGREEMENT | |
|---|---|
| | a) all Cash and Cash Equivalents of Seller; <br><br> b) all Contracts, equipment, furniture and fixtures listed on Schedule 1.2(b); <br><br> c) all equipment and other assets and items that are owned by a Person other than Seller; <br><br> d) the bank accounts of Seller; <br><br> e) all Health and Welfare Plans and Employee Benefit and any assets of any such plans or any right, title, or interest in any of the assets, trusts or other funding vehicle thereof or relating thereto; <br><br> f) any equity securities of Seller; <br><br> g) retainers held by professionals retained by Seller in the Bankruptcy Case; <br><br> h) funds in the Professional Fee Escrow Account (as defined in the DIP Order); and <br><br> i) any other asset, right, interest or other entitlement that is not a Purchased Asset. <br><br> **Stalking Horse Agreement, § 1.2.** |
| **Assumed Liabilities** | Effective as of the Closing Date (or, with respect to Assumed Liabilities under Assumed Contracts that are assumed by Buyer after the Closing, such later date of assumption as set forth in Section 1.5), Buyer shall assume from Seller and agree from and after the Closing Date to pay, perform, and discharge when due in accordance with their terms only those Liabilities specifically identified in Schedule 1.3 and Seller shall irrevocably convey, transfer, and assign to Buyer, those Liabilities, without duplication and only to the extent not paid prior to the Closing Date and no other Liabilities (collectively, the "Assumed Liabilities") <br><br> **Stalking Horse Agreement, § 1.3.** |
| **Excluded Liabilities** | The Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge, or in any other manner be liable or responsible for any Liabilities of Seller, whether existing on or prior to the Closing Date or arising thereafter, including: <br><br> a) any break-up or termination fees incurred in connection with Buyer's assumption of the Assumed Contracts, <br><br> b) all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Seller or of any of its predecessors in connection with this Agreement or the administration of the Chapter 11 Case (including all fees and expenses of professionals engaged by Seller) and administrative expenses and priority claims accrued through the Closing Date and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement, (ii) the |

| | |
|---|---|
| **SUMMARY OF STALKING HORSE AGREEMENT** | |

| | |
|---|---|
| | negotiation, execution and consummation of the DIP Note, and (iii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Seller or of any of its predecessors payable as a result of the consummation of the transactions contemplated by this Agreement, |
| | c) Liabilities with respect to all Employee Benefit Plans and Health and Welfare Plans of Seller, |
| | d) Liabilities with respect to any employees or independent contractors not hired by Buyer, |
| | e) all employment related Liabilities with respect to any Current Employee or Former Employee (including any unpaid bonus, incentive compensation paid time off, severance, retention, payroll taxes, any claim under federal, state or local equivalent of the WARN Act, COBRA liabilities, with respect to any terminated employees or other individual who is a COBRA qualified beneficiary on account of the individual's relation to an employee) with respect to COBRA, including any individual who becomes an "M&A qualified beneficiary" within the meaning of sections 601, et. seq., of ERISA and section 4980B of the Code (f) except with respect to any Transfer Taxes as set forth in Section 9.1, |
| | f) (A) Liabilities for any Taxes (including any applicable withholding Taxes) of Seller attributable to any taxable period or (B) Liabilities for Taxes relating to the Purchased Assets attributable to the Pre-Closing Tax Period (including any Pre-Closing Straddle Taxes), |
| | g) all Liabilities arising with respect to or relating to any of the Excluded Assets, whether before, on or after the Closing Date, |
| | h) all Liabilities of Seller in respect of or relating to any Contract to which any Seller is party or is otherwise bound that are not Assumed Contracts and all Liabilities arising out of the rejection of any Contract that is not an Assumed Contract by Seller, |
| | i) all Liabilities relating to Claims, actions, suits, arbitrations, litigation matters, Proceedings or investigations (in each case whether involving private parties, Governmental Entities, or otherwise) involving, against, or affecting any Seller, Purchased Assets, or any assets or properties of Seller, except as a result of the ownership or operation of any of the Purchased Assets from and after the Closing date and |
| | j) (j) any and all other Liabilities, other than the Assumed Liabilities (collectively, the "Excluded Liabilities"). |
| | **Stalking Horse Agreement, § 1.4.** |

| | SUMMARY OF STALKING HORSE AGREEMENT |
|---|---|
| **Conditions to Closing** | Conditions Precedent to the Obligations of Buyer and Seller The respective obligations of each Party to consummate the transactions contemplated hereby are subject to the satisfaction (or written waiver by each of Seller and Buyer) on or prior to the Closing Date, of each of the following conditions:<br><br>a) no court or other Governmental Entity has issued, enacted, entered, promulgated, or enforced any Law or Decree restraining, enjoining, or otherwise prohibiting the transactions contemplated hereby;<br><br>b) the Bankruptcy Court shall have entered the Sale Order on terms acceptable to the Buyer and the Sale Order shall be a Final Order; and<br><br>c) there shall not be pending or threatened by any Governmental Entity any Proceeding (i) challenging or seeking to restrain, prohibit, alter, or materially delay the consummation of any of the transactions contemplated hereby, or (ii) seeking to obtain from either Party any damages in connection with the transactions contemplated hereby.<br><br>The Parties agree that, subject to Section 7.4, all of the Purchased Assets being sold by Seller are being sold as an inseparable package that must be approved as an inseverable whole, and the closing of the sale on all of the Purchased Assets shall occur simultaneously.<br><br>Conditions Precedent to the Obligations of Buyer The obligations of Buyer to consummate the transactions contemplated hereby are subject to the satisfaction (or written waiver by Buyer in its sole discretion), on or prior to the Closing Date, of each of the following conditions:<br><br>a) as of the date hereof and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1, Section 3.2, Section 3.3, Section 3.4 and Section 3.17 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;<br><br>b) Seller shall have performed in all material respects all of the covenants and agreements required to be performed by Seller under this Agreement at or prior to the Closing;<br><br>c) since the date hereof, no event shall have occurred which has resulted or would reasonably be expected to result in a Material Adverse Effect; |

| SUMMARY OF STALKING HORSE AGREEMENT | |
|---|---|
| | d) there shall be no Order of the Bankruptcy Court or any other court of competent jurisdiction prohibiting Buyer from submitting a credit bid pursuant to Section 363(k) of the Bankruptcy Code in satisfaction of the Purchase Price and consummating the transactions contemplated hereby; <br><br> e) the DIP Order shall have been entered by the Bankruptcy Court on terms and conditions acceptable to the Buyer and the DIP Order shall be a Final Order; and <br><br> f) Seller shall have delivered, or caused to be delivered, to Buyer all of Seller's deliverables set forth in Section 2.4. <br><br> Conditions Precedent to the Obligations of SellerThe obligations of Seller to consummate the transactions contemplated hereby are subject to the satisfaction (or written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions: <br><br> a) as of the date hereof and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2, Section 4.3, and Section 4.6 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded; <br><br> b) Buyer shall have performed in all material respects all of the covenants and agreements required to be performed by them under this Agreement at or prior to the Closing; <br><br> c) Buyer shall have delivered, or caused to be delivered, to Seller all of Buyer's deliverables set forth in Section 2.5; and <br><br> d) Seller has not determined that the exercise of its fiduciary duties under the Bankruptcy Code requires Seller to pursue an Alternative Transaction. <br><br> **Stalking Horse Agreement, §§ 7.1-7.3.** |
| **"Insider" Status of Stalking Horse Bidder** Local Rule 6004-1(b)(iv)(A) | The Purchaser is an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. |
| **Agreements with Management or Key** | N/A |

| SUMMARY OF STALKING HORSE AGREEMENT | |
|---|---|
| **Employees**<br>Local Rule 6004-1(b)(iv)(B) | |
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | N/A |
| **Private Sale/No Competitive Bidding**<br>Local Rule 6004-1(b)(iv)(D) | The Debtor has proposed an open Auction and sale process. |
| **Closing and Other Deadlines**<br>Local Rule 6004-1(b)(iv)(E) | Closing shall occur by July 31, 2026. |
| **Good Faith Deposit**<br>Local Rule 6004-1(b)(iv)(F) | N/A |
| **Interim Arrangements with Stalking Horse Bidder**<br>Local Rule 6004-1(b)(iv)(G) | N/A |
| **Use of Proceeds**<br>Local Rule 6004-1(b)(iv)(H) | In accordance with Section 2.1(a), Buyer shall satisfy the Purchase Price at Closing as to (1) the amount set forth in clause (i) therein by discharging Seller, and Seller shall be deemed to be discharged, from all or a portion of the DIP Obligations, (2) the amount set forth in clause (ii) thereof by discharging Seller, and Seller shall be deemed to be discharged from, all obligations under the Prepetition Note, and (3) the amount set forth in clause (iv) therein, by paying the Cure Amounts in cash; provided, that the Buyer reserves the right to use cash consideration to satisfy the Purchase Price for the amounts in clauses (i) or (ii).<br>**Stalking Horse Agreement, § 2.1(b).** |
| **Tax Exemption**<br>Local Rule 6004-1(b)(iv)(I) | N/A |

| SUMMARY OF STALKING HORSE AGREEMENT | |
|---|---|
| **Record Retention** Local Rule 6004-1(b)(iv)(J) | During the Interim Period, Seller will provide Buyer and its authorized Representatives with reasonable access, upon reasonable advance notice and during regular business hours, to the Purchased Assets; provided, that (i) such access does not unreasonably interfere with the normal operations of Seller, (ii) such access will occur in such a manner as Seller reasonably determine to be appropriate to protect the confidentiality of the transactions contemplated hereby, (iii) all requests for access will be directed to Jacen Dinoff or Jarod Wada or such other Person(s) as Seller may designate in writing from time to time, and (iv) nothing in the Stalking Horse Agreement will require Seller to provide access to, or to disclose any information to, Buyer if such access or disclosure (A) would reasonably be expected to cause significant competitive harm to Seller if the transactions contemplated hereby are not consummated (unless Buyer signs a confidentiality agreement regarding such information), (B) would waive any legal privilege, or (C) would be in violation of applicable Laws or the provisions of any agreement to which Seller is bound; provided, that, in the event that Seller withholds access or information in reliance on the foregoing clause (C), Seller shall provide (to the extent reasonably practicable without waiving or violating the applicable legal privilege or Law) notice to Buyer that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law. **Stalking Horse Agreement, § 6.2.** |
| **Sale of Avoidance Actions** Local Rule 6004-1(b)(iv)(K) | The Stalking Horse Agreement contemplates the sale of all Avoidance Actions. "Avoidance Actions" is defined under the Stalking Horse Agreement to mean "all causes of action, lawsuits, claims, rights of recovery, and other similar rights of Seller arising under Chapter 5 of the Bankruptcy Code." **Stalking Horse Agreement, §§ 1.1(c), 11.2.** |
| **Successor Liability** Local Rule 6004-1(b)(iv)(L) | The Debtor intends to seek a finding and ruling in the Sale Order that provides that Buyer shall not be a successor in interest to the Seller for any purpose and that the sale is free and clear of any successor liability claims. |
| **Sale Free and Clear of Unexpired Leases** Local Rule 6004-1(b)(iv)(M) | The Debtor intends to seek entry of a Sale Order that provides, among other things, Bankruptcy Court approval of the sale of the Purchased Assets free and clear of all Liens pursuant to, *inter alia*, sections 105, 363, and 365 of the Bankruptcy Code. |
| **Credit Bid** Local Rule 6004-1(b)(iv)(N) | The Purchase Price includes a credit bid by Buyer. The Stalking Horse Agreement contemplates Buyer credit bidding obligations equal to (i) all or a portion of the DIP Obligations *plus* (ii) the aggregate principal amount of the Prepetition Note as of the Closing, and any other accrued and unpaid fees |

| SUMMARY OF STALKING HORSE AGREEMENT | |
|---|---|
| | and expenses in respect thereof as of Closing, which shall equal Four Million Six Hundred and Three Thousand and Thiry Nine dollars ($4,603,039.00). **Stalking Horse Agreement, § 2.1(a)(1)-(ii).** |
| **Relief from Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | The Debtor has requested a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). |

### III.   The Bidding Procedures.

21.   The Bidding Procedures are designed to facilitate a fair, robust and competitive sale process to ensure that the value of the Assets is maximized.  The Bidding Procedures allow the Debtor to solicit and evaluate bids from potential bidders and determine the highest or otherwise best offer for its Assets on a reasonable timeline.  The Debtor believes the timeframe contemplated by the Bidding Procedures will be sufficient to allow potential bidders to conduct diligence and formulate competing bids.  The Debtor, with the assistance of its sales agent, Sherwood, is continuing the marketing process for the Debtor's Assets.

22.   While all interested bidders should read the Bidding Procedures in their entirety, the following sets forth a summary of the key provisions of the Bidding Procedures, including those provisions required to be highlighted under Local Rule 6004-1:[7]

---

[7]   This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Bidding Procedures, the Bidding Procedures govern in all respects.  Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Bidding Procedures.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids** Local Rule 6004-1(c)(i)(A)-(B) | **A. Bid Deadline** – The Bid Deadline to submit a binding and irrevocable offer to acquire the Assets is July 14, 2026. **Bidding Procedures, Section A**. **B. Determination by the Debtor** – As appropriate throughout the Bidding Process (as defined in the Bidding Procedures), the Debtor will consult with (a) the Debtor's prepetition and DIP Lender; (b) any statutory committee of unsecured creditors appointed in the Chapter 11 Case (a "<u>Committee</u>"), if any, and such Committee's counsel, and (c) any other party that becomes a consultation party as set forth in this subsection of the Bidding Procedures (collectively, the "<u>Consultation Parties</u>" and each, a "<u>Consultation Party</u>"); *provided*, that no person or entity that constitutes a Potential Bidder, an Acceptable Bidder, a Stalking Horse Bidder, a Successful Bidder, or a Back-up Bidder (each as defined in the Bidding Procedures, and collectively, a "<u>Bidding Party</u>") (as determined by the Debtor, in its reasonable discretion) shall be deemed a Consultation Party for so long as such person constitutes a Bidding Party. The Debtor shall consult with the Consultation Parties with respect to each of the following: (a) coordinating with Potential Bidders regarding the conduct of their respective due diligence, (b) evaluating bids from Potential Bidders on any or all of the Assets, (c) negotiating any bid made to acquire any or all of the Assets, and (d) making such other determinations as are provided in the Bidding Procedures (collectively, the "<u>Bidding Process</u>"). For the avoidance of doubt, if a member of a Committee (or their affiliates, as applicable) is actively participating as a Bidding Party, then the remaining members of the Committee other than such Potential Bidder, and the Committee's counsel, shall continue to be Consultation Parties, but shall not provide any information they receive as Consultation Parties to such Bidding Party. **Bidding Procedures, Section C**. **C. Diligence Access Requirements** – Any Potential Bidder that (a) has previously executed or executes a confidentiality agreement on customary terms that are reasonably acceptable to the Debtor (a "<u>Confidentiality Agreement</u>"), (b) provides sufficient evidence, as reasonably determined by the Debtor, that the Potential Bidder intends to obtain due diligence and participate in the sale process for a *bona fide* purpose consistent with the Bidding Procedures, and (c) provides evidence of such Potential Bidder's financial capability to acquire the Assets, which shall include financial statements, including current audited and unaudited financial information, or if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, (any such Potential Bidder being referred to as an "<u>Acceptable Bidder</u>") will be eligible to receive due diligence materials and access to certain non-public information regarding the Assets. The Debtor will provide each Acceptable Bidder with such information as is reasonably contemplated |

to enable such Acceptable Bidder to make a Bid for the Assets. The Debtor will also provide to each Acceptable Bidder reasonable due diligence information as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request. The Debtor will post substantially all written due diligence provided to any Acceptable Bidder to the Debtor's electronic data room (the "Data Room"). The Debtor may restrict or limit the access of an Acceptable Bidder to the Data Room if the Debtor determines, based on its reasonable business judgment, that certain information in the Data Room is sensitive, proprietary, or otherwise not appropriate for disclosure to such Acceptable Bidder.

**Bidding Procedures, Section D.**

D. **Bid Requirements –** To be eligible to participate in the Auction, a Potential Bidder must deliver to the Debtor and its advisors, a written, irrevocable offer that must be determined by the Debtor, in its reasonable business judgment (in consultation with the Consultation Parties), to satisfy each of the following conditions (collectively, the "Bid Requirements"):

(i.) **Purpose**. Each Potential Bidder must state that the Bid includes an offer by the Potential Bidder to purchase substantially all of the Assets and identify the Assets with reasonable specificity and the particular liabilities, if any, the Potential Bidder seeks to assume.

(ii.) **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid for the Assets (the "Purchase Price") and must indicate the source of consideration, including funding commitments, and confirm that such consideration is not subject to any contingencies. The Purchase Price must provide for (i) an aggregate amount of cash sufficient to pay all DIP Obligations (as defined in the DIP Order) outstanding at the closing in full (which for the avoidance of doubt shall include the Roll-Up), (ii) the Prepetition Secured Indebtedness (to the extent such Prepetition Secured Indebtedness is not a DIP Obligation, and (iii) the payment of all cure amounts and all other amounts required to effect the assumption and assignment of all applicable executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code.

(iii.) **Assumed Liabilities**. Provide for the assumption of at least the same assumed liabilities as set forth in the Stalking Horse Agreement.

(iv.) **Minimum Bid**. The value of each Bid for all or substantially all of the Seller's Assets, as determined by the Debtor in its business judgment (in consultation with the Consultation Parties) must exceed: (a) the Stalking Horse Purchase Price set forth in the Stalking Horse Agreement, *plus* (b) the Expense Reimbursement payable to the Stalking Horse Bidder under the Stalking Horse Agreement, *plus* (c) the amount necessary to finance the Debtor's Chapter 11 Case from the date a Bid is

19

selected as the Successful Bid  through the effective date of a confirmed plan of reorganization or other emergence from chapter 11 (the "Estate Funding Commitment"), and *plus* (d) the minimum Bid increment of $250,000 (collectively, a "Minimum Bid").  The Debtor and its advisors will determine, in their reasonable business judgment and in consultation with the Consultation Parties, the value of any assumed liabilities that differ from those included in the Stalking Horse Bid.

Each Bid seeking to acquire only a portion of the Debtor's Assets must have a value that in the Debtor's reasonable business judgment (in consultation with the Consultation Parties), either independently or in conjunction with one or more other Bids, exceeds the value that would be realized for such Assets pursuant to the Stalking Horse Bid.

**(v.)**   **Bid Deposit**.  Each Bid must be accompanied by a cash deposit (made by wire transfer or certified or cashier's check) equal to 10% of the aggregate value of the cash and non-cash consideration of the Bid (the "Good Faith Deposit"), which will be held in a segregated account established by the Debtor.  To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the purchase price contemplated by such Qualified Bid, the Debtor reserves the right to require that such Qualified Bidder increase its Good Faith Deposit so that it equals 10% of the increased Purchase Price.

**(vi.)**   **Committed Financing**.  If a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtor's satisfaction that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations (including any assumed liabilities and the Estate Funding Commitment) under its Bid.   Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, board of directors or credit committee or similar approvals, and shall have covenants, conditions and term and termination provisions acceptable to the Debtor.

**(vii.)**   **Good Faith Offer**.  Each Bid must constitute a good faith, bona fide offer to purchase the Assets set forth in such Bid.

**(viii.)**   **Marked Agreement**.  Each Bid must be accompanied by clean and duly executed transaction documents including, at a minimum, a draft purchase agreement, including the exhibits and schedules related thereto, and any related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the Sale, along with redlines of such agreements marked to reflect any amendments and

modifications from the Stalking Horse Agreement and any other applicable transaction documents relating to the Stalking Horse Bid, which amendments and modifications may not be inconsistent with the Bidding Procedures. Each such draft purchase agreement (the "Proposed Agreement") must provide for payment in cash at closing of the Expense Reimbursement to the Stalking Horse Bidder. A Bid must also contain a sale order based on, and marked against, the order approving the sale (the "Sale Order") (which will be provided by the Debtor to bidders prior to the Bid Deadline) to show any other proposed modifications to the Sale Order. The documents contemplated by this subsection of the Bidding Procedures shall be referred to as the "Qualified Bid Documents."

(ix.) **Contracts and Leases; Employees**. Each Bid must identify an initial schedule of executory contracts and unexpired leases to be assumed and assigned to the Potential Bidder in connection with the Sale. Each Bid must identify with specificity (i) the party responsible for satisfying cure amounts and other amounts that have accrued under assumed and assigned contracts and leases after the Petition Date and prior to the Closing, including amounts that have accrued but not yet become due prior to the Closing, (ii) the Seller's leases to be assumed and assigned to the Potential Bidder; and (iii) which of the Debtor's employees or groups thereof will be offered employment with the Potential Bidder to the extent it is the Successful Bidder and the Closing occurs.

(x.) **No Contingencies**. A Bid must contain a clear statement that it is not conditioned on any contingency, including, among others, on obtaining any of the following (a) financing, (b) shareholder, board of directors, or other approvals, and/or (c) the outcome or completion of a due diligence review by the Potential Bidder.

(xi.) **Binding and Irrevocable**. A Potential Bidder's Bid must be irrevocable unless and until the Debtor accepts a higher Bid and such Potential Bidder is not selected as the Back-Up Bidder (as defined in the Bidding Procedures). In the event a Bid is chosen as the Back-Up Bid (as defined the Bidding Procedures), it must remain irrevocable until the Seller and the Successful Bidder consummate the Sale.

(xii.) **Joint Bids**. The Debtor will be authorized to approve joint Bids (Bids submitted on behalf of more than one Acceptable Bidder) in its reasonable discretion, on a case-by-case basis.

(xiii.) **Adequate Assurance Information**. Each Bid must be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the reasonable satisfaction of the Debtor, that such Potential Bidder (a) has the financial wherewithal and ability to consummate the acquisition of the Assets covered by

21

the Bid (the "Closing"), and (b) can provide adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform, under any contracts that are proposed to be assumed and assigned to such party. Such evidence may also include audited and unaudited financial statements, tax returns, bank account statements and/or any other documentation that the Debtor further requests. The Bid must also identify a contact person that parties may contact to obtain additional Adequate Assurance Information.

**(xiv.)** **Identity**. Each Bid must fully disclose the identity of each entity that will be participating in connection with such Bid (including any equity owners or sponsors, if the purchaser is an entity formed for the purpose of consummating the acquisition of the Assets), and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties. A Bid must also fully disclose any connections or agreements with the Debtor, any known, potential, prospective bidder, or Qualified Bidder (as defined in the Bidding Procedures), or any officer, director, or equity security holder of the Debtor.

**(xv.)** **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors and, if required, its shareholders (or a comparable governing body reasonably acceptable to the Debtor) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

**(xvi.)** **No Fees**. Except as otherwise provided in the Stalking Horse Agreement with respect to the Stalking Horse Bid: (a) each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction; (b) by submitting its Bid, each Potential Bidder agrees to waive its right to request or receive fees or reimbursement of expenses on any basis, including under section 503(b) of the Bankruptcy Code; and (c) each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement.

**(xvii.)** **Adherence to Bidding Procedures**. By submitting its Bid, each Potential Bidder is agreeing to (a) abide by and honor the terms of the Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction and (b) serve as Back-Up Bidder, if its Bid is selected as the next highest or next best bid after the Successful Bid with respect to the applicable assets.

22

| | |
|---|---|
| | **(xviii.)** <u>**Regulatory Approvals and Covenants**</u>. A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the applicable Sale, if any, and the time period within which the Potential Bidder expects to receive such governmental, licensing, regulatory, or third-party approvals. |
| | **(xix.)** <u>**Non Reliance**</u>. Each Bid must include a written acknowledgement and representation that the Potential Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets and liabilities prior to making its Bid, (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets and liabilities in making its Bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Potential Bidder's proposed purchase agreement for the Assets. |
| | **(xx.)** <u>**Time Frame for Closing**</u>. A Bid by a Potential Bidder must be reasonably likely (based on experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined in the Bidding Procedures), within a time frame acceptable to the Debtor. |
| | **(xxi.)** <u>**Consent to Jurisdiction**</u>. The Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Debtor's qualification of Bids, the Auction, the construction and enforcement of the Bidding Procedures, the Sale documents, and the Closing, as applicable. |
| | **(xxii.)** <u>**Damages**</u>. A Bid must provide that the Debtor has the right to pursue all available damages in the event of the Bidder's breach of, or failure to perform under, the Proposed Agreement. |
| | **Bidding Procedures, Section E.** |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder** Local Rule 6004-1(c)(i)(C) | The Stalking Horse Bid provides for an Expense Reimbursement in the amount of up to $200,000 for of all out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by the Stalking Horse Bidder in connection with negotiation, diligence, execution, performance and enforcement of the Stalking Horse Agreement on the terms and conditions set forth in the Stalking Horse Agreement. |
| **Modification of Bidding and Auction Procedures** Local Rule 6004-1(c)(i)(D) | The Bid Procedures may be modified by the Debtor, after timely consultation with the Stalking Horse Bidder, in any manner that is not inconsistent with or otherwise in contravention of the other terms of the Bid Procedures or the Bid Procedures Order, including, without limitation, (a) imposing additional terms and conditions with respect to any or all bidders, (b) extending the deadlines set |

| | |
|---|---|
| | forth in the Bidding Procedures or the date for the Auction and/or Sale Hearing (which may occur in open court); or (c) amending the Bid Procedures as they may determine to be in the best interests of the Debtor's estate; *provided that* all such modifications are disclosed to all Potential Bidders (if applicable) or Qualified Bidders (if applicable) on the record prior to or during the Auction; *provided further that* any actions taken by the Debtor under this subsection shall not be deemed to be waivers of any terms, conditions, defaults or events of default set forth in the DIP Note (as defined in the DIP Order), the DIP Order, or Stalking Horse Agreement, and nothing in the Bidding Procedures shall prevent the Stalking Horse Bidder from exercising any of its rights and remedies under the Stalking Horse Agreement.  The Bankruptcy Court has exclusive jurisdiction with respect to any dispute that may arise with respect to the Bid Procedures. <br><br>**Bidding Procedures, Section R.** |
| **Closing with Alternative Back-Up Bidder(s)** <br> Local Rule 6004-1(c)(i)(E) | If for any reason the Successful Bidder fails to consummate the Qualified Bid within the time permitted after the entry of the Sale Order, then the Qualified Bidder(s) with the next-highest or otherwise second-best Bid (or combination of Bids) for the Assets (a "<u>Back-Up Bidder</u>"), as determined by the Debtor after consultation with its advisors, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid (a "<u>Back-Up Bid</u>"), and the Debtor will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid as soon as commercially reasonably practicable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court. <br><br> Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid must remain open until the earlier of (i) the Closing of the Successful Bid and (ii) any termination date with respect to the Back-Up Bid as set forth in the Stalking Horse Agreement or the purchase agreement with any other Back-Up Bidder. <br><br>**Bidding Procedures, Section M.** |
| **Provisions Governing the Auction** <br> Local Rule 6004-1(c)(ii) | If one or more Qualified Bids (other than the Stalking Horse Bid) is received by the Bid Deadline, the Debtor will conduct the Auction with respect to the Debtor's Assets. The Auction will commence on **July 20, 2026**, at the offices of Cole Schotz P.C., telephonically, or by video via Zoom, or such later time or other place as the Debtor will timely notify all other Qualified Bidders. <br><br> The Auction will be conducted in accordance with the following procedures (the "<u>Auction Procedures</u>"): <br><br> (i)    the Auction will be conducted openly; <br><br> (ii)    only the Qualified Bidders, including the Stalking Horse Bidder, will be entitled to bid at the Auction; <br><br> (iii)    the Qualified Bidders, including the Stalking Horse Bidder, must appear, telephonically, or by video via Zoom, or through duly authorized representatives who have actual and |

documented authority to bind the Qualifier Bidders at the Auction;

(iv)   only the duly authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder) will be permitted to participate in the Auction and the Consultation Parties, the U.S. Trustee and all creditors will be permitted to attend the Auction; *provided* that any party in interest may request permission to attend the Auction, and the Debtor may permit such party to attend the Auction;

(v)   bidding at the Auction will begin at the Starting Bid;

(vi)   subsequent Bids at the Auction, including any Bids by any Stalking Horse Bidder, must be made in minimum increments of $250,000 (or such other amount as the Debtor may determine) of additional value, if applicable (such Bid, an "Overbid");

(vii)   an Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtor's estate than any prior Qualified Bid or Overbid, as determined in the Debtor's reasonable business judgment and after consultation with the Consultation Parties, but shall otherwise comply with the terms of the Bidding Procedures;

(viii)   each Qualified Bidder will be informed of the terms of the previous Bids and the Debtor shall, during the course of the Auction, promptly inform each Qualified Bidder of which subsequent Bids reflect, in the Debtor's reasonable business judgment (in consultation with the Consultation Parties), the highest or otherwise best bid(s) for the Assets;

(ix)   the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

(x)   each Qualified Bidder will be required to confirm on the record at the commencement of the Auction and again at the conclusion of the Auction that it has not engaged in any collusion with the Debtor, any other Qualified Bidder or any other person or entity regarding the Bid Procedures, the Auction, any bid for the Assets, or any proposed transaction relating to the Assets;

(xi)   the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then prevailing highest or otherwise best Bid;

25

|  | (xii) the Debtor reserves the right, in its reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Debtor and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment, may require to establish that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and |
|---|---|
|  | (xiii) the Auction will be governed by such other Auction Procedures as may be announced by the Debtor and its advisors, in consultation with the Consultation Parties, from time to time on the record at the Auction; *provided that* such other Auction Procedures are (a) not inconsistent with the Bidding Procedures Order, the Bankruptcy Code, or any other order of the Bankruptcy Court, (b) disclosed orally or in writing to all Qualified Bidders and other attendees at the Auction and recorded on the record, and (c) determined by the Debtor (in consultation with the Consultation Parties), in good faith, to further the goal of attaining the highest or otherwise best offer for the Assets. |
|  | To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, and (ii) to the extent a Qualified Bidder fails to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtor, in its reasonable business judgment and in consultation with the Consultation Parties, such Qualified Bidder shall be disqualified from continuing to participate in the Auction. |
|  | For the avoidance of doubt, nothing in the Bidding Procedures, including, without limitation, the Auction Procedures, prevents the Debtor from exercising its fiduciary duties under applicable law (as reasonably determined in good faith by the Debtor in consultation with its outside legal counsel). |
|  | **Bidding Procedures**, **Section J.** |

23.     Importantly, the Bidding Procedures recognize and comply with the Debtor's

fiduciary obligations to maximize sale value, and, as such, do not impair the Debtor's ability to

26

consider all qualified bid proposals and, as noted, preserve the Debtor's right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtor's estate.

**IV.      Form and Manner of Sale Notice.**

24.      As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtor will serve the Sale Notice, the Bidding Procedures Order, and the Bidding Procedures upon the following parties or their respective counsel, if known (collectively, the "Notice Parties"): (i) the U.S. Trustee; (ii) counsel to the Debtor's prepetition and DIP Lender; (iii) counsel to the Stalking Horse Bidder; (iv) the holders of the thirty (30) largest unsecured claims against the Debtor; (v) the United States Attorney's Office for the District of Delaware; (vi) the Internal Revenue Service; (vii) the attorneys general for the states in which the Debtor operates; (viii) any parties known or reasonably believed to have expressed an interest in the Debtor's assets; (ix) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the Debtor's assets; and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002.

25.      In addition, as soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtor will provide notice of the Auction, if any, and the Sale Hearing through the publication of the Sale Notice on the website of the Debtor's proposed noticing and claims agent to be retained in the Chapter 11 Case, Stretto, Inc., at https://cases.stretto.com/SiFiNetworks  (the "Case Website") and will also publish the Sale Notice, with any modifications necessary for ease of publication, once in the national edition of *The New York Times* or any other publications the Debtor deems appropriate to provide notice to any other potential interested parties.

26.      The Debtor submits that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including: (a) the date, time,

and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the dates and deadlines related to the Sale Hearing; and (d) instructions for promptly obtaining a copy of the Stalking Horse Agreement.  Accordingly, the Debtor requests that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction or Sale Hearing is required.

**V.      Assumption and Assignment Procedures.**

27.      To facilitate the Sale, the Debtor seeks authority to assume and assign the Assigned Contracts designated by the Successful Bidder to the Successful Bidder.  The Debtor seeks authority to assume and assign the Assigned Contracts to the Successful Bidder in accordance with the assumption and assignment procedures set forth below (the "Assumption Procedures"), to govern the assumption and assignment of all of the Debtor's executory contracts and unexpired leases to be assumed and assigned in connection with the Sale, subject to the payment of any payments necessary to cure any defaults arising under any Assigned Contract (the "Cure Payments").  The Assumption Procedures are as follows:

   a.  **Contract Assumption Notice.**  On or prior to **July 2, 2026** (the "Assumption Notice Deadline"), the Debtor shall file with the Court and serve a notice of contract assumption (the "Assumption Notice"), in substantially the form attached to the Bidding Procedures Order as **Exhibit 3**, via first class mail and e-mail (where available) on all counterparties to all potential Assigned Contracts (each, a "Counterparty" and, collectively, the "Counterparties").  The Assumption Notice shall include, without limitation, a list of Assigned Contracts (the "Assigned Contract List") that may be assumed and assigned in connection with the Sale and the Cure Payment, if any, that the Debtor believes is required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) for each of the Assigned Contracts.  If no Cure Payment is listed on the Assigned Contracts List for a particular Assigned Contract, the Debtor's asserted Cure Payment for such Assigned Contract shall be deemed to be $0.00.  The Assigned Contracts List shall identify each of the potential Assigned Contracts by the name or appropriate description and date of such potential Assigned Contract (if available), the Counterparties and the address of such Counterparties for notice purposes.  Service of an Assumption Notice does not constitute an admission that such contract is an executory contract or unexpired lease or that such stated Cure Payment constitutes a claim against the Debtor or a right against the Successful

28

Bidder (all rights with respect thereto being expressly reserved).  Further, the inclusion of a contract or lease on the Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.

b.  **Cure Payments**. The payment of the applicable Cure Payments specified in the Assumption Notice or a Supplemental Assumption Notice by the Successful Bidder or the Debtor, as applicable and in accordance with the Stalking Horse Agreement, after the expiration of the applicable objection period and the failure of any applicable Counterparty to timely and properly object to the proposed Cure Payment or to the assumption or assignment of its executory contract or unexpired lease, shall (i) effect a cure of all defaults existing thereunder as of the filing of the Assumption Notice, and (ii) compensate for any actual pecuniary loss to such Counterparty resulting from such default.

c.  **Contract Objections**. Objections, if any, to the proposed assumption and assignment of a contract or lease, including objections to Cure Payments (each, as defined above, a "Contract Objection"), must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, the correct cure amount alleged by the objecting Counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served, so as to be actually received by, the Objection Notice Parties (as defined in the Assumption Notice) by 4:00 p.m. (ET) on the date that is 14 days after service of the Assumption Notice, except as otherwise set forth below with respect to Subsequently Designated Assigned Contracts.

d.  **Changes to Assigned Contract List and Cure Payments.** At the election of the Successful Bidder, up until two (2) business days prior to the closing of any Sale, the Debtor may file and serve supplements or amendments to the Assigned Contracts List (each, a "Supplemental Assumption Notice") to (i) add previously omitted Assigned Contracts to the Assigned Contracts List as contracts that may be assumed and assigned to a Successful Bidder in accordance with the definitive agreement for the Sale by filing a supplement to the Assigned Contracts List or (ii) modify the Cure Payment for any Assigned Contract (together, "Subsequently Designated Assigned Contracts").  Contract Objections with respect to Subsequently Designated Assigned Contracts shall be filed no later than ten (10) days from service of a Supplemental Assumption Notice identifying the Subsequently Designated Assigned Contracts and served on the Objection Notice Parties (the "Subsequently Designated Assigned Contracts Deadline").  Such objections must (a) be in writing, (b) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court and served so as to be actually received by the Objection Notice Parties.  Any party or entity who fails to timely and properly make an objection with respect to the Subsequently Designated Assigned Contracts on or before the Subsequently Designated Assigned Contracts Deadline shall be forever

29

barred from asserting any objection with respect to the Subsequently Designated Assigned Contracts.

e. **Removal of Contracts from Assigned Contract List.** Up until two (2) business days prior to Closing, the Debtor is authorized, but not directed, if the Purchaser so requests, to remove an Assigned Contract from the Assigned Contract List that a Successful Bidder proposes be assumed and assigned in connection with the Sale.

f. **Notice of Successful Bidder/Adequate Assurance Objections.** As soon as practicable after the Auction and in no event later than twenty-four (24) hours after the Auction, the Debtor shall file with the Court and post on the Case Website at https://cases.stretto.com/SiFiNetworks, the Notice of Successful Bidder, substantially in the form attached to the Bidding Procedures Order as **Exhibit 4**, identifying any Successful Bidder and Back-Up Bidder, together with a copy of the Successful Bidder's proposed purchase agreement and financial and other information regarding adequate assurance of future performance of the Assigned Contracts, and serve the Notice of Successful Bidder on the Counterparties by first class mail and e-mail (where available), and the Counterparties shall file any Contract Objections solely on the basis of adequate assurance of future performance by the Successful Bidder other than the Stalking Horse Bidder (each, an "Adequate Assurance Objection") not later than the Sale Hearing (the "Adequate Assurance Objections Deadline").

g. **Assigned Contracts.** At the Sale Hearing, the Debtor will seek Court approval of the assumption and assignment to the Successful Bidder of the Assigned Contracts, subject to the dispute resolution procedures set forth in paragraph 24(h) in the Bidding Procedures Order; *provided that*, in the event the Successful Bidder is not the Stalking Horse Bidder, objections to adequate assurance of future performance of the Assigned Contracts by such Successful Bidder shall be heard at a subsequent hearing, as set forth in paragraph 24(h) in the Bidding Procedures Order.  The inclusion of an Assigned Contract on an Assumption Notice will not (a) obligate the Debtor to assume any Assigned Contract listed thereon nor the Successful Bidder to take assignment of such Assigned Contract or (b) constitute any admission or agreement of the Debtor that such Assigned Contract is an executory contract.

h. **Dispute Resolution.** To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) (any such dispute, a "Cure Dispute"), such Contract Objection shall be adjudicated at the Sale Hearing or at such other date and time as the Debtor determines, in its discretion and in consultation with the Successful Bidder and the Consultation Parties (subject to the Court's availability).  If such Contract Objection has not been resolved prior to the closing of the Sale (whether by an order of the Court or by agreement with the

30

Counterparty), the Successful Bidder may (a) treat such Counterparty's contract or lease as part of Excluded Assets or (b) temporarily treat the Counterparty's contract or lease as part of Excluded Assets (a "Designated Agreement"), proceed to the closing of the Sale with respect to all other Assets, and determine whether to treat the Designated Agreement as an Assigned Contract, or part of Excluded Assets within ten (10) business days after resolution of such objection (whether by order of the Court or by agreement of the applicable Successful Bidder, the Counterparty, and the Debtor).

i. **Back-Up Bidder Adequate Assurance Objections.** In the event that a Successful Bidder does not consummate the Sale and a Back-Up Bidder (other than the Stalking Horse Bidder) has been previously identified, the Debtor shall file with the Court and post on the Case Website at https://cases.stretto.com/SiFiNetworks, a notice of the Debtor's intent to proceed with a Back-Up Bid (the "Notice of Intent to Proceed with Back-Up Bid"), together with a copy of the Back-Up Bidder's proposed purchase agreement and financial and other information regarding adequate assurance of future performance of the Assigned Contracts by the Back-Up Bidder (including the name of the Back-Up Bidder and description of its business), and serve the Notice of Intent to Proceed with Back-Up Bid on the Counterparties by first class mail and e-mail (where available), and the Counterparties shall have seven (7) days to file and serve on the Objection Notice Parties a Contract Objection solely on the basis of adequate assurance of future performance by the Back-Up Bidder. If any objections are filed, the Debtor shall schedule a hearing, which may be expedited, upon reasonable notice under the circumstances (which shall be no less than ten (10) days after the Notice of Intent to Proceed with Back-Up Bid is filed), with respect to such Contract Objections.

j. **Contract Assumption at Closing.** No Assigned Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order authorizing the assumption and assignment of such Assigned Contracts or (ii) the date the Sale has closed.

28. Any party failing to timely and properly file an objection to the Cure Payment or the proposed assumption and assignment of an Assigned Contract listed on the Contract Assumption Notice is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Assigned Contract, (c) the related relief requested in the Motion, and (d) the Sale. Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from

31

accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code, and from asserting any additional cure or other amounts against the Debtor and the Successful Bidder, as applicable, with respect to such party's Assigned Contract.

29.    To provide the Counterparties with information concerning the Successful Bidder and any Back-Up Bidder who may take assignment of their contracts or leases and enable them to object to such assignment on adequate assurance grounds (to the extent the Successful Bidder/Back-Up Bidder is not the Stalking Horse Bidder), as soon as practicable after the Auction and in no event less than 24 hours after the Auction, the Debtor shall file with the Court and serve on all Counterparties a Notice of Successful Bidder substantially in the form attached as **Exhibit 4** to the Bidding Procedures Order.

## BASIS FOR RELIEF REQUESTED

### I.    The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Consistent with the Debtor's Reasonable Business Judgment.

30.    Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

31.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was provided to interested parties, (c) whether the sale will produce a fair and reasonable price for the property, and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at \*2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

32.     Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Env't. Energy, Inc. (In re O'Brien Env't. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Integrated Res.*, 147 B.R. at 659 (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

33.     The Debtor has carefully designed a process that it believes will maximize the value of the Assets and produce maximum recoveries for its estate. This process includes both entry into the Stalking Horse Agreement, to set a baseline bid for the Auction, and the Bidding Procedures, which are designed to promote active bidding from interested parties and to elicit the highest or otherwise best offers available for the Debtor's Assets. The Debtor is confident that the Bidding Procedures will allow the Debtor to solicit additional offers and conduct its sale process in a

33

controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package of consideration for the assets and who can demonstrate the wherewithal to take on the assets, obligations, and liabilities being transferred.  In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.  In the event the Debtor receives competing bids, the Bid Procedures provide the Debtor the opportunity to schedule an Auction with respect to such bids and then select the highest or otherwise best bid.

34.     The Debtor respectfully submits that the Stalking Horse Agreement and the Bidding Procedures will encourage robust bidding for the assets and are appropriate under, and consistent with, the relevant standards governing overbid processes in bankruptcy proceedings.  Accordingly, the Debtor respectfully submits that the Stalking Horse Agreement and the Bidding Procedures should be approved.

**II.     Approval of the Expense Reimbursement is Appropriate.**

35.     The Debtor believes that the Expense Reimbursement is fair and reasonable under the circumstances.  The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254, at \*1 n. 1 (E.D. Wis. July 7, 2011).  As a result, stalking horse bidders virtually always require expense reimbursement and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase

34

agreement." *Id.* (citation omitted).  Thus, the use of bidding protections has become an established practice in chapter 11 cases.

36.     Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

37.     As a result, courts routinely approve such bid protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of [bid protections] . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (citing *O'Brien*, 181 F.3d at 535) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (same).  The allowance of the Expense Reimbursement is in the best interests of the Debtor's estate and its creditors, as the Stalking Horse Agreement will establish a floor for further bidding that may increase the consideration given in exchange for the Assets, which will inure to the benefit of the Debtor's estate.

38.     In the Third Circuit, bid protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 ("[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503."); *Women First Healthcare, Inc.*, 332 B.R. 115, at 121–23 (Bankr. D. Del. 2005) (holding that the general standard used for all administrative expenses applies to bid protections).  Thus, the allowability of expense reimbursements, "like that

of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181 F.3d at 535).

39.     Here, the Expense Reimbursement provided for in the Stalking Horse Agreement was negotiated at arms' length and in good faith and were a necessary inducement to Stalking Horse Bidder's participation in the proposed sale transaction and willingness to subject its bid to a competitive auction process.   The Stalking Horse Bid sets a "floor" value for the Assets that maximizes the likelihood that the Debtor will receive the highest or otherwise best offer for the Assets for the benefit of the Debtor's estate.   Moreover, the Stalking Horse Bidder expended, and will continue to expend, time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale, despite the fact that its Stalking Horse Bid will be subject not only to Court approval, but also to overbidding by third parties.

40.     The Expense Reimbursement provided to the Stalking Horse Bidder (a) is an actual and necessary cost and expense of preserving the Debtor's estate within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) is commensurate to the real and material benefits conferred upon the Debtor's estate by the Stalking Horse Bidder, and (c) is fair, reasonable, and appropriate, including in light of the size and nature of the proposed Sale, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder. In short, the proposed Expense Reimbursement constitutes a "fair and reasonable percentage of the proposed purchase price" and is "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662.

41.     In addition, the Expense Reimbursement provided to the Stalking Horse Bidder falls well within the range of bidding protections typically approved by the bankruptcy courts in

the Third Circuit. The Expense Reimbursement represents up to $200,000 to cover the Stalking Horse Bidder's costs and expenses, including internal and external professional fees. This protection was necessary to induce the Stalking Horse Bidder to expend the time, resources, and effort required to negotiate and execute the Stalking Horse Agreement and to subject its bid to a competitive auction process, notwithstanding the risk that a higher or better offer could be accepted. The Expense Reimbursement is consistent with the range of bid protections typically paid in sale transactions that have been recently approved, including in instances where the prepetition lender was serving as the stalking horse bidder in the context of a credit bid. *See In re Accelerate Diagnostics, Inc.* No. 25-10837 (KBO) (Bankr. D. Del. June 5, 2025) [D.I. 143] (approving expense reimbursement to prepetition lender as stalking horse bidder); *In re Near Intelligence, Inc.*, No. 23-11962 (TMH) (Bankr. D. Del. Jan 21, 2023) [D.I. 198] (same); *In re An Global LLC*, No. 23-11294 (JKS) (Bankr. D. Del. Oct. 10, 2023) [D.I. 233] (same); *In re Pegasus Home Fashions, Inc.*, No. 23-11235 (MFW) (Bankr. D. Del. Sept. 28, 2023) [D.I. 136] (same); *In re Indep. Pet Partners Holdings, LLC*, No. 23-10153 (LSS) (Bankr. D. Del. Feb. 24, 2023) [D.I. 185] (approving expense reimbursement to prepetition secured party and DIP lender); *In re Alamo Drafthouse Cinemas Holdings, LLC*, No. 21-10474 (MFW) (Bankr. D. Del. May 3, 2021) [D.I. 436] (approving expense reimbursement and break-up fee to prepetition secured lender); *In re Knotel, Inc.*, No. 21-10146 (MFW) (Bankr. D. Del. Mar. 19, 2021) [D.I. 946] (same).

42.     The Expense Reimbursement is a sound exercise of the Debtor's business judgment and are in the best interests of the Debtor, its estate, and all stakeholders. Accordingly, the Court should approve the Expense Reimbursement.

37

**III.    The Assumption and Assignment Procedures and the Assignment of Any Designated Contracts Should Be Approved.**

43.    In connection with the assumption and assignment of certain Assigned Contracts, the Debtor believes it is necessary to establish a process by which (a) the Debtor and Counterparties to Assigned Contracts can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code and (b) such Counterparties can object to the assumption and assignment of the Assigned Contracts and/or related cure amounts.

44.    The Debtor also requests that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to (a) the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code and (b) assignment notwithstanding any anti-alienation provision or other restriction on assignment. *See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

45.    The Debtor believes that the Assumption Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtor requests the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

**IV.    The Form and Manner of the Sale Notice and Notice of Successful Bidder Should Be Approved.**

46.    Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21 days' notice of a proposed sale of the Debtor's Assets.  As soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtor will cause the Sale Notice, the Bidding Procedures Order, and the Bidding Procedures to be served upon the Notice Parties, which

38

the Debtor expects to occur in advance of the 21 days' notice period required by Bankruptcy Rule 2002(a).

47.     The Sale Notice, which includes information concerning the "free and clear" nature of the Sale, the Bidding Procedures, the Stalking Horse Bid, and other material information, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rule 6004-1.  Accordingly, no further notice is necessary and the Debtor requests that this Court approve the form and manner of the notice of the Sale Notice.

48.     In addition, to provide the Counterparties with information concerning the Successful Bidder and any Back-Up Bidder who may take assignment of their contracts or leases and enable them to object to such assignment on adequate assurance grounds (to the extent the Successful Bidder/Back-Up Bidder is not the Stalking Horse Bidder), as soon as practicable after the Auction and in no event later than 24 hours after the Auction, the Debtor shall file with the Court and serve on all Counterparties the Notice of Successful Bidder.  The Debtor submits that such service of the Notice of Successful Bidder is proper and sufficient to timely and properly notice that the Debtor will proceed with assumption and assignment of the Assigned Contracts in connection with the Sale.  Accordingly, the Debtor requests that this Court approve the form and manner of notice of the Notice of Successful Bidder.

**V.     Approval of the Sale is Appropriate and In the Best Interest of the Debtor's Estate.**

**A. The Sale Should Be Approved as an Exercise of the Debtor's Sound Business Judgment.**

49.     Bankruptcy Code section 363(b) provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize

the use, sale or lease of property of the estate, courts have found that a debtor's sale or use of its assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification." *See Martin*, 91 F.3d at 395; *Del. & Hudson*, 124 B.R. at 176; *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Lionel Corp.*, 722 F.2d at 1070.

50.     Once the Debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also Integrated Res.,* 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

51.     The Debtor has a sound business justification for the sale of its assets. The Debtor entered the Chapter 11 Case with the Stalking Horse Bid in hand.  The Stalking Horse Bid provides significant value to the Debtor's estate and ensures the continuation of the Debtor's operations.  Moreover, the Stalking Horse Bid will be subject to the Auction and Bidding Procedures set forth herein, and the competitive bidding process will ensure that the Debtor obtains the best possible value for its assets.  *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056 (PJW), 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").  As such, the sale of the Debtor's Assets is a valid and sound exercise of the Debtor's business judgment.

**B. Adequate and Reasonable Notice of the Sale Will Be Provided.**

52.    As set forth above, the Sale Notice (a) will be served in a manner that provides at least 21-days' notice of the date, time and location of the Sale Hearing, (b) informs interested parties of the deadlines for objecting to the Sale, and (c) otherwise includes all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order, after notice and a hearing, before it is served on parties in interest, and, as such, the Debtor is confident that the Sale Notice will be properly vetted by the time of service thereof.

**C. The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good Faith Buyer."**

53.    Pursuant to Bankruptcy Code section 363(m), a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *Abbotts Dairies*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).

54.    In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith. *See In re Pursuit Capital Mgmt., LLC*, 874 F.3d 124, 135 (3d Cir. 2017) ("The good faith requirement speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Dura Auto. Sys., Inc.,* No. 06-11202 KJC, 2007 WL 7728109, at *96 (Bankr. D. Del. Aug. 15, 2007) (same).

41

55.    The Debtor submits that the Successful Bidder arising from the Auction (if any), will be a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m) and the terms of any purchase agreement with any Successful Bidder will be negotiated at arms-length and in good faith without any collusion or fraud.  Accordingly, the Debtor will be prepared to show at the hearing to approve any such sale that the Successful Bidder is entitled to the full protections of Bankruptcy Code section 363(m).

### D. The Sale Should Be Approved "Free and Clear" Under Bankruptcy Code Section 363(f).

56.    Bankruptcy Code section 363(f) permits the Debtor to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets) if:  (i) applicable nonbankruptcy law permits such a free and clear sale; (ii) the holder of the interest consents; (iii) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f)..  As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f).  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same). The Debtor believes that it will be able to demonstrate at the Sale Hearing that it has satisfied one or more of these conditions.

**E.  Assumption and Assignment of Assigned Contracts Should Be Approved.**

57.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease. *See*, *e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice).  The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

58.     The Court should approve the decision to assume and assign the executory contracts and unexpired leases in connection with the Sale as a sound exercise of the Debtor's business judgment, consistent with the well-settled standard in this district governing same.  The potential Assigned Contracts include those executory contracts and unexpired leases that are necessary to run the Debtor's business.  It is unlikely that any purchaser would want to acquire the Debtor's Assets on a going-concern basis unless a significant number of the Assigned Contracts needed to conduct the business and manage the day-to-day operations were included in the transaction.  As such, making the potential Assigned Contracts available for assignment is essential to inducing the best offer for the Assets.

59.     Accordingly, the Debtor submits that the assumption and assignment of the Assigned Contracts by way of the Assumption Procedures should be approved as an exercise of its business judgment.

60.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code that a debtor (a) cure, or provide adequate assurance of prompt cure of, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  11 U.S.C. § 365.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *Matter of Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

61.     The Debtor submits that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied.  The proposed Assumption Procedures set forth in the Bidding Procedures Order provide a clear process by which the Debtor will provide notice of the potential assumption and assignment of executory contracts and unexpired leases and the procedures for resolving any objections thereto.  The Assumption Procedures afford Counterparties a meaningful opportunity to challenge the Debtor's proposed cure amounts and assumption and assignment of any executory contract or unexpired lease.  Thus, the Bidding Procedures and Assumption Procedures ensure that all defaults will be cured in connection with the assignment of the Assigned Contracts, as required by section 365(b)(1)(A).

62.     Similarly, the Debtor submits that Counterparties will receive adequate assurance of future performance under the Assigned Contracts, as required by section 365(b)(1)(C) of the

Bankruptcy Code.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  *Matter of U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, the required assurance will fall short of an absolute guarantee of performance.  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Luce Indus.*, 8 B.R. at 107; *see also In re Great Atl. & Pac. Tea Co., Inc.*, 472 B.R. 666, 674 (S.D.N.Y. 2012) ("A debtor need not provide 'an absolute guarantee of performance.'").

63.      The Debtor believes that it will demonstrate that the requirements for assumption and assignment of certain Assigned Contracts to the Stalking Horse Bidder (or other successful bidder) will be satisfied.  As required by the Bidding Procedures, the Debtor will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness and ability of the interested party to perform under the Assigned Contracts).  Further, all Counterparties will be provided with notice of the proposed assumption and assignment and will have adequate time and opportunity to object to the assumption or proposed cure amount or otherwise be heard with respect thereto.

### F.  Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.

64.      A secured creditor is allowed to "credit bid" the amount of its claim in a sale.  Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is

undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

65.    Here, the Stalking Horse APA contemplates consideration in the form of a credit bid of the Prepetition Secured Indebtedness and the DIP Obligations.  The Stalking Horse Bidder is entitled to credit bid some or all of the claims secured by its collateral pursuant to section 363(k) of the Bankruptcy Code.  Accordingly, the credit bid contemplated by the Stalking Horse APA should be authorized.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

66.    To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

67.    Notice of this Motion will be given to: (i) the U.S. Trustee; (ii) counsel to the Debtor's prepetition and DIP Lender; (iii) counsel to the Stalking Horse Bidder; (iv) the holders of the thirty (30) largest unsecured claims against the Debtor; (v) the United States Attorney's Office for the District of Delaware; (vi) the Internal Revenue Service; (vii) the attorneys general for the states in which the Debtor operates; (viii) any parties known or reasonably believed to have expressed an interest in the Debtor's assets; (ix) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in the Debtor's assets; and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**NO PRIOR REQUEST**

68.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully request that the Court grant the relief requested by this Motion and such further relief as may be just and proper under the circumstances.

Dated:  June 5, 2026          **COLE SCHOTZ P.C.**
   Wilmington, Delaware

              */s/ Patrick J. Reilley*
              Patrick J. Reilley (No. 4451)
              Michael E. Fitzpatrick (No. 6797)
              500 Delaware Avenue, Suite 600
              Wilmington, DE 19801
              Telephone: (302) 652-3131
              Facsimile: (302) 652-3117
              preilley@coleschotz.com
              mfitzpatrick@coleschotz.com

              -and-

              Daniel F.X. Geoghan (*pro hac vice* admission pending)
              Jacob S. Frumkin (*pro hac vice* admission pending)
              Mark Tsukerman (*pro hac vice* admission pending)
              Tejal Majethia (*pro hac vice* admission pending)
              1325 Avenue of the Americas, 19th Floor
              New York, NY 10019
              Telephone: (212) 752-8000
              Facsimile: (212) 752-8393
              dgeoghan@coleschotz.com
              jfrumkin@coleschotz.com
              mstukerman@coleschotz.com
              tmajethia@coleschotz.com

              *Proposed Counsel for Debtor and*
              *Debtor in Possession*

**Exhibit A**

**Bidding Procedures Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| SiFi Networks America, LLC, | Case No. 26-10912 (___) |
| Debtor.[1] |  |

## ORDER (I) APPROVING THE
## BIDDING PROCEDURES, (II) SCHEDULING
## CERTAIN DATES AND DEADLINES WITH RESPECT THERETO,
## (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
## (IV) APPROVING THE STALKING HORSE AGREEMENT, (V) APPROVING
## THE PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtor and debtor in possession

(the "Debtor") for entry of an order (the "Order"), (i) authorizing and approving sale and bidding

procedures (the "Bidding Procedures") attached hereto as **Exhibit 1**, (ii) scheduling certain dates

and deadlines in connection with the Sale, including the Bid Deadline, Auction, Sale Hearing,

(iii) approving the form and manner of (1) notice of the Auction and Sale Hearing (the "Sale Notice")

attached hereto as **Exhibit 2**, (2) notice of the Assumption Procedures (the "Assumption Notice")

attached hereto as **Exhibit 3**, and (3) notice of Successful Bidder and Back-Up Bidder (the "Notice

of Successful Bidder") attached hereto as **Exhibit 4**, (iv) approving procedures for assuming and

assigning executory contracts and unexpired leases and certain related notices, including notice of

proposed cure amounts, (v) approving the terms of the Stalking Horse Agreement attached hereto as

**Exhibit 5**, including the bid protections, (vi) and granting related relief, all as more fully set forth

---

[1]  The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990).  The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

in the Motion; and upon consideration of the First Day Declaration; and the United States District Court for the District of Delaware having jurisdiction to consider this Motion under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors and other parties in interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor;

**THE COURT HEREBY FINDS THAT**:

A.    Statutory Predicates. The predicates for the relief granted herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014 and Local Rules 2002-1, 6004-1, and 9013-1.

B.    Notice of Motion.  The Debtor's notice of the Motion, the Hearing, and the proposed entry of this Order was sufficient under the circumstances of this case and complied with

2

all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the applicable Local Rules. Accordingly, no other or further notice of the Motion or the entry of this Order is necessary or required.

C.      Sale Process. The Debtor and its advisors have been engaging with a number of potentially interested parties to solicit and develop the highest and otherwise best offers for the Debtor's Assets.

D.      Bidding Procedures. The Debtor has articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which were developed in good faith, are fair, reasonable, and appropriate under the circumstances, and are designed to maximize the recovery on, and realizable value of, the Debtor's Assets, as determined by the Debtor in an exercise of its business judgment. The Bidding Procedures comply with the requirements of Local Rule 6004-1(c).

E.      Stalking Horse Bidder. The bid protections, including the Expense Reimbursement payable under the Stalking Horse Agreement shall be deemed an actual and necessary cost of preserving the Debtor's estate within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code and treated as an allowed administrative expense claim against the Debtor's estate pursuant to sections 503(b) and 507(a)(2) of the bankruptcy Code.

F.      Sale Notice. The notice provided by the Debtor regarding the Sale (the "Sale Notice") is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Sale and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the assets for sale; (v) representations describing the Sale as being free and clear

3

of liens, claims, interests, and other encumbrances; and (vi) notice of the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder and the rights, procedures, and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

G.    Assumption Procedures.    The Assumption Notice is reasonably calculated to provide Counterparties to the Assigned Contracts with proper notice of the intended assumption and assignment of their executory contracts, any Cure Payments, and the Assumption Procedures. The Assumption Procedures comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

H.    Notice of Successful Bidder.    The Notice of Successful Bidder, substantially in the form attached hereto as **Exhibit 4**, is reasonably calculated to provide interested parties with timely and proper notice of any proposed Sale Transaction with respect to the Assets, including, without limitation: (a)  the Successful Bidder for the Assets, (b) the Back-Up Bidder, if applicable, (c) the key terms of the proposed Sale Transaction, and (d) the date, time, and place for the Sale Hearing.

I.    Other Findings. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the preceding findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the preceding conclusions of law constitute findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED THAT**:

1.    The Motion is granted to the extent set forth in this Order.

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled prior to or at the Hearing are overruled.

4

**I.    Important Dates and Deadlines**

3.    The following dates and deadlines are hereby approved:

| Event or Deadline | Proposed Date and Time (all times in the prevailing Eastern Time) |
|---|---|
| Deadline to File and Serve Sale Notice | July 2, 2026 |
| Deadline to Publish Sale Notice | July 2, 2026 |
| Deadline to File and Serve Assumption Notice | July 2, 2026 |
| Contract Objections Deadline | 4:00 p.m. (ET) on the date that is 14 days after the service of the Assumption Notice |
| Bid Deadline | July 14, 2026 |
| Notice of Successful Bidder and Cancellation of Auction (if no Auction) | July 15, 2026 |
| Auction (if Qualified Bids received) | July 17, 2026 at 10:00 a.m. (ET) |
| Deadline to File Notice of Successful Bidder and Back-Up Bidder | July 20, 2026 |
| Sale Objection Deadline | July 22, 2026 at 4:00 p.m. (ET) |
| Debtor's Response to Objections, if any | July 24, 2026 at 4:00 p.m. (ET) |
| Sale Hearing | July 29, 2026 |

4.    **Sale and Contract Objection Deadline**. (a) **July 22, 2026, at 4:00 p.m., prevailing Eastern Time** (the "Sale Objection Deadline"), shall be the deadline by which objections to the entry of an order by the Court approving the Sale, including to the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code shall be filed, and (b) **4:00 p.m., prevailing Eastern Time on the date that is 14 days after service of the Assumption Notice** (the "Contract Objection Deadline"), shall be the deadline by which objections to the assumption of any Assigned Contract (other than the Subsequently Designated Assigned Contracts, as defined in paragraph 24(d) herein) shall be filed. Such objections must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, and (c) be filed with the Court and served so as to be actually received by:  (i) proposed counsel to

the Debtor, Cole Schotz P.C., 500 Delaware Avenue, Suite 600, Wilmington, DE 19801, Attn: Daniel F.X. Geoghan (dgeoghan@coleschotz.com) and Jacob S. Frumkin (jfrumkin@coleschotz.com); (ii) counsel to the DIP Lender and Stalking Horse Bidder, (a) Clifford Chance US LLP, Two Manhattan West, 375 9th Avenue, New York, New York 10001, Attn: David Feldman (David.Feldman@cliffordchance.com) and Matthew L. Hinker (Matthew.Hinker@cliffordchance.com), (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Sean M. Beach (sbeach@ycst.com); (iii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jon Lipshie (Jon.Lipshie@usdoj.gov); and (iv) counsel to any statutory committee appointed in this case (the parties identified in (i) through (iv), collectively, the "Objection Notice Parties"). Any party or entity who (i) fails to timely and properly make an objection to the Sale on or before the Sale Objection Deadline shall be forever barred from asserting any objection to the Sale, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances, and other interests, and (ii) fails to timely and properly make an objection to the assumption of an Assigned Contract on or before the Contract Objection Deadline shall be forever barred from asserting any objection to the assumption of such Assigned Contract, including with respect to cure amounts, adequate assurance of future performance, or any other matter relating to such assumption.

5.      **Bid Deadline**. **July 14**, **2026**, is the deadline by which all Qualified Bids must be actually received by the parties specified in the Bidding Procedures.

6.      **Auction**. **July 17, 2026, at 10:00 a.m., prevailing Eastern Time**, is the date and time the Auction, if one is needed, may be held in accordance with the Bidding Procedures at the offices of proposed counsel to the Debtor, Cole Schotz P.C. The Debtor shall send written notice

of the date, time, and place of the Auction to the Qualified Bidders no later than two (2) business days before such Auction and will post notice of the date, time, and place of the Auction no later than two (2) business days before such Auction on the Case Website of the Debtor's notice, claims, and solicitation agent at https://cases.stretto.com/SiFiNetworks.

7.      **Sale Hearing**. **July 29, 2026, at __:00 _.m., prevailing Eastern Time**, is the date and time for the hearing for the Court to consider the Successful Bid, pursuant to which the Debtor and the Successful Bidder will consummate the Sale; *provided, however*, that the Sale Hearing may be continued by the Debtor in accordance with the Bidding Procedures, from time to time, without further notice to creditors or parties in interest.

8.      **Adequate Assurance**. In the event the Successful Bidder is not the Stalking Horse Bidder, objections to adequate assurance of future performance of the Assigned Contracts by such Successful Bidder must be filed with the Court and served on the Objection Notice Parties no later than the Sale Hearing.

**II.     Stalking Horse and Expense Reimbursement.**

9.      The Debtor is hereby authorized to select ArcLink Fiber LLC, together with any designated affiliate thereof, as the Stalking Horse Bidder (the "Stalking Horse Bidder").

10.      The Debtor is authorized, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to enter into and perform under the Stalking Horse Agreement, subject to the solicitation of higher or otherwise better offers for the Acquired Assets (as defined in the Stalking Horse Agreement) and entry of the Sale Order.

11.      The Stalking Horse Agreement is authorized and approved in the form attached to this Order as **Exhibit 5** as the stalking horse bid for the acquired Assets (the "Stalking Horse Bid").

7

12.     The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the Stalking Horse Bid shall be deemed a Qualified Bid, for all purposes under the Bidding Procedures Order and Bidding Procedures.

13.     The Stalking Horse Agreement shall be binding and enforceable on the parties thereto in accordance with its terms subject to entry of the Sale Order.  The failure to describe specifically or include any provision of the Stalking Horse Agreement or related documents in the Motion or herein shall not diminish or impair the effectiveness of such provision as to such parties. The Stalking Horse Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, solely in accordance with the terms thereof, without further order of the Court.

14.     The Expense Reimbursement is hereby approved.  The obligation of the Debtor to pay the Expense Reimbursement shall survive termination of the Stalking Horse Agreement, the dismissal or conversion of the Chapter 11 Case, and confirmation of any plan of reorganization or liquidation and shall (i) constitute an allowed super priority administrative expense of Seller under section 503(b) and 507(a) of the Bankruptcy Code which shall be senior to and have priority over all other administrative expense claims of the kind specified in section 503(b) of the Bankruptcy Code; *provided*, that the priority of such super priority administrative expense claims shall be junior to:  (i) the Carve-Out (as defined in the DIP Order) and claims arising under the DIP Note; (ii) not be altered, amended, discharged, or affected by any chapter 11 plan proposed or confirmed in the Seller's Bankruptcy Case; (iii) be paid by the Seller in the time and manner provided for in the Stalking Horse Agreement without further order of the Bankruptcy Court; and (iv) not be subject to any bar date in this Bankruptcy Case or any requirement to seek approval under Sections 502,

8

503(b), 507(a)(2) or any other provision of the Bankruptcy Code or file any request for allowance of administrative claim or proof of claim.

15.     Subject to the Bidding Procedures and entry of the Sale Order, the Debtor and Stalking Horse Bidder are granted all rights and remedies provided to them under the Stalking Horse Agreement, including, without limitation, the right to specifically enforce the Stalking Horse Agreement (including with respect to the Expense Reimbursement) in accordance with its terms.

**III.     Auction, Bidding Procedures, Sale Notice, and Related Relief.**

16.     The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to any proposed Sale.  Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Order.  The Debtor is authorized to take any and all reasonable actions necessary to implement the Bidding Procedures.

17.     Without prejudice to the rights of the Stalking Horse Bidder under the Stalking Horse APA, the Debtor shall have the right to, in their reasonable business judgment, and in a manner consistent with their fiduciary duties and applicable law, modify the Bidding Procedures, including to, among other things, (i) extend or waive deadlines or other terms and conditions set forth therein, (ii) adopt new rules and procedures for conducting the bidding and Auction process, (iii) if applicable, provide reasonable accommodations to a Qualified Bidder, or (iv) otherwise modify the Bidding Procedures to further promote competitive bidding for and maximizing the value of the Assets; *provided*, that such extensions, waivers, new rules and procedures, accommodations and modifications (i) do not conflict with and are not inconsistent with this Order, the Bidding Procedures, the DIP Order, the Bankruptcy Code or any order of the Court, (ii) do not frustrate or otherwise impair the Stalking Horse Bidder's ability to close the Sale, (iii) do not modify

9

(a) the Expense Reimbursement, unless the Stalking Horse Bidder agrees to such modification in writing in its sole discretion, or (b) the rules, procedures, or deadlines set forth herein, or adopt new rules, procedures, or deadlines that would impair in any material respect the Stalking Horse Bidder's right to payment of the Expense Reimbursement without the express written consent of the Stalking Horse Bidder in its sole discretion, (iv) are promptly communicated to each Qualified Bidder, (v) do not extend the Bid Deadline, the date of the Auction, the closing of the Auction, or any other Milestones (as defined in the DIP Order), in consultation with the DIP Lender, and (vi) are in form and substance acceptable to the DIP Lender

18.     For the avoidance of doubt and notwithstanding anything to the contrary contained in this Order, this Order does not approve the sale of the Assets or authorize the consummation of the Sale, such approval and authorization (if any) to be considered only at the Sale Hearing and all rights of all parties in interest to object to such approval and authorization are reserved.

19.     Except as provided in the Stalking Horse Agreement, no person or entity shall be entitled to any expense reimbursement, break-up fee, "topping," termination, or other similar fee or payment in connection with any Sale, and by submitting a bid, such person or entity is deemed to have waived their right to request or file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

20.     Any deposit provided by a Qualified Bidder shall be held in a segregated account by the Debtor or its agent in accordance with the Bidding Procedures, and shall not become property of the Debtor's bankruptcy estate unless and until released to the Debtor pursuant to the terms of the purchase agreement with such Qualified Bidder or order of this Court.

21.     The Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Stalking Horse Bid is a Qualified Bid, as set forth in the Bidding Procedures.  The Stalking Horse Bidder is,

10

and will be deemed to be, a Qualified Bidder for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth herein and without any further action by the Stalking Horse Bidder.

22.     The Sale Notice, substantially in the form attached hereto as **Exhibit 2**, is hereby approved.  As soon as reasonably practicable following the entry of this Order, the Debtor will cause the Bidding Procedures and Sale Notice to be served upon the following parties, and their respective counsel, if known (collectively, the "Notice Parties"): (i) the U.S. Trustee; (ii) counsel to the DIP Lender and Stalking Horse Bidder; (iii) the holders of the thirty (30) largest unsecured claims against the Debtor; (iv) the United States Attorney's Office for the District of Delaware; (v) the Internal Revenue Service; (vi) the attorneys general for the states in which the Debtor operates; (vii) any parties known or reasonably believed to have expressed an interest in the Debtor's Assets; (viii) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the Debtor's Assets; and (ix)  any party that has requested notice pursuant to Bankruptcy Rule 2002.  In addition, as soon as practicable, after entry of this Order, the Debtor shall publish the Sale Notice, with any modification necessary for ease of publication, on the Case Website of the Debtor and once in the national edition of *The New York Times* or any other publications the Debtor deems appropriate to provide notice to any other potential interested parties.

## IV.      The Assumption and Assignment Procedures.

23.     The procedures set forth below regarding the assumption and assignment of the executory contracts and unexpired leases proposed to be assumed by the Debtor pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder pursuant to section 365(f) of

11

the Bankruptcy Code in connection with the Sale (the "Assumption Procedures") are hereby approved to the extent set forth herein.

24. These Assumption Procedures shall govern the assumption and assignment of all of the Debtor's executory contracts and unexpired leases to be assumed and assigned in connection with the Sale (each, an "Assigned Contract," and, collectively, the "Assigned Contracts"), subject to the payment of any payments necessary to cure any defaults arising under any Assigned Contract (the "Cure Payments"):

a. **Contract Assumption Notice.**  On or prior to **July 2, 2026** (the "Assumption Notice Deadline"), the Debtor shall file with the Court and serve a notice of contract assumption (the "Assumption Notice"), in substantially the form attached hereto as **Exhibit 3**, via first class mail and e-mail (where available) on all counterparties to all potential Assigned Contracts (each, a "Counterparty" and, collectively, the "Counterparties").  The Assumption Notice shall include, without limitation, a list of Assigned Contracts (the "Assigned Contract List") that may be assumed and assigned in connection with the Sale and the Cure Payment, if any, that the Debtor believes is required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) for each of the Assigned Contracts.  If no Cure Payment is listed on the Assigned Contracts List for a particular Assigned Contract, the Debtor's asserted Cure Payment for such Assigned Contract shall be deemed to be $0.00.  The Assigned Contracts List shall identify each of the potential Assigned Contracts by the name or appropriate description and date of such potential Assigned Contract (if available), the Counterparties and the address of such Counterparties for notice purposes. Service of an Assumption Notice does not constitute an admission that such contract is an executory contract or unexpired lease or that such stated Cure Payment constitutes a claim against the Debtor or a right against the Successful Bidder (all rights with respect thereto being expressly reserved).  Further, the inclusion of a contract or lease on the Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.

b. **Cure Payments**. The payment of the applicable Cure Payments specified in the Assumption Notice or a Supplemental Assumption Notice by the Successful Bidder or the Debtor, as applicable and in accordance with the Stalking Horse Agreement, after the expiration of the applicable objection period and the failure of any applicable Counterparty to timely and properly object to the proposed Cure Payment or to the assumption or assignment of its executory contract or unexpired lease, shall (i) effect a cure of all defaults existing thereunder as of the filing of the Assumption Notice, and (ii) compensate for any actual pecuniary loss to such Counterparty resulting from such default.

12

c. **Contract Objections**. Objections, if any, to the proposed assumption and assignment of a contract or lease, including objections to Cure Payments (each, as defined above, a "Contract Objection"), must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, the correct cure amount alleged by the objecting Counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served, so as to be actually received by, the Objection Notice Parties (as defined in the Assumption Notice) by 4:00 p.m. (ET) on the date that is 14 days after service of the Assumption Notice, except as otherwise set forth below with respect to Subsequently Designated Assigned Contracts.

d. **Changes to Assigned Contract List and Cure Payments.** At the election of the Successful Bidder, up until two (2) business days prior to the closing of any Sale, the Debtor may file and serve supplements or amendments to the Assigned Contracts List (each, a "Supplemental Assumption Notice") to (i) add previously omitted Assigned Contracts to the Assigned Contracts List as contracts that may be assumed and assigned to a Successful Bidder in accordance with the definitive agreement for the Sale by filing a supplement to the Assigned Contracts List or (ii) modify the Cure Payment for any Assigned Contract (together, "Subsequently Designated Assigned Contracts"). Contract Objections with respect to Subsequently Designated Assigned Contracts shall be filed no later than ten (10) days from service of a Supplemental Assumption Notice identifying the Subsequently Designated Assigned Contracts and served on the Objection Notice Parties (the "Subsequently Designated Assigned Contracts Deadline"). Such objections must (a) be in writing, (b) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court and served so as to be actually received by the Objection Notice Parties. Any party or entity who fails to timely and properly make an objection with respect to the Subsequently Designated Assigned Contracts on or before the Subsequently Designated Assigned Contracts Deadline shall be forever barred from asserting any objection with respect to the Subsequently Designated Assigned Contracts.

e. **Removal of Contracts from Assigned Contract List.** Up until two (2) business days prior to Closing, the Debtor is authorized, but not directed, if the Purchaser so requests, to remove an Assigned Contract from the Assigned Contract List that a Successful Bidder proposes be assumed and assigned in connection with the Sale.

f. **Notice of Successful Bidder/Adequate Assurance Objections.** As soon as practicable after the Auction and in no event later than twenty-four (24) hours after the Auction, the Debtor shall file with the Court and post on the Case Website at https://cases.stretto.com/SiFiNetworks, the notice substantially in the form attached hereto as **Exhibit 4** (the "Notice of Successful Bidder"),

13

identifying any Successful Bidder and Back-Up Bidder, together with a copy of the Successful Bidder's proposed purchase agreement and financial and other information regarding adequate assurance of future performance of the Assigned Contracts, and serve the Notice of Successful Bidder on the Counterparties by first class mail and e-mail (where available), and the Counterparties shall file any Contract Objections solely on the basis of adequate assurance of future performance by the Successful Bidder other than the Stalking Horse Bidder (each, an "Adequate Assurance Objection") not later than the Sale Hearing (the "Adequate Assurance Objections Deadline").

g. **Assigned Contracts.** At the Sale Hearing, the Debtor will seek Court approval of the assumption and assignment to the Successful Bidder of the Assigned Contracts, subject to the dispute resolution procedures set forth in paragraph 24(h) hereof; *provided that*, in the event the Successful Bidder is not the Stalking Horse Bidder, objections to adequate assurance of future performance of the Assigned Contracts by such Successful Bidder shall be heard at a subsequent hearing, as set forth in paragraph 24(h) hereof. The inclusion of an Assigned Contract on an Assumption Notice will not (a) obligate the Debtor to assume any Assigned Contract listed thereon nor the Successful Bidder to take assignment of such Assigned Contract or (b) constitute any admission or agreement of the Debtor that such Assigned Contract is an executory contract.

h. **Dispute Resolution.** To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) (any such dispute, a "Cure Dispute"), such Contract Objection shall be adjudicated at the Sale Hearing or at such other date and time as the Debtor determines, in its discretion and in consultation with the Successful Bidder and the Consultation Parties (subject to the Court's availability). If such Contract Objection has not been resolved prior to the closing of the Sale (whether by an order of the Court or by agreement with the Counterparty), the Successful Bidder may (a) treat such Counterparty's contract or lease as part of Excluded Assets or (b) temporarily treat the Counterparty's contract or lease as part of Excluded Assets (a "Designated Agreement"), proceed to the closing of the Sale with respect to all other Assets, and determine whether to treat the Designated Agreement as an Assigned Contract, or part of Excluded Assets within ten (10) business days after resolution of such objection (whether by order of the Court or by agreement of the applicable Successful Bidder, the Counterparty, and the Debtor).

i. **Back-Up Bidder Adequate Assurance Objections.** In the event that a Successful Bidder does not consummate the Sale and a Back-Up Bidder (other than the Stalking Horse Bidder) has been previously identified, the Debtor shall file with the Court and post on the Case Website at https://cases.stretto.com/SiFiNetworks, a notice of the Debtor's intent to proceed with a Back-Up Bid (the "Notice of Intent to Proceed with Back-Up

14

Bid"), together with a copy of the Back-Up Bidder's proposed purchase agreement and financial and other information regarding adequate assurance of future performance of the Assigned Contracts by the Back-Up Bidder (including the name of the Back-Up Bidder and description of its business), and serve the Notice of Intent to Proceed with Back-Up Bid on the Counterparties by first class mail and e-mail (where available), and the Counterparties shall have seven (7) days to file and serve on the Objection Notice Parties a Contract Objection solely on the basis of adequate assurance of future performance by the Back-Up Bidder.  If any objections are filed, the Debtor shall schedule a hearing, which may be expedited, upon reasonable notice under the circumstances (which shall be no less than ten (10) days after the Notice of Intent to Proceed with Back-Up Bid is filed), with respect to such Contract Objections.

j.   **Contract Assumption at Closing.** No Assigned Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order authorizing the assumption and assignment of such Assigned Contracts or (ii) the date the Sale has closed.

25.   Any party failing to timely and properly file an objection to the Cure Payment or the proposed assumption and assignment of an Assigned Contract listed on the Assumption Notice or a Supplemental Assumption Notice is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Assigned Contract, (c) the related relief requested in the Motion, and (d) the Sale.  Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code, and from asserting any additional cure or other amounts against the Debtor and the Successful Bidder, as applicable, with respect to such party's Assigned Contract.

**V.       Assumption Notice and Notice of Successful Bidder.**

26.   The Assumption Notice attached hereto as **Exhibit 3** and the Notice of Successful Bidder attached hereto as **Exhibit 4** are hereby approved.

27.     To provide the Counterparties with information concerning the Successful Bidder and any Back-Up Bidder who may be assigned their contracts or leases and enable them to object to such assignment on adequate assurance grounds (to the extent the Successful Bidder/Back-Up Bidder is not the Stalking Horse Bidder), as soon as practicable after the Auction and in no event less than twenty-four (24) hours before the date of the Sale Hearing, the Debtor shall file with the Court and serve on all Counterparties the Notice of Successful Bidder.

**VI.     Back-Up Bidder.**

28.     Following entry of the Sale Order, if the Successful Bidder fails to consummate the Successful Bid, the Debtor may designate the Back-Up Bid to be the new Successful Bid and the Back-Up Bidder to be the new Successful Bidder, and, subject to resolution of any adequate assurance objections filed pursuant to paragraph 24(i) above, the Debtor shall be authorized, but not required, to consummate the transaction with the Back-Up Bidder without further order of this Court, so long as such Back-Up Bid shall have been approved in connection with the Court's approval of the Successful Bid, or subject to Court approval if not.  In such case of a breach or failure to perform on the part of the Successful Bidder and in such other circumstances as may be specified in the definitive documentation governing the Successful Bid, the defaulting Successful Bidder's deposit, if any, shall be forfeited to the Debtor.  The Debtor's right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Back-Up Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures are reserved.

**VII.     Credit Bidding.**

29.     Any bidder holding a perfected security interest in any of the Assets may seek to credit bid all, or a portion of, such bidder's claims for its respective collateral in accordance with

and to the fullest extent applicable under section 363(k) of the Bankruptcy Code (each such bid, a "Credit Bid"); *provided*, that such Credit Bid complies with the terms of the Bidding Procedures.

30.     Pursuant to the terms and conditions of the DIP Order, the Stalking Horse Bidder is permitted to credit bid any outstanding DIP Obligations and Prepetition Secured Indebtedness in accordance with and to the fullest extent applicable under 363(k) of the Bankruptcy Code in any sale of Assets and may assign such right to credit bid in whole or in part to any of their affiliates. The Stalking Horse Bidder shall have the unqualified right to credit bid on a dollar-for-dollar basis up to the full amount of the DIP Obligations and the Prepetition Secured Indebtedness pursuant to and to the fullest extent applicable under section 363(k) of the Bankruptcy Code.

**VIII.     Miscellaneous.**

31.     The failure to include or reference a particular provision of the Bidding Procedures specifically in this Order shall not diminish or impair the effectiveness or enforceability of such a provision.

32.     In the event of any inconsistencies between this Order and the Motion, this Order shall govern in all respects.  In the event of any inconsistencies between this Order and the Bidding Procedures attached hereto as **Exhibit 1**, the Bidding Procedures shall govern in all respects.

33.     Any substantial contribution claims by any Bidder are deemed waived, to the extent based solely on such Bidder's submission of a Bid in accordance with the Bidding Procedures.

34.     This Order shall be binding on and inure to the benefit of the Debtor, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estate of the Debtor.

35.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

17

36.     To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in this case, the terms of this Order shall govern.

37.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

38.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

39.     The Debtor is authorized to make non-substantive changes to the Bidding Procedures, the Assumption Procedures, and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors.

40.     The Debtor is authorized to take all reasonable actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

41.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## Exhibit 1

## Bidding Procedures

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SiFi Networks America, LLC, | Case No. 26-10912 (___) |
| Debtor.[1] | |

**BIDDING PROCEDURES IN CONNECTION
WITH THE SALE OF THE DEBTOR'S ASSETS**

On [●], 2026, the above-captioned debtor and debtor in possession (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). These bidding procedures (the "Bidding Procedures") set forth the process by which Debtor shall market to interested parties and conduct a sale (the "Sale") by auction (the "Auction") of all or substantially all of the Debtor's assets (the "Assets"). The Sale will be subject to bidding as set forth herein and subject to the approval of the Bankruptcy Court, pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

On [●], 2026, the Debtor filed the *Debtor's Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Approving the Sale of Substantially All of the Debtor's Assets, (VII) Authorizing the Debtor's Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Motion"), to be heard by the Bankruptcy Court (i) on [●], 2026 with respect to the Bidding Procedures, and (ii) on [●], 2026 (or at such other time as the Bankruptcy Court may determine) with regard to all other matters related to the Motion (the "Sale Hearing").[2]

On [●], 2026, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (VI) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order") approving, among other things, these Bidding Procedures.

---

[1]    The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990). The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

As described in the Bidding Procedures Order, SiFi Networks America, LLC (the "Seller") has entered into an asset purchase agreement (the "Stalking Horse Agreement") with ArcLink Fiber LLC (or its designee, the "Stalking Horse Bidder")[3] pursuant to which, among other things, the Stalking Horse Bidder has committed to (a) purchase, acquire, and take assignment and delivery of, free and clear of all liens, claims, encumbrances, and other interests (except as otherwise provided in the Stalking Horse Agreement), substantially all of the Seller's Assets, as more fully set forth in the Stalking Horse Agreement, and (b) assume certain liabilities associated with the Seller's operations to the extent expressly set forth in the Stalking Horse Agreement (collectively, the "Stalking Horse Bid"), for a purchase price (the "Stalking Horse Purchase Price") consisting of a credit bid pursuant to section 363(k) of the Bankruptcy Code (the "Credit Bid") of obligations equal to: (i) all or a portion of the DIP Obligations *plus* (ii) the aggregate principal amount of the Prepetition Note as of the Closing, the aggregate amount of the subclauses (i) and (ii) equaling Four Million Six Hundred and Three Thousand and Thiry Nine dollars ($4,603,039.00), *plus* (iii) the Assumed Liabilities, *plus* (iv) the Cure Amounts.

The Stalking Horse Agreement provides for reimbursement of all out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by the Stalking Horse Bidder in connection with the negotiation, diligence, execution, performance and enforcement of the Stalking Horse Agreement up to $200,000 (the "Expense Reimbursement"), on the terms and conditions set forth in the Stalking Horse Agreement and the Bidding Procedures Order.

The Bidding Procedures set forth the process by which the Debtor is authorized to solicit the highest or otherwise best bid or bids (each, a "Bid") for the Seller's Assets, culminating in the Auction if competing Qualified Bids (as defined herein) are received. The Sale is contemplated to be implemented under section 363 of the Bankruptcy Code pursuant to the terms and conditions of either (a) the Stalking Horse Agreement, as the same may be amended pursuant to the terms thereof, or (b) such other applicable asset purchase agreement upon the receipt of a Successful Bid (as defined herein) that the Debtor has determined in its business judgment (in consultation with the Consultation Parties) is the best or highest bid in accordance with these Bidding Procedures.

> **Copies of the Bidding Procedures Order, or any other documents in the Debtor's Chapter 11 Case are available at https://cases.stretto.com/SiFiNetworks**

## A.    Important Dates.

These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in an Auction, thereby competing to make the highest or otherwise best offer for the Assets. Subject to the Debtor's rights set forth herein, the following table sets forth key dates and deadlines with respect to the Sale process.

---

[3]    The Stalking Horse Bidder is the Debtor's (i) DIP Lender and (ii) prepetition secured lender. SiFi Networks America Ltd. ("SNA Ltd") is the parent of the Debtor. In April 2026, SNA Ltd was acquired by PATRIZIA, a German infrastructure investment manager. The Stalking Horse Bidder is an affiliate of PATRIZIA.

| Event or Deadline | Proposed Date and Time (all times in the prevailing Eastern Time) |
|---|---|
| Deadline to File and Serve Sale Notice | July 2, 2026 |
| Deadline to Publish Sale Notice | July 2, 2026 |
| Deadline to File and Serve Assumption Notice | July 2, 2026 |
| Contract Objections Deadline | 4:00 p.m. (ET) on the date that is 14 days after the service of the Assumption Notice |
| Bid Deadline | July 14, 2026 |
| Notice of Successful Bidder and Cancellation of Auction (if no Auction) | July 15, 2026 |
| Auction (if Qualified Bids received) | July 17, 2026 at 10:00 a.m. (ET) |
| Deadline to File Notice of Successful Bidder and Back-Up Bidder | July 20, 2026 |
| Sale Objection Deadline | July 22, 2026 at 4:00 p.m. (ET) |
| Debtor's Response to Objections, if any | July 24, 2026 at 4:00 p.m. (ET) |
| Sale Hearing | July 29, 2026 |

**B.      Potential Bidder.**

For purposes of the Bidding Procedures, a "Potential Bidder" shall refer to any person or entity interested in submitting a bid.  For the avoidance of doubt, the Stalking Horse Bidder is a Qualified Bidder (as defined below) and is not a Potential Bidder or an Acceptable Bidder (as defined below).

**C.      Determination by the Debtor.**

As appropriate throughout the Bidding Process (as defined below), the Debtor will consult with (a) the Debtor's prepetition and DIP Lender; (b) any statutory committee of unsecured creditors appointed in the Chapter 11 Case (a "Committee"), if any, and such Committee's counsel, and (c) any other party that becomes a consultation party as set forth in this subsection of the Bidding Procedures (collectively, the "Consultation Parties" and each, a "Consultation Party"); *provided*, that no person or entity that constitutes a Potential Bidder, an Acceptable Bidder, a Stalking Horse Bidder, a Successful Bidder, or a Back-up Bidder (each as defined herein, and collectively, a "Bidding Party") (as determined by the Debtor, in its reasonable discretion) shall be deemed a Consultation Party for so long as such person constitutes a Bidding Party.  The Debtor shall consult with the Consultation Parties with respect to each of the following: (a) coordinating with Potential Bidders regarding the conduct of their respective due diligence, (b) evaluating bids from Potential Bidders on any or all of the Assets, (c) negotiating any bid made to acquire any or all of the Assets, and (d) making such other determinations as are provided in these Bidding Procedures (collectively, the "Bidding Process").  For the avoidance of doubt, if a member of a Committee (or their affiliates, as applicable) is actively participating as a Bidding Party, then the remaining members of the Committee other than such

3

Potential Bidder, and the Committee's counsel, shall continue to be Consultation Parties, but shall not provide any information they receive as Consultation Parties to such Bidding Party.

**D.      Due Diligence.**

   **(i.)          Access to Due Diligence**.

Any Potential Bidder that (a) has previously executed or executes a confidentiality agreement on customary terms that are reasonably acceptable to the Debtor (a "Confidentiality Agreement"), (b) provides sufficient evidence, as reasonably determined by the Debtor, that the Potential Bidder intends to obtain due diligence and participate in the sale process for a *bona fide* purpose consistent with these Bidding Procedures, and (c) provides evidence of such Potential Bidder's financial capability to acquire the Assets, which shall include financial statements, including current audited and unaudited financial information, or if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, (any such Potential Bidder being referred to as an "Acceptable Bidder") will be eligible to receive due diligence materials and access to certain non-public information regarding the Assets.  The Debtor will provide each Acceptable Bidder with such information as is reasonably contemplated to enable such Acceptable Bidder to make a Bid for the Assets.  The Debtor will also provide to each Acceptable Bidder reasonable due diligence information as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request.  The Debtor will post substantially all written due diligence provided to any Acceptable Bidder to the Debtor's electronic data room (the "Data Room").  The Debtor may restrict or limit the access of an Acceptable Bidder to the Data Room if the Debtor determines, based on its reasonable business judgment, that certain information in the Data Room is sensitive, proprietary, or otherwise not appropriate for disclosure to such Acceptable Bidder.

The due diligence period will end on the Bid Deadline (as defined herein).  Following the Bid Deadline, the Debtor may, in its reasonable discretion, furnish additional non-public information to a Qualified Bidder or Qualified Bidders that submitted a Qualified Bid (each as defined herein), but shall have no obligation to do so.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtor or its advisors, regarding qualification as an Acceptable Bidder or Qualified Bidder, the terms of the Potential Bidder's Bid, or the ability of the Potential Bidder to acquire the Assets.  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtor, to determine that such bidder is no longer a Potential Bidder or that any bid made by such Potential Bidder is not a Qualified Bid.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtor will not furnish any confidential information relating to the Debtor, the Assets or liabilities, or the Sale to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement.

The Debtor and its advisors will coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided that* the Debtor may

decline to provide such information to Acceptable Bidders who, in the Debtor's reasonable business judgment, have not established that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate their Bid. No conditions relating to the completion of due diligence will be permitted to exist after the Bid Deadline.

The Debtor also reserves the right to withhold any diligence materials from an Acceptable Bidder who the Debtor reasonably determines is a competitor of the Debtor or is affiliated with any competitor of the Debtor. Neither the Debtor nor its representatives will be obligated to furnish information of any kind whatsoever to any person that is not determined to be an Acceptable Bidder or a Consultation Party. The Debtor will make any diligence information available to the Stalking Horse Bidder if such diligence has been made available to any other Acceptable Bidder.

Each Acceptable Bidder will be deemed to acknowledge and represent that it: (a) either directly or through its advisors has had an opportunity to conduct any and all due diligence regarding the Seller's Assets and liabilities prior to making any Qualified Bid; (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets and liabilities in making any Qualified Bid; and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Seller's Assets or liabilities, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or the Acceptable Bidder's proposed purchase agreement (including, in the case of the Stalking Horse Bidder, the Stalking Horse Agreement). Neither the Debtor nor any of its employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors, or professionals are responsible for, or will bear any liability with respect to, any information obtained by Acceptable Bidders in connection with the Sale, other than any representations, warranties or other liability set forth in an executed and effective asset purchase agreement.

> **The Debtor has designated its sales agent, Sherwood Partners, Inc.,
> to coordinate all reasonable requests for additional information and due
> diligence access. Please contact Jarod Wada (jwada@sherwoodpartners.com)
> and Eric Brown (ebrown@sherwoodpartners.com) for additional information and due
> diligence access.**

### (ii.)    <u>No Communications Among Acceptable Bidders.</u>

There must be no communications regarding the Debtor's sale process between and among Acceptable Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder), unless the Debtor has previously authorized such communication in writing. The Debtor reserves the right, in its reasonable business judgment and in consultation with the Consultation Parties, to disqualify any Acceptable Bidders that have communicated between and amongst themselves.

**E.      Bid Requirements.**

To be eligible to participate in the Auction, a Potential Bidder must deliver to the Debtor and its advisors, a written, irrevocable offer that must be determined by the Debtor, in its reasonable business judgment (in consultation with the Consultation Parties), to satisfy each of the following conditions (collectively, the "Bid Requirements"):

(i.)      **Purpose**. Each Potential Bidder must state that the Bid includes an offer by the Potential Bidder to purchase substantially all of the Assets and identify the Assets with reasonable specificity and the particular liabilities, if any, the Potential Bidder seeks to assume.

(ii.)     **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid for the Assets (the "Purchase Price") and must indicate the source of consideration, including funding commitments, and confirm that such consideration is not subject to any contingencies.  The Purchase Price must provide for (i) an aggregate amount of cash sufficient to pay all DIP Obligations (as defined in the DIP Order[4]) outstanding at the closing in full (which for the avoidance of doubt shall include the Roll-Up), (ii) the Prepetition Secured Indebtedness (to the extent such Prepetition Secured Indebtedness is not a DIP Obligation, and (iii) the payment of all cure amounts and all other amounts required to effect the assumption and assignment of all applicable executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code.

(iii.)    **Assumed Liabilities**. Provide for the assumption of at least the same assumed liabilities as set forth in the Stalking Horse Agreement.

(iv.)     **Minimum Bid**. The value of each Bid for all or substantially all of the Seller's Assets, as determined by the Debtor in its business judgment (in consultation with the Consultation Parties) must exceed: (a) the Stalking Horse Purchase Price set forth in the Stalking Horse Agreement, *plus* (b) the Expense Reimbursement payable to the Stalking Horse Bidder under the Stalking Horse Agreement, *plus* (c) the amount necessary to finance the Debtor's Chapter 11 Case from the date a Bid is selected as the Successful Bid  through the effective date of a confirmed plan of reorganization or other emergence from chapter 11 (the "Estate Funding Commitment"), and *plus* (d) the minimum Bid increment of $250,000 (collectively, a "Minimum Bid").  The Debtor and its advisors will determine, in their reasonable business judgment and in consultation with the Consultation Parties, the value of any assumed liabilities that differ from those included in the Stalking Horse Bid.

---

[4]      "DIP Order" means the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Noteholder, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* filed concurrently with the Motion and any final version of such order.

6

Each Bid seeking to acquire only a portion of the Debtor's Assets must have a value that in the Debtor's reasonable business judgment (in consultation with the Consultation Parties), either independently or in conjunction with one or more other Bids, exceeds the value that would be realized for such Assets pursuant to the Stalking Horse Bid.

**(v.)**     **Bid Deposit**. Each Bid must be accompanied by a cash deposit (made by wire transfer or certified or cashier's check) equal to 10% of the aggregate value of the cash and non-cash consideration of the Bid (the "Good Faith Deposit"), which will be held in a segregated account established by the Debtor.  To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the purchase price contemplated by such Qualified Bid, the Debtor reserves the right to require that such Qualified Bidder increase its Good Faith Deposit so that it equals 10% of the increased Purchase Price.

**(vi.)**    **Committed Financing**. If a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtor's satisfaction that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations (including any assumed liabilities and the Estate Funding Commitment) under its Bid.  Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, board of directors or credit committee or similar approvals, and shall have covenants, conditions and term and termination provisions acceptable to the Debtor.

**(vii.)**   **Good Faith Offer**. Each Bid must constitute a good faith, bona fide offer to purchase the Assets set forth in such Bid.

**(viii.)**  **Marked Agreement**. Each Bid must be accompanied by clean and duly executed transaction documents including, at a minimum, a draft purchase agreement, including the exhibits and schedules related thereto, and any related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the Sale, along with redlines of such agreements marked to reflect any amendments and modifications from the Stalking Horse Agreement and any other applicable transaction documents relating to the Stalking Horse Bid, which amendments and modifications may not be inconsistent with these Bidding Procedures. Each such draft purchase agreement (the "Proposed Agreement") must provide for payment in cash at closing of the Expense Reimbursement to the Stalking Horse Bidder.  A Bid must also contain a sale order based on, and marked against, the order approving the sale (the "Sale Order") (which will be provided by the Debtor to bidders prior to the Bid Deadline) to show any other proposed modifications to the Sale Order.  The documents contemplated by this subsection shall herein be referred to as the "Qualified Bid Documents."

7

**(ix.)** **Contracts and Leases; Employees**. Each Bid must identify an initial schedule of executory contracts and unexpired leases to be assumed and assigned to the Potential Bidder in connection with the Sale. Each Bid must identify with specificity (i) the party responsible for satisfying cure amounts and other amounts that have accrued under assumed and assigned contracts and leases after the Petition Date and prior to the Closing, including amounts that have accrued but not yet become due prior to the Closing, (ii) the Seller's leases to be assumed and assigned to the Potential Bidder; and (iii) which of the Debtor's employees or groups thereof will be offered employment with the Potential Bidder to the extent it is the Successful Bidder and the Closing occurs.

**(x.)** **No Contingencies**. A Bid must contain a clear statement that it is not conditioned on any contingency, including, among others, on obtaining any of the following (a) financing, (b) shareholder, board of directors, or other approvals, and/or (c) the outcome or completion of a due diligence review by the Potential Bidder.

**(xi.)** **Binding and Irrevocable**. A Potential Bidder's Bid must be irrevocable unless and until the Debtor accepts a higher Bid and such Potential Bidder is not selected as the Back-Up Bidder (as defined herein). In the event a Bid is chosen as the Back-Up Bid (as defined below), it must remain irrevocable until the Seller and the Successful Bidder consummate the Sale.

**(xii.)** **Joint Bids**. The Debtor will be authorized to approve joint Bids (Bids submitted on behalf of more than one Acceptable Bidder) in its reasonable discretion, on a case-by-case basis.

**(xiii.)** **Adequate Assurance Information**. Each Bid must be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the reasonable satisfaction of the Debtor, that such Potential Bidder (a) has the financial wherewithal and ability to consummate the acquisition of the Assets covered by the Bid (the "Closing"), and (b) can provide adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform, under any contracts that are proposed to be assumed and assigned to such party. Such evidence may also include audited and unaudited financial statements, tax returns, bank account statements and/or any other documentation that the Debtor further requests. The Bid must also identify a contact person that parties may contact to obtain additional Adequate Assurance Information.

**(xiv.)** **Identity**. Each Bid must fully disclose the identity of each entity that will be participating in connection with such Bid (including any equity owners or sponsors, if the purchaser is an entity formed for the purpose of consummating the acquisition of the Assets), and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties. A Bid must also fully disclose any connections or agreements with the

8

Debtor, any known, potential, prospective bidder, or Qualified Bidder (as defined herein), or any officer, director, or equity security holder of the Debtor.

**(xv.)** <u>**Authorization**</u>. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors and, if required, its shareholders (or a comparable governing body reasonably acceptable to the Debtor) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

**(xvi.)** <u>**No Fees**</u>. Except as otherwise provided in the Stalking Horse Agreement with respect to the Stalking Horse Bid: (a) each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction; (b) by submitting its Bid, each Potential Bidder agrees to waive its right to request or receive fees or reimbursement of expenses on any basis, including under section 503(b) of the Bankruptcy Code; and (c) each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement.

**(xvii.)** <u>**Adherence to Bidding Procedures**</u>. By submitting its Bid, each Potential Bidder is agreeing to (a) abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction and (b) serve as Back-Up Bidder, if its Bid is selected as the next highest or next best bid after the Successful Bid with respect to the applicable assets.

**(xviii.)** <u>**Regulatory Approvals and Covenants**</u>. A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the applicable Sale, if any, and the time period within which the Potential Bidder expects to receive such governmental, licensing, regulatory, or third-party approvals.

**(xix.)** <u>**Non Reliance**</u>. Each Bid must include a written acknowledgement and representation that the Potential Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets and liabilities prior to making its Bid, (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets and liabilities in making its Bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Potential Bidder's proposed purchase agreement for the Assets.

**(xx.)** <u>**Time Frame for Closing**</u>. A Bid by a Potential Bidder must be reasonably likely (based on experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame acceptable to the Debtor.

9

**(xxi.) Consent to Jurisdiction**. The Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Debtor's qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the Closing, as applicable.

**(xxii.) Damages**. A Bid must provide that the Debtor has the right to pursue all available damages in the event of the Bidder's breach of, or failure to perform under, the Proposed Agreement.

Bids fulfilling all of the preceding requirements, as determined by the Debtor and its advisors, in their reasonable business judgment and in consultation with the Consultation Parties, will be deemed to be "Qualified Bids," and those parties submitting Qualified Bids will be deemed to be "Qualified Bidders." The Debtor shall provide the Stalking Horse Bidder a copy of each Qualified Bid by no later than one (1) business day after the Bid Deadline. The Debtor reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid in order for such Bid to comply with the requirements for Qualified Bids as set forth herein.

The Debtor may request additional information from a Potential Bidder or Qualified Bidder at any time prior to or during the Auction to evaluate such bidder's ability to (a) bid at the Auction over and above its initial offer in its Qualified Bid, (b) consummate the Sale, and (c) fulfill its obligations in connection therewith. Each Potential Bidder or Qualified Bidder shall be obligated to provide such additional information within one (1) business day of receiving such requests as a condition to participating further in the Auction and Sale processes. The Debtor, in consultation with the Consultation Parties, may disqualify such Potential Bidder or Qualified Bidder if such party fails to comply with such requests.

For the avoidance of doubt, notwithstanding anything to the contrary herein, the Stalking Horse Bidder is a Qualified Bidder (and exempt from the Bid Requirements) and the Stalking Horse Bid is a Qualified Bid, which qualifies the Stalking Horse Bidder to participate in the Auction as a Qualified Bidder. If the Stalking Horse Bid is chosen as the Successful Bid, the rights and obligations of the Stalking Horse Bidder shall be as set forth in the Stalking Horse Agreement (as the same may be modified in connection with the Auction). If the Stalking Horse Bid is selected as the Back-Up Bid, it must remain irrevocable only for so long as is required under the Stalking Horse Agreement.

**F.    Determination of Qualified Bidders**.

As soon as practicable after the Bid Deadline, the Debtor and its advisors will determine, in consultation with the Consultation Parties, which Potential Bidders are Qualified Bidders and will notify the Potential Bidders whether Bids submitted constitute, alone or together with other Bids, Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. To the extent reasonably practicable, proposed counsel to the Debtor shall provide copies of the material terms of each Qualified Bid to the advisors of the Consultation Parties on a professionals' eyes only basis at least twenty-four (24) hours prior to the Auction; *provided* that any information regarding a bid may be withheld from the Consultation Parties or redacted to the extent that the Debtor determines, in its

10

reasonable business judgment, that sharing such information would be likely to have a negative impact on potential bidding or otherwise be contrary to the goal of maximizing value for the Debtor's estate from the sale process; *provided, further* that Debtor shall provide the Stalking Horse Bidder a copy of each Qualified Bid by no later than one (1) business day after the Bid Deadline.  Any Bid that is not deemed a Qualified Bid will not be considered by the Debtor.

**Qualified Bids must be received by each of the Debtor's advisors so as to be <u>actually received</u> no later than <u>July 14, 2026</u>.**

### G.    Evaluation of Qualified Bids.

Prior to the Auction, the Debtor and its advisors (in consultation with the Consultation Parties) will evaluate Qualified Bids and identify the Qualified Bid that is at least the Minimum Bid amount, and is in the Debtor's reasonable business judgment, the highest or otherwise best Bid (the "<u>Starting Bid</u>").  In determining the Starting Bid, the Debtor will take into account, among other things, (i) the amount and nature of consideration offered in each Qualified Bid, (ii) the impact on customers, vendors, and employees, including the number of employees proposed to be transferred, (iii) the execution risk attendant to any submitted Bids, (iv) the number, type, and nature of any changes to the Stalking Horse Agreement, if any, requested by the Qualified Bidder, including the type and obligations to be assumed in the Qualified Bid, (v) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Qualified Bid, (vi) the tax consequences of such Qualified Bid, (vii) the assumption of liabilities, including obligations under contracts and leases, and (viii) the cure amounts to be paid (collectively, the "<u>Evaluation Criteria</u>").  Not later than one (1) business day prior to the date of the Auction, the Debtor will (1) notify the Stalking Horse Bidder as to which Qualified Bid is the Starting Bid and (2) distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

If any Bid is determined by the Debtor not to be a Qualified Bid, the Debtor will refund such Potential Bidder's Good Faith Deposit and all accumulated interest thereon on or within ten (10) business days after the Bid Deadline, or as soon as reasonably practicable thereafter.

### H.    Sole Qualified Bid.

If no Qualified Bids, other than the Stalking Horse Bid, are received by the Bid Deadline, then the Auction will not occur, the Stalking Horse Bidder will be deemed the Successful Bidder, and the Debtor will pursue entry of an order by the Bankruptcy Court approving the Stalking Horse Agreement and authorizing the Sale to the Stalking Horse Bidder at the Sale Hearing (as defined herein).

11

**I.    Credit Bidding and Credit Bid Backup Bid.**

At the Auction, any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtor's' estate (a "Secured Creditor") shall have the right to credit bid all or a portion of such Secured Creditor's allowed claims pursuant to section 363(k) of the Bankruptcy Code; *provided* that a credit bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected and unavoidable liens on any Assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment) including, for the avoidance of doubt, the DIP Obligations and the Prepetition Secured Indebtedness; *provided, further*, that any Secured Creditor that intends to participate in the Auction with a Bid that includes a credit bid shall, as a condition to such participation, (i) notify the Debtor at least five (5) calendar days prior to the Bid Deadline that it intends to submit a credit bid, and (ii) provide all documentation requested by the Debtor to establish the lien, claims, and encumbered assets that will be the subject of the Secured Creditor's potential credit bid.  For the avoidance of doubt, a Secured Creditor shall be required to provide cash consideration in respect of any Assets to be acquired but do not constitute collateral securing such Secured Creditor's claim(s).

For the further avoidance of doubt, the requirements of the immediately preceding paragraph shall not apply to the Stalking Horse Bidder and to the fullest extent permissible under Section 363(k) of the Bankruptcy Code, the Stalking Horse Bidder may credit bid as set forth in the Stalking Horse Agreement and at the Auction, in its sole and absolute discretion, any of (i) the DIP Obligations (as defined in the Stalking Horse Agreement) held by the Stalking Horse Bidder, and (b) the Prepetition Secured Indebtedness (as defined in the DIP Motion) held by the Stalking Horse Bidder, (the "Credit Bid").

**J.    Auction.**

If one or more Qualified Bids (other than the Stalking Horse Bid) is received by the Bid Deadline, the Debtor will conduct the Auction with respect to the Debtor's Assets.  The Auction will commence on **July 17, 2026, at 10:00 a.m., prevailing Eastern Time,** at the offices of Cole Schotz P.C., telephonically, or by video via Zoom, or such later time or other place as the Debtor will timely notify all other Qualified Bidders.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

(i)     the Auction will be conducted openly;

(ii)    only the Qualified Bidders, including the Stalking Horse Bidder, will be entitled to bid at the Auction;

(iii)   the Qualified Bidders, including the Stalking Horse Bidder, must appear, telephonically, or by video via Zoom, or through duly authorized representatives who have actual and documented authority to bind the Qualifier Bidders at the Auction;

(iv)    only the duly authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder) will be permitted to participate in the Auction and the Consultation Parties, and the U.S. Trustee and all creditors will be permitted to attend the Auction; *provided* that any party in interest may request permission to attend the Auction, and the Debtor may permit such party to attend the Auction;

(v)    bidding at the Auction will begin at the Starting Bid;

(vi)    subsequent Bids at the Auction, including any Bids by any Stalking Horse Bidder, must be made in minimum increments of $250,000 (or such other amount as the Debtor may determine) of additional value, if applicable (such Bid, an "Overbid");

(vii)    an Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtor's estate than any prior Qualified Bid or Overbid, as determined in the Debtor's reasonable business judgment and after consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures;

(viii)    each Qualified Bidder will be informed of the terms of the previous Bids and the Debtor shall, during the course of the Auction, promptly inform each Qualified Bidder of which subsequent Bids reflect, in the Debtor's reasonable business judgment (in consultation with the Consultation Parties), the highest or otherwise best bid(s) for the Assets;

(ix)    the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

(x)    each Qualified Bidder will be required to confirm on the record at the commencement of the Auction and again at the conclusion of the Auction that it has not engaged in any collusion with the Debtor, any other Qualified Bidder or any other person or entity regarding these Bid Procedures, the Auction, any bid for the Assets, or any proposed transaction relating to the Assets;

(xi)    the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then prevailing highest or otherwise best Bid;

(xii)    the Debtor reserves the right, in its reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Debtor and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment, may require to establish that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

(xiii) the Auction will be governed by such other Auction Procedures as may be announced by the Debtor and its advisors, in consultation with the Consultation Parties, from time to time on the record at the Auction; *provided that* such other Auction Procedures are (a) not inconsistent with the Bidding Procedures Order, the Bankruptcy Code, or any other order of the Bankruptcy Court, (b) disclosed orally or in writing to all Qualified Bidders and other attendees at the Auction and recorded on the record, and (c) determined by the Debtor (in consultation with the Consultation Parties), in good faith, to further the goal of attaining the highest or otherwise best offer for the Assets.

To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, and (ii) to the extent a Qualified Bidder fails to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtor, in its reasonable business judgment and in consultation with the Consultation Parties, such Qualified Bidder shall be disqualified from continuing to participate in the Auction.

For the avoidance of doubt, nothing in the Bidding Procedures, including, without limitation, the Auction Procedures, prevents the Debtor from exercising its fiduciary duties under applicable law (as reasonably determined in good faith by the Debtor in consultation with its outside legal counsel).

### K.      Acceptance of the Successful Bid or Successful Bids.

The Debtor, in the exercise of its reasonable business judgment and in consultation with the Consultation Parties, will identify the highest or otherwise best Qualified Bid for the Assets (the "Successful Bid," and the person or entity submitting a Successful Bid, the "Successful Bidder"), which will be determined by considering, among other things, (a) the total expected consideration to be received by the Debtor, (b) the Qualified Bidder's ability to close a transaction and the timing thereof (including any anticipated delays to Closing and the cost to the Debtor of such delays), and other matters affecting the execution risk associated with a particular Bid, (c) the expected net benefit to the estate, (d) the impact on customers, vendors, and employees, (e) if applicable, the certainty of the Debtor being able to confirm a plan, and (f) any other criteria, including the Evaluation Criteria, as may be considered by the Debtor in its reasonable business judgment (in consultation with the Consultation Parties).  The Successful Bidder or Successful Bidders and the Debtor shall, as soon as commercially reasonably practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which such Successful Bid was made.  The Auction shall close when the Successful Bidder and Debtor execute all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which such Successful Bid was made.

The Debtor shall file a notice in substantially the form annexed to the Bidding Procedures Order as **Exhibit 4** (the "Notice of Successful Bidder") identifying the Successful Bidder and attaching the proposed asset purchase agreement with the Successful Bidder, no later than one Business Day after the conclusion of the Auction.  Such Notice of Successful Bidder shall also

14

identify the Back-Up Bidder and contain either (i) a summary of the material terms of the Back-Up Bid or (ii) proposed asset purchase agreement with the Back-Up Bidder.

If an Auction is held, the Debtor will be deemed to have accepted a Qualified Bid only when such Qualified Bid is declared a Successful Bid at the Auction.  Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and entry of an order approving such Successful Bid (the "Sale Order").

**L.      Sale Hearing.**

The Sale Hearing will be held before the Bankruptcy Court to consider approval of the Successful Bid or Successful Bids, pursuant to which the Seller and the Successful Bidder will consummate the Sale, on **July 29, 2026, at [●]:[●]0 [●].m., prevailing Eastern Time**, before the Bankruptcy Court.  If an Auction is held, the Debtor will present the results of the Auction to the Bankruptcy Court at the Sale Hearing, at which certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (a) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, and (c) consummation of the Successful Bid will provide the highest or otherwise best value for the Debtor's Assets and is in the best interests of the Debtor's estate.

**The Sale Hearing may be continued to a later date by the Debtor by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

**M.      Designation of Back-Up Bidder(s).**

If for any reason the Successful Bidder fails to consummate the Qualified Bid within the time permitted after the entry of the Sale Order, then the Qualified Bidder(s) with the next-highest or otherwise second-best Bid (or combination of Bids) for the Assets (a "Back-Up Bidder"), as determined by the Debtor after consultation with its advisors, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid (a "Back-Up Bid"), and the Debtor will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid as soon as commercially reasonably practicable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court.

Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid must remain open until the earlier of (i) the Closing of the Successful Bid and (ii) any termination date with respect to the Back-Up Bid as set forth in the Stalking Horse Agreement or the purchase agreement with any other Back-Up Bidder.

15

**N.      Return of Good Faith Deposit to Qualified Bidders that Submit Qualified Bids.**

The Good Faith Deposit of the Successful Bidder will, upon consummation of the Successful Bid, become property of the Debtor's estate and be credited to the portion of the Purchase Price, subject to the terms and conditions of the purchase agreement(s) with the Successful Bidder or Back-Up Bidder, as applicable.  If the Successful Bidder (or Back-Up Bidder) fails to consummate the Successful Bid (or Back-Up Bid), then the Good Faith Deposit of such Successful Bidder (or Back-Up Bidder) will be irrevocably forfeited to the Debtor and may be retained by the Debtor as damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtor, in each case, subject to the terms and conditions of the purchase agreement(s) with the Successful Bidder or Back-Up Bidder, as applicable.

The Good Faith Deposit of any unsuccessful Qualified Bidders (except for the Back-Up Bidder) will be returned within the earlier of five (5) business days after the conclusion of the Auction or upon the permanent withdrawal of the proposed Sale of the Seller's Assets.  The Good Faith Deposit of the Back-Up Bidder, if any, will be returned to such Back-Up Bidder no later than five business days after the Closing with the Successful Bidder.

Except as set forth in the first paragraph of this subsection, all deposits shall be held in a segregated account maintained by the Debtor and at no time shall be deemed property of the Debtor's estate absent further order of the Bankruptcy Court.

**O.      Reservation of Rights.**

The Debtor reserves its rights to modify, in consultation with the Consultation Parties and with the consent of the Stalking Horse Bidder only until the commencement of the Auction, these Bidding Procedures in good faith, including by setting procedures for an Auction, to further the goal of attaining the highest or otherwise best offer for the Assets, or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.  The Debtor shall provide notice of any such modification to any Qualified Bidder, including the Stalking Horse Bidder.

All parties expressly reserve all of their rights (and do not waive any such rights) to seek Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, the Sale, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

**P.      Consent to Jurisdiction.**

All Qualified Bidders at the Auction will be deemed to have consented to the jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Sale, the Auction, and/or the construction and enforcement of these Bidding Procedures, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to a Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Bankruptcy Court on an expedited basis.

**Q.      Sale Is As Is/Where Is.**

The Assets sold pursuant to these Bidding Procedures will be conveyed at the Closing in their then present condition, "as is, with all faults, and without any warranty whatsoever, express or implied," except as otherwise expressly provided in the purchase agreement with the Successful Bidder.  Except as otherwise provided in the applicable purchase agreements, all of the Seller's right, title and interest in and to the Assets shall be sold free and clear of all Interests in accordance with sections 363 and 365 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the Sale of the Assets.

**R.      Modifications**.

The Bid Procedures may be modified by the Debtor, after timely consultation with the Stalking Horse Bidder, in any manner that is not inconsistent with or otherwise in contravention of the other terms of these Bid Procedures or the Bid Procedures Order, including, without limitation, (a) imposing additional terms and conditions with respect to any or all bidders, (b) extending the deadlines set forth herein or the date for the Auction and/or Sale Hearing (which may occur in open court); or (c) amending the Bid Procedures as they may determine to be in the best interests of the Debtor's estate; *provided that* all such modifications are disclosed to all Potential Bidders (if applicable) or Qualified Bidders (if applicable) on the record prior to or during the Auction; *provided further that* any actions taken by the Debtor under this subsection shall not be deemed to be waivers of any terms, conditions, defaults or events of default set forth in the DIP Note (as defined in the DIP Order), the DIP Order, or Stalking Horse Agreement, and nothing herein shall prevent the Stalking Horse Bidder from exercising any of its rights and remedies under the Stalking Horse Agreement.  The Bankruptcy Court has exclusive jurisdiction with respect to any dispute that may arise with respect to these Bid Procedures.

*      *      *      *      *

17

## **Exhibit 2**

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SiFi Networks America, LLC, | Case No. 26-10912 (___) |
| Debtor.[1] | |

## NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtor and debtor in possession (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Court") on [●], 2026 (the "Petition Date").

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2026, the Debtor filed *Debtor's Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Approving the Sale of Substantially All of the Debtor's Assets, (VII) Authorizing the Debtor's Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (VIII) Granting Related Relief* [Docket No. [●] (the "Motion").[2, 3]

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2026, the Court entered an order [Docket No. [●]] (the "Bidding Procedures Order") granting certain of the relief sought in the Motion, including, among other things, (i) authorizing and approving sale and bidding procedures (the "Bidding Procedures"), (ii) scheduling certain dates and deadlines in connection with the Sale, including the Bid Deadline, Auction, Sale Hearing, (iii) approving the form and manner of (1) notice of the Auction and Sale Hearing (the "Sale Notice"), (2) notice of the Assumption Procedures (the "Assumption Notice"), and (3) notice of Successful Bidder and Back-Up Bidder (the "Notice of Successful Bidder"), (iv) approving procedures for assuming and assigning executory contracts and unexpired leases and certain related notices, including notice of proposed cure amounts, (v) approving the terms of the Stalking Horse Agreement, including the bid protections, (vi) and granting related relief approving the terms of the Stalking Horse Agreement, including the bid

---

[1]   The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990).  The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3]   The Stalking Horse Bidder is the Debtor's (i) DIP Lender and (ii) prepetition secured lender.  SiFi Networks America Ltd. ("SNA Ltd") is the parent of the Debtor.  In April 2026, SNA Ltd was acquired by PATRIZIA, a German infrastructure investment manager.  The Stalking Horse Bidder is an affiliate of PATRIZIA.

protections.  All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[4]

## CONTACT PERSON FOR PARTIES INTERESTED IN SUBMITTING A BID

The Bidding Procedures set forth the requirements for becoming a Qualified Bidder and submitting a Qualified Bid.  Any party interested in making an offer to purchase the Assets must comply strictly with the Bidding Procedures.  Only Qualified Bids will be considered by the Debtor, in accordance with the Bidding Procedures.

**Any interested bidder should contact, as soon as possible:**

i. proposed counsel to the Debtor, Cole Schotz P.C., 500 Delaware Avenue, Suite 600, Wilmington, DE 19801, Attn: Daniel F.X. Geoghan (dgeoghan@coleschotz.com), Jacob S. Frumkin (jfrumkin@coleschotz.com), and Michael E. Fitzpatrick (mfitzpatrick@coleschotz.com); and

ii. the Debtor's proposed sales agent, Sherwood Partners, Inc., 3945 Freedom Circle , Suite 520, Santa Clara, CA 95054, Attn: Jarod Wada (jwada@sherwoodpartners.com) and Eric Brown (ebrown@sherwoodpartners.com).

## OBTAINING ADDITIONAL INFORMATION

Copies of the Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Agreement and all other documents filed with the Court, are available free of charge on the Debtor's case information website, located at https://cases.stretto.com/SiFiNetworks.

## IMPORTANT DATES AND DEADLINES[5]

| Event or Deadline | Proposed Date and Time (all times in the prevailing Eastern Time) |
|---|---|
| Deadline to File and Serve Sale Notice | July 2, 2026 |
| Deadline to Publish Sale Notice | July 2, 2026 |
| Deadline to File and Serve Assumption Notice | July 2, 2026 |
| Contract Objections Deadline | 4:00 p.m. (ET) on the date that is 14 days after the service of the Assumption Notice |
| Bid Deadline | July 14, 2026 |

---

[4]    To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

[5]    The following dates and deadlines may be extended by the Debtor or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

| Event or Deadline | Proposed Date and Time (all times in the prevailing Eastern Time) |
|---|---|
| Notice of Successful Bidder and Cancellation of Auction (if no Auction) | July 15, 2026 |
| Auction (if Qualified Bids received) | July 17, 2026 at 10:00 a.m. (ET) |
| Deadline to File Notice of Successful Bidder and Back-Up Bidder | July 20, 2026 |
| Sale Objection Deadline | July 22, 2026 at 4:00 p.m. (ET) |
| Debtor's Response to Objections, if any | July 24, 2026 at 4:00 p.m. (ET) |
| Sale Hearing | July 29, 2026 |

1.       **Bid Deadline**. The deadline to submit a Qualified Bid is **July 14, 2026**.

2.       **Auction**. If one or more Qualified Bids is received by the Bid Deadline, the Debtor will conduct the Auction with respect to the Debtor's Assets.  The Auction will commence on **July 17, 2026, at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Cole Schotz P.C., telephonically, or by video via Zoom, or such later time or other place as the Debtor will timely notify all Qualified Bidders.  The Auction is open to all creditors and the U.S. Trustee to attend.  However, only Qualified Bidders or their representatives and advisors may participate.  **All interested or potentially affected parties should carefully review the Bidding Procedures and the Bidding Procedures Order.**

3.       **Objection Deadlines**. The deadline to file an objection to the Sale, including the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code (a "Sale Objection") is **July 22, 2026 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline").  The deadline to file an objection to the potential assumption or assumption and assignment of the Assigned Contracts and Cure Amounts related thereto (a "Contract Objection") (except as otherwise set forth in the Assumption Procedures) is **4:00 p.m. (prevailing Eastern Time)** on the date that is 14 days after the service of the Assumption Notice (the "Contract Objections Deadline").  The deadline to file any Contract Objections solely on the basis of adequate assurance of future performance by a Successful Bidder and/or Back-Up Bidder other than the Stalking Horse Bidder (an "Adequate Assurance Objection") is the Sale Hearing (the "Adequate Assurance Objections Deadline").

4.       **Sale Hearing**.  A hearing (the "Sale Hearing") to consider approval of the proposed Sale **free and clear of all liens, claims, interests and encumbrances** will be held on **July 29, 2026 at __:00 __.m. (prevailing Eastern Time)** before The Honorable [●], Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, at District of Delaware, at 824 Market Street North, ___ Floor, Wilmington, Delaware 19801, or at such other place (which may be by video conference) and time as the Debtor shall notify all Qualified Bidders and all other parties entitled to attend the Auction.  The Debtor has the right to adjourn or cancel the Auction at or prior to the Auction.

3

**FILING OBJECTIONS**

Sale Objections, Contract Objections, and Adequate Assurance Objections, if any, must (a) be in writing; (b) state, with specificity, the legal and factual bases thereof; (c) be filed with the Court by no later than the applicable deadlines stated above, as applicable; and (d) served so as to be actually received by: (i) proposed counsel to the Debtor, Cole Schotz P.C., 500 Delaware Avenue, Suite 600, Wilmington, DE 19801, Attn: Daniel F.X. Geoghan (dgeoghan@coleschotz.com) and Jacob S. Frumkin (jfrumkin@coleschotz.com); (ii) counsel to the Stalking Horse Bidder and DIP Lender, counsel to the DIP Lender and Stalking Horse Bidder, (a) Clifford Chance US LLP, Two Manhattan West, 375 9th Avenue, New York, New York 10001, Attn: David Feldman (David.Feldman@cliffordchance.com) and Matthew L. Hinker (Matthew.Hinker@cliffordchance.com), (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Sean M. Beach (sbeach@ycst.com); (iii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jon Lipshie (Jon.Lipshie@usdoj.gov); and (iv) counsel to any statutory committee appointed in this case.

**CONSEQUENCES OF FAILING TO TIMELY
AND PROPERLY ASSERT AN OBJECTION**

*Any party who fails to make a timely and proper Sale Objection on or before the Sale and Contract Objections Deadline in accordance with the Bidding Procedures Order and this Notice shall be forever barred from asserting any Sale Objection, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.*

*Any party who fails to make a timely and proper Contract Objection on or before the Sale Objection Deadline or the Contract Objections Deadline in accordance with the Bidding Procedures Order and this Notice shall be forever barred from asserting any Sale Objection or Contract Objection, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.*

*Any party who fails to make a timely and proper Adequate Assurance Objection on or before the Auction and Adequate Assurance Objections Deadline in accordance with the Bidding Procedures Order and this Notice shall be forever barred from asserting any Adequate Assurance Objection, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.*

**NO SUCCESSOR LIABILITY**

*The Sale will be free and clear of, among other things, any claim arising from any conduct of the Debtor prior to the closing of the Sale, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such claim arises out of or relates to events occurring prior to the closing of the Sale. Accordingly, as a result of the Sale, the Successful Bidder will not be a successor to the Debtor by reason of any theory of law or equity, and the Successful Bidder will have no liability, except as expressly provided in the Successful Bidder's asset purchase agreement, for any liens, claims, encumbrances and other interests against or in the Debtor under any theory of law, including successor liability theories.*

4

Dated: _____ \_\_, 2026          **COLE SCHOTZ P.C.**
      Wilmington, Delaware

                                             */s/ DRAFT*

Patrick J. Reilley (No. 4451)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
preilley@coleschotz.com
mfitzpatrick@coleschotz.com

-and-

Daniel F.X. Geoghan (*pro hac vice* admission pending)
Jacob S. Frumkin (*pro hac vice* admission pending)
Mark Tsukerman (*pro hac vice* admission pending)
Tejal Majethia (*pro hac vice* admission pending)
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
dgeoghan@coleschotz.com
jfrumkin@coleschotz.com
mstukerman@coleschotz.com
tmajethia@coleschotz.com

*Proposed Counsel for Debtor and*
*Debtor in Possession*

**Exhibit 3**

**Assumption Notice**

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SiFi Networks America, LLC, | Case No. 26-10912 (___) |
| Debtor.[1] | |

**NOTICE OF POTENTIAL ASSUMPTION OF EXECUTORY
CONTRACTS OR UNEXPIRED LEASES AND CURE AMOUNTS**

**PLEASE TAKE NOTICE** that the above-captioned debtor and debtor in possession (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Court") on [●], 2026 (the "Petition Date").

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2026, the Debtor filed *Debtor's Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Approving the Sale of Substantially All of the Debtor's Assets, (VII) Authorizing the Debtor's Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (VIII) Granting Related Relief* [Docket No. [●] (the "Motion")[2]

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2026, the Court entered an order [Docket No. [●]] (the "Bidding Procedures Order") granting certain of the relief sought in the Motion, including, among other things, (i) authorizing and approving sale and bidding procedures (the "Bidding Procedures"), (ii) scheduling certain dates and deadlines in connection with the Sale, including the Bid Deadline, Auction, Sale Hearing, (iii) approving the form and manner of (1) notice of the Auction and Sale Hearing (the "Sale Notice"), (2) notice of the Assumption Procedures (the "Assumption Notice"), and (3) notice of Successful Bidder and Back-Up Bidder (the "Notice of Successful Bidder"), (iv) approving procedures for assuming and assigning executory contracts and unexpired leases and certain related notices, including notice of proposed cure amounts, (v) approving the terms of the Stalking Horse Agreement, including the bid protections, (vi) and granting related relief approving the terms of the Stalking Horse Agreement, including the bid protections.[3]

---

[1]    The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990).  The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3]    To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

**PLEASE TAKE FURTHER NOTICE** that the Bidding Procedures Order, among other things, established procedures for (a) the assumption of certain executory contracts and unexpired leases that the Debtor believes it might seek to assume and assign to the Stalking Horse Bidder or another Successful Bidder in connection with a Sale (collectively, the "Assigned Contracts") and (b) the determination of related Cure Payments (as defined below).  The Debtor is a party to numerous Assigned Contracts and, in accordance with the Bidding Procedures Order, hereby file this notice identifying (x) the Assigned Contracts, which may be assumed and assigned to the Stalking Horse Bidder or another Successful Bidder in connection with a Sale, if one occurs and (y) the proposed amounts, if any, the Debtor believes are owed to the counterparty to the Assigned Contract to cure any defaults or arrears existing under the Assigned Contract (the "Cure Payments"), both as set forth on **Exhibit 1** attached hereto. Other than the Cure Payments listed on **Exhibit 1**, the Debtor is not aware of any amounts due and owing under the Assigned Contracts listed therein.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A CONTRACT OR LEASE THAT MAY BE ASSUMED AND ASSIGNED AS PART OF THE SALE**. *The presence of an Assigned Contract listed on Exhibit 1 attached hereto does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed and assigned as part of the Sale.  The Debtor reserves all of its rights, claims and causes of action with respect to the Assigned Contracts listed on Exhibit 1 attached hereto.  The assumption and assignment of the contracts and leases on the Assigned Contracts List is not guaranteed and is subject to approval by the Court and the Debtor's or Successful Bidder's right to remove from the Assigned Contracts List.*

Pursuant to the Assumption Procedures, objections to the proposed assumption and assignment of an Assigned Contract (a "Contract Objection"), including any objection relating to the Cure Payment or adequate assurance of the Stalking Horse Bidder's future ability to perform, must (a) be in writing; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (c) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under Bankruptcy Code sections 365(b)(1)(A) and (B) for the applicable Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto; (d) be served: (i) proposed counsel to the Debtor, Cole Schotz P.C., 500 Delaware Avenue, Suite 600, Wilmington, DE 19801, Attn: Daniel F.X. Geoghan (dgeoghan@coleschotz.com) and Jacob S. Frumkin (jfrumkin@coleschotz.com); (ii) counsel to the Stalking Horse Bidder and DIP Lender counsel to the DIP Lender and Stalking Horse Bidder, (a) Clifford Chance US LLP, Two Manhattan West, 375 9th Avenue, New York, New York 10001, Attn: David Feldman (David.Feldman@cliffordchance.com) and Matthew L. Hinker (Matthew.Hinker@cliffordchance.com), (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Sean M. Beach (sbeach@ycst.com); (iii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jon Lipshie (Jon.Lipshie@usdoj.gov); and (iv) counsel to any statutory committee appointed in this case (the parties identified in (i) through (iv), collectively, the "Objection Notice Parties"); and (e) be filed with the Clerk of the Court and

served by **4:00 p.m., prevailing Eastern Time on the date that is 14 days after service of this Assumption Notice.**

*If a counterparty to a assigned contract files a Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing, such later hearing date that the Debtor determines in its discretion, or such other date determined by the Court and in consultation with the Successful Bidder and the Consultation Parties (subject to the Court's availability). All other objections to the proposed assumption or proposed assumption and assignment of the Debtor's right, title, and interest in, to, and under the Assigned Contracts will be heard at the Sale Hearing.*

**PLEASE TAKE FURTHER NOTICE** that although the Debtor has made a good-faith effort to identify all Assigned Contracts that might be assumed and assigned in connection with a Sale, the Debtor or the Successful Bidder may identify certain other executory contracts that should be assumed and assigned in connection with a Sale. Accordingly, the Debtor has reserved the right up until two (2) business days prior to the closing of any Sale, to (i) add any previously omitted Assigned Contracts to the Assigned Contracts List as contracts that may be assumed and assigned to a Successful Bidder in accordance with the definitive documentation for the Sale, (ii) modify the previously stated Cure Payment associated with any Assigned Contract; and/or (iii) remove any Assigned Contract from the Assigned Contracts List that a Successful Bidder proposes to be assumed and assigned in connection with the Sale.

<u>**OBTAINING ADDITIONAL INFORMATION**</u>

Copies of the Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Agreement and all other documents filed with the Court, are available free of charge on the Debtor's case information website, located at <u>https://cases.stretto.com/SiFiNetworks</u>.

<u>**CONSEQUENCES OF FAILING TO TIMELY**</u>
<u>**AND PROPERLY ASSERT AN OBJECTION**</u>

*UNLESS YOU FILE AN OBJECTION TO THE CURE AMOUNT AND/OR THE ASSUMPTION OR ASSIGNMENT OF YOUR CONTRACT OR LEASE IN ACCORDANCE WITH THE INSTRUCTIONS AND DEADLINES SET FORTH HEREIN, YOU SHALL BE (A) BARRED FROM OBJECTING TO THE CURE AMOUNT SET FORTH ON <u>EXHIBIT 1</u>, (B) ESTOPPED FROM ASSERTING OR CLAIMING ANY CURE AMOUNT AGAINST THE DEBTOR, THE STALKING HORSE BIDDER OR SUCH OTHER SUCCESSFUL BIDDER THAT IS GREATER THAN THE CURE AMOUNT SET FORTH ON <u>EXHIBIT 1</u>, AND (C) DEEMED TO HAVE CONSENTED TO THE ASSUMPTION AND/OR ASSIGNMENT OF YOUR CONTRACT OR LEASE.*

[*Remainder of Page Intentionally Left Blank*]

3

Dated: _____ __, 2026
       Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ DRAFT*_____
Patrick J. Reilley (No. 4451)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
preilley@coleschotz.com
mfitzpatrick@coleschotz.com

-and-

Daniel F.X. Geoghan (*pro hac vice* admission pending)
Jacob S. Frumkin (*pro hac vice* admission pending)
Mark Tsukerman (*pro hac vice* admission pending)
Tejal Majethia (*pro hac vice* admission pending)
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
dgeoghan@coleschotz.com
jfrumkin@coleschotz.com
mstukerman@coleschotz.com
tmajethia@coleschotz.com

*Proposed Counsel for Debtor and
Debtor in Possession*

**Exhibit 4**

**Notice of Successful Bidder**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SiFi Networks America, LLC, | Case No. 26-10912 (___) |
| Debtor.[1] | |

**NOTICE OF SUCCESSFUL BIDDER AND BACK-UP BIDDER
WITH RESPECT TO THE AUCTION OF THE DEBTOR'S ASSETS**

**PLEASE TAKE NOTICE** that, on [●], 2026, the Court entered an order [Docket No. [●]] (the "Bidding Procedures Order") granting certain of the relief sought in the Motion, including, among other things, approving the (a) Stalking Horse Agreement and related bid protections, (b) Bidding Procedures, which establish the key dates and times related to the Sale and the Auction, and (c) Assumption Procedures.

**PLEASE TAKE FURTHER NOTICE** that on **[●]**, 2026, pursuant to the Bidding Procedures Order, the Debtor conducted the Auction with respect to the Assets.

**PLEASE TAKE FURTHER NOTICE** that, at the conclusion of the Auction, the Debtor selected the following Successful Bidder and Back-Up Bidder with respect to the Assets:

| Asset(s) | Successful Bidder | Back-Up Bidder |
|---|---|---|
| | | |
| | | |

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing to consider approval of (i) the Sale, (ii) transfer of the Assets to the Successful Bidder, **free and clear of all liens, claims, interests, and encumbrances**, in accordance with section 363(f) of the Bankruptcy Code, and (iii) approval of the releases contemplated by the asset purchase agreement, will be held before The Honorable _____, Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, at District of Delaware, at 824 Market Street North, ___ Floor, Wilmington, Delaware 19801, or pursuant to the Court's hearing procedures on **[●], 2026 at __:00 __.m. (prevailing Eastern Time)**. The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court or by notice filed on the docket in the Chapter 11 Case.

**PLEASE TAKE FURTHER NOTICE** that any objections (a) to the identity of the Successful Bidder or the Back-Up Bidder, and/or (b) the ability of the Successful Bidder or Back-

---

[1]  The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990).  The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

Up Bidder (other than the Stalking Horse Bidder) to provide adequate assurance of future performance to counterparties to executory contracts and unexpired leases contemplated to be assumed and assigned must be filed with the Court and served on the Objection Notice Parties (defined below) so as to be received no later than **July 22, 2026, at 4:00 p.m. prevailing Eastern Time.**

**PLEASE TAKE FURTHER NOTICE** that the "Objection Notice Parties" are: (i) proposed counsel to the Debtor, Cole Schotz P.C., 500 Delaware Avenue, Suite 600, Wilmington, DE 19801, Attn: Daniel F.X. Geoghan (dgeoghan@coleschotz.com) and Jacob S. Frumkin (jfrumkin@coleschotz.com); (ii) counsel to the Stalking Horse Bidder and DIP Lender, counsel to the DIP Lender and Stalking Horse Bidder, (a) Clifford Chance US LLP, Two Manhattan West, 375 9th Avenue, New York, New York 10001, Attn: David Feldman (David.Feldman@cliffordchance.com) and Matthew L. Hinker (Matthew.Hinker@cliffordchance.com), (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Sean M. Beach (sbeach@ycst.com); (iii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jon Lipshie (Jon.Lipshie@usdoj.gov); and (iv) counsel to any statutory committee appointed in this case.

**PLEASE TAKE FURTHER NOTICE** that, at the Sale Hearing, the Debtor will seek Court approval of the Successful Bid, and the assumption and assignment of the Assigned Contracts (as defined in the Bidding Procedures Order) to the Successful Bidder. Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the sale of the Debtor's Assets and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder cannot or refuses to consummate the Sale because of the breach or failure on the part of the Successful Bidder, the Back-Up Bidder will be deemed the new Successful Bidder and the Debtor shall be authorized, but not required, upon approval of the Back-Up Bid following notice and a hearing, to close with the Back-Up Bidder on the Back-Up Bid upon further order of the Court.

**PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the terms and conditions of the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict, and the Debtor encourages parties in interest to review the Bidding Procedures Order in its entirety. Parties with questions regarding this Notice should contact the Debtor's counsel at the contact information provided herein.

**PLEASE TAKE FURTHER NOTICE** that parties interested in receiving more information regarding the contemplated sale and/or copies of any related documents may visit the websites maintained by Stretto, Inc., the Debtor's claims and noticing agent, at https://cases.stretto.com/SiFiNetworks.

[*Remainder of Page Intentionally Left Blank*]

2

Dated: _____ __, 2026                    **COLE SCHOTZ P.C.**
       Wilmington, Delaware

*/s/ DRAFT*
Patrick J. Reilley (No. 4451)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
preilley@coleschotz.com
mfitzpatrick@coleschotz.com

-and-

Daniel F.X. Geoghan (*pro hac vice* admission pending)
Jacob S. Frumkin (*pro hac vice* admission pending)
Mark Tsukerman (*pro hac vice* admission pending)
Tejal Majethia (*pro hac vice* admission pending)
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
dgeoghan@coleschotz.com
jfrumkin@coleschotz.com
mstukerman@coleschotz.com
tmajethia@coleschotz.com

*Proposed Counsel for Debtor and*
*Debtor in Possession*

3

**Exhibit 5**

**Stalking Horse Agreement**

*Execution Version*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of [•], 2026, is made subject to the conditions set forth herein and is entered into by and between ArcLink Fiber LLC, a Delaware limited liability company ("**Buyer**"), and SiFi Networks America, LLC, a Delaware limited liability company, ("**Seller**"). Buyer and Seller are referred to herein individually as a "**Party**" and collectively as the "**Parties**."  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article XI.

## RECITALS

[**WHEREAS**, on [June __], 2026, Seller filed a voluntary petition for relief (the "**Chapter 11 Case**") under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), case number [•] (the "**Bankruptcy Case**");][1] and

**WHEREAS**, Buyer desires to purchase the Purchased Assets (defined below) from Seller, and Seller desires to sell, assign, and transfer to Buyer the Purchased Assets, in a sale authorized by the Bankruptcy Court free and clear of all Liens (defined below) pursuant to, *inter alia*, sections 105, 363, and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement, subject to entry of a final, non-appealable order in form and substance satisfactory to Buyer (it being understood and agreed that if the Sale Order requires Buyer to assume, pay or otherwise become responsible for any liabilities of Seller that do not constitute Assumed Liabilities as expressly defined herein, then such Sale Order shall not be satisfactory to Buyer) by the Bankruptcy Court approving this Agreement and the transactions contemplated hereby (the "**Sale Order**").

**NOW, THEREFORE**, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF THE PURCHASED ASSETS

1.1     Purchase and Sale of the Purchased Assets. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Seller shall sell, assign, transfer and deliver to Buyer (or one or more of its designees), and Buyer (or one or more of its designees) shall purchase, acquire, and accept from Seller, all of Seller's rights, title, and interest in and to the Purchased Assets, free and clear of all Liens (except for Liens supporting the Assumed Liabilities expressly set forth in Schedule 1.3 and Liens expressly set forth in the Sale Order). The "**Purchased Assets**" means all of the following assets of Seller, other than the Excluded Assets (defined below):

---

[1] Note to Draft: To be confirmed, pending filing of the petition.

(a)      all equipment, furniture and fixtures listed on Schedule 1.1(a);

(b)      all Assumed Contracts or other rights that have been assumed by and assigned to Buyer pursuant to Section 1.5;

(c)      all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, entitlements, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) in each case related to any other Purchased Asset or any of the Assumed Liabilities, all Avoidance Actions, and all claims and causes of action of Seller as of the Closing Date related to any other Purchased Asset or any of the Assumed Liabilities, including rights of set-off and rights of recoupment, refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Seller against any equityholders or officers, managers, directors or employees of Seller;

(d)      all Accounts Receivable as of the Closing Date;

(e)      all documents (whether written or electronic) primarily related to any of the other Purchased Assets, including all books and records, financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, customer lists, information and records, data, plans, engineering, reports and recorded knowledge;

(f)      all goodwill and going concern value associated with any of the other Purchased Assets, including all rights under any confidentiality agreements executed by any third party for the benefit of Seller to the extent relating to the Purchased Assets or the Assumed Liabilities (or any portion thereof);

(g)      all personnel files for those Current Employees who are hired or retained by Buyer, except as prohibited by applicable Law;

(h)      all rights of Seller under any non-disclosure and confidentiality, invention assignment, non-compete, non-solicitation, and other restrictive covenant agreements with Current Employees and Former Employees, directors, consultants, independent contractors and agents of Seller, and other third parties to the extent relating to the Purchased Assets or the Assumed Liabilities (or any portion thereof);

(i)      all rights under or pursuant to all warranties, representations, and guarantees made by suppliers, manufacturers, contractors, and any other Person to the extent relating to equipment purchased, products sold, or services provided to Seller and related to any other Purchased Asset or any of the Assumed Liabilities;

(j)      all deposits (including deposits in transit, customer deposits and security deposits (whether maintained in trust, escrow or otherwise) for rent, electricity, telephone, utilities or otherwise, and other prepaid charges and expenses of Seller);

2

(k)      subject to Section 363(b)(1)(A) of the Bankruptcy Code, all of Seller's telephone numbers, fax numbers, e-mail addresses, websites, URLs, social media accounts and internet domain names, along with all required login information, set forth on Schedule 1.1(k);

(l)      Seller's interest in any existing manufacturer's warranties or guarantees and other similar warranties and guarantees with respect to the Purchased Assets, which by their terms may be transferable to Buyer;

(m)      all other rights (including any Intellectual Property rights in the foregoing), demands, claims, credits, allowances, rebates, or other refunds and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature, and all advances and prepayments, in each case related to any other Purchased Asset or any of the Assumed Liabilities; and

(n)      all rights to any Tax deposits, credits, refunds, drawbacks or rebates of any Seller or any of their Subsidiaries or that any Seller or any of their Subsidiaries may qualify for with respect to the Purchased Assets (except to the extent that any such items relating to Taxes that are treated as Excluded Liabilities are actually applied by Seller in full or partial satisfaction of such Liabilities).

1.2      Excluded Assets. Notwithstanding the foregoing or any other provision of this Agreement to the contrary, the Purchased Assets shall not include the Excluded Assets. Seller is not conveying, assigning, or delivering to Buyer, and Buyer is not purchasing, acquiring, or accepting from Seller, any Excluded Assets. "**Excluded Assets**" means all assets that do not constitute a Purchased Asset, including the following assets, properties and rights:

(a)      all Cash and Cash Equivalents of Seller;

(b)      all Contracts, equipment, furniture and fixtures listed on Schedule 1.2(b);

(c)      all equipment and other assets and items that are owned by a Person other than Seller;

(d)      the bank accounts of Seller;

(e)      all Health and Welfare Plans and Employee Benefit and any assets of any such plans or any right, title, or interest in any of the assets, trusts or other funding vehicle thereof or relating thereto;

(f)      any equity securities of Seller;

(g)      retainers held by professionals retained by Seller in the Bankruptcy Case;

(h)      funds in the Professional Fee Escrow Account (as defined in the DIP Order); and

(i)      any other asset, right, interest or other entitlement that is not a Purchased Asset.

3

1.3     No Assumption of Liabilities. Effective as of the Closing Date (or, with respect to Assumed Liabilities under Assumed Contracts that are assumed by Buyer after the Closing, such later date of assumption as set forth in Section 1.5), Buyer shall assume from Seller and agree from and after the Closing Date to pay, perform, and discharge when due in accordance with their terms only those Liabilities specifically identified in Schedule 1.3 and Seller shall irrevocably convey, transfer, and assign to Buyer, those Liabilities, without duplication and only to the extent not paid prior to the Closing Date and no other Liabilities (collectively, the "**Assumed Liabilities**").

1.4     Excluded Liabilities. Notwithstanding anything herein to the contrary and other than the Assumed Liabilities, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge, or in any other manner be liable or responsible for any Liabilities of Seller, whether existing on or prior to the Closing Date or arising thereafter, including (a) any break-up or termination fees incurred in connection with Buyer's assumption of the Assumed Contracts, (b) all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Seller or of any of its predecessors in connection with this Agreement or the administration of the Chapter 11 Case (including all fees and expenses of professionals engaged by Seller) and administrative expenses and priority claims accrued through the Closing Date and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement, (ii) the negotiation, execution and consummation of the DIP Note, and (iii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Seller or of any of its predecessors payable as a result of the consummation of the transactions contemplated by this Agreement, (c) Liabilities with respect to all Employee Benefit Plans and Health and Welfare Plans of Seller, (d) Liabilities with respect to any employees or independent contractors not hired by Buyer, (e) all employment related Liabilities with respect to any Current Employee or Former Employee (including any unpaid bonus, incentive compensation paid time off, severance, retention, payroll taxes, any claim under federal, state or local equivalent of the WARN Act, COBRA liabilities, with respect to any terminated employees or other individual who is a COBRA qualified beneficiary on account of the individual's relation to an employee) with respect to COBRA, including any individual who becomes an "M&A qualified beneficiary" within the meaning of sections 601, et. seq., of ERISA and section 4980B of the Code (f) except with respect to any Transfer Taxes as set forth in Section 9.1, (A) Liabilities for any Taxes (including any applicable withholding Taxes) of Seller attributable to any taxable period or (B) Liabilities for Taxes relating to the Purchased Assets attributable to the Pre-Closing Tax Period (including any Pre-Closing Straddle Taxes), (g) all Liabilities arising with respect to or relating to any of the Excluded Assets, whether before, on or after the Closing Date, (h) all Liabilities of Seller in respect of or relating to any Contract to which any Seller is party or is otherwise bound that are not Assumed Contracts and all Liabilities arising out of the rejection of any Contract that is not an Assumed Contract by Seller, (i) all Liabilities relating to Claims, actions, suits, arbitrations, litigation matters, Proceedings or investigations (in each case whether involving private parties, Governmental Entities, or otherwise) involving, against, or affecting any Seller, Purchased Assets, or any assets or properties of Seller, except as a result of the ownership or operation of any of the Purchased Assets from and after the Closing date and (j) any and all other Liabilities, other than the Assumed Liabilities (collectively, the "**Excluded Liabilities**").

4

1.5     Assumption and Assignment of Contracts.

(a)     Schedule 1.5 sets forth a list (the "**Assumed Contract List**") of all Contracts to which Seller is a party and which the Parties have agreed will be assumed and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code (each, an "**Assumed Contract**"), together with the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contract necessary to assign such Assumed Contract to Buyer pursuant to Section 365(b)(1)(A) and Section 365(b)(1)(B) of the Bankruptcy Code (such amounts, the "**Cure Amounts**") for each Assumed Contract, if any. Buyer will have the right to amend the Assumed Contract List in its sole and absolute discretion at (i) any time prior to the Closing Date to (A) remove an Assumed Contract from the Assumed Contract List or add any Contract to the Assumed Contract List or (B) modify the Cure Amount if such modified Cure Amount is agreed to by the applicable contractual counterparty, and (ii) at any time after the Closing Date to remove any Contract in the event that after the Closing Date, (A) the Bankruptcy Court determines (or the Parties otherwise agree in writing (email being sufficient)) that the actual Cure Amounts exceed the estimated Cure Amounts, or (B) a timely filed objection to a Cure Amount or to Buyer's assumption and assignment of an Assumed Contract is not resolved. In connection with the serving of the motion to enter the Sale Order and in accordance with the Bid Procedures Order, the Seller shall file with the Bankruptcy Court and serve notice by first class mail on all non-debtor counterparties to all Assumed Contracts (such notice, an "**Assumption Notice**") of the potential assignment of the Assumed Contracts which shall include (i) the proposed Cure Amounts for such Assumed Contract and (ii) an objection deadline for such non-debtor party to object to the proposed Cure Amounts. To the extent Buyer exercises its right under this paragraph to amend or modify the Assumed Contract List from time to time to include additional Assumed Contracts, Seller shall deliver written notices (each, a "**Supplemental Assumption Notice**") to all non-debtor parties to such Assumed Contracts in substantially the same form as the Assumption Notice and in accordance with the Bid Procedures Order. Seller shall provide a copy of the Assumption Notice to Buyer, and at the Closing shall assume and assign to, and Buyer shall accept the assignment of and assume such Assumed Contract or Lease.

(b)     At Buyer's request, and at Buyer's sole cost and expense, Seller shall reasonably cooperate from the date hereof forward with Buyer as reasonably requested by Buyer (i) to allow Buyer to enter into an amendment of any Lease or Assumed Contract upon assumption of such Lease or Assumed Contract by Buyer (and Seller shall reasonably cooperate with Buyer to the extent reasonably requested by Buyer in negotiations with the counterparty thereto), or (ii) to otherwise amend any Lease or Assumed Contract to the extent such amendments would not adversely affect Seller; provided that Seller shall not be required to enter into any such amendment if such amendment would result in an assumption by Seller of such Lease or Assumed Contract, unless such Lease or Assumed Contract will be assigned to Buyer at the time of such assumption.

(c)     The Parties shall use their commercially reasonable efforts, and cooperate with each other to obtain any counterparty or third party consent ("**Consent**") that is required to assume and assign to Buyer any Assumed Contract; provided, however, that none of the Parties or in the case of Buyer, any of Buyer's Affiliates, shall be required to pay any consideration therefor other than filing, recordation or similar fees, which shall be borne by Buyer. To the extent that any such Consent is not obtained by the Closing Date, Seller so long as it is in existence, shall use

5

reasonable best efforts (at Buyer's sole cost) during the term of such Assumed Contract to (i) provide to Buyer the benefits under such Assumed Contract, (ii) cooperate in any reasonable and lawful arrangement, including holding such Assumed Contract in trust for Buyer pending receipt of the required Consent, designed to provide such benefits to Buyer, and (iii) enforce for the account of Buyer any rights of Seller under such Assumed Contract, including the right to elect to terminate such Assumed Contract in accordance with the terms thereof upon the written direction of Buyer. Buyer shall reasonably cooperate with Seller in order to enable Seller to provide to Buyer the benefits contemplated by this Section 1.5(c).

(d)    Seller shall use its reasonable best efforts to obtain one or more orders of the Bankruptcy Court, which order(s) shall be in form and substance reasonably acceptable to Buyer, and shall reflect the terms and conditions set forth herein, to assume and assign the Assumed Contracts to Buyer on the terms set forth in this Section 1.5.

(e)    Notwithstanding the foregoing, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by Seller in accordance with the terms hereof, deemed rejected under Section 365 of the Bankruptcy Code, or terminated by the other party thereto or terminates or expires in accordance with its terms on or prior to the Closing Date and is not continued or otherwise extended prior to or upon assumption and assignment; provided, that Seller shall not reject any Contracts without the prior written consent of Buyer in its sole discretion, or (ii) requires a consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the assumption and assignment by Seller to Buyer of such Contract pursuant to Section 365 of the Bankruptcy Code, and no such consent has been obtained prior to the Closing. In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Seller's rights under such Permit, and no such consent has been obtained prior to the Closing.

1.6    **Designated Purchaser**

(a)    In connection with the Closing, without limitation by the terms of Section 10.5, the Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 1.6 and without the consent of the Seller, one (1) or more Affiliates to exercise certain of the Buyer's rights and assume certain of the Assumed Liabilities, including to (i) purchase specified Purchased Assets (including specified Assumed Contracts) and pay the Cure Amounts, as applicable, and/or (ii) assume specified Assumed Liabilities (any such Affiliate of the Buyer that shall be properly designated by the Buyer in accordance with this Section 1.6, a "**Designated Buyer**"); provided that (a) no such designation would impede or materially delay the Closing or affect the timely receipt of any regulatory approval, and (b) such Designated Buyer complies with procedures set forth in the Bid Procedures Order, provided, however, Buyer shall remain fully liable for the performance of all obligations hereunder notwithstanding such designation. At and after the Closing, the Buyer shall, or shall cause its Designated Buyer(s) to, honor the Buyer's obligations at the Closing. After the Closing, any reference to the Buyer made in this Agreement shall include reference to the appropriate Designated Buyer(s), if any. After the Closing, all obligations of the Buyer and its Designated

Buyer(s) under this Agreement shall be several and not joint and the only Party with Liability as to a particular Assumed Liability is the Buyer or the Designated Buyer assuming such obligation at the Closing and no other Buyer or Designated Buyer.

(b)     The designation of a Designated Buyer in accordance with Section 1.6(a) shall be made by the Buyer by way of a written notice to be delivered to the Seller in no event later than two (2) Business Days prior to Closing, which written notice shall (i) contain appropriate information about the Designated Buyer(s), (ii) indicate which Purchased Assets and Assumed Liabilities the Buyer intends such Designated Buyer(s) to purchase and/or assume, as applicable, hereunder and (iii) include a signed counterpart to this Agreement pursuant to which the Designated Buyer(s) agree to be bound by the terms of this Agreement as it relates to such Designated Buyer(s) and which authorizes the Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1     Consideration.

(a)     The aggregate consideration to be paid by Buyer for the purchase of the Purchased Assets (the "**Purchase Price**") shall be a credit bid pursuant to section 363(k) of the Bankruptcy Code (the "**Credit Bid**") of obligations equal to (i) all or a portion of the DIP Obligations *plus* (ii) the aggregate principal amount of the Prepetition Note as of the Closing, and any other accrued and unpaid fees and expenses in respect thereof as of Closing, the aggregate amount of subclauses (i) and (ii) equaling Four Million Six Hundred and Three Thousand and Thirty Nine dollars ($4,603,039.00), *plus* (iii) the Assumed Liabilities, *plus* (iv) the Cure Amounts.

(b)     In accordance with Section 2.1(a), Buyer shall satisfy the Purchase Price at Closing as to (1) the amount set forth in clause (i) therein by discharging Seller, and Seller shall be deemed to be discharged, from all or a portion of the DIP Obligations, (2) the amount set forth in clause (ii) thereof by discharging Seller, and Seller shall be deemed to be discharged from, all obligations under the Prepetition Note, and (3) the amount set forth in clause (iv) therein, by paying the Cure Amounts in cash; provided, that the Buyer reserves the right to use cash consideration to satisfy the Purchase Price for the amounts in clauses (i) or (ii).

2.2     Closing Date Payment. At the Closing, subject to Section 7.4 and the satisfaction terms set forth in Section 2.1(b), Buyer shall deliver, or cause to be delivered, to Seller an amount equal to the Cure Amounts (the "**Closing Date Payment**"**)** in accordance with Section 2.1(b), being made to Seller in cash by wire transfer of immediately available funds to such bank account(s) as shall be designated by Seller.

2.3     Closing. Pursuant to the terms and subject to the conditions of this Agreement, the closing of the purchase and sale of the Purchased Assets and all transactions contemplated hereby (the "**Closing**") will take place by telephone conference or other electronic exchange of documents at a time and on the date (the "**Closing Date**") that is the first (1st) Business Day after the date on which all conditions to the obligations of Seller and Buyer to consummate the transactions

7

contemplated hereby set forth in <u>Article VII</u> (other than conditions with respect to actions Seller or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time and place as shall be mutually agreed upon by Seller and Buyer in writing (email being sufficient) prior thereto.

2.4     <u>Closing Deliveries by Seller</u>. At or prior to the Closing, Seller shall deliver to Buyer the following:

(a)     a Bill of Sale, Assignment and Assumption Agreement in substantially the form of <u>Exhibit A</u> (the "**Bill of Sale, Assignment and Assumption Agreement**") with respect to the Purchased Assets and Assumed Liabilities, respectively, duly executed by Seller;

(b)     a copy of the Sale Order, as entered by the Bankruptcy Court;

(c)     an officer's certificate, dated as of the Closing Date, duly executed by an authorized officer of Seller certifying that the conditions set forth in <u>Section 7.2</u> have been satisfied;

(d)     a good standing certificate of Seller issued by the appropriate officer of the State of Delaware issued within ten (10) days of the Closing Date;

(e)     a properly completed and duly executed Internal Revenue Service Form W-9 of Seller dated within ten business days of the Closing Date;

(f)     a copy of the properly completed and duly executed IRS Form 8832 previously filed by Seller with the Internal Revenue Service to elect to be treated as a corporation for U.S. federal income tax purposes; and

(g)     any further assurances as required pursuant to this Agreement.

2.5     <u>Closing Deliveries by Buyer</u>. At the Closing, Buyer shall deliver to Seller:

(a)     the Closing Date Payment;

(b)     the Bill of Sale, Assignment and Assumption Agreement, duly executed by Buyer;

(c)     an officer's certificate, dated as of the Closing Date, duly executed by an authorized officer of Buyer certifying that the conditions set forth in <u>Section 7.3</u> have been satisfied; and

(d)     any further assurances as required pursuant to this Agreement.

2.6     <u>Withholding</u>. The Parties shall be entitled to withhold and deduct from the amounts otherwise payable to any recipient pursuant to this Agreement such amounts as may be required to be withheld or deducted under the Code or any other provision of federal, state, local, or foreign Tax Laws and all such amounts withheld or deducted shall be treated for all purposes of this Agreement as having been paid to the Party in respect of which such withholding or deduction was

8

made; provided, however, that, absent a change in Law, Buyer shall not withhold Tax with respect to the Purchase Price so long as Seller has provided an IRS Form W-9 pursuant to Section 2.4(e). The Parties shall cooperate in good faith to reduce or otherwise eliminate any such withholding obligation to the extent permitted by applicable Law.

2.7    Allocation. The Purchase Price (and any other items treated as consideration for U.S. federal income Tax purposes) shall be allocated among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder or any similar provision of state, local or foreign Law as applicable (the "**Allocation**"). The Allocation shall be delivered by Buyer to Seller within ninety (90) days after the Closing. Seller will have the right to request reasonable changes to the Allocation within thirty (30) days after Buyer's delivery thereof, which requested changes shall be set forth in writing by Seller in reasonable detail. Buyer and Seller shall negotiate in good faith using commercially reasonable efforts to resolve any changes so requested by Seller, and any such changes accepted by the Parties (or any such changes requested by Seller that are affirmatively rejected in writing by Buyer and not disputed further in writing by the Seller after thirty (30) days following the Buyer's receipt thereof) shall be considered final and binding on the Parties. With respect to any changes proposed by the Seller that remain in dispute following such thirty (30) day period, Buyer's draft of the Allocation shall control. Buyer and Seller shall file all Tax Returns (including Internal Revenue Service Form 8594) consistent with the Allocation (taking into account any revisions made by Buyer in response to comments by Seller) absent a change in Law. Neither Buyer nor Seller shall take any position or in the case of Buyer, permit any of Buyer's Affiliates, to take any position inconsistent with the final Allocation in the preparation of financial statements or in the course of any audit by any Tax authority, Tax review or Tax proceeding related to any Tax Returns, unless, and then only to the extent, required by a "determination" as defined in Section 1313 of the Code, provided, however, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of the Allocation, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging such Allocation. Buyer and Seller shall promptly notify and provide the other with reasonable assistance in the event of an examination, audit, or other proceeding relating to Taxes regarding the Allocation pursuant to this Section 2.7. Notwithstanding any other provisions of this Agreement, this Section 2.7 shall survive the Closing Date without limitation.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows as of the date hereof and as of the Closing Date, subject in all respects to the limitations imposed by Seller's status as a debtor-in-possession under the Bankruptcy Code:

3.1    Organization and Qualification. Seller (a) is a limited liability company duly formed, validly existing, and in good standing under the Laws of the State of Delaware, (b) has all requisite power and authority to own and operate its properties and to conduct its business as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing in every jurisdiction in which its ownership of property or the conduct of

9

its business as now conducted requires it to qualify. Seller does not have any subsidiaries and does not own any equity securities in any other Person.

3.2    Authorization of Agreement. Seller has all requisite power and authority to execute and deliver this Agreement and each Related Document to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby in accordance with the provisions of the Bankruptcy Code, subject to approval by the Bankruptcy Court. All acts or Proceedings required to be taken by Seller to authorize the execution and delivery of this Agreement and the Related Documents, and the performance of Seller's obligations hereunder and thereunder, have been properly taken and will be taken as authorized by the Bankruptcy Court in accordance with the Sale Order. This Agreement has been duly and validly executed and delivered by Seller, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the Related Documents to which Seller is a party will have been duly and validly executed and delivered by Seller. This Agreement constitutes the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity. Each Related Document to which Seller is or will be a party, when executed and delivered, constitutes or will constitute the valid and legally binding obligations of Seller, enforceable against Seller, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principals of equity.

3.3    Conflicts; Consents. Assuming that requisite Bankruptcy Court approvals are obtained through entry of the Sale Order, and all necessary notices, authorizations, approvals, Decrees, Permits, or consents set forth on Schedule 3.3 are made, given, or obtained (as applicable), the execution, delivery, and performance by Seller of this Agreement and the Related Documents and the consummation by Seller of the transactions contemplated hereby and thereby, do not: (a) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of Seller, (b) violate any Law applicable to Seller or by which any property or asset of Seller is bound, or (c) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Lien on any property or asset of Seller under, any Assumed Contract.

3.4    Title to Purchased Assets; Sufficiency of Purchased Assets. Seller, as of immediately prior to the Closing Date, will have good and valid title to, or, in the case of any leased assets, has good and valid leasehold interests in, each of the Purchased Assets, and will have the power and right to sell, assign, transfer, convey and deliver, as the case may be, to Buyer, all of the Purchased Assets, free and clear of all Liens, subject to entry of the Sale Order. To Seller's Knowledge, the Purchased Assets are in good operating condition and repair, subject to ordinary wear and tear, and are suitable for the purposes for which they are currently used in the Business.

3.5    Compliance with Laws. To Seller's Knowledge, Seller is, and for the prior three (3) years has been, in material compliance with all applicable Laws related to the Business and the ownership and operation of the Purchased Assets, including Tax Laws and there are no outstanding orders with respect to the Business or any of the Purchased Assets.

10

3.6     Permits. Seller does not hold any Permits related to or required for the ownership or operation of the Business and, to Seller's Knowledge, no material Permits are required for the ownership or operation of the Business.

3.7     Contracts. To Seller's Knowledge, Schedule 3.7 sets forth an accurate list of all material Contracts to which Seller is a party or that are used in or related to the Purchased Assets (and Seller has made available to Buyer true and complete copies of all such Contracts, including all amendments, modifications and supplements thereto). Except for those arising out of the Chapter 11 Case and payment of the Cure Amounts as of the date of this Agreement, to Seller's Knowledge, (a) Seller is not in breach or default of its obligations under any Assumed Contract, (b) no condition exists that with notice or lapse of time or both would constitute a default by Seller or under any such Assumed Contract, and (c) no other party to any such Assumed Contract is in breach or default thereunder.

3.8     Intellectual Property.

(a)     Seller does not own any patents, patent applications, trademark registrations, applications for trademark registration, copyright registrations, applications for copyright registration, domain names, or software except as set forth on Schedule 1.1(k).

(b)     To Seller's Knowledge, except for those arising out of the Chapter 11 Case and payment of the Cure Amounts as of the date of this Agreement, Seller is not in breach of any of the terms of any third party license agreement in any way related to any software. All Contracts pursuant to which Seller receives from or grants to any third party rights under Intellectual Property by license, assignment or otherwise  are set forth on Schedule 3.8 (other than Contracts relating to unmodified, commercially available off-the-shelf software, non-disclosure agreements entered into in the Ordinary Course, and Contracts where the license of any Intellectual Property Rights is incidental to such Contract).

(c)     To Seller's Knowledge, Seller has not received any written notice, or been subject to any Proceeding, with respect to any alleged infringement, misappropriation or other violation by Seller of any Intellectual Property owned by any other Person.

(d)     To Seller's Knowledge, all Current Employees, Former Employees, independent contractors, and consultants who have been involved in the creation, development or improvement of any material Intellectual Property on behalf of Seller during the course of their employment or engagement have signed and delivered to Seller written agreements including confidentiality and non-disclosure obligations in favor of Seller.

(e)     To Seller's Knowledge, Seller maintains commercially reasonable policies and procedures regarding data security, data privacy, collection of data, data transfer, and the use of data, has commercially reasonable written agreements in place, or otherwise has commercially reasonable safeguards in place, in each case to protect personally identifiable information ("**PII**") and confidential information in Seller's possession or control from unauthorized access by third Persons and to ensure that the operation of Seller's business (including with respect to employee matters) is in compliance in all material respects with all applicable Laws, with all applicable contractual commitments and privacy policies of Seller with respect to PII or privacy, security, or

11

security breach notification requirements, and with any applicable industry standards to which Seller is subject (collectively, "**Data Security Requirements**"). To Seller's Knowledge, Seller, and the conduct of its business, are and have been in compliance with all Data Security Requirements in all material respects. To Seller's Knowledge, there has been no (i) actual, suspected, or alleged (in writing) unauthorized access to or use, acquisition, destruction, damage, loss, corruption, unintended, or improper disclosure, or breaches of the security of any PII or confidential information collected, maintained, or stored by or on behalf of Seller or in Seller's possession or control, or any System, or (ii) assertion, claim, or other Proceeding that has given rise or may give rise to any Liability under applicable Laws or industry regulation in relation to data protection, data security, or data privacy for PII or any other Data Security Requirement. Seller has not been subject to any external investigations or audits concerning any Data Security Requirement.

3.9     Litigation. To Seller's Knowledge, Schedule 3.9 sets forth all Proceedings brought by or against Seller, and there is no other Proceeding pending or, to Seller's Knowledge, threatened before any Governmental Entity against Seller, the Business, any of the Purchased Assets or any of the Assumed Liabilities or that would materially impair Seller's ability to consummate the transactions contemplated hereby or any of the Related Documents. Except as set forth in Schedule 3.9 or the Chapter 11 Case, there are no Orders outstanding against Seller with respect to the Business or any of the Purchased Assets.

3.10    Employees and Employment Matters.

(a)     Seller is not a party to or bound by any collective bargaining agreement or other Contract with any labor union, works council, or other labor organization, and no employees are represented by any labor union, works council, or other labor organization with respect to their employment with Seller. Schedule 3.10(a)(A) sets forth an accurate list of all Current Employees, including each such Current Employee's (i) name, (ii) job title, (iii) hire date, (iv) annual salary or hourly rate (or, if applicable, other compensation rate if not paid by a salary or hourly rate), (v) employment status (*e.g.*, full-time, part-time, or temporary), (vi) work location (including city and state), (vii) status as exempt or non-exempt from overtime pay requirements, (viii) accrued but unused vacation or paid time off, (ix) bonus or commissions paid in 2025 and to date in 2026, (x) leave status (including the type of leave and anticipated date of return), (xi) visa status and (xii) employing entity. Schedule 3.10(a)(B) sets forth an accurate list, as of the date hereof, of the names of each individual independent contractor currently retained by Seller, either in an individual capacity or through a legal entity through which such independent contractor provides services, along with each independent contractor's dates of engagement, description of services provided, fees paid in 2025 and to date in 2026, and location where services are provided. During the last three (3) calendar years, there has been no determination by any Governmental Entity that any independent contractor is an employee of Seller.

(b)     To Seller's Knowledge and except as set forth on Schedule 3.9, Seller is in compliance in all material respects with all Laws related to employment, employment practices, and labor, including all Laws respecting terms and conditions of employment, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), immigration (including the completion of Forms I-9 for all employees and the proper confirmation of employee visas), discrimination, retaliation, harassment, disability rights and benefits, equal

12

opportunity, plant closures and layoffs (including the WARN Act), COBRA, employee trainings and notices, workers' compensation, labor relations, employee leave issues, COVID-19, affirmative action, and unemployment insurance. To Seller's Knowledge, Seller does not have any Liability for any unpaid wages, salaries, wage premiums, commissions, bonuses, fees, or other compensation to its current or former directors, officers, employees, and independent contractors under applicable Law, Contract, or policy.

3.11    Employee Benefit Plans.

(a)    Schedule 3.11(a) lists each Employee Benefit Plan. Any Employee Benefit Plan that is a Health and Welfare Plan is identified on Schedule 3.11(a) with an "*". With respect to each Employee Benefit Plan:

(i).    no Employee Benefit Plan is intended to meet the requirements of a "qualified plan" under Section 401(a) of the Code; and

(ii).    Seller has made available to Buyer copies of the current plan documents for all Employee Benefit Plans.

(b)    To Seller's Knowledge, each Employee Benefit Plan has been established, funded, maintained and administered, in each case, in accordance with its terms and all applicable Laws. There is no pending or, to Seller's Knowledge, threatened, Proceedings relating to any of the Employee Benefit Plans.

(c)    To Seller's Knowledge, oo Employee Benefit Plan is, and Seller does not have any Liability or obligation with respect to any (i) "defined benefit plan" (as defined in Section 3(35) of ERISA) or any other plan that is or was subject to Title IV of ERISA or Sections 412 or 430 of the Code, (ii) "multiemployer plan" (as defined in Section 3(37) of ERISA), (iii) "multiple employer plan" (within the meaning of Section 210 of ERISA or Section 413(c) of the Code), or (iv) "multiple employer welfare arrangement" (as such term is defined in Section 3(40) of ERISA). No Employee Benefit Plan provides for, and Seller has not promised to provide, post-termination or retiree health or welfare benefits to any Person, other than as required by COBRA.

3.12    Real Property. Seller does not own any real property. Except as set forth on Schedule 3.12, Seller is not a party to any Leases, in connection with its ownership or operation of the Business.

3.13    Environmental Matters. Except as set forth on Schedule 3.13, with respect to the Business:

(a)    To Seller's Knowledge Seller has not used, handled, stored, transported, released, disposed of, or arranged for the disposal of, or exposed any Person to, any Hazardous Substance, in each case as has given or would reasonably be expected to give rise to Liability under any Environmental Law; and

(b)    Seller has made available to Buyer true and complete copies of all environmental audits, assessments, and reports in its possession or reasonable control and related to any of the Purchased Assets.

3.14    <u>Tax Matters</u>. To <u>Seller's Knowledge, except as set forth on Schedule 3.14:</u>

(a)    all Tax Returns required to be filed under applicable Law by Seller have been filed and such Tax Returns are true, complete, and correct in all material respects;

(b)    all Taxes required to be paid by Seller have been timely paid, whether or not shown as due on any Tax Return;

(c)    there is not currently in effect any extension or waiver of any statute of limitations of any jurisdiction regarding the assessment or collection of any Tax relating to the Purchased Assets;

(d)    Seller is not currently the beneficiary of any extension of time within which to file any Tax Return, other than automatic extensions obtained in the ordinary course of business;

(e)    no assessment, deficiency or adjustment relating to Taxes has been asserted, proposed or threatened with respect to the Purchased Assets. There is no ongoing or pending Tax audit, contest or other Proceeding by any Governmental Entity with respect to any material Taxes or material Tax Returns with respect to the Purchased Assets, and, to the knowledge of Seller, no such Tax audit, contest or other Proceeding relating to Taxes has been threatened; and

(f)    All Taxes for which Seller is or has ever been obligated to withhold from amounts owing to any Person have been fully withheld and timely reported and paid over to the appropriate Governmental Entity in compliance with applicable Law and Seller has complied with all applicable Law pertaining to the valid documentation of any exemptions claimed with respect to sales or use, gross receipts, payroll, or other similar withholding Taxes for which Seller would otherwise be considered liable.

3.15    <u>Foreign Corrupt Practices Act</u>. To Seller's Knowledge, Seller nor Seller's officers, directors (or equivalent), or other authorized representatives or agents acting on their behalf have: (i) violated in any material respect any applicable Laws relating to anti-bribery or anti-corruption (governmental or commercial), including the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act of 2010 and all laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions, or offered, paid, promised to pay, authorized the payment of, received, or solicited anything of value under circumstances such that all or a portion of such thing of value would be offered, given, or promised, directly or indirectly, to any Person to obtain any improper advantage or (ii) made any disclosure, to or been subject to any investigations or inquiries by, a Governmental Entity regarding material non-compliance with any such Laws.

3.16    <u>No TID U.S. Business</u>. To Seller's Knowledge, none of the Purchased Assets are a "TID U.S. business" as defined at 31 C.F.R. § 800.248.

3.17    <u>Brokers</u>. Except as set forth on Schedule 3.17, Seller has not entered into any Contract to pay, and has no Liability for, any fees or commissions or other amounts to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer or any of its Affiliates could become liable or obligated to pay.

14

3.18    <u>Related Party Transactions</u>. No officer, director, manager or, to Seller's Knowledge, employee or contractor of Seller has any direct or indirect interest in any Assumed Contract or other commitment of the Business (excluding Contracts relating to any such person's employment with the Business) or any Purchased Asset.

3.19    <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> or in any of the Related Documents, Buyer acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and Buyer has not relied on, the accuracy or completeness of any express or implied representation or warranty with respect to Seller or the Purchased Assets. Without limiting the foregoing, Buyer acknowledges that the Purchased Assets are being sold "AS IS, WHERE IS" with all faults and without any representation or warranty of any kind, express or implied, except as expressly set forth in this <u>Article III</u> or in any of the Related Documents, and that Seller specifically disclaims any warranty of merchantability, usage, suitability, or fitness for any particular purpose with respect to the Purchased Assets or any part thereof. Buyer acknowledges that other than as specifically provided in this Agreement or in any of the Related Documents, Seller has made no representation, warranty or guaranty, express or implied, oral or written, past, present or future, of, as to, or including: (a) the condition or state of repair of the Purchased Assets; or (b) the quality, nature, adequacy, and physical condition of the Purchased Assets. Buyer hereby expressly waives and renounces its ability to rescind the sale of the Purchased Assets under any applicable law. Seller and Buyer agree that this provision shall survive the execution of this Agreement and the Closing of the sale of the Purchased Assets.

3.20    <u>No Survival of Representations and Warranties</u>. None of the representations or warranties of Seller or Buyer contained in this Agreement or in any certificate or document delivered pursuant hereto shall survive the Closing. Upon the occurrence of the Closing, all such representations and warranties shall terminate and be of no further force or effect, and no Party shall have any liability or obligation after the Closing with respect to any breach of any representation or warranty contained herein.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows as of the date hereof and as of the Closing Date.

4.1    <u>Organization and Qualification</u>. Buyer (a) is an entity duly organized, validly existing and in good standing under the Laws of the State of Delaware and (b) has all requisite power and authority to own and operate its properties and to carry on its business as now conducted.

4.2    <u>Authorization of Agreement</u>. The execution, delivery, and performance of this Agreement and the Related Documents (to which Buyer is or will be a party) by Buyer, and the consummation by Buyer of the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery,

15

or performance of this Agreement and the Related Documents (to which Buyer is or will be a party) by Buyer. This Agreement has been duly and validly executed and delivered by Buyer, and, assuming this Agreement is a valid and binding obligation of Seller, this Agreement constitutes a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

4.3     Conflicts; Consents.

(a)     Assuming that all necessary notices, authorizations, approvals, Decrees, Permits, or consents are made, given, or obtained (as applicable), the execution, delivery, and performance by Buyer of this Agreement and the Related Documents (to which Buyer is or will be a party) and the consummation by Buyer of the transactions contemplated hereby and thereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of Buyer, (ii) violate any Law applicable to Buyer or by which any property or asset of Buyer is bound, or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Lien on any property or asset of Buyer under, Contract; except, in each case, for any such violations, breaches, defaults, or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Buyer to consummate the transactions contemplated hereby and thereby.

(b)     Buyer is not required to file, seek, or obtain any notice, authorization, approval, Decree, Permit, or consent of or with any Governmental Entity in connection with the execution, delivery, and performance by Buyer of this Agreement or the Related Documents (to which Buyer is or will be a party) or the consummation by Buyer of the transactions contemplated hereby and thereby, except where failure to obtain such consent, approval, authorization, or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Buyer to consummate the transactions contemplated hereby and thereby.

4.4     Funding. Buyer has, or will have at the Closing, (i) the legal right to make a credit bid pursuant to Section 363(k) of the Bankruptcy Code in order to pay the Credit Bid portion of the Purchase Price and (ii) sufficient funds in an aggregate amount necessary to pay the Closing Date Payment.

4.5     No Litigation. There are no material Proceedings pending or, to Buyer's actual knowledge, threatened against or affecting Buyer, except where such Proceedings would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Buyer to consummate the transactions contemplated hereby.

4.6     No Broker. Buyer has not entered into any Contract to pay, and has no Liability for, any fees or commissions or other amounts to any broker, finder, or agent with respect to the transactions contemplated hereby for which Seller could become liable or obligated to pay.

16

4.7     No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV, Seller acknowledges and agrees that neither Buyer nor any other Person on behalf of Buyer makes, and Seller has not relied on, the accuracy or completeness of any express or implied representation or warranty with respect to Buyer. Seller and Buyer agree that this provision shall survive the execution of this Agreement and the Closing of the sale of the Purchased Assets.

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1     Bankruptcy Actions.

(a)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Seller shall work in good faith to obtain entry by the Bankruptcy Court of the Sale Order by the milestone set forth in the DIP Order for entry of the Sale Order; provided, that, that the Sale Order shall be in form and substance acceptable to Buyer. Seller shall furnish Buyer with a draft of the proposed Sale Order within seven (7) days before filing the proposed Sale Order with the Bankruptcy Court.

(b)     Buyer shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Representatives of Buyer available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code. The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (A) the execution, delivery, and performance by Seller of this Agreement, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all claims, liens, and encumbrances within the meaning of Section 363(f) of the Bankruptcy Code, (C) the assumption and assignment of the Assumed Contracts to Buyer, and (D) the performance by Seller of its obligations under this Agreement, and (ii) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grant Buyer the protections of Section 363(m) of the Bankruptcy Code.

(c)     Representatives of Seller and Buyer shall (i) appear in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated hereby, and (ii) keep the other Party reasonably apprised of the status of material matters related to the transactions contemplated hereby.

(d)     Seller's obligations under this Agreement and in connection with the transactions contemplated hereby and thereby are subject to entry of and, to the extent entered, the Sale Order. Nothing in this Agreement shall require Seller to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to Seller's creditors or the Bankruptcy Court.

17

(e)     Seller shall give appropriate notice, and provide appropriate opportunity for hearing, to all Persons entitled thereto, of all motions, orders, hearings, and other proceedings relating to this Agreement or any Related Document and the transactions contemplated hereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

(f)     Seller and Buyer shall take all commercially reasonable actions as may be reasonably necessary to cause the entry of the Sale Order, including, to the extent reasonably practicable, furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Buyer agrees that it will promptly take such commercially reasonable actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of (x) providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

(g)     If the Bid Procedures Order, Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order, Bid Procedures Order or other such order), and this Agreement has not otherwise been terminated pursuant to Section 8.1, Seller shall immediately notify Buyer of such appeal, petition, or motion and shall use commercially reasonable efforts to defend such appeal, petition, or motion and shall use commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition, or motion.

5.2     Copies of Pleadings. Seller shall consult with Buyer concerning the Sale Order and any other orders of the Bankruptcy Court relating to the transactions contemplated hereby, and the bankruptcy pleadings and proceedings in connection therewith. Except as otherwise expressly provided, to the extent reasonably practicable at least two (2) Business Days prior to filing thereof, Seller shall provide Buyer with drafts of all documents, motions, orders, filings or pleadings that Seller proposes to file with the Bankruptcy Court that relate to the approval of this Agreement, the Sale Order and the consummation of the transactions contemplated hereby and any such documents, motions, orders, filings or pleadings shall be in form and substance acceptable to the Buyer . Seller shall also promptly provide Buyer with copies of all pleadings received by or served by or upon Seller that relate to or, in Seller's judgment, are reasonably expected to affect the transactions provided for in this Agreement and which have not, to the actual knowledge of Seller, otherwise been served on Buyer.

**ARTICLE VI**

**COVENANTS AND AGREEMENTS**

6.1     Conduct of Seller. During the Interim Period, except (a) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (b) as required by applicable

18

Law, or (c) with the prior written consent of Buyer (which consent shall not be unreasonably withheld), Seller shall:

(a)      operate the business and the Purchased Assets in the Ordinary Course and preserve all business relationships;

(b)      not sell, assign, license, transfer, convey, lease, surrender, relinquish, or otherwise dispose of any of the Purchased Assets;

(c)      not subject any of the Purchased Assets to any new Lien;

(d)      not take or agree to commit to take any action that would make any representation or warranty of Seller inaccurate in any material respect;

(e)      maintain, preserve and protect all of the Purchased Assets in the condition in which they exist on the date hereof, except for (i) ordinary wear and tear, and (ii) replacements, modifications, or maintenance in the ordinary course of business;

(f)      not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing, or (ii) that would reasonably be expected to impair the ability of Seller or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(g)      not assume, reject, or assign any Contract that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated hereby, to Buyer;

(h)      not enter into new Contracts other than in the Ordinary Course or amend or voluntarily terminate or cancel any Contracts;

(i)      make all post-petition payments related to Assumed Contracts that become or became due or payable pursuant to the terms thereof;

(j)      comply in all material respects with all material Laws applicable to it or having jurisdiction over its business or any Purchased Asset;

(k)      not, directly or indirectly, cancel, forgive, or compromise any material debt or claim or waive or release any material right of, in each case that constitutes a Purchased Asset;

(l)      not (i) establish, adopt, amend, or terminate any Employee Benefit Plan or any other plan, program, policy, agreement, or arrangement that would be an Employee Benefit Plan if it were in existence as of the date hereof, (ii) increase or decrease the compensation or benefits payable or provided to, or to become payable or be provided to, any Current Employees or Former Employees, (iii) grant, promise, or announce any severance, equity, or equity-based incentive compensation or bonus (including any retention, transaction, or change in control bonus), or (iv) accelerate the time of vesting, funding, or payment of any compensation or benefit under any Employee Benefit Plan or otherwise;

19

(m)     not negotiate, modify, extend, or enter into any collective bargaining agreement or other Contract with any labor union, works council, or other labor organization or recognize or certify any labor union, labor organization, works council, or group of employees as the bargaining representative for any employees of Seller;

(n)     not implement or announce any employee layoffs, plant closings, reductions in force, furloughs, temporary layoffs, or other such actions that could implicate the WARN Act;

(o)     not hire, engage, terminate (without cause), furlough, or temporarily lay off any employee or independent contractor;

(p)     not cancel, terminate, fail to renew or allow to lapse any insurance policy covering the Purchased Assets;

(q)     not make any capital expenditure except as permitted by the budget approved by the Bankruptcy Court;

(r)     not waive or release any non-competition, non-solicitation, non-disclosure, non-interference, non-disparagement, or other restrictive covenant obligation of any Current Employee or Former Employee;

(s)     not disclose any confidential information to any Person other than in the ordinary course of business in circumstances involving reasonable and customary confidentiality restrictions;

(t)     (i) conduct its business in the Ordinary Course, (ii) preserve the existing business organization and keep management of its business intact, and (iii) keep available the services of the Current Employees, and maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Current Employees, and others having business dealings with Seller, to the extent, in each case, reasonably feasible;

(u)     not (i) make, change or revoke any material Tax election (including, for the avoidance of doubt, a Tax election relating to Seller's classification as a corporation for U.S. federal income tax purposes), (ii) change any annual accounting period, (iii) change any material method of accounting for Tax purposes, (iv) settle any claim or assessment in a Tax proceeding in respect of a material amount of Taxes, (v) surrender any right to claim a material refund for Taxes, (vi) other than with respect to automatic or automatically granted extensions, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, or (vii) file (in a manner inconsistent with past practice) or amend any material Tax Return relating to the Purchased Assets; or

(v)     agree or commit to do any of the foregoing.

6.2     <u>Access to Information</u>.

(a)     During the Interim Period, Seller will provide Buyer and its authorized Representatives with reasonable access, upon reasonable advance notice and during regular business hours, to the Purchased Assets; provided, that (i) such access does not unreasonably

20

interfere with the normal operations of Seller, (ii) such access will occur in such a manner as Seller reasonably determine to be appropriate to protect the confidentiality of the transactions contemplated hereby, (iii) all requests for access will be directed to Jacen Dinoff or Jarod Wada or such other Person(s) as Seller may designate in writing from time to time, and (iv) nothing herein will require Seller to provide access to, or to disclose any information to, Buyer if such access or disclosure (A) would reasonably be expected to cause significant competitive harm to Seller if the transactions contemplated hereby are not consummated (unless Buyer signs a confidentiality agreement regarding such information), (B) would waive any legal privilege, or (C) would be in violation of applicable Laws or the provisions of any agreement to which Seller is bound; provided, that, in the event that Seller withholds access or information in reliance on the foregoing clause (C), Seller shall provide (to the extent reasonably practicable without waiving or violating the applicable legal privilege or Law) notice to Buyer that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

(b)     Except as otherwise agreed to by Seller in writing, Buyer will not contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, noteholder, or other material business relation of Seller prior to the Closing Date with respect to Seller, its business, or the transactions contemplated hereby without the prior consent of Seller (which consent shall not be unreasonably withheld, conditioned, or delayed) for each such contact.

6.3     Regulatory Approvals.

(a)     Seller will (i) make or cause to be made all filings and submissions required to be made by Seller under any applicable Laws for the consummation of the transactions contemplated hereby, (ii) cooperate with Buyer in exchanging such information and providing such assistance as Buyer may reasonably request in connection with the foregoing, and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings, and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)     Buyer will, and will cause its affiliates to, (i) make or cause to be made all filings and submissions required to be made by Buyer under any applicable Laws for the consummation of the transactions contemplated hereby, (ii) cooperate with Seller in exchanging such information and providing such assistance as Seller may reasonably request in connection with all of the foregoing, and (iii) (A) promptly supply any additional information and documentary material that may be requested in connection with such filings, and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

(c)     Notwithstanding anything in this Agreement to the contrary, Buyer, including its Affiliates, shall not be required, either pursuant to this Section 6.3 or otherwise, to (i) negotiate, commit to or effect, by consent decree, hold separate order or otherwise, the sale, lease, license, divestiture or disposition of any assets, rights, product lines or businesses, (ii) terminate any existing relationships, contractual rights or obligations, (iii) terminate any joint venture or other arrangement, (iv) create any relationship, contractual rights or obligations, (v) effectuate any other change or restructuring, (vi) otherwise take or commit to take any actions, including agreeing to prior approval restrictions, with respect to the businesses, product lines or assets of the Buyer

21

or its respective Affiliates, or (vii) enter into litigation to overturn or challenge any governmental determination or action.

6.4    Reasonable Best Efforts; Cooperation.

(a)    Notwithstanding anything to the contrary in this Agreement, each Party shall use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, or advisable under applicable Law to cause the transactions contemplated hereby to be effected as soon as practicable, in accordance with the terms hereof, and to cooperate with the other Party in connection with any step required to be taken as a part of its obligations hereunder.

(b)    The obligations of Seller under this Agreement shall be subject to any approvals or authorizations required from the Bankruptcy Court pursuant to the Bankruptcy Code, Seller's obligations as debtor-in-possession to comply with any order of the Bankruptcy Court, and Seller's duties under the Bankruptcy Code to seek and obtain the highest or otherwise best net value for the Purchased Assets and potentially consummate a transaction for the sale of the Purchased Assets with another party, which in Seller's business judgment would maximize the value of its bankruptcy estate (an "**Alternative Transaction**"). For purposes of clarity, an Alternative Transaction may include (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of Seller, (ii) any merger, consolidation, share exchange or other similar transaction to which Seller is a party that has the effect of transferring, directly or indirectly, all or any portion of the Purchased Assets, or any issuance, sale or transfer of equity interests in, Seller, (iii) any direct or indirect sale of all or any portion of the Purchased Assets, (iv) any issuance, sale or transfer of equity interests in, the Seller or (v) any other transaction (other than a liquidation or a plan of liquidation), including a reorganization (in any jurisdiction, whether domestic, foreign, international or otherwise), that transfers or vests ownership of, economic rights to, or benefits in all or a portion of the Purchased Assets, to any party other than Buyer or any of its Affiliates, in each instance, whether or not such transaction is entered into in connection with any bankruptcy, insolvency, arrangement, proposal, receivership or similar Proceedings.

6.5    Further Assurances. From time to time, as and when requested by either Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated hereby.

6.6    Insurance Matters. Except as set forth below, Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to the Purchased Assets that is maintained by Seller shall cease to provide any coverage with respect to the Purchased Assets and no further coverage shall be available to Buyer or the Purchased Assets under any such policies.

6.7    Employees and Offers of Employment.

(a)    Buyer may, in its sole discretion, offer employment to certain employees of Seller, and Seller shall cooperate with Buyer in connection with such offers of employment.

22

(b)     Nothing herein shall be construed to require Buyer to hire any employee of Seller, and the hiring of any employees shall not be a term or condition of this Agreement.

(c)     Prior to the Closing, except as required by Law, Buyer shall be permitted to issue communications (including any electronic communication) to any Current Employee without the prior written approval of Seller. Seller agrees to cooperate in good faith in order to facilitate any offers of employment and Seller shall terminate the employment of any employee that accepts an offer of employment with Buyer immediately prior to the commencement of such employment and any such termination costs shall be the sole obligation of Seller.

(d)     Seller agrees that, notwithstanding the terms of any non-competition, non-solicit, non-disclosure, or similar restrictive covenant between Seller and any Current Employee hired by Buyer (the "**RCAs**"), such individual shall be permitted to provide services to Buyer and its Affiliates following the Closing, and Seller will not seek to enforce the terms of any such RCA following the Closing, and Seller shall use commercially reasonable efforts to transfer the benefits of the RCAs to Buyer, which shall be an intended third party beneficiary of the benefits of such RCAs.

(e)     Buyer shall maintain employee records transferred to Buyer hereunder for as long as required by applicable Law, and during that period will afford Seller reasonable access to such records during Buyer's normal business hours. Buyer shall maintain the confidentiality of such records and limit access thereto to the extent required by applicable Law.

(f)     Seller shall retain Liability for, and Buyer shall not acquire or assume, any Liability, claim, or Proceeding related to any Current Employee or Former Employee or current or former independent contractor or any employment, benefit, or related matters of Seller. Seller shall retain liability for, and Buyer shall not acquire or assume any Liability with respect to any Employee Benefit Plan. Buyer shall not be a successor employer under any applicable law.

(g)     Unless agreed to otherwise in writing by Buyer, any employees of Seller hired by Buyer shall be employees "at-will".

(h)     This Section 6.7 shall be binding upon and inure solely to the benefit of each of the Parties to this Agreement; nothing in this Section 6.7 expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature whatever; and no provision of this Section 6.7 will create any third-party beneficiary rights in (i) any Current Employee or Former Employee, or (ii) any current or former employee, officer, director or individual service provider of Seller's Affiliates in respect of continued employment or service or any other matter. This Section 6.7 shall not be considered, or deemed to be, an amendment to or establishment of any Employee Benefit Plan or any other compensation or benefit plan, program, agreement or arrangement. Nothing in this Section 6.7 shall obligate Buyer or any of its Affiliates (i) to continue to employ any Current Employee for any specific period of time following the Closing Date or (ii) limit the right of Buyer or any of its Affiliates to, at any time, change or modify any benefit or compensation plan, program, agreement or arrangement at any time and in any manner.

6.8     Notice of Certain Events. During the Interim Period, Seller shall promptly notify Buyer of, and furnish to Buyer, any information regarding: (a) any written notice or other

23

communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement or any Related Document (including with respect to the transfer of personal information), or that otherwise relates to any written status update prepared by a third party and related to any of the Purchased Assets; (b) any written notice or other communication from any Governmental Entity (other than the Bankruptcy Court) related to or in connection with the transactions contemplated hereby or any Related Document; (c) any material Proceeding initiated, filed, commenced or, to Seller's Knowledge, threatened against or relating any of the Purchased Assets; or (d) the occurrence of any event or condition or the existence of any fact that (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions relating to the Closing to be satisfied. Buyer's receipt of information pursuant to this Section 6.8 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement or any other Related Document, and shall not be deemed to amend or supplement the Schedules. Notwithstanding anything to the contrary herein, in no event shall the information provided pursuant to this Section 6.8 be deemed to modify any representation or warranty hereunder or be included as a supplement to the Schedules.

6.9    Accounts Receivable.

(a)    As of the Closing Date, Seller hereby (i) authorizes Buyer to open any and all mail addressed to Seller relating to the Purchased Assets and delivered to Buyer if received on or after the Closing Date, and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks, or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing Date, as the case may be, made payable or endorsed to Seller or Seller's order, for Buyer's own account.

(b)    As of the Closing Date, Seller agrees that any monies, checks, or negotiable instruments received by Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing Date, as the case may be, shall be held in trust by Seller for Buyer's benefit and account, and Seller shall pay over to Buyer or its designee the amount of such payments within five (5) Business Days.

(c)    As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by Buyer after the Closing.

6.10    Confidentiality.

(a)    Neither Party nor any of such Party's employees, agents, or Representatives and, solely with respect to Buyer, any of Buyer's Affiliates, shall reveal or disclose to any Person any Confidential Information concerning the business or affairs of the other Party that it may have acquired from such Party in the course of pursuing the transactions contemplated hereby without the prior written consent of such Party, other than, with respect to Buyer, Confidential Information relating to the Purchased Assets or the Assumed Liabilities.

24

(b)      Seller nor any of its employees, agents, or Representatives will disclose to any Person any Confidential Information concerning the Purchased Assets or the Assumed Liabilities that Seller or any of its employees, agents, or Representatives acquired prior to the Closing Date.

(c)      Notwithstanding the foregoing, either Party may disclose any such Confidential Information as follows:  (i) to such Party's affiliates and its or its affiliates' employees, lenders, counsel, or accountants, the actions for which the applicable Party will be responsible, (ii) to comply with any applicable Law or Decree; provided, that prior to making any such disclosure, the Party making the disclosure notifies the other Party of any Proceeding of which it is aware which may result in disclosure and uses commercially reasonable efforts to limit or prevent such disclosure, (iii) to the extent that the Confidential Information is or becomes generally available to the public through no fault of the Party or its affiliates making such disclosure, or (iv) to the extent that the same information becomes available to the Party making such disclosure on a non-confidential basis from a source other than a Party or its affiliates, which source is not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation to the other Party.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1      Conditions Precedent to the Obligations of Buyer and Seller. The respective obligations of each Party to consummate the transactions contemplated hereby are subject to the satisfaction (or written waiver by each of Seller and Buyer) on or prior to the Closing Date, of each of the following conditions:

(a)      no court or other Governmental Entity has issued, enacted, entered, promulgated, or enforced any Law or Decree restraining, enjoining, or otherwise prohibiting the transactions contemplated hereby;

(b)      the Bankruptcy Court shall have entered the Sale Order on terms acceptable to the Buyer and the Sale Order shall be a Final Order; and

(c)      there shall not be pending or threatened by any Governmental Entity any Proceeding (i) challenging or seeking to restrain, prohibit, alter, or materially delay the consummation of any of the transactions contemplated hereby, or (ii) seeking to obtain from either Party any damages in connection with the transactions contemplated hereby.

The Parties agree that, subject to Section 7.4, all of the Purchased Assets being sold by Seller are being sold as an inseparable package that must be approved as an inseverable whole, and the closing of the sale on all of the Purchased Assets shall occur simultaneously.

7.2      Conditions Precedent to the Obligations of Buyer. The obligations of Buyer to consummate the transactions contemplated hereby are subject to the satisfaction (or written waiver by Buyer in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      as of the date hereof and as of the Closing Date (in each case, except for any

representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1, Section 3.2, Section 3.3, Section 3.4 and Section 3.17 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     Seller shall have performed in all material respects all of the covenants and agreements required to be performed by Seller under this Agreement at or prior to the Closing;

(c)     since the date hereof, no event shall have occurred which has resulted or would reasonably be expected to result in a Material Adverse Effect;

(d)     there shall be no Order of the Bankruptcy Court or any other court of competent jurisdiction prohibiting Buyer from submitting a credit bid pursuant to Section 363(k) of the Bankruptcy Code in satisfaction of the Purchase Price and consummating the transactions contemplated hereby;

(e)     the DIP Order shall have been entered by the Bankruptcy Court on terms and conditions acceptable to the Buyer and the DIP Order shall be a Final Order; and

(f)     Seller shall have delivered, or caused to be delivered, to Buyer all of Seller's deliverables set forth in Section 2.4.

7.3     Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the transactions contemplated hereby are subject to the satisfaction (or written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     as of the date hereof and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2, Section 4.3, and Section 4.6 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     Buyer shall have performed in all material respects all of the covenants and agreements required to be performed by them under this Agreement at or prior to the Closing;

(c)     Buyer shall have delivered, or caused to be delivered, to Seller all of Buyer's deliverables set forth in Section 2.5; and

26

(d)    Seller has not determined that the exercise of its fiduciary duties under the Bankruptcy Code requires Seller to pursue an Alternative Transaction.

7.4    Waiver of Conditions. Except in the case of fraud, upon the occurrence of the Closing, any condition set forth herein that was not satisfied as of the Closing Date will be deemed to have been waived for all purposes by the Party having the benefit of such conditions as of and after the Closing Date.

## ARTICLE VIII

## TERMINATION

8.1    Termination of Agreement. This Agreement may be terminated only in accordance with this Article VIII. This Agreement may be terminated at any time prior to the Closing Date:

(a)    by the mutual written consent of the Parties;

(b)    by written notice of either Party, upon the issuance of a Final Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby; provided, that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Final Order was caused by the breach or action or inaction of such Party;

(c)    by Buyer if there shall have been a breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement or any other event or condition shall result in Seller being incapable of satisfying one or more of their representations, warranties, covenants or agreements set forth herein, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) days after written Notice thereof shall have been received by Seller;

(d)    by Seller by giving written notice to Buyer at any time prior to the Closing Date in the event Buyer has breached any material covenant contained in the Sale Order or this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of thirty (30) days after the notice of the breach;

(e)    by Buyer, if the Closing shall not have occurred on or before July 31, 2026 (the "**Outside Date**"); provided, that Buyer shall not be permitted to terminate this Agreement pursuant to this Section 8.1(e) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of Buyer;

(f)    subject to Section 10.17, by Buyer if Seller withdraws or seeks authority to withdraw the Bid Procedures Order or the Sale Order, or announces any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party), other than a plan of reorganization or liquidation or wind-down plan of Seller's estate post-Closing acceptable to the Buyer;

(g)    by either Party, if there shall be any (i) order or other Law or (ii) Governmental Entity that issues any final and non-appealable ruling or order that, in each case (x)

27

prohibits, prevents or enjoins the consummation of the transactions contemplated by this Agreement or otherwise makes the consummation of the transactions contemplated by this Agreement illegal and (y) remains in effect for five (5) Business Days after notice of such order or other Law has been received by Buyer and Seller; provided, that the right to terminate this Agreement under this Section 8.1(g) shall not be available to any Party whose breach of this Agreement shall have been the cause of, or shall have resulted in the order or other Law prohibiting, restraining, or enjoining the transactions contemplated by this Agreement;

(h)    by Buyer, if the Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Chapter 11 Case;

(i)    automatically and without any action or notice by either Party, or Buyer to Seller, immediately upon:

(i). the consummation of an Alternative Transaction; or

(ii).    if Buyer is not selected as the Successful Bidder at the conclusion of the Auction, unless Buyer is designated as "backup bidder" under the Sale Order;

(j)    by Buyer or Seller, if the Bankruptcy Court enters a final, non-appealable order that precludes the consummation of the transactions contemplated hereby on the terms and conditions under this Agreement;

(k)    by written notice of either Party, if all of the conditions set forth in Section 7.2 or 7.3, as applicable, have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, and Buyer or Seller, as applicable, fails to complete the Closing at the time required by Section 2.3;

(l)    by Buyer, if Buyer receives notice that (i) any Contract that is an Assumed Contract has been removed as an Assumed Contract pursuant to Section 1.5(e), (ii) a contractual counterparty to any Assumed Contract may exercise rights to terminate such Assumed Contract or (iii) any other occurrence, whether due to lapse of time, exercise of right or otherwise, may reasonably render Buyer incapable of receiving the benefits of such Assumed Contract;

(m)    by Buyer, upon a termination of the DIP Note or upon a modification of any DIP Order in any material respect without the consent of the requisite DIP Lender;

(n)    by Buyer, if there is an Event of Default (as defined in the DIP Note), the DIP Obligations are accelerated, and the DIP Loan (as defined in the DIP Note) is terminated;

(o)    by Buyer, if for any reason Buyer is not permitted by the Bankruptcy Court, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid the DIP Obligations and/or the Prepetition Secured Indebtedness in payment of all or any portion of the Credit Bid portion of the Purchase Price;

28

(p)      by Buyer if the Seller files a motion with the Bankruptcy Court seeking any post-Petition Date financing in the Bankruptcy Case (other than the DIP Note) that seeks to displace or prime any of the liens granted under the DIP Note and/or DIP Order or attach any additional liens to any of the Purchased Assets, without the prior written consent of Buyer; and

(q)      by Buyer, if any order is entered  pursuant to section 362 Bankruptcy Code or any other similar provisions to lift the automatic stay or seeks similar relief with respect to any Acquired Assets without the prior written consent of Buyer.

8.2      Effect of Termination. In the event of termination and abandonment by Buyer, on the one hand, or Seller, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party (such written notice shall state the termination provision in this Agreement that such terminating Party is claiming provides a basis for termination of this Agreement), and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by or Liability of either Party (other than with respect to the sections set forth in this Agreement that shall continue in full force and effect in accordance with this Section 8.2 following such termination), except that such termination shall not relieve any Party of any Liability for fraud or willful breach of this Agreement.

8.3      Break-Up Fee and Expense Reimbursement.

(a)      In the event of a termination of this Agreement by Buyer pursuant to Section 8.1 the Seller shall pay the Break-Up Fee to Buyer within three (3) Business Days following the consummation of an Alternative Transaction (or any portion thereof).

(b)      In the event that this Agreement is terminated for any reason other than by Seller pursuant to Section 8.1(d), Seller or any successor thereto shall pay to Buyer an amount equal to the reasonable and documented costs and out-of-pocket expenses incurred by Buyer in connection with the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby in the amount of up to $200,000 (the "**Expense Reimbursement**"). The Seller shall pay the Expense Reimbursement to Buyer within three (3) Business Days following the termination of this Agreement.

(c)      Seller's obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to this Section 8.3 shall survive termination of this Agreement and shall constitute an allowed super priority administrative expense of Seller under Section 503(b) of the Bankruptcy Code which shall be senior to and have priority over all other administrative expense claims of the kind specified in section 503(b) of the Bankruptcy Code. The Bid Procedures Order shall allow and approve the Break-Up Fee and Expense Reimbursement on the terms set forth herein and provide superpriority status to the payment of the Break-Up Fee and Expenses Reimbursement pursuant to this Section 8.3.  The Break-Up Fee and the Expense Reimbursement shall be deemed earned upon entry of the Bid Procedures Order.

8.4      Effect of Termination or Breach.

(a)      Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve either Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

29

(b)    Except as set forth in Section 8.1(i), no termination of this Agreement pursuant to Section 8.1 shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made. If the transactions contemplated hereby are not consummated: (i) this Agreement shall become null and void and of no further force and effect (except that Section 8.3, this Section 8.4, Article X and Article XI, shall survive any such termination), and (ii) if this Agreement is terminated by Buyer pursuant to a termination right set forth in this Article VIII or by Seller for any reason, Seller shall not be entitled to any damages, losses, or payment from Buyer, and Buyer shall have no further liability of any kind to Seller, or any third party on account of this Agreement. The Parties hereby agree that it is impossible to determine accurately the amount of damages that Seller would suffer if the transactions contemplated hereby were not consummated as a result of a breach of this Agreement by Buyer or that Buyer would suffer if the transactions contemplated hereby were not consummated as a result of a breach of this Agreement by Seller. As a result, notwithstanding anything in this Agreement to the contrary, Buyer hereby agrees that, in the event of a termination of this Agreement for any reason other than by Seller pursuant to 8.1(d), (A) the Break-Up Fee and Expense Reimbursement (as applicable, pursuant to Sections 8.3(a) or 8.3(b)) shall be delivered to Buyer as liquidated damages against Seller for all liabilities of Seller under this Agreement, and (B) such liquidated damages shall be the sole and exclusive remedy, at Law and equity, of Buyer against Seller for Seller's breach and such termination and Seller shall have no further liability of any kind to Buyer, any of its affiliates, or any third party on account of this Agreement.

## ARTICLE IX

## TAXES

9.1    Transfer Taxes. Any sales, use, purchase, transfer, deed, fixed asset, stamp, documentary stamp, use, registration, or other similar Taxes and recording charges payable solely by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated hereby (the "**Transfer Taxes**") shall be paid by Buyer. Buyer shall be responsible for filing any Tax Returns related to Transfer Taxes and the Parties shall cooperate to prepare any such Tax Returns.

9.2    Tax Returns and Apportionment.

(a)    Seller will prepare and file, or cause to be prepared and filed, any Tax Return with respect to the Purchased Assets for any taxable period ending on or before the Closing Date with an original due date on or before the Closing Date. Buyer shall prepare and file all Tax Returns relating to the Purchased Assets that have an original due date after the Closing Date including any Tax Return relating to a Taxable period that begins on or before the Closing Date and ends after the Closing Date (a "**Straddle Period**"). Unless otherwise specified in this Section 9.2(a), Seller shall be solely responsible for any Tax Returns relating to Taxes that are included in or related to the Excluded Liabilities.

(b)    Seller shall bear and be liable for any Taxes attributable to any taxable period ending on or before the Closing Date (a "**Pre-Closing Tax Period**") including any Taxes attributable to the pre-Closing portion of any Straddle Period as determined in accordance with

30

this Section 9.2(b) ("**Pre-Closing Straddle Taxes**"). Except as described in the following sentence, the amount of Pre-Closing Straddle Taxes will be determined based on an interim closing of the books as of the end of the day on the Closing Date. The amount of any real property, personal property and similar *ad valorem* Taxes for a Straddle Period that are Pre-Closing Straddle Taxes will be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period. The amount of Taxes allocable to Seller for the Pre-Closing Tax Period shall be estimated as of the Closing Date and paid over at the Closing to Buyer; provided, however, that final payments with respect to the any such Taxes that are not able to be calculated as of the Closing Date shall be calculated and paid over as soon as practicable after the Closing Date but no later than five (5) business days after determination of the amount of any such Taxes. Notwithstanding anything to the contrary herein, Seller shall bear and be liable for, and Buyer shall have no liability for, any Taxes included in or related to the Excluded Liabilities.

9.3     Cooperation. The Parties shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and Proceedings with respect to any Taxes in respect of the Purchased Assets and the Assumed Liabilities. Pursuant to such cooperation, each Party shall (i) provide the other with such assistance as may reasonably be requested (subject to reimbursement of reasonable out-of-pocket expenses) in connection with the preparation of any Tax Return, audit or other examination by any Governmental Entity or other Proceeding relating to Taxes (in connection with the Purchased Assets), (ii) retain and provide the other Party with any records or other information that may be relevant to such Tax Return, audit or other Proceeding and (iii) inform the other Party of any final determination of any such audit or examination, proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such Tax Return or Tax proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Seller shall abide by all record retention agreements entered into with any Governmental Entity and give Buyer thirty (30) days' written notice prior to transferring, destroying or discarding any records relating to Taxes and if Buyer so requests, shall allow Buyer to take possession of such Tax records.

9.4     Other Tax Matters. Except as specifically set forth in this Agreement, neither Party makes any representations regarding the implications of the transactions contemplated herein on any liability for any Taxes to any Governmental Entity.

## ARTICLE X

## MISCELLANEOUS

10.1     Expenses. Whether or not the Closing takes place, except as otherwise provided herein, all fees, costs, and expenses incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the consummation of the transactions contemplated hereby will be paid by the Party incurring such fees, costs, and expenses.

31

10.2   Closing Law Firm. The law firm of Clifford Chance US LLP, or such other law firm as Buyer may select in its reasonable discretion (the "**Closing Firm**"), will be authorized to perform the Closing in consultation with bankruptcy counsel for Seller. Buyer will be solely responsible for payment of any fees or costs incurred by or related to the services provided by the Closing Firm.

10.3   Notices. Except as otherwise expressly provided herein, all notices, demands, and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, receipt confirmed, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service, or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address, or street address, as applicable, set forth below, or at such other number, electronic mail address, or street address as such Party may specify by written notice to the other Party.

> Notices to Buyer:
>
> ArcLink Fiber LLC
> 24 Endell Street, London
> United Kingdom, WC2H 9HQ
> Attn:  Phoebe Smith and Bart Saenen
> Email: future@patrizia.ag; SIFITopco@patrizia.ag
>
> with a copy to (which shall not constitute notice):
>
> Clifford Chance US LLP
> Attn: Laurens Wilkes; David Feldman; Alexandra Wilde; Matthew Hinker
> 845 Texas Ave, Suite 2700
> Houston, TX 77002
> Email: laurens.wilkes@cliffordchance.com; david.feldman@cliffordchance.com; alexandra.wilde@cliffordchance.com; matthew.hinker@cliffordchance.com.
>
> and
>
> Young Conaway Stargatt & Taylor LLP
> Attn: Sean M. Beach
> Rodney Square
> 1000 North King Street
> Wilmington, DE 19801
> Email: sbeach@yvst.com
>
> Notices to Seller:
>
> SiFi Networks America, LLC
> Attn: Jacen Dinoff, Chief Restructuring Officer
> 700 Technology Park Drive, Suite 212

Billerica, MA  01821
Email: jdinoff@kcpadvisory.com

with a copy to (which shall not constitute notice):

Cole Schotz P.C.
Attn: James Stefanick; Daniel F. X. Geoghan; Jacob Frumkin
1325 Avenue of the Americas
New York, NY 10019
Email:                          jstefanick@coleschotz.com;
dgeoghan@coleschotz.com; jfrumkin@coleschotz.com

10.4     Binding Effect. This Agreement shall be binding upon Buyer and, subject to the entry into and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor case.

10.5     Assignment. This Agreement may not be assigned by any of the Parties, provided, however, that Buyer may assign this Agreement and the rights and obligations hereunder to a Designated Purchaser; provided, further, that nothing herein shall be deemed to prohibit Buyer from assigning any of the Purchased Assets, the Assumed Liabilities, or any rights related thereto to any Person after the Closing Date.

10.6     Amendment and Waiver. Any provision of this Agreement or exhibits hereto may be (a) amended only in a writing signed by the Parties, or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.7     Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.8     Non-Recourse. This Agreement may only be enforced against, and any Proceeding based upon, arising out of or related to this Agreement may only be brought against, the entities that are expressly named as Parties to this Agreement. Except to the extent named as a Party to this Agreement, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, incorporator, employee, affiliate, agent, or advisor of either Party or any subsidiary of either Party will have any liability (whether in Contract, tort, equity, or otherwise) for any of the representations, warranties, covenants, agreements, or other obligations or liabilities of any of the parties to this Agreement or for any Proceeding based upon, arising out of, or related to this Agreement.

10.9     Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision

33

of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.10 <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.11 <u>Complete Agreement</u>. This Agreement, together with the Related Documents, contains the entire agreement of the Parties respecting the sale and purchase of the Purchased Assets and the assumption of the Assumed Liabilities and the transactions contemplated hereby and by the Related Documents and supersedes all prior agreements among the Parties respecting the sale and purchase of the Purchased Assets, the assumption of the Assumed Liabilities and the transactions contemplated hereby and thereby.

10.12 <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated hereby. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance, or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions hereby and without that right, neither Party would have entered into this Agreement. The Parties acknowledge and agree that either Party pursuing an injunction or injunctions or other Decree to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Decree. The remedies available to the Parties pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled under this Agreement, and the election to pursue an injunction or specific performance will not restrict, impair, or otherwise limit the Parties from seeking to collect or collecting damages as limited pursuant to this Agreement.

(b)    If, prior to the Outside Date, either Party commences any Proceeding, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by the other Party, the Outside Date will automatically be extended (i) for the period during which such Proceeding is pending, *plus* ten (10) Business Days, or (ii) by such other time period established by the court presiding over such Proceeding, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty of Seller made herein.

34

10.13    Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Proceeding that may be based upon, arising out of, or related to this Agreement brought by the other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken, (b) in the event the Bankruptcy Case is closed, or if the Bankruptcy Court is unwilling or unable to hear such Proceeding, in the Chancery Court of the State of Delaware (and any state appellate court therefrom within the State of Delaware), or (c) if the Chancery Court of the State of Delaware declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware. Each of the Parties hereby irrevocably submits to the exclusive jurisdiction of such with regard to any such Proceeding arising out of or relating to this Agreement. The Parties irrevocably agree that venue would be proper in any of the courts referenced above and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Proceeding. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices herein.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, all matters related to this Agreement will be governed by and construed in accordance with the internal Laws of the State of Delaware without regard to conflicts of Law principles.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH PROCEEDING WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE AND UNCONDITIONAL WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    Counterparts. This Agreement may be executed in any number of counterparts, including by means of electronically transmitted portable document format (pdf) signature pages, each of which shall be an original but all of which together shall constitute one and the same instrument.

10.16  Bulk Sales Laws. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens in the Purchased Assets, including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers," or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated hereby.

10.17  Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its directors or officers, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For purposes of clarity, Seller shall retain the right to pursue any Alternative Transaction that, in Seller's business judgment, will maximize the value of its bankruptcy estate.

## ARTICLE XI
## INTERPRETATION AND DEFINITIONS

11.1  References and Rules of Construction. All references in this Agreement to Exhibits, Schedules, Articles, Sections, subsections, clauses and other subdivisions refer to the corresponding Exhibits, Schedules, Articles, Sections, subsections, clauses and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Exhibits, Schedules, Articles, Sections, subsections, clauses and other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision unless expressly so limited. The words "this Article," "this Section," "this subsection," "this clause" and words of similar import refer only to the Article, Section, subsection and clause hereof in which such words occur. The word "including" (in its various forms) means including without limitation. All references to "$" or "dollars" shall be deemed references to United States dollars. For purposes of determining the United States dollar equivalent of any non-United States currency, such currency shall be deemed to have been converted into United States dollars at 12:00 p.m. prevailing Eastern Time on the date on which such amount was paid, incurred, distributed or otherwise determined in non-United States currency at the applicable foreign exchange spot rate for settlement as quoted by Bloomberg on www.bloomberg.com/markets/currencies/fxc.html, or as displayed on another information service of similar repute which publishes that rate of exchange from time to time. Each accounting term not defined herein will have the meaning given to it under GAAP as interpreted as of the date of this Agreement. Unless expressly provided to the contrary, the word "or" is not exclusive and has the meaning represented by the phrase "and/or." Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Exhibits and Schedules referred to herein are attached to and by this reference incorporated herein for all purposes. Reference herein to any federal, state, local or foreign Law shall be deemed to also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise, and reference herein to any

36

agreement, instrument or Law means such agreement, instrument or Law as from time to time amended, modified or supplemented, including, in the case of agreements or instruments, by waiver or consent and, in the case of Laws, by succession of comparable successor Laws. References to a Person are also to its permitted successors and permitted assigns. References to any date shall mean such date in New York, New York. The words "made available to Buyer," "provided to Buyer" or similar phrases shall mean made and remaining available to Buyer or its representatives in the data room prepared by Seller at least three Business Days prior to the date hereof or provided to Buyer or its Representatives in response to requests for materials or information, in each case, prior to the date hereof.

11.2    Defined Terms. As used in this Agreement, the following terms shall have the respective meanings set forth below:

"**Accounts Receivable**" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, bill receivables, trade accounts, hold backs, retention, book debts, insurance claims, negotiable instruments, chattel paper (including completed work which has not yet been billed), vendor and supplier rebates and other receivables (including in respect of goods shipped, products sold, licenses granted, services rendered or otherwise and all amounts that may be returned or returnable with respect to letters of credit or other financial collateral drawn down prior to the closing of the transaction) from third parties, together with any unpaid financing charges accrued thereon, in each instance, of Seller, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"**Affiliate**" means, with respect to any Person, any Person that directly or indirectly Controls, is Controlled by or is under common Control with such Person; provided, however, with respect to Seller, Buyer shall not be deemed an Affiliate of Seller for purposes of this Agreement.

"**Agreement**" means this Asset Purchase Agreement, as it may be amended or modified in accordance with the provisions hereof.

"**Allocation**" has the meaning ascribed to such term in Section 2.7.

"**Alternative Transaction**" has the meaning ascribed to such term in Section 6.4(b).

"**Assumed Contract List**" has the meaning ascribed to such term in Section 1.5(a).

"**Assumed Contract**" has the meaning ascribed to such term in Section 1.5(a).

"**Assumed Liabilities**" has the meaning ascribed to such term in Section 1.3.

"**Assumption Notice**" has the meaning ascribed to such term in Section 1.5(a).

"**Auction**" has the meaning ascribed to such term in the Bid Procedures Order.

"**Avoidance Actions**" means all causes of action, lawsuits, claims, rights of recovery, and other similar rights of Seller arising under Chapter 5 of the Bankruptcy Code.

"**Bankruptcy Case**" has the meaning ascribed to such term in the Recitals.

37

"**Bankruptcy Code**" has the meaning ascribed to such term in the Recitals.

"**Bid Procedures Order**" means an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit B.

"**Bill of Sale, Assignment and Assumption Agreement**" has the meaning ascribed to such term in Section 2.4(a).

"**Break-Up Fee**" means an amount equal to three percent (3%) of the Purchase Price to compensate Buyer for serving as the "stalking horse" and subjecting this Agreement and the Related Documents to higher and better offers.

"**Business**" means the ownership, operation and use of the Purchased Assets by Seller, and the conduct of other activities of Seller incidental to the foregoing.

"**Business Day**" means each calendar day except Saturdays, Sundays, and any other day on which banks are required or authorized to close in the State of Delaware or London, England.

"**Buyer**" has the meaning ascribed to such term in the Introduction.

"**Cash and Cash Equivalents**" means, collectively, all of Seller's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities, and other cash equivalents.

"**Chapter 11 Case**" has the meaning ascribed to such term in the Recitals.

"**Closing Date Payment**" has the meaning ascribed to such term in Section 2.2.

"**Closing Date**" has the meaning ascribed to such term in Section 2.3.

"**Closing Firm**" has the meaning ascribed to such term in Section 10.2.

"**Closing**" has the meaning ascribed to such term in Section 2.3.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidential Information**" means any non-public or proprietary information concerning the businesses and affairs of either Party.

"**Consent**" has the meaning ascribed to such term in Section 1.5(c).

"**Contract**" means any written agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, bid, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission, or commitment that, in each case, is legally-binding.

38

"**Control**" means the ability to direct the management and policies of a Person, whether through ownership of voting securities or other voting power of such Person or the ability to appoint a majority of the directors or management or otherwise to control the management and policies of a Person. The terms "Controls" and "Controlled by" and other derivatives shall be construed accordingly.

"**Credit Bid**" has the meaning ascribed to such term in Section 2.1.

"**Cure Amounts**" has the meaning ascribed to such term in Section 1.5.

"**Current Employees**" means all individuals (including directors, officers, independent contractors, or other individual service providers) employed or engaged by Seller, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"**Data Security Requirements**" has the meaning ascribed to such term in Section 3.8(e).

"**Decree**" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order, or any other order of any Governmental Entity.

"**Designated Buyer**" has the meaning ascribed to such term in Section 1.6.

"**DIP Lender**" means the lender under the DIP Note, in its capacity as such.

"**DIP Note**" means the Delayed Draw Term Loan Note Promissory Note, dated as of [•], by and between the Seller and the DIP Lender, as amended, restated, supplemented or otherwise modified from time to time.

"**DIP Loans**" has the meaning ascribed to the term "Loan" in the DIP Note.

"**DIP Motion"** has meaning ascribed to the term "Motion" in the DIP Order.

"**DIP Obligations**" has the meaning ascribed to the term "Obligations" in the DIP Note.

"**DIP Order**" means the order of the Bankruptcy Court approving the DIP Note, including the "**Interim DIP Order**" and the "**Final DIP Order**" (each as defined in the DIP Motion ).

"**Employee Benefit Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), whether or not ERISA is applicable to such plan, and each other bonus, incentive, retention, stock option, stock purchase, restricted stock, equity-based, phantom, retirement, savings, pension, deferred compensation, supplemental retirement, health, welfare, paid leave, employment, compensation, severance and other similar fringe or employee benefit plans, programs or arrangements (whether written or oral, funded or unfunded) currently maintained, sponsored or contributed to by Seller for the benefit of any Current Employee or Former Employee, officer, director, individual contractor, or individual consultant of Seller (or their beneficiaries or dependents) or with respect to which Seller has any current, or would be reasonably expected to have any, liability or obligation (whether actual, contingent, or otherwise),

39

including on behalf of any ERISA Affiliate.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is part of the same controlled group, or under common control with, or part of an affiliated service group that includes Seller within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"**ERISA**" means the United States Employee Retirement Income Security Act of 1974, as amended.

"**Excluded Assets**" has the meaning ascribed to such term in Section 1.2.

"**Excluded Liabilities**" has the meaning ascribed to such term in Section 1.4.

"**Expense Reimbursement**" has the meaning ascribed to such term in Section 8.3(b).

"**Final Order**" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the bankruptcy rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"**Former Employees**" means all individuals (including directors, officers, independent contractors, or other individual service providers) who have been employed or engaged previously by Seller (or any of its predecessors) who are not Current Employees.

"**Governmental Entity**" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body, or other governmental entity.

"**Hazardous Substance**" means any toxic or hazardous material, substance, or waste regulated or as to which liability or standards of conduct may be imposed under any Environmental Laws.

"**Health and Welfare Plans**" means those Employee Benefit Plans set forth or required to be set forth on Schedule 3.11(a) providing for medical, dental, life, disability, long-term care or other welfare insurance.

"**Intellectual Property**" means any and all rights, title, and interest in or relating to intellectual property or proprietary rights, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all

40

reissues, continuations, continuations-in-part, divisionals, extensions, and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names, and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations, and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, copyrights, database, and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) rights in software (including object code, source code, Systems, tools, firmware, interfaces, and related documentation and materials), data, and databases; (e) inventions (whether or not patentable or reduced to practice) and all improvements thereto, processes, methods, designs, technologies, techniques, protocols, methodologies, formulae, formulations, algorithms, layouts, specifications, discoveries, compositions, industrial models, architectures, drawings, plans, ideas, research and development, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, trade secrets, know-how, and other proprietary confidential information (collectively, "**Trade Secrets**"); and (f) copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"**Interim Period**" means the period between the close of business on the date of this Agreement and the earlier of (x) Closing and (y) the termination of this Agreement.

"**Law**" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, Decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion, or requirement issued, enacted, adopted, promulgated, implemented, or otherwise put into effect by or under the authority of any Governmental Entity.

"**Leases**" means all leases, subleases, licenses, concessions, and other agreements (written or oral) or arrangements pursuant to which Seller holds any real property, together with all amendments, extensions, renewals, guaranties, and other agreements and arrangements with respect thereto, and including the right to all security deposits and other amounts and instruments deposited by or on behalf of Seller thereunder.

"**Liabilities**" means any and all debts, liabilities, commitments and obligations, whether direct or indirect, fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, due or to become due, known or unknown, asserted or not asserted, ascertained or ascertainable.

"**Lien**" means any lien, license, encumbrance, claim, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale, or other title retention agreements and other similar impositions, imperfections, defects of title, or other restrictions on transfer or use.

"**Material Adverse Effect**" means any change, event, effect, development, condition, circumstance, or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances, or occurrences), that (a) is materially adverse to the

41

financial condition or results of operations of the Purchased Assets (taken as a whole), or (b) would reasonably be expected to prevent, materially delay or materially impair the ability of Seller to consummate the transactions contemplated hereby or the Related Documents on the terms set forth herein and therein.

"**Ordinary Course**" means the ordinary course of Seller's business with respect to the Purchased Assets; provided, such business is operated consistent in nature, scope and magnitude with Seller's past customs, operations, practices, and procedures.

"**Outside Date**" has the meaning ascribed to such term in Section 8.1(e).

"**Party**" or "**Parties**" has the meaning ascribed to such term in the Introduction.

"**Permit**" means any franchise, approval, permit, license, concessions, order, registration, certificate, variance, consent, exemption, or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"**PII**" has the meaning ascribed to such term in Section 3.8(e).

"**Pre-Closing Tax Period**" has the meaning ascribed to such term in Section 9.2(b).

"**Pre-Closing Straddle Taxes**" has the meaning ascribed to such term in Section 9.2(b).

"**Prepetition Note**" means that certain Secured Promissory Term Note, dated as of May 6, 2026 among Sifi Networks America, LLC, as the borrower and ArcLink Fiber LLC as the noteholder.

"**Proceeding**" means any action, suit, litigation, claim, complaint, demand, charge, arbitration or proceeding (including any civil, criminal, administrative, investigative, enforcement, regulatory or appellate proceeding), hearing, inquiry, audit, examination, mediation, or investigation commenced, brought, conducted or heard by or before, or otherwise involving any court or other Governmental Entity or any arbitrator, whether at Law or in equity.

"**Purchase Price**" has the meaning ascribed to such term in Section 2.1.

"**Purchased Assets**" has the meaning ascribed to such term in Section 1.1.

"**Related Documents**" means the Bill of Sale, Assignment and Assumption Agreement, and any other agreements, certificates and other instruments delivered, given or contemplated pursuant to this Agreement.

"**Representatives**" shall mean a Person's designees, officers, counsel, accountants, actuaries, financing sources, and other authorized representatives.

42

"**Sale**" has the meaning set forth in the Bid Procedures Order.

"**Sale Hearing**" means the hearing seeking entry of the Sale Order, which hearing may, with the prior written consent of Buyer which may be withheld in its sole discretion, take the form of a hearing to consider confirmation of Seller's Chapter 11 plan.

"**Sale Motion**" means a motion filed by the Debtor in the Bankruptcy Court, in form and substance acceptable to Buyer, among other things, requesting (a) approval of this Agreement, (b) authorization of the sale of the Purchased Assets to Buyer pursuant to section 363 of the Bankruptcy Code, pursuant to the terms and conditions set forth herein, free and clear of any Liens (other than Permitted Liens), (c) authorization of the assumption by, and assignment to, Buyer of the Assumed Contracts and the Assumed Liabilities pursuant to section 365 of the Bankruptcy Code and (d) authorization of the other transactions contemplated by this Agreement.

"**Sale Order**" has the meaning ascribed to such term in the Recitals.

"**Seller's Knowledge**" means, with respect to Seller, the actual knowledge, without any obligation of inquiry or investigation, of Michael Wyse.

"**Seller**" has the meaning ascribed to such term in the Introduction.

"**Straddle Period**" has the meaning ascribed to such term in Section 9.2(a).

"**Successful Bidder**" has the meaning ascribed to such term by the Bid Procedures Order.

"**Supplemental Assumption Notice**" has the meaning ascribed to such term in Section 1.5(a).

"**Systems**" means servers, software, computer firmware, computer hardware, electronic data processing equipment, websites, databases, interfaces, platforms, circuits, networks, network equipment, peripherals, computer systems, and other computer, communications, and telecommunications devices and equipment, and other information technology systems, and data or information contained therein or transmitted thereby, in each case owned, leased, licensed, or otherwise used or relied on by Seller.

"**Tax Return**" means any return, declaration, report, claim for refund or information, return, or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Tax**" or "**Taxes**" means any United States federal, state, local, or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, sales, use, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary, or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether or not disputed.

43

"**Transfer Taxes**" has the meaning ascribed to such term in <u>Section 9.1</u>.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Laws.

[*Signatures on following page*]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLER:**

SIFI NETWORKS AMERICA, LLC

By: _Jacen Dinoff_____

Name:  Jacen Dinoff

Title:    Chief Restructuring Officer

**BUYER:**

ARCLINK FIBER LLC

By:      _____

Name:

Title:

By:      _____

Name:

Title:

[Signature Page to Asset Purchase Agreement]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLER**</u>:

SIFI NETWORKS AMERICA, LLC

By: _____

Name:

Title:

<u>**BUYER:**</u>

ARCLINK FIBER LLC

By: *Bart Saenen* _____
    A1FFA9975007476...

Name:  Bart Saenen

Title:   Director

By: _____
    F1C0DAE085354C1...

Name:  Phoebe Smith

Title:   Director

[Signature Page to Asset Purchase Agreement]

## Exhibit A

**Form of Bill of Sale, Assignment and Assumption Agreement**

See attached.

*Execution Version*

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

This Bill of Sale, Assignment and Assumption Agreement (this "**Agreement**") is made as of [•] (the "**Effective Date**"), by and between ArcLink Fiber LLC, a Delaware limited liability company ("**Buyer**"), and SiFi Networks America, LLC, a Delaware limited liability company ("**Seller**").

WHEREAS, Seller and Buyer are parties to that certain Asset Purchase Agreement, dated as of the date hereof (the "**Purchase Agreement**"); and

WHEREAS, pursuant to the Purchase Agreement, Seller has, amongst other things, agreed to sell, convey, assign and transfer to Buyer, and Buyer has agreed to purchase, acquire and accept from Seller, all of the Purchased Assets on the terms and subject to the conditions set forth in the Purchase Agreement.

NOW, THEREFORE, on the terms and subject to the conditions set forth herein and in the Purchase Agreement and in consideration of the mutual covenants set forth herein and in the Purchase Agreement, and other good and valuable consideration as set forth in the Purchase Agreement, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

1.    Defined Terms.    Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Purchase Agreement.

2.    Sale, Assignment and Assumption of Purchased Assets. Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Seller hereby sells, assigns, transfers and delivers to Buyer, and Buyer hereby purchases, acquires and accepts from Seller, free and clear of all Liens (except for Liens supporting the Assumed Liabilities expressly set forth in Schedule 1.3 of the Purchase Agreement and Liens expressly set forth in the Sale Order), all the right, title and interest of Seller in, to and under the Purchased Assets.

3.    Assignment and Assumption of Assumed Liabilities. Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Buyer hereby assumes only the Liabilities of Seller expressly included under the Assumed Liabilities (excluding the Excluded Liabilities).

4.    No Assumption of Excluded Liabilities. Other than the Assumed Liabilities specifically assumed by Buyer pursuant to the Purchase Agreement, Buyer expressly does not, and shall not, assume or agree to assume, pay, satisfy, discharge, perform or be responsible for in any manner and shall not, by virtue of the execution and delivery of this Agreement, be deemed to have assumed or to have agreed to pay, satisfy, discharge or perform or be responsible for in any manner, the Excluded Liabilities or any other Liabilities of Seller of any nature whatsoever.

5.    Relation to Asset Purchase Agreement. This Agreement is intended only to effect the transfer of Assets pursuant to the Purchase Agreement, and nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warranties, covenants, agreements, obligations, conditions, representations or, in general any of the rights and remedies, and any of the obligations

of any party set forth in the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

6.      Counterparts. This Agreement may be executed in any number of counterparts, including by means of electronically transmitted portable document format (pdf) signature pages, each of which shall be an original but all of which together shall constitute one and the same instrument.

7.      Miscellaneous. Section 6.5 (*Further Assurances*), 10.3 (*Notices*), 10.4 (*Binding Effect*) 10.5 (*Assignment*), 10.6 (*Amendment and Waiver*), 10.9 (*Severability*), 10.10 (*Construction*), 10.11 (*Complete Agreement*), 10.12 (*Specific Performance*), 10.13 (*Jurisdiction and Exclusive Venue*), 10.14 (*Governing Law; Waiver of Jury Trial*), and 11.1 (*References and Rules of Construction*) of the Purchase Agreement are hereby incorporated by reference into this Agreement *mutatis mutandis*.

[*Signature page follows.*]

2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers effective as of the Effective Date.

**SELLER:**

SIFI NETWORKS AMERICA, LLC

By: _____

Name:

Title:

**BUYER:**

ARCLINK FIBER LLC

By: _____

Name:

Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

## Exhibit B

**Form of Bid Procedures Order**

Intentionally omitted.