IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br><br>SiFi Networks America, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-10912 (BLS)<br><br>**Ref. D.I. 13** |

**LIMITED OBJECTION OF T-MOBILE USA, INC. TO DEBTOR'S MOTION
FOR ENTRY OF AN ORDER (I) APPROVING THE BIDDING PROCEDURES,
(II) SCHEDULING CERTAIN DATES AND DEADLINES WITH RESPECT
THERETO, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(IV) APPROVING THE STALKING HORSE AGREEMENT, (V) APPROVING
THE PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, (VI) APPROVING THE SALE
OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (VII) AUTHORIZING
THE DEBTOR'S ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND
(VIII) GRANTING RELATED RELIEF**

T-Mobile USA, Inc. ("T-Mobile"), through its undersigned counsel, hereby files this limited objection (the "Limited Objection") to the *Debtor's Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Approving the Sale of Substantially All of the Debtor's Assets, (VII) Authorizing The Debtor's Assumption And Assignment Of Certain Executory Contracts and Unexpired Leases, and (VIII) Granting Related Relief* [D.I. 13] (the "Motion")[2]

---

[1] The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990). The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

filed by the above-captioned debtor (the "Debtor").  In support of this Limited Objection, T-Mobile respectfully states as follows:

## PRELIMINARY STATEMENT

1.  T-Mobile does not oppose the Debtor's efforts to seek approval of an orderly sale process designed to maximize estate value.  These objectives, however, are best served by bidding procedures that are transparent and include a reasonable timeframe in order to provide prospective bidders with a meaningful opportunity to participate in the bidding process on a fully informed basis.  To this end, T-Mobile objects to the expedited timeline and aspects of the Bidding Procedures that create uncertainty and unnecessary burden for prospective bidders.  The procedures leave several material aspects of the bidding process undefined or otherwise incapable of being determined sufficiently in advance of the Bid Deadline, which is set for July 14, just six days after the hearing on this Motion.  This uncertainty coupled with the abrupt timeline presents a process which is unlikely to produce a value-maximizing transaction.

2.  These issues are particularly important where, as here, the proposed sale is anchored by a stalking horse bidder that is not an unrelated third party but rather the Debtor's prepetition secured lender, DIP lender, and an insider of the Debtor.  Under these circumstances, the Bidding Procedures should clearly define the requirements for submitting a Qualified Bid and provide prospective bidders with sufficient information to compete on equal footing.  As currently drafted, the Bidding Procedures fail to do so.

3.  *First*, the procedures require prospective bidders to submit an Estate Funding Commitment as part of any Qualified Bid in an unknown amount and for unknown reasons given that the Debtor has already secured DIP financing.  Not only does this leave prospective bidders in the dark with respect to a material component of the Bidding Requirements, but it also provides

the Stalking Horse Bidder with an unfair advantage—the ability to credit bid its remaining committed DIP claims while at the same time requiring competing bidders to submit a minimum overbid (in an uncertain amount) that covers the costs of administration of the Debtor's estate.  The Stalking Horse Bidder, in its capacity as the prepetition and DIP lender, should be required to "pay the freight" if it wants to utilize the tools of chapter 11 to maximize the value of its collateral. Instead, the proposed bidding procedures appear designed to provide the Stalking Horse Bidder with an expedited foreclosure on its collateral or, in the event any other purchasers are able to ascertain value and present a bid during this short period of time, a guarantee that someone else will pick up the tab for the chapter 11 process.  Bidding procedures are required to maximize value for all stakeholders—not just the Debtor's prepetition lender and owner.

4.       *Second*, the procedures require that prospective bidders satisfy other minimum bid requirements that cannot presently be determined from the information available, while simultaneously requiring bids to be submitted on an expedited timeline with limited time for diligence.

5.       *Lastly*, the proposed adequate assurance requirements are insufficient to ensure that contract counterparties receive non-financial and operational information necessary to evaluate a proposed assignee's ability to perform under the assigned contracts given the specialized nature of the Debtor's business.  For these reasons, T-Mobile respectfully submits that the Court deny the Motion, or in the alternative, direct the Debtor to modify the Bidding Procedures in accordance with this Limited Objection.

## **RELEVANT BACKGROUND**

6.       T-Mobile and the Debtor are parties to a framework agreement which governs the parties' relationship with respect to fiber network projects that are developed, managed and/or

operated by certain non-debtor SPV affiliates of the Debtor (the "Project Companies").  T-Mobile is also party to separate agreements with certain Project Companies that provide T-Mobile with access to the Project Companies' fiber-to-the-premises networks for the provision of residential internet services.

7.    On June 5, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor continues to operate its business and property as a debtor in possession under Sections 1107 and 1108 of the Bankruptcy Code.

8.    On June 22, 2026, the United States Trustee appointed the Official Committee of Unsecured Creditors in this Chapter 11 Case [D.I. 84].

9.    On the Petition Date, the Debtor also filed the Motion, pursuant to which the Debtor seeks to sell substantially all of its assets.  In connection with the proposed sale, the Debtor selected ArcLink Fiber LLC ("ArcLink") as the Stalking Horse Bidder.  Notably, ArcLink also serves as the Debtor's prepetition secured lender and postpetition DIP lender and, according to the Motion, is a statutory "insider" of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code.  Mot. at 14.

### LIMITED OBJECTION

10.    One of the primary purposes of the Bankruptcy Code is to maximize the value of the bankruptcy estate for the benefit of creditors.  *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (finding that a debtor, as a fiduciary to the estate, has a duty to maximize the value of the estate).  To further this purpose, sale procedures must seek to "facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards,* 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998).

11.     Additionally, transactions involving insiders are subject to a heightened level of scrutiny.  *See Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein.").

## I.     The Estate Funding Commitment Should be Removed.

12.     The Bidding Procedures require prospective bidders to include in their bid an "Estate Funding Commitment," which is defined as "the amount necessary to finance the Debtor's Chapter 11 Case from the date a Bid is selected as the Successful Bid through the effective date of a confirmed plan of reorganization or other emergence from chapter 11."  Mot. at 20.

13.     This requirement is unnecessary and inappropriate under the circumstances.  Rather than facilitating an open and competitive sale process designed to maximize estate value, the Estate Funding Commitment introduces uncertainty into the bidding process by requiring prospective bidders to commit to undefined funding obligations.

14.     First, the magnitude of this minimum bid requirement is completely uncertain and undefined.  The Bidding Procedures provide no information to any prospective bidders regarding what the amounts necessary to fund the Debtor's estate would be or what those costs might include. Indeed, the Estate Funding Commitment requires an open-ended commitment by any prospective purchaser to finance future events—plan confirmation or "other emergence"—that may or may

not ever occur.  Prospective purchasers have no way to quantify the scope of this requirement, which undoubtedly chills bidding and should be removed.

15.     Second, this lack of clarity is particularly troubling where, as here, the Stalking Horse Bidder is an insider, DIP lender, and prepetition secured lender.  Because insider transactions are subject to heightened scrutiny, the Court should require greater—not less—clarity regarding the obligations imposed on prospective bidders.  *See Crown Vill. Farm, LLC,* 415 B.R. at 93.

16.     Third, the Estate Funding Commitment creates advantages for the Stalking Horse Bidder that are inappropriate and not conducive to maximizing value for all stakeholders.  In essence, the proposed Bidding Procedures provide the Stalking Horse Bidder with either an expedited sale to itself of its collateral or a guarantee that any other purchaser will fulfill the Estate Funding Commitment and cover its DIP commitments.  This framework is not designed to maximize value for all parties.

17.     Finally, it may be argued that the Stalking Horse Bidder could have, instead, credit bid all of its secured claims but by keeping the initial credit bid lower, it promotes greater interest in the assets and potential bidding.  However, the Estate Funding Commitment already appears to functionally require any potential bidder to clear all of the Stalking Horse Bidder's debt while, at the same time, allowing the Stalking Horse Bidder to maintain additional credit bidding capacity. All this framework does is create complexity and uncertainty in the process.

18.     The Estate Funding Commitment has not been quantified in any way and, as a result, prospective bidders cannot determine the Minimum Bid amount necessary to comply with the Bidding Procedures before investing substantial time and expense in completing diligence and preparing a bid.  Faced with that uncertainty, otherwise interested bidders may elect not to

participate at all, thereby chilling competitive bidding. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) (affirming bankruptcy court's denial of a break-up fee and finding that "such fees and expenses would perhaps chill or at best certainly complicate the competitive bidding process"). As a result, the Estate Funding Commitment should be removed from the Bidding Procedures.

**II.     The Minimum Bid Amount Cannot be Determined.**

19.     The Bidding Procedures require any overbid to exceed the value of the Stalking Horse Bid. Yet, prospective bidders cannot determine the minimum overbid amount due to an absence of information in the Bidding Procedures.

20.     The Stalking Horse Purchase Price includes not only the stated credit bid amount and the Estate Funding Commitment but also Assumed Liabilities and Cure Amounts that also have not been quantified or estimated. The Debtor should disclose the information necessary to calculate the Minimum Bid prior to approval of the Bidding Procedures and sufficiently in advance of the Bid Deadline in order to enable prospective bidders to determine such minimum consideration and submit a Qualified Bid. Absent disclosure of these material Stalking Horse Bid components, prospective bidders cannot objectively determine whether their bids satisfy the Bidding Procedures. This failure undermines the open and competitive sale process contemplated by the Bankruptcy Code and impairs the ability of prospective bidders to compete on a fully informed basis. Moreover, this failure is particularly acute where, as here, the proposed sale is anchored by an insider stalking horse bid. *See In re Edwards*, 228 B.R. at 561; *Crown Vill. Farm, LLC,* 415 B.R. at 93.

**III.    The Sale Timeline Does Not Provide Sufficient Time for Diligence.**

21.     Under the proposed sale timeline, prospective bidders initially were afforded only

7

13 days between the originally scheduled hearing on the Motion (July 1, 2026) and the Bid Deadline (July 14, 2026) to complete diligence and prepare a Qualified Bid. Following adjournment of the hearing to July 8, 2026, prospective bidders now effectively have only six days between the hearing and Bid Deadline to do so, absent a corresponding extension of the sale schedule.  The abbreviated timeline demands that, within a very short window, prospective bidders must simultaneously evaluate the assets being sold, review executory contracts, quantify cure obligations and assumed liabilities, and determine the amount of the Estate Funding Commitment.

22.     This timeline is especially concerning against the backdrop of a proposed insider transaction.  Here, on a rushed timeline, prospective bidders are required to undertake potentially significant and costly diligence and prepare a bid that satisfies the Bidding Requirements, all while an insider of the Debtor is positioned to acquire the assets.  Under these circumstances, the abbreviated bidding schedule risks discouraging prospective bidders from investing the time and expense necessary to prepare competing bids.  *See In re Del. Valley Lift Truck Inc.*, 640 B.R. 342 (Bankr. E.D. Pa. 2022) (finding that an expedited 47-day sale process between the filing of the bidding procedures motion and the sale hearing "would obviously chill any opportunity for competitive bidding").  As such, T-Mobile submits that the proposed sale timeline should be extended to provide prospective bidders with a meaningful window to complete diligence and prepare Qualified Bids.

**IV.     The Adequate Assurance Procedures Should be Enhanced.**

23.     The Adequate Assurance Information required under the Bidding Procedures is limited to information demonstrating that the prospective bidder "(a) has the financial wherewithal and ability to consummate the acquisition. . . and (b) can provide adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy

Code, and the Potential Bidder's willingness to perform, under any contracts that are proposed to be assumed and assigned to such party." Mot. at 21-22. These requirements should be modified to explicitly require that any proposed assignee provide sufficient information to enable contract counterparties to determine whether the proposed assignee can satisfy non-financial and operational obligations under the assigned contracts. Although the primary focus of adequate assurance of future performance concerns the assignee's financial ability to perform, non-financial considerations should also be considered. *See Warner Bros. Ent., Inc. v. Vill. Roadshow Ent. Grp. USA, Inc. (In re Vill. Roadshow Ent. Grp. USA, Inc.)*, 676 B.R. 821, 829-30 (D. Del. 2025). Such considerations are of particular importance here given the nature of the Debtor's business and the fact that the assigned contracts involve specialized telecommunications infrastructure projects where counterparties will necessarily require information regarding a proposed assignee's operational capabilities and ability to perform under these contracts, together with a meaningful opportunity to evaluate that information before any objection deadline expires. Thus, the adequate assurance requirements in the Bidding Procedures should be modified accordingly.

### **RESERVATION OF RIGHTS**

24.     Nothing herein shall be construed as (a) T-Mobile's consent to the proposed sale, the assumption or assignment of any contract, any proposed cure amount, or the adequacy of any proposed adequate assurance showing, or (b) a waiver of any rights, claims, defenses, objections, or remedies available to T-Mobile under the Bankruptcy Code, non-bankruptcy law, or any agreement between T-Mobile, on the one hand, and the Debtor or any of the Debtor's affiliates, on the other hand. T-Mobile expressly reserves the right to supplement, amend and/or modify this Limited Objection and to assert additional objections with respect to this Motion and/or the proposed sale. T-Mobile expressly reserves all rights with respect to any agreement between T-

Mobile, on the one hand, and the Debtor or any of the Debtor's affiliates, on the other hand, including the right to object to assumption, assignment, cure amount, or adequate assurance upon receipt of any notice of assumption.

## **CONCLUSION**

25.     For the reasons stated above, T-Mobile respectfully requests that the Court deny the Motion.

Dated:  July 1, 2026
         Wilmington, Delaware

Respectfully submitted,

**PASHMAN STEIN WALDER HAYDEN, P.C**
By: /s/ *Alexis R. Gambale*
John W. Weiss (Del. I.D. No. 4160)
Alexis R. Gambale (Del. I.D. No. 7150)
824 North Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 592-6496
Email: jweiss@pashmanstein.com
         agambale@pashmanstein.com

-and-

**ALSTON & BIRD LLP**
James J. Vincequerra (admitted *pro hac vice*)
William Hao (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email: james.vincequerra@alston.com
         william.hao@alston.com

*Counsel for T-Mobile USA, Inc.*