**<u>Exhibit 1</u>**

**Further Revised Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SiFi Networks America, LLC,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 26-10912 (BLS)<br><br>**Re: Docket No. 13** |

**ORDER (I) APPROVING THE**
**BIDDING PROCEDURES, (II) SCHEDULING**
**CERTAIN DATES AND DEADLINES WITH RESPECT THERETO,**
**(III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,**
**(IV) APPROVING THE STALKING HORSE AGREEMENT, (V) APPROVING**
**THE PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtor and debtor in possession

(the "Debtor") for entry of an order (the "Order"), (i) authorizing and approving sale and bidding

procedures (the "Bidding Procedures") attached hereto as **Exhibit 1**, (ii) scheduling certain dates

and deadlines in connection with the Sale, including the Bid Deadline, Auction, Sale Hearing,

(iii) approving the form and manner of (1) notice of the Auction and Sale Hearing (the "Sale Notice")

attached hereto as **Exhibit 2**, (2) notice of the Assumption Procedures (the "Assumption Notice")

attached hereto as **Exhibit 3**, and (3) notice of Successful Bidder and Back-Up Bidder (the "Notice

of Successful Bidder") attached hereto as **Exhibit 4**, (iv) approving procedures for assuming and

assigning executory contracts and unexpired leases and certain related notices, including notice of

proposed cure amounts, (v) approving the terms of the Stalking Horse Agreement attached hereto as

**Exhibit 5**, including the bid protections, (vi) and granting related relief, all as more fully set forth

---

[1]    The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990).  The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

in the Motion; and upon consideration of the First Day Declaration; and the United States District Court for the District of Delaware having jurisdiction to consider this Motion under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors and other parties in interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor;

THE COURT HEREBY FINDS THAT:

A.	Statutory Predicates. The predicates for the relief granted herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014 and Local Rules 2002-1, 6004-1, and 9013-1.

B.	Notice of Motion. The Debtor's notice of the Motion, the Hearing, and the proposed entry of this Order was sufficient under the circumstances of this case and complied with

all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the applicable Local Rules. Accordingly, no other or further notice of the Motion or the entry of this Order is necessary or required.

C. <u>Sale Process</u>. The Debtor and its advisors have been engaging with a number of potentially interested parties to solicit and develop the highest and otherwise best offers for the Debtor's Assets.

D. <u>Bidding Procedures</u>. The Debtor has articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which were developed in good faith, are fair, reasonable, and appropriate under the circumstances, and are designed to maximize the recovery on, and realizable value of, the Debtor's Assets, as determined by the Debtor in an exercise of its business judgment. The Bidding Procedures comply with the requirements of Local Rule 6004-1(c).

E. <u>Sale Notice</u>. The notice provided by the Debtor regarding the Sale (the "<u>Sale Notice</u>") is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Sale and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the assets for sale; (v) representations describing the Sale as being free and clear of liens, claims, interests, and other encumbrances; and (vi) notice of the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder and the rights, procedures, and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

F. <u>Assumption Procedures</u>. The Assumption Notice is reasonably calculated to provide Counterparties to the Assigned Contracts with proper notice of the intended assumption

and assignment of their executory contracts, any Cure Payments, and the Assumption Procedures. The Assumption Procedures comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

G.    Notice of Successful Bidder.  The Notice of Successful Bidder, substantially in the form attached hereto as **Exhibit 4**, is reasonably calculated to provide interested parties with timely and proper notice of any proposed Sale Transaction with respect to the Assets, including, without limitation: (a)  the Successful Bidder for the Assets, (b) the Back-Up Bidder, if applicable, (c) the key terms of the proposed Sale Transaction, and (d) the date, time, and place for the Sale Hearing.

H.    Other Findings. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the preceding findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the preceding conclusions of law constitute findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED THAT**:

1.    The Motion is granted to the extent set forth in this Order.

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled prior to or at the Hearing are overruled.

## I.      Important Dates and Deadlines

3.      The following dates and deadlines are hereby approved:

| Event or Deadline | Proposed Date and Time (all times in the prevailing Eastern Time) |
|---|---|
| Deadline to File and Serve Sale Notice | July 9, 2026 |
| Deadline to Publish Sale Notice | As soon as reasonably practicable following entry of the Bidding Procedures Order |
| Deadline to File and Serve Assumption Notice | July 9, 2026 |
| Contract Objections Deadline | 4:00 p.m. (ET) on the date that is 14 days after the service of the Assumption Notice |
| Bid Deadline | July 27, 2026 |
| Notice of Successful Bidder and Cancellation of Auction (if no Auction) | July 28, 2026 |
| Auction (if Qualified Bids received) | July 29, 2026 at 10:00 a.m. (ET) |
| Deadline to File Notice of Successful Bidder and Back-Up Bidder | July 30, 2026 |
| Sale Objection Deadline | July 31, 2026 at 4:00 p.m. (ET) |
| Debtor's Response to Objections, if any | August 4, 2026 at 4:00 p.m. (ET) |
| Sale Hearing | August 6, 2026 at 11:00 a.m. (ET) |

4.      **Sale and Contract Objection Deadline**. (a) **July 31, 2026, at 4:00 p.m., prevailing Eastern Time** (the "Sale Objection Deadline"), shall be the deadline by which objections to the entry of an order by the Court approving the Sale, including to the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code shall be filed, and (b) **4:00 p.m., prevailing Eastern Time on the date that is 14 days after service of the Assumption Notice** (the "Contract Objection Deadline"), shall be the deadline by which objections to the assumption of any Assigned Contract (other than the Subsequently Designated Assigned Contracts, as defined in paragraph 24(d) herein) shall be filed. Such objections must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof,

and (c) be filed with the Court and served so as to be actually received by: (i) counsel to the Debtor, Cole Schotz P.C., 500 Delaware Avenue, Suite 600, Wilmington, DE 19801, Attn: Daniel F.X. Geoghan (dgeoghan@coleschotz.com) and Jacob S. Frumkin (jfrumkin@coleschotz.com); (ii) counsel to the DIP Lender and Stalking Horse Bidder, (a) Clifford Chance US LLP, Two Manhattan West, 375 9th Avenue, New York, New York 10001, Attn: David Feldman (David.Feldman@cliffordchance.com) and Matthew L. Hinker (Matthew.Hinker@cliffordchance.com), (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Sean M. Beach (sbeach@ycst.com); (iii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jon Lipshie (Jon.Lipshie@usdoj.gov); and (iv) counsel to the Official Committee of Unsecured Creditors, Lowenstein Sandler LLP (a) 1000 N. West Street, Suite 1200 Wilmington, Delaware 19801, Attn: Christoper Ward (cward@lowenstein.com) and (b) 1251 Avenue of the Americas, New York, NY 10020, Attn: Gianfranco Finizio (gfinizio@lowenstein.com) (the parties identified in (i) through (iv), collectively, the "Objection Notice Parties"). Any party or entity who (i) fails to timely and properly make an objection to the Sale on or before the Sale Objection Deadline shall be forever barred from asserting any objection to the Sale, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances, and other interests, and (ii) fails to timely and properly make an objection to the assumption of an Assigned Contract on or before the Contract Objection Deadline shall be forever barred from asserting any objection to the assumption of such Assigned Contract, including with respect to cure amounts, adequate assurance of future performance, or any other matter relating to such assumption.

5.      **Bid Deadline**. **July 27**, **2026**, is the deadline by which all Qualified Bids must be actually received by the parties specified in the Bidding Procedures.

6.      **Auction**. **July 29, 2026, at 10:00 a.m., prevailing Eastern Time**, is the date and time the Auction, if one is needed, may be held in accordance with the Bidding Procedures at the offices of counsel to the Debtor, Cole Schotz P.C.  The Debtor shall send written notice of the date, time, and place of the Auction to the Qualified Bidders no later than two (2) business days before such Auction and will post notice of the date, time, and place of the Auction no later than two (2) business days before such Auction on the Case Website of the Debtor's notice, claims, and solicitation agent at https://cases.stretto.com/SiFiNetworks.

7.      **Sale Hearing**. **August 6, 2026, at 11:00 a.m., prevailing Eastern Time**, is the date and time for the hearing for the Court to consider the Successful Bid, pursuant to which the Debtor and the Successful Bidder will consummate the Sale; *provided, however*, that the Sale Hearing may be continued by the Debtor, in consultation with the Consultation Parties, in accordance with the Bidding Procedures, from time to time, without further notice to creditors or parties in interest.

8.      **Adequate Assurance**. In the event the Successful Bidder is not the Stalking Horse Bidder, objections to adequate assurance of future performance of the Assigned Contracts by such Successful Bidder must be filed with the Court and served on the Objection Notice Parties no later than the Sale Hearing.

**II.      Stalking Horse.**

9.      The Debtor is hereby authorized to select ArcLink Fiber LLC, together with any designated affiliate thereof, as the Stalking Horse Bidder (the "Stalking Horse Bidder").

10.     The Debtor is authorized, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to enter into and perform under the Stalking Horse Agreement, subject to the solicitation of

higher or otherwise better offers for the Acquired Assets (as defined in the Stalking Horse Agreement) and entry of the Sale Order.

11.    The Stalking Horse Agreement is authorized and approved in substantially the form attached to this Order as **Exhibit 5** as the stalking horse bid for the acquired Assets (the "Stalking Horse Bid").

12.    The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the Stalking Horse Bid shall be deemed a Qualified Bid, for all purposes under the Bidding Procedures Order and Bidding Procedures.

13.    The Stalking Horse Agreement shall be binding and enforceable on the parties thereto in accordance with its terms subject to entry of the Sale Order.  The failure to describe specifically or include any provision of the Stalking Horse Agreement or related documents in the Motion or herein shall not diminish or impair the effectiveness of such provision as to such parties. The Stalking Horse Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, solely in accordance with the terms thereof, without further order of the Court.

14.    Subject to the Bidding Procedures and entry of the Sale Order, the Debtor and Stalking Horse Bidder are granted all rights and remedies provided to them under the Stalking Horse Agreement, including, without limitation, the right to specifically enforce the Stalking Horse Agreement in accordance with its terms.

III.    **Auction, Bidding Procedures, Sale Notice, and Related Relief.**

15.    The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to any proposed Sale.  Any party

8

desiring to submit a Bid shall comply with the Bidding Procedures and this Order.  The Debtor is authorized to take any and all reasonable actions necessary to implement the Bidding Procedures.

16.    Without prejudice to the rights of the Stalking Horse Bidder under the Stalking Horse APA, the Debtor shall have the right to, in their reasonable business judgment, and in a manner consistent with their fiduciary duties and applicable law, modify the Bidding Procedures, in consultation with the Consultation Parties, including to, among other things, (i) extend or waive deadlines or other terms and conditions set forth therein, (ii) adopt new rules and procedures for conducting the bidding and Auction process, (iii) if applicable, provide reasonable accommodations to a Qualified Bidder, or (iv) otherwise modify the Bidding Procedures to further promote competitive bidding for and maximizing the value of the Assets; *provided*, that such extensions, waivers, new rules and procedures, accommodations and modifications (i) do not conflict with and are not inconsistent with this Order, the Bidding Procedures, the DIP Order, the Bankruptcy Code or any order of the Court, (ii) do not frustrate or otherwise impair the Stalking Horse Bidder's ability to close the Sale, (iii) are promptly communicated to each Qualified Bidder, (iv) do not extend the Bid Deadline, the date of the Auction, the closing of the Auction, or any other Milestones (as defined in the DIP Order), in consultation with the DIP Lender, and (v) are in form and substance acceptable to the DIP Lender

17.    For the avoidance of doubt and notwithstanding anything to the contrary contained in this Order, this Order does not approve the sale of the Assets or authorize the consummation of the Sale, such approval and authorization (if any) to be considered only at the Sale Hearing and all rights of all parties in interest to object to such approval and authorization are reserved.

18.    No person or entity shall be entitled to any expense reimbursement, break-up fee, "topping," termination, or other similar fee or payment in connection with any Sale, and by

submitting a bid, such person or entity is deemed to have waived their right to request or file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

19.     Any deposit provided by a Qualified Bidder shall be held in a segregated account by the Debtor or its agent in accordance with the Bidding Procedures, and shall not become property of the Debtor's bankruptcy estate unless and until released to the Debtor pursuant to the terms of the purchase agreement with such Qualified Bidder or order of this Court.

20.     The Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Stalking Horse Bid is a Qualified Bid, as set forth in the Bidding Procedures.  The Stalking Horse Bidder is, and will be deemed to be, a Qualified Bidder for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth herein and without any further action by the Stalking Horse Bidder.

21.     The Sale Notice, substantially in the form attached hereto as **Exhibit 2**, is hereby approved.  As soon as reasonably practicable following the entry of this Order, the Debtor will cause the Bidding Procedures and Sale Notice to be served upon the following parties, and their respective counsel, if known (collectively, the "Notice Parties"): (i) the U.S. Trustee; (ii) counsel to the DIP Lender and Stalking Horse Bidder; (iii) the Committee; (iv) the United States Attorney's Office for the District of Delaware; (v) the Internal Revenue Service; (vi) the attorneys general for the states in which the Debtor operates; (vii) any parties known or reasonably believed to have expressed an interest in the Debtor's Assets; (viii) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the Debtor's Assets; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In addition, as soon as practicable, after entry of this Order, the Debtor shall publish the Sale Notice, with any

10

modification necessary for ease of publication, on the Case Website of the Debtor and once in the national edition of *The New York Times* or any other publications, in consultation with the Consultation Parties, the Debtor deems appropriate to provide notice to any other potential interested parties.

## IV.    The Assumption and Assignment Procedures.

22.    The procedures set forth below regarding the assumption and assignment of the executory contracts and unexpired leases proposed to be assumed by the Debtor pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder pursuant to section 365(f) of the Bankruptcy Code in connection with the Sale (the "Assumption Procedures") are hereby approved to the extent set forth herein.

23.    These Assumption Procedures shall govern the assumption and assignment of all of the Debtor's executory contracts and unexpired leases to be assumed and assigned in connection with the Sale (each, an "Assigned Contract," and, collectively, the "Assigned Contracts"), subject to the payment of any payments necessary to cure any defaults arising under any Assigned Contract (the "Cure Payments"):

a. **Contract Assumption Notice.**  On or prior to **July 9, 2026** (the "Assumption Notice Deadline"), the Debtor shall file with the Court and serve a notice of contract assumption (the "Assumption Notice"), in substantially the form attached hereto as **Exhibit 3**, via first class mail and e-mail (where available) on all counterparties to all potential Assigned Contracts (each, a "Counterparty" and, collectively, the "Counterparties"). The Assumption Notice shall include, without limitation, a list of Assigned Contracts (the "Assigned Contract List") that may be assumed and assigned in connection with the Sale and the Cure Payment, if any, that the Debtor believes is required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) for each of the Assigned Contracts. If no Cure Payment is listed on the Assigned Contracts List for a particular Assigned Contract, the Debtor's asserted Cure Payment for such Assigned Contract shall be deemed to be $0.00. The Assigned Contracts List shall identify each of the potential Assigned Contracts by the name or appropriate description and date of such potential Assigned Contract (if available), the Counterparties and the address of such Counterparties for notice purposes. Service of an Assumption Notice does not constitute an admission that such

11

contract is an executory contract or unexpired lease or that such stated Cure Payment constitutes a claim against the Debtor or a right against the Successful Bidder (all rights with respect thereto being expressly reserved).  Further, the inclusion of a contract or lease on the Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.

b.  **Cure Payments**. The payment of the applicable Cure Payments specified in the Assumption Notice or a Supplemental Assumption Notice by the Successful Bidder or the Debtor, as applicable and in accordance with the Stalking Horse Agreement, after the expiration of the applicable objection period and the failure of any applicable Counterparty to timely and properly object to the proposed Cure Payment or to the assumption or assignment of its executory contract or unexpired lease, shall (i) effect a cure of all defaults existing thereunder as of the filing of the Assumption Notice, and (ii) compensate for any actual pecuniary loss to such Counterparty resulting from such default.

c.  **Contract Objections**. Objections, if any, to the proposed assumption and assignment of a contract or lease, including objections to Cure Payments (each, as defined above, a "Contract Objection"), must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, the correct cure amount alleged by the objecting Counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served, so as to be actually received by, the Objection Notice Parties (as defined in the Assumption Notice) by 4:00 p.m. (ET) on the date that is 14 days after service of the Assumption Notice, except as otherwise set forth below with respect to Subsequently Designated Assigned Contracts.

d.  **Changes to Assigned Contract List and Cure Payments.** At the election of the Successful Bidder, up until two (2) business days prior to the closing of any Sale, the Debtor may file and serve supplements or amendments to the Assigned Contracts List (each, a "Supplemental Assumption Notice") to (i) add previously omitted Assigned Contracts to the Assigned Contracts List as contracts that may be assumed and assigned to a Successful Bidder in accordance with the definitive agreement for the Sale by filing a supplement to the Assigned Contracts List or (ii) modify the Cure Payment for any Assigned Contract (together, "Subsequently Designated Assigned Contracts").  Contract Objections with respect to Subsequently Designated Assigned Contracts shall be filed no later than ten (10) days from service of a Supplemental Assumption Notice identifying the Subsequently Designated Assigned Contracts and served on the Objection Notice Parties (the "Subsequently Designated Assigned Contracts Deadline").  Such objections must (a) be in writing, (b) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court and served so as to be actually received by the Objection Notice Parties.  Any party or entity who fails to timely and properly make an objection

12

with respect to the Subsequently Designated Assigned Contracts on or before the Subsequently Designated Assigned Contracts Deadline shall be forever barred from asserting any objection with respect to the Subsequently Designated Assigned Contracts.

e. **Removal of Contracts from Assigned Contract List.** Up until two (2) business days prior to Closing, the Debtor is authorized, but not directed, if the Purchaser so requests, to remove an Assigned Contract from the Assigned Contract List that a Successful Bidder proposes be assumed and assigned in connection with the Sale.

f. **Notice of Successful Bidder/Adequate Assurance Objections.** As soon as practicable after the Auction and in no event later than twenty-four (24) hours after the Auction, the Debtor shall file with the Court and post on the Case Website at https://cases.stretto.com/SiFiNetworks, the notice substantially in the form attached hereto as **Exhibit 4** (the "Notice of Successful Bidder"), identifying any Successful Bidder and Back-Up Bidder, together with a copy of the Successful Bidder's proposed purchase agreement and financial and other information regarding adequate assurance of future performance of the Assigned Contracts, and serve the Notice of Successful Bidder on the Counterparties by first class mail and e-mail (where available), and the Counterparties shall file any Contract Objections solely on the basis of adequate assurance of future performance by the Successful Bidder other than the Stalking Horse Bidder (each, an "Adequate Assurance Objection") not later than the Sale Hearing (the "Adequate Assurance Objections Deadline").

g. **Assigned Contracts.** At the Sale Hearing, the Debtor will seek Court approval of the assumption and assignment to the Successful Bidder of the Assigned Contracts, subject to the dispute resolution procedures set forth in paragraph 24(h) hereof; *provided that*, in the event the Successful Bidder is not the Stalking Horse Bidder, objections to adequate assurance of future performance of the Assigned Contracts by such Successful Bidder shall be heard at a subsequent hearing, as set forth in paragraph 24(h) hereof.  The inclusion of an Assigned Contract on an Assumption Notice will not (a) obligate the Debtor to assume any Assigned Contract listed thereon nor the Successful Bidder to take assignment of such Assigned Contract or (b) constitute any admission or agreement of the Debtor that such Assigned Contract is an executory contract.

h. **Dispute Resolution.** To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) (any such dispute, a "Cure Dispute"), such Contract Objection shall be adjudicated at the Sale Hearing or at such other date and time as the Debtor determines, in its discretion and in consultation with the Successful Bidder and the Consultation Parties (subject to the Court's availability).  If such Contract Objection has not been resolved prior to the

13

closing of the Sale (whether by an order of the Court or by agreement with the Counterparty), the Successful Bidder may (a) treat such Counterparty's contract or lease as part of Excluded Assets or (b) temporarily treat the Counterparty's contract or lease as part of Excluded Assets (a "Designated Agreement"), proceed to the closing of the Sale with respect to all other Assets, and determine whether to treat the Designated Agreement as an Assigned Contract, or part of Excluded Assets within ten (10) business days after resolution of such objection (whether by order of the Court or by agreement of the applicable Successful Bidder, the Counterparty, and the Debtor).

i.   **Back-Up Bidder Adequate Assurance Objections.** In the event that a Successful Bidder does not consummate the Sale and a Back-Up Bidder (other than the Stalking Horse Bidder) has been previously identified, the Debtor shall file with the Court and post on the Case Website at https://cases.stretto.com/SiFiNetworks, a notice of the Debtor's intent to proceed with a Back-Up Bid (the "Notice of Intent to Proceed with Back-Up Bid"), together with a copy of the Back-Up Bidder's proposed purchase agreement and financial and other information regarding adequate assurance of future performance of the Assigned Contracts by the Back-Up Bidder (including the name of the Back-Up Bidder and description of its business), and serve the Notice of Intent to Proceed with Back-Up Bid on the Counterparties by first class mail and e-mail (where available), and the Counterparties shall have seven (7) days to file and serve on the Objection Notice Parties a Contract Objection solely on the basis of adequate assurance of future performance by the Back-Up Bidder.  If any objections are filed, the Debtor shall schedule a hearing, which may be expedited, upon reasonable notice under the circumstances (which shall be no less than ten (10) days after the Notice of Intent to Proceed with Back-Up Bid is filed), with respect to such Contract Objections.

j.   **Contract Assumption at Closing.** No Assigned Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order authorizing the assumption and assignment of such Assigned Contracts or (ii) the date the Sale has closed.

24.   Any party failing to timely and properly file an objection to the Cure Payment or the proposed assumption and assignment of an Assigned Contract listed on the Assumption Notice or a Supplemental Assumption Notice is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Assigned Contract, (c) the related relief requested in the Motion, and (d) the Sale.  Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Assigned Contract, adequate assurance of future

performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code, and from asserting any additional cure or other amounts against the Debtor and the Successful Bidder, as applicable, with respect to such party's Assigned Contract.

**V.        Assumption Notice and Notice of Successful Bidder.**

25.      The Assumption Notice attached hereto as **Exhibit 3** and the Notice of Successful Bidder attached hereto as **Exhibit 4** are hereby approved.

26.      To provide the Counterparties with information concerning the Successful Bidder and any Back-Up Bidder who may be assigned their contracts or leases and enable them to object to such assignment on adequate assurance grounds (to the extent the Successful Bidder/Back-Up Bidder is not the Stalking Horse Bidder), as soon as practicable after the Auction and in no event less than twenty-four (24) hours before the date of the Sale Hearing, the Debtor shall file with the Court and serve on all Counterparties the Notice of Successful Bidder.

**VI.       Back-Up Bidder.**

27.      Following entry of the Sale Order, if the Successful Bidder fails to consummate the Successful Bid, the Debtor may designate the Back-Up Bid to be the new Successful Bid and the Back-Up Bidder to be the new Successful Bidder, and, subject to resolution of any adequate assurance objections filed pursuant to paragraph 24(i) above, the Debtor shall be authorized, but not required, to consummate the transaction with the Back-Up Bidder without further order of this Court, so long as such Back-Up Bid shall have been approved in connection with the Court's approval of the Successful Bid, or subject to Court approval if not.  In such case of a breach or failure to perform on the part of the Successful Bidder and in such other circumstances as may be

specified in the definitive documentation governing the Successful Bid, the defaulting Successful Bidder's deposit, if any, shall be forfeited to the Debtor.  The Debtor's right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Back-Up Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures are reserved.

**VII.      Credit Bidding.**

28.      Any bidder holding a perfected security interest in any of the Assets may seek to credit bid all, or a portion of, such bidder's claims for its respective collateral in accordance with and to the fullest extent applicable under section 363(k) of the Bankruptcy Code (each such bid, a "Credit Bid"); *provided*, that such Credit Bid complies with the terms of the Bidding Procedures.

29.      Pursuant to the terms and conditions of the DIP Order, the Stalking Horse Bidder is permitted to credit bid any outstanding DIP Obligations and Prepetition Secured Indebtedness in accordance with and to the fullest extent applicable under 363(k) of the Bankruptcy Code in any sale of Assets and may assign such right to credit bid in whole or in part to any of their affiliates. The Stalking Horse Bidder shall have the right, subject to the DIP Order, to credit bid on a dollar-for-dollar basis up to the full amount of the DIP Obligations and the Prepetition Secured Indebtedness pursuant to and to the fullest extent applicable under section 363(k) of the Bankruptcy Code.

**VIII.     Miscellaneous.**

30.      The failure to include or reference a particular provision of the Bidding Procedures specifically in this Order shall not diminish or impair the effectiveness or enforceability of such a provision.

16

31.     In the event of any inconsistencies between this Order and the Motion, this Order shall govern in all respects.  In the event of any inconsistencies between this Order and the Bidding Procedures attached hereto as **Exhibit 1**, the Bidding Procedures shall govern in all respects.

32.     Any substantial contribution claims by any Bidder are deemed waived, to the extent based solely on such Bidder's submission of a Bid in accordance with the Bidding Procedures.

33.     This Order shall be binding on and inure to the benefit of the Debtor, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estate of the Debtor.

34.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

35.     To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in this case, the terms of this Order shall govern.

36.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

37.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

38.     The Debtor is authorized to make non-substantive changes, in consultation with the Consultation Parties, to the Bidding Procedures, the Assumption Procedures, and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors.

39.     The Debtor is authorized to take all reasonable actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

40.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## Exhibit 1

## Bidding Procedures

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SiFi Networks America, LLC, | Case No. 26-10912 (BLS) |
| Debtor.[1] | |

**BIDDING PROCEDURES IN CONNECTION
WITH THE SALE OF THE DEBTOR'S ASSETS**

On June 5, 2026, the above-captioned debtor and debtor in possession (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). These bidding procedures (the "Bidding Procedures") set forth the process by which Debtor shall market to interested parties and conduct a sale (the "Sale") by auction (the "Auction") of all or substantially all of the Debtor's assets (the "Assets"). The Sale will be subject to bidding as set forth herein and subject to the approval of the Bankruptcy Court, pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

On June 5, 2026, the Debtor filed the *Debtor's Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Approving the Sale of Substantially All of the Debtor's Assets, (VII) Authorizing the Debtor's Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (VIII) Granting Related Relief* [Docket No. 13] (the "Motion"), to be heard by the Bankruptcy Court (i) on [July 8], 2026 with respect to the Bidding Procedures, and (ii) on [●], 2026 (or at such other time as the Bankruptcy Court may determine) with regard to all other matters related to the Motion (the "Sale Hearing").[2]

On [●], 2026, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (VI) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order") approving, among other things, these Bidding Procedures.

---

[1]   The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990). The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

As described in the Bidding Procedures Order, SiFi Networks America, LLC (the "Seller") has entered into an asset purchase agreement (the "Stalking Horse Agreement") with ArcLink Fiber LLC (or its designee, the "Stalking Horse Bidder")[3] pursuant to which, among other things, the Stalking Horse Bidder has committed to (a) purchase, acquire, and take assignment and delivery of, free and clear of all liens, claims, encumbrances, and other interests (except as otherwise provided in the Stalking Horse Agreement), substantially all of the Seller's Assets, as more fully set forth in the Stalking Horse Agreement, and (b) assume certain liabilities associated with the Seller's operations to the extent expressly set forth in the Stalking Horse Agreement (collectively, the "Stalking Horse Bid"), for a purchase price (the "Stalking Horse Purchase Price") consisting of a credit bid pursuant to section 363(k) of the Bankruptcy Code (the "Credit Bid") of obligations equal to: (i) the DIP Obligations *plus* (ii) the aggregate principal amount of the Prepetition Note as of the Closing *plus* (iii) cash in the amount equal to $200,000, the aggregate amount of the subclauses (i) through (iii) equaling Five Million Eight Hundred and Fifty-Three Thousand and Thirty-Nine dollars ($5,853,039.00), *plus* (iv) the Assumed Liabilities, *plus* (v) the Cure Amounts.

The Bidding Procedures set forth the process by which the Debtor is authorized to solicit the highest or otherwise best bid or bids (each, a "Bid") for the Seller's Assets, culminating in the Auction if competing Qualified Bids (as defined herein) are received. The Sale is contemplated to be implemented under section 363 of the Bankruptcy Code pursuant to the terms and conditions of either (a) the Stalking Horse Agreement, as the same may be amended pursuant to the terms thereof, or (b) such other applicable asset purchase agreement upon the receipt of a Successful Bid (as defined herein) that the Debtor has determined in its business judgment (in consultation with the Consultation Parties) is the best or highest bid in accordance with these Bidding Procedures.

> **Copies of the Bidding Procedures Order, or any other documents in the Debtor's Chapter 11 Case are available at**
> **https://cases.stretto.com/SiFiNetworks**

## A.      Important Dates.

These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in an Auction, thereby competing to make the highest or otherwise best offer for the Assets. Subject to the Debtor's rights set forth herein, the following table sets forth key dates and deadlines with respect to the Sale process.

| Event or Deadline | Proposed Date and Time (all times in the prevailing Eastern Time) |
|---|---|
| Deadline to File and Serve Sale Notice | July 9, 2026 |
| Deadline to Publish Sale Notice | As soon as reasonably practicable following entry of the Bidding Procedures Order |
| Deadline to File and Serve Assumption Notice | July 9, 2026 |

---

[3]   The Stalking Horse Bidder is the Debtor's (i) DIP Lender and (ii) prepetition secured lender. SiFi Networks America Ltd. ("SNA Ltd") is the parent of the Debtor. In April 2026, SNA Ltd was acquired by PATRIZIA, a German infrastructure investment manager. The Stalking Horse Bidder is an affiliate of PATRIZIA.

| Contract Objections Deadline | 4:00 p.m. (ET) on the date that is 14 days after the service of the Assumption Notice |
|---|---|
| Bid Deadline | July 27, 2026 |
| Notice of Successful Bidder and Cancellation of Auction (if no Auction) | July 28, 2026 |
| Auction (if Qualified Bids received) | July 29, 2026 at 10:00 a.m. (ET) |
| Deadline to File Notice of Successful Bidder and Back-Up Bidder | July 30, 2026 |
| Sale Objection Deadline | July 31, 2026 at 4:00 p.m. (ET) |
| Debtor's Response to Objections, if any | August 4, 2026 at 4:00 p.m. (ET) |
| Sale Hearing | August 6, 2026 at 11:00 a.m. (ET) |

**B.      Potential Bidder.**

For purposes of the Bidding Procedures, a "Potential Bidder" shall refer to any person or entity interested in submitting a bid.  For the avoidance of doubt, the Stalking Horse Bidder is a Qualified Bidder (as defined below) and is not a Potential Bidder or an Acceptable Bidder (as defined below).

**C.      Determination by the Debtor.**

As appropriate throughout the Bidding Process (as defined below), the Debtor will consult with (a) the Debtor's prepetition and DIP Lender; (b) any statutory committee of unsecured creditors appointed in the Chapter 11 Case (a "Committee"), if any, and such Committee's counsel, and (c) any other party that becomes a consultation party as set forth in this subsection of the Bidding Procedures (collectively, the "Consultation Parties" and each, a "Consultation Party"); *provided*, that no person or entity that constitutes a Potential Bidder, an Acceptable Bidder, a Stalking Horse Bidder, a Successful Bidder, or a Back-up Bidder (each as defined herein, and collectively, a "Bidding Party") (as determined by the Debtor, in its reasonable discretion) shall be deemed a Consultation Party for so long as such person constitutes a Bidding Party.  The Debtor shall consult with the Consultation Parties with respect to each of the following: (a) coordinating with Potential Bidders regarding the conduct of their respective due diligence, (b) evaluating bids from Potential Bidders on any or all of the Assets, (c) negotiating any bid made to acquire any or all of the Assets, and (d) making such other determinations as are provided in these Bidding Procedures (collectively, the "Bidding Process").  For the avoidance of doubt, if a member of a Committee (or their affiliates, as applicable) is actively participating as a Bidding Party, then the remaining members of the Committee other than such Potential Bidder, and the Committee's counsel, shall continue to be Consultation Parties, but shall not provide any information they receive as Consultation Parties to such Bidding Party.

3

**D.      Due Diligence.**

     **(i.)**        **Access to Due Diligence**.

Any Potential Bidder that (a) has previously executed or executes a confidentiality agreement on customary terms that are reasonably acceptable to the Debtor (a "Confidentiality Agreement"), (b) provides sufficient evidence, as reasonably determined by the Debtor, that the Potential Bidder intends to obtain due diligence and participate in the sale process for a *bona fide* purpose consistent with these Bidding Procedures, and (c) provides evidence of such Potential Bidder's financial capability to acquire the Assets, which shall include financial statements, including current audited and unaudited financial information, or if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, (any such Potential Bidder being referred to as an "Acceptable Bidder") will be eligible to receive due diligence materials and access to certain non-public information regarding the Assets.  The Debtor will provide each Acceptable Bidder with such information as is reasonably contemplated to enable such Acceptable Bidder to make a Bid for the Assets.  The Debtor will also provide to each Acceptable Bidder reasonable due diligence information as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request.  The Debtor will post substantially all written due diligence provided to any Acceptable Bidder to the Debtor's electronic data room (the "Data Room").  The Debtor may, in consultation with the Consultation Parties, restrict or limit the access of an Acceptable Bidder to the Data Room if the Debtor determines, based on its reasonable business judgment, that certain information in the Data Room is sensitive, proprietary, or otherwise not appropriate for disclosure to such Acceptable Bidder.

The due diligence period will end on the Bid Deadline (as defined herein).  Following the Bid Deadline, the Debtor may, in consultation with the Consultation Parties, furnish additional non-public information to a Qualified Bidder or Qualified Bidders that submitted a Qualified Bid (each as defined herein), but shall have no obligation to do so.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtor or its advisors, regarding qualification as an Acceptable Bidder or Qualified Bidder, the terms of the Potential Bidder's Bid, or the ability of the Potential Bidder to acquire the Assets.  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtor, to determine that such bidder is no longer a Potential Bidder or that any bid made by such Potential Bidder is not a Qualified Bid.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtor will not furnish any confidential information relating to the Debtor, the Assets or liabilities, or the Sale to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement.

The Debtor and its advisors will coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided that* the Debtor may decline to provide such information to Acceptable Bidders who, in the Debtor's reasonable business judgment, have not established that such Acceptable Bidders intend in good faith to, or

have the capacity to, consummate their Bid.  No conditions relating to the completion of due diligence will be permitted to exist after the Bid Deadline.

The Debtor also reserves the right, in consultation with the Consultation Parties, to withhold any diligence materials from an Acceptable Bidder who the Debtor reasonably determines is a competitor of the Debtor or is affiliated with any competitor of the Debtor.  Neither the Debtor nor its representatives will be obligated to furnish information of any kind whatsoever to any person that is not determined to be an Acceptable Bidder or a Consultation Party.  The Debtor will make any diligence information available to the Stalking Horse Bidder if such diligence has been made available to any other Acceptable Bidder.

Each Acceptable Bidder will be deemed to acknowledge and represent that it: (a) either directly or through its advisors has had an opportunity to conduct any and all due diligence regarding the Seller's Assets and liabilities prior to making any Qualified Bid; (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets and liabilities in making any Qualified Bid; and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Seller's Assets or liabilities, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or the Acceptable Bidder's proposed purchase agreement (including, in the case of the Stalking Horse Bidder, the Stalking Horse Agreement). Neither the Debtor nor any of its employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors, or professionals are responsible for, or will bear any liability with respect to, any information obtained by Acceptable Bidders in connection with the Sale, other than any representations, warranties or other liability set forth in an executed and effective asset purchase agreement.

---

**The Debtor has designated its sales agent, Sherwood Partners, Inc.,
to coordinate all reasonable requests for additional information and due
diligence access.  Please contact Jarod Wada (jwada@sherwoodpartners.com)
and Eric Brown (ebrown@sherwoodpartners.com) for additional information and due
diligence access.**

---

### (ii.)    No Communications Among Acceptable Bidders.

There must be no communications regarding the Debtor's sale process between and among Acceptable Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder), unless the Debtor, in consultation with the Consultation Parties, has previously authorized such communication in writing.  The Debtor reserves the right, in its reasonable business judgment and in consultation with the Consultation Parties, to disqualify any Acceptable Bidders that have communicated between and amongst themselves.

**E.       Bid Requirements.**

To be eligible to participate in the Auction, a Potential Bidder must deliver to the Debtor and its advisors, a written, irrevocable offer that must be determined by the Debtor, in its reasonable business judgment (in consultation with the Consultation Parties), to satisfy each of the following conditions (collectively, the "Bid Requirements"):

---

**All Bids must be delivered by email to each of the following parties so as to be actually received no later than the Bid Deadline:**

| **Counsel to the Debtor** | **Sales Agent** |
|---|---|
| Cole Schotz P.C. | Sherwood Partners, Inc. |
| Daniel F.X. Geoghan | Jarod Wada (jwada@sherwoodpartners.com) |
| (dgeoghan@coleschotz.com) | Eric Brown |
| Jacob S. Frumkin | (ebrown@sherwoodpartners.com) |
| (jfrumkin@coleschotz.com) | |

**Counsel to the Committee**

Lowenstein Sandler LLP
Christopher A. Ward
(cward@lowenstein.com)
Gianfranco Finizio
(gfinizio@lowenstein.com)

---

**(i.)**     **Purpose**. Each Potential Bidder must state that the Bid includes an offer by the Potential Bidder to purchase substantially all of the Assets and identify the Assets with reasonable specificity and the particular liabilities, if any, the Potential Bidder seeks to assume.

**(ii.)**    **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid for the Assets (the "Purchase Price") and must indicate the source of consideration, including funding commitments, and confirm that such consideration is not subject to any contingencies. The Purchase Price must provide for (i) an aggregate amount of cash sufficient to pay all DIP Obligations (as defined in the DIP Order[4]) outstanding at the closing in full (which for the avoidance of doubt shall include

---

[4]     "DIP Order" means the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Noteholder, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* filed concurrently with the Motion and any final version of such order.

the Roll-Up), (ii) the Prepetition Secured Indebtedness (to the extent such Prepetition Secured Indebtedness is not a DIP Obligation, and (iii) the payment of all cure amounts and all other amounts required to effect the assumption and assignment of all applicable executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code.

(iii.)   **Assumed Liabilities**. Provide for the assumption of at least the same assumed liabilities as set forth in the Stalking Horse Agreement.

(iv.)   **Minimum Bid**. The value of each Bid for all or substantially all of the Seller's Assets, as determined by the Debtor in its business judgment (in consultation with the Consultation Parties) must exceed: (a) the Stalking Horse Purchase Price set forth in the Stalking Horse Agreement, *plus* (b) the amount necessary to finance the Debtor's                                           Chapter                                           11 Case from the date a Bid is selected as the Successful Bid  through the effective date of a confirmed plan of reorganization or other emergence from chapter 11 that is no less than the amount provided by the Stalking Horse Bidder under the DIP Facility (the "Estate Funding Commitment"), and *plus* (c) the minimum Bid increment of $200,000 (collectively, a "Minimum Bid").  The Debtor and its advisors will determine, in their reasonable business judgment and in consultation with the Consultation Parties, the value of any assumed liabilities that differ from those included in the Stalking Horse Bid.

Each Bid seeking to acquire only a portion of the Debtor's Assets must have a value that in the Debtor's reasonable business judgment (in consultation with the Consultation Parties), either independently or in conjunction with one or more other Bids, exceeds the value that would be realized for such Assets pursuant to the Stalking Horse Bid.

(v.)   **Bid Deposit**. Each Bid must be accompanied by a cash deposit (made by wire transfer or certified or cashier's check) equal to 10% of the aggregate value of the cash and non-cash consideration of the Bid (the "Good Faith Deposit"), which will be held in a segregated account established by the Debtor.  To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the purchase price contemplated by such Qualified Bid, the Debtor reserves the right, in consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so that it equals 10% of the increased Purchase Price.

(vi.)   **Committed Financing**. If a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtor's satisfaction that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations (including any assumed liabilities and the Estate Funding Commitment) under its Bid.  Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, board

7

of directors or credit committee or similar approvals, and shall have covenants, conditions and term and termination provisions acceptable to the Debtor.

**(vii.)** **<u>Good Faith Offer</u>**. Each Bid must constitute a good faith, bona fide offer to purchase the Assets set forth in such Bid.

**(viii.)** **<u>Marked Agreement</u>**. Each Bid must be accompanied by clean and duly executed transaction documents including, at a minimum, a draft purchase agreement, including the exhibits and schedules related thereto, and any related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the Sale, along with redlines of such agreements marked to reflect any amendments and modifications from the Stalking Horse Agreement and any other applicable transaction documents relating to the Stalking Horse Bid, which amendments and modifications may not be inconsistent with these Bidding Procedures. A Bid must also contain a sale order based on, and marked against, the order approving the sale (the "<u>Sale Order</u>") (which will be provided by the Debtor to bidders prior to the Bid Deadline) to show any other proposed modifications to the Sale Order.  The documents contemplated by this subsection shall herein be referred to as the "<u>Qualified Bid Documents</u>."

**(ix.)** **<u>Contracts and Leases; Employees</u>**. Each Bid must identify an initial schedule of executory contracts and unexpired leases to be assumed and assigned to the Potential Bidder in connection with the Sale.  Each Bid must identify with specificity (i) the party responsible for satisfying cure amounts and other amounts that have accrued under assumed and assigned contracts and leases after the Petition Date and prior to the Closing, including amounts that have accrued but not yet become due prior to the Closing, (ii) the Seller's leases to be assumed and assigned to the Potential Bidder; and (iii) which of the Debtor's employees or groups thereof will be offered employment with the Potential Bidder to the extent it is the Successful Bidder and the Closing occurs. The executory contracts and unexpired leases to potentially be assumed by the Stalking Horse Bidder are attached to the Stalking Horse Agreement at Schedule 1.5, which is attached hereto at Exhibit 5.

**(x.)** **<u>No Contingencies</u>**. A Bid must contain a clear statement that it is not conditioned on any contingency, including, among others, on obtaining any of the following (a) financing, (b) shareholder, board of directors, or other approvals, and/or (c) the outcome or completion of a due diligence review by the Potential Bidder.

**(xi.)** **<u>Binding and Irrevocable</u>**. A Potential Bidder's Bid must be irrevocable unless and until the Debtor accepts a higher Bid and such Potential Bidder is not selected as the Back-Up Bidder (as defined herein).  In the event a Bid is chosen as the Back-Up Bid (as defined below), it must remain irrevocable until the Seller and the Successful Bidder consummate the Sale.

**(xii.)** **<u>Joint Bids</u>**. The Debtor will be authorized to approve joint Bids (Bids submitted on behalf of more than one Acceptable Bidder) in its reasonable discretion (and in consultation with the Consultation Parties), on a case-by-case basis.

**(xiii.)** **Adequate Assurance Information**. Each Bid must be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the reasonable satisfaction of the Debtor, that such Potential Bidder (a) has the financial wherewithal and ability to consummate the acquisition of the Assets covered by the Bid (the "Closing"), and (b) can provide adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform, under any contracts that are proposed to be assumed and assigned to such party. Such evidence may also include audited and unaudited financial statements, tax returns, bank account statements and/or any other documentation that the Debtor further requests. The Bid must also identify a contact person that parties may contact to obtain additional Adequate Assurance Information.

**(xiv.)** **Identity**. Each Bid must fully disclose the identity of each entity that will be participating in connection with such Bid (including any equity owners or sponsors, if the purchaser is an entity formed for the purpose of consummating the acquisition of the Assets), and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties. A Bid must also fully disclose any connections or agreements with the Debtor, any known, potential, prospective bidder, or Qualified Bidder (as defined herein), or any officer, director, or equity security holder of the Debtor.

**(xv.)** **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors and, if required, its shareholders (or a comparable governing body reasonably acceptable to the Debtor) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

**(xvi.)** **No Fees**. Except as otherwise provided in the Stalking Horse Agreement with respect to the Stalking Horse Bid: (a) each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction; (b) by submitting its Bid, each Potential Bidder agrees to waive its right to request or receive fees or reimbursement of expenses on any basis, including under section 503(b) of the Bankruptcy Code; and (c) each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement.

**(xvii.)** **Adherence to Bidding Procedures**. By submitting its Bid, each Potential Bidder is agreeing to (a) abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction and (b) serve as Back-Up Bidder, if its Bid is selected as the next highest or next best bid after the Successful Bid with respect to the applicable assets.

9

**(xviii.) <u>Regulatory Approvals and Covenants</u>**. A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the applicable Sale, if any, and the time period within which the Potential Bidder expects to receive such governmental, licensing, regulatory, or third-party approvals.

**(xix.) <u>Non Reliance</u>**. Each Bid must include a written acknowledgement and representation that the Potential Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets and liabilities prior to making its Bid, (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets and liabilities in making its Bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Potential Bidder's proposed purchase agreement for the Assets.

**(xx.) <u>Time Frame for Closing</u>**. A Bid by a Potential Bidder must be reasonably likely (based on experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame acceptable to the Debtor.

**(xxi.) <u>Consent to Jurisdiction</u>**. The Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Debtor's qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the Closing, as applicable.

**(xxii.) <u>Damages</u>**. A Bid must provide that the Debtor has the right to pursue all available damages in the event of the Bidder's breach of, or failure to perform under, the Proposed Agreement.

**(xxiii.) <u>Back-Up Bidder</u>**. Each Bidder must acknowledge that by submitting a Bid, the Bidder agrees to be a Back-Up Bidder, should the Bid be so selected.

Bids fulfilling all of the preceding requirements, as determined by the Debtor and its advisors, in their reasonable business judgment and in consultation with the Consultation Parties, will be deemed to be "Qualified Bids," and those parties submitting Qualified Bids will be deemed to be "Qualified Bidders." The Debtor shall provide the Stalking Horse Bidder a copy of each Qualified Bid by no later than one (1) business day after the Bid Deadline. The Debtor reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid in order for such Bid to comply with the requirements for Qualified Bids as set forth herein.

The Debtor may request additional information from a Potential Bidder or Qualified Bidder at any time prior to or during the Auction to evaluate such bidder's ability to (a) bid at the Auction over and above its initial offer in its Qualified Bid, (b) consummate the Sale, and (c) fulfill its

10

obligations in connection therewith.  Each Potential Bidder or Qualified Bidder shall be obligated to provide such additional information within one (1) business day of receiving such requests as a condition to participating further in the Auction and Sale processes.  The Debtor, in consultation with the Consultation Parties, may disqualify such Potential Bidder or Qualified Bidder if such party fails to comply with such requests.

For the avoidance of doubt, notwithstanding anything to the contrary herein, the Stalking Horse Bidder is a Qualified Bidder (and exempt from the Bid Requirements) and the Stalking Horse Bid is a Qualified Bid, which qualifies the Stalking Horse Bidder to participate in the Auction as a Qualified Bidder.  If the Stalking Horse Bid is chosen as the Successful Bid, the rights and obligations of the Stalking Horse Bidder shall be as set forth in the Stalking Horse Agreement (as the same may be modified in connection with the Auction).  If the Stalking Horse Bid is selected as the Back-Up Bid, it must remain irrevocable only for so long as is required under the Stalking Horse Agreement.

## F.      Determination of Qualified Bidders.

As soon as practicable after the Bid Deadline, the Debtor and its advisors will determine, in consultation with the Consultation Parties, which Potential Bidders are Qualified Bidders and will notify the Potential Bidders whether Bids submitted constitute, alone or together with other Bids, Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. As soon as reasonably practicable after the receipt of Qualified Bids, counsel to the Debtor shall provide copies of the material terms of each Qualified Bid to the advisors of the Consultation Parties on a professionals' eyes only basis, to the extent not already received pursuant to another provision of these Bidding Procedures; *provided* that any information regarding a bid may be withheld from the Consultation Parties or redacted to the extent that the Debtor determines, in its reasonable business judgment, that sharing such information would be likely to have a negative impact on potential bidding or otherwise be contrary to the goal of maximizing value for the Debtor's estate from the sale process; *provided, further* that Debtor shall provide the Stalking Horse Bidder a copy of each Qualified Bid by no later than one (1) business day after the Bid Deadline.  Any Bid that is not deemed a Qualified Bid will not be considered by the Debtor.

**Qualified Bids must be received by each of the Debtor's advisors so as to be <u>actually received</u> no later than <u>July 27, 2026</u>.**

## G.      Evaluation of Qualified Bids.

Prior to the Auction, the Debtor and its advisors (in consultation with the Consultation Parties) will evaluate Qualified Bids and identify the Qualified Bid that is at least the Minimum Bid amount, and is in the Debtor's reasonable business judgment, the highest or otherwise best Bid (the "<u>Starting Bid</u>").  In determining the Starting Bid, the Debtor will take into account, among other things, (i) the amount and nature of consideration offered in each Qualified Bid, (ii) the impact on customers, vendors, and employees, including the number of employees proposed to be transferred, (iii) the execution risk attendant to any submitted Bids, (iv) the number, type, and nature of any changes to the Stalking Horse Agreement, if any, requested by the Qualified Bidder, including the type and obligations to be assumed in the Qualified Bid, (v) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Qualified

11

Bid, (vi) the tax consequences of such Qualified Bid, (vii) the assumption of liabilities, including obligations under contracts and leases, and (viii) the cure amounts to be paid (collectively, the "Evaluation Criteria").  Not later than one (1) business day prior to the date of the Auction, the Debtor will (1) notify the Stalking Horse Bidder as to which Qualified Bid is the Starting Bid and (2) distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

If any Bid is determined by the Debtor not to be a Qualified Bid, the Debtor will refund such Potential Bidder's Good Faith Deposit and all accumulated interest thereon on or within ten (10) business days after the Bid Deadline, or as soon as reasonably practicable thereafter.

**H.      Sole Qualified Bid.**

If no Qualified Bids, other than the Stalking Horse Bid, are received by the Bid Deadline, then the Auction will not occur, the Stalking Horse Bidder will be deemed the Successful Bidder, and the Debtor will pursue entry of an order by the Bankruptcy Court approving the Stalking Horse Agreement and authorizing the Sale to the Stalking Horse Bidder at the Sale Hearing (as defined herein).

**I.      Credit Bidding and Credit Bid Back-Up Bid.**

At the Auction, any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtor's' estate (a "Secured Creditor") shall have the right to credit bid all or a portion of such Secured Creditor's allowed claims pursuant to section 363(k) of the Bankruptcy Code; *provided* that a credit bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected and unavoidable liens on any Assets included in such Bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder consents to alternative treatment) including, for the avoidance of doubt, the DIP Obligations and the Prepetition Secured Indebtedness; *provided, further*, that any Secured Creditor that intends to participate in the Auction with a Bid that includes a credit bid shall, as a condition to such participation, (i) notify the Debtor at least five (5) calendar days prior to the Bid Deadline that it intends to submit a credit bid, and (ii) provide all documentation requested by the Debtor to establish the lien, claims, and encumbered assets that will be the subject of the Secured Creditor's potential credit bid.  For the avoidance of doubt, a Secured Creditor shall be required to provide cash consideration in respect of any Assets to be acquired but do not constitute collateral securing such Secured Creditor's claim(s).

For the further avoidance of doubt, the requirements of the immediately preceding paragraph shall not apply to the Stalking Horse Bidder and to the fullest extent permissible under Section 363(k) of the Bankruptcy Code, the Stalking Horse Bidder may, subject to the DIP Order, credit bid as set forth in the Stalking Horse Agreement and at the Auction, in its sole and absolute discretion, any of (i) the DIP Obligations (as defined in the Stalking Horse Agreement) held by the Stalking Horse Bidder, and (b) the Prepetition Secured Indebtedness (as defined in the DIP Motion) held by the Stalking Horse Bidder, (the "Credit Bid").

**J.      Auction.**

If one or more Qualified Bids (other than the Stalking Horse Bid) is received by the Bid Deadline, the Debtor will conduct the Auction with respect to the Debtor's Assets.  The Auction

will commence on **July 29, 2026**, **at 10:00 a.m., prevailing Eastern Time,** at the offices of Cole Schotz P.C., telephonically, or by video via Zoom, or such later time or other place as the Debtor will timely notify all other Qualified Bidders.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

(i)     the Auction will be conducted openly;

(ii)    only the Qualified Bidders, including the Stalking Horse Bidder, will be entitled to bid at the Auction;

(iii)   the Qualified Bidders, including the Stalking Horse Bidder, must appear, telephonically, or by video via Zoom, or through duly authorized representatives who have actual and documented authority to bind the Qualifier Bidders at the Auction;

(iv)    only the duly authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder) will be permitted to participate in the Auction and the Consultation Parties, and the U.S. Trustee and all creditors will be permitted to attend the Auction; *provided* that any party in interest may request permission to attend the Auction, and the Debtor may permit such party to attend the Auction;

(v)     bidding at the Auction will begin at the Starting Bid;

(vi)    subsequent Bids at the Auction, including any Bids by any Stalking Horse Bidder, must be made in minimum increments of $200,000 (or such other amount as the Debtor may determine) of additional value, if applicable (such Bid, an "Overbid");

(vii)   an Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtor's estate than any prior Qualified Bid or Overbid, as determined in the Debtor's reasonable business judgment and after consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures;

(viii)  each Qualified Bidder will be informed of the terms of the previous Bids and the Debtor shall, during the course of the Auction, promptly inform each Qualified Bidder of which subsequent Bids reflect, in the Debtor's reasonable business judgment (in consultation with the Consultation Parties), the highest or otherwise best bid(s) for the Assets;

(ix)    the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

(x)     each Qualified Bidder will be required to confirm on the record at the commencement of the Auction and again at the conclusion of the Auction that it has not engaged in any collusion with the Debtor, any other Qualified Bidder or

any other person or entity regarding these Bid Procedures, the Auction, any bid for the Assets, or any proposed transaction relating to the Assets;

(xi) the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then prevailing highest or otherwise best Bid;

(xii) the Debtor reserves the right, in its reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Debtor and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment, may require to establish that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

(xiii) the Auction will be governed by such other Auction Procedures as may be announced by the Debtor and its advisors, in consultation with the Consultation Parties, from time to time on the record at the Auction; *provided that* such other Auction Procedures are (a) not inconsistent with the Bidding Procedures Order, the Bankruptcy Code, or any other order of the Bankruptcy Court, (b) disclosed orally or in writing to all Qualified Bidders and other attendees at the Auction and recorded on the record, and (c) determined by the Debtor (in consultation with the Consultation Parties), in good faith, to further the goal of attaining the highest or otherwise best offer for the Assets.

To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, and (ii) to the extent a Qualified Bidder fails to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtor, in its reasonable business judgment and in consultation with the Consultation Parties, such Qualified Bidder shall be disqualified from continuing to participate in the Auction.

For the avoidance of doubt, nothing in the Bidding Procedures, including, without limitation, the Auction Procedures, prevents the Debtor from exercising its fiduciary duties under applicable law (as reasonably determined in good faith by the Debtor in consultation with its outside legal counsel).

### K.    Acceptance of the Successful Bid or Successful Bids.

The Debtor, in the exercise of its reasonable business judgment and in consultation with the Consultation Parties, will identify the highest or otherwise best Qualified Bid for the Assets (the "<u>Successful Bid</u>," and the person or entity submitting a Successful Bid, the "<u>Successful Bidder</u>"), which will be determined by considering, among other things, (a) the total expected

consideration to be received by the Debtor, (b) the Qualified Bidder's ability to close a transaction and the timing thereof (including any anticipated delays to Closing and the cost to the Debtor of such delays), and other matters affecting the execution risk associated with a particular Bid, (c) the expected net benefit to the estate, (d) the impact on customers, vendors, and employees, (e) if applicable, the certainty of the Debtor being able to confirm a plan, and (f) any other criteria, including the Evaluation Criteria, as may be considered by the Debtor in its reasonable business judgment (in consultation with the Consultation Parties).  The Successful Bidder or Successful Bidders and the Debtor shall, as soon as commercially reasonably practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which such Successful Bid was made.  The Auction shall close when the Successful Bidder and Debtor execute all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which such Successful Bid was made.

The Debtor shall file a notice in substantially the form annexed to the Bidding Procedures Order as **Exhibit 4** (the "Notice of Successful Bidder") identifying the Successful Bidder and attaching the proposed asset purchase agreement with the Successful Bidder, no later than one Business Day after the conclusion of the Auction.  Such Notice of Successful Bidder shall also identify the Back-Up Bidder and contain either (i) a summary of the material terms of the Back-Up Bid or (ii) proposed asset purchase agreement with the Back-Up Bidder.

If an Auction is held, the Debtor will be deemed to have accepted a Qualified Bid only when such Qualified Bid is declared a Successful Bid at the Auction.  Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and entry of an order approving such Successful Bid (the "Sale Order").

## L.    Sale Hearing.

The Sale Hearing will be held before the Bankruptcy Court to consider approval of the Successful Bid or Successful Bids, pursuant to which the Seller and the Successful Bidder will consummate the Sale, on **August 6, 2026 at 11:00 a.m., prevailing Eastern Time**, before the Bankruptcy Court.  If an Auction is held, the Debtor will present the results of the Auction to the Bankruptcy Court at the Sale Hearing, at which certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (a) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, and (c) consummation of the Successful Bid will provide the highest or otherwise best value for the Debtor's Assets and is in the best interests of the Debtor's estate.

**The Sale Hearing may be continued to a later date by the Debtor by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

## M.    Designation of Back-Up Bidder(s).

If for any reason the Successful Bidder fails to consummate the Qualified Bid within the time permitted after the entry of the Sale Order, then the Qualified Bidder(s) with the next-highest or otherwise second-best Bid (or combination of Bids) for the Assets (a "Back-Up Bidder") (which

15

for the avoidance of doubt may be the Stalking Horse Bidder), as determined by the Debtor after consultation with its advisors, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid (a "Back-Up Bid"), and the Debtor will be authorized, but not required, to consummate the transaction pursuant to the Backup Bid as soon as commercially reasonably practicable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court.

Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid must remain open until the earlier of (i) the Closing of the Successful Bid and (ii) any termination date with respect to the Back-Up Bid as set forth in the Stalking Horse Agreement or the purchase agreement with any other Back-Up Bidder.

**N.      Return of Good Faith Deposit to Qualified Bidders that Submit Qualified Bids.**

The Good Faith Deposit of the Successful Bidder will, upon consummation of the Successful Bid, become property of the Debtor's estate and be credited to the portion of the Purchase Price, subject to the terms and conditions of the purchase agreement(s) with the Successful Bidder or Back-Up Bidder, as applicable.  If the Successful Bidder (or Back-Up Bidder) fails to consummate the Successful Bid (or Back-Up Bid), then the Good Faith Deposit of such Successful Bidder (or Back-Up Bidder) will be irrevocably forfeited to the Debtor and may be retained by the Debtor as damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtor, in each case, subject to the terms and conditions of the purchase agreement(s) with the Successful Bidder or Back-Up Bidder, as applicable.

The Good Faith Deposit of any unsuccessful Qualified Bidders (except for the Back-Up Bidder) will be returned within the earlier of five (5) business days after the conclusion of the Auction or upon the permanent withdrawal of the proposed Sale of the Seller's Assets.  The Good Faith Deposit of the Back-Up Bidder, if any, will be returned to such Back-Up Bidder no later than five business days after the Closing with the Successful Bidder.

Except as set forth in the first paragraph of this subsection, all deposits shall be held in a segregated account maintained by the Debtor and at no time shall be deemed property of the Debtor's estate absent further order of the Bankruptcy Court.

**O.      Reservation of Rights.**

The Debtor reserves its rights to modify, in consultation with the Consultation Parties and with the consent of the Stalking Horse Bidder only until the commencement of the Auction, these Bidding Procedures in good faith, including by setting procedures for an Auction, to further the goal of attaining the highest or otherwise best offer for the Assets, or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.  The Debtor shall provide notice of any such modification to any Qualified Bidder, including the Stalking Horse Bidder.

All parties expressly reserve all of their rights (and do not waive any such rights) to seek Bankruptcy Court relief with regard to the Auction, the Bidding Procedures, the Sale, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

16

**P.      Consent to Jurisdiction.**

All Qualified Bidders at the Auction will be deemed to have consented to the jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Sale, the Auction, and/or the construction and enforcement of these Bidding Procedures, as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to a Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Bankruptcy Court on an expedited basis.

**Q.      Sale Is As Is/Where Is.**

The Assets sold pursuant to these Bidding Procedures will be conveyed at the Closing in their then present condition, "as is, with all faults, and without any warranty whatsoever, express or implied," except as otherwise expressly provided in the purchase agreement with the Successful Bidder.  Except as otherwise provided in the applicable purchase agreements, all of the Seller's right, title and interest in and to the Assets shall be sold free and clear of all Interests in accordance with sections 363 and 365 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the Sale of the Assets.

**R.      Modifications**.

The Bid Procedures may be modified by the Debtor, after timely consultation with the Stalking Horse Bidder, in any manner that is not inconsistent with or otherwise in contravention of the other terms of these Bid Procedures or the Bid Procedures Order, including, without limitation, (a) imposing additional terms and conditions with respect to any or all bidders, (b) extending the deadlines set forth herein or the date for the Auction and/or Sale Hearing (which may occur in open court); or (c) amending the Bid Procedures as they may determine to be in the best interests of the Debtor's estate; *provided that* all such modifications are disclosed to all Potential Bidders (if applicable) or Qualified Bidders (if applicable) on the record prior to or during the Auction; *provided further that* any actions taken by the Debtor under this subsection shall not be deemed to be waivers of any terms, conditions, defaults or events of default set forth in the DIP Note (as defined in the DIP Order), the DIP Order, or Stalking Horse Agreement, and nothing herein shall prevent the Stalking Horse Bidder from exercising any of its rights and remedies under the Stalking Horse Agreement.  The Bankruptcy Court has exclusive jurisdiction with respect to any dispute that may arise with respect to these Bid Procedures.

*      *      *      *      *

**Exhibit 2**

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SiFi Networks America, LLC, | Case No. 26-10912 (BLS) |
| Debtor.[1] | |

**NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING**

**PLEASE TAKE NOTICE** that the above-captioned debtor and debtor in possession (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Court") on June 5, 2026 (the "Petition Date").

**PLEASE TAKE FURTHER NOTICE** that, on June 5, 2026, the Debtor filed *Debtor's Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Approving the Sale of Substantially All of the Debtor's Assets, (VII) Authorizing the Debtor's Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (VIII) Granting Related Relief* [Docket No. [●] (the "Motion").[2, 3]

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2026, the Court entered an order [Docket No. [●]] (the "Bidding Procedures Order") granting certain of the relief sought in the Motion, including, among other things, (i) authorizing and approving sale and bidding procedures (the "Bidding Procedures"), (ii) scheduling certain dates and deadlines in connection with the Sale, including the Bid Deadline, Auction, Sale Hearing, (iii) approving the form and manner of (1) notice of the Auction and Sale Hearing (the "Sale Notice"), (2) notice of the Assumption Procedures (the "Assumption Notice"), and (3) notice of Successful Bidder and Back-Up Bidder (the "Notice of Successful Bidder"), (iv) approving procedures for assuming and assigning executory contracts and unexpired leases and certain related notices, including notice of proposed cure amounts, (v) approving the terms of the Stalking Horse Agreement, including the bid protections, (vi) and granting related relief approving the terms of the Stalking Horse Agreement, including the bid

---

[1]    The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990).  The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3]    The Stalking Horse Bidder is the Debtor's (i) DIP Lender and (ii) prepetition secured lender.  SiFi Networks America Ltd. ("SNA Ltd") is the parent of the Debtor.  In April 2026, SNA Ltd was acquired by PATRIZIA, a German infrastructure investment manager.  The Stalking Horse Bidder is an affiliate of PATRIZIA.

protections.  All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[4]

## CONTACT PERSON FOR PARTIES INTERESTED IN SUBMITTING A BID

The Bidding Procedures set forth the requirements for becoming a Qualified Bidder and submitting a Qualified Bid.  Any party interested in making an offer to purchase the Assets must comply strictly with the Bidding Procedures.  Only Qualified Bids will be considered by the Debtor, in accordance with the Bidding Procedures.

**Any interested bidder should contact, as soon as possible:**

    i.      counsel to the Debtor, Cole Schotz P.C., 500 Delaware Avenue, Suite 600, Wilmington, DE 19801, Attn: Daniel F.X. Geoghan (dgeoghan@coleschotz.com), Jacob S. Frumkin (jfrumkin@coleschotz.com), and Michael E. Fitzpatrick (mfitzpatrick@coleschotz.com); and

    ii.     the Debtor's sales agent, Sherwood Partners, Inc., 3945 Freedom Circle , Suite 520, Santa Clara, CA 95054, Attn: Jarod Wada (jwada@sherwoodpartners.com) and Eric Brown (ebrown@sherwoodpartners.com).

## OBTAINING ADDITIONAL INFORMATION

Copies of the Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Agreement and all other documents filed with the Court, are available free of charge on the Debtor's case information website, located at https://cases.stretto.com/SiFiNetworks.

## IMPORTANT DATES AND DEADLINES[5]

| Event or Deadline | Proposed Date and Time (all times in the prevailing Eastern Time) |
| --- | --- |
| Deadline to File and Serve Sale Notice | July 9, 2026 |
| Deadline to Publish Sale Notice | As soon as reasonably practicable following entry of the Final Order |
| Deadline to File and Serve Assumption Notice | July 9, 2026 |
| Contract Objections Deadline | 4:00 p.m. (ET) on the date that is 14 days after the service of the Assumption Notice |

---

[4]    To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

[5]    The following dates and deadlines may be extended by the Debtor or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

| Event or Deadline | Proposed Date and Time (all times in the prevailing Eastern Time) |
|---|---|
| Bid Deadline | July 27, 2026 |
| Notice of Successful Bidder and Cancellation of Auction (if no Auction) | July 28, 2026 |
| Auction (if Qualified Bids received) | July 29, 2026 at 10:00 a.m. (ET) |
| Deadline to File Notice of Successful Bidder and Back-Up Bidder | July 30, 2026 |
| Sale Objection Deadline | July 31, 2026 at 4:00 p.m. (ET) |
| Debtor's Response to Objections, if any | August 4, 2026 at 4:00 p.m. (ET) |
| Sale Hearing | August 6, 2026 at 11:00 a.m. (ET) |

1.      **Bid Deadline**. The deadline to submit a Qualified Bid is **July 27, 2026**.

2.      **Auction**. If one or more Qualified Bids is received by the Bid Deadline, the Debtor will conduct the Auction with respect to the Debtor's Assets.  The Auction will commence on **July 29, 2026, at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Cole Schotz P.C., telephonically, or by video via Zoom, or such later time or other place as the Debtor will timely notify all Qualified Bidders.  The Auction is open to all creditors and the U.S. Trustee to attend.  However, only Qualified Bidders or their representatives and advisors may participate.  **All interested or potentially affected parties should carefully review the Bidding Procedures and the Bidding Procedures Order.**

3.      **Objection Deadlines**. The deadline to file an objection to the Sale, including the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code (a "Sale Objection") is **July 31, 2026 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline").  The deadline to file an objection to the potential assumption or assumption and assignment of the Assigned Contracts and Cure Amounts related thereto (a "Contract Objection") (except as otherwise set forth in the Assumption Procedures) is **4:00 p.m. (prevailing Eastern Time)** on the date that is 14 days after the service of the Assumption Notice (the "Contract Objections Deadline").  The deadline to file any Contract Objections solely on the basis of adequate assurance of future performance by a Successful Bidder and/or Back-Up Bidder other than the Stalking Horse Bidder (an "Adequate Assurance Objection") is the Sale Hearing (the "Adequate Assurance Objections Deadline").

4.      **Sale Hearing**.  A hearing (the "Sale Hearing") to consider approval of the proposed Sale **free and clear of all liens, claims, interests and encumbrances** will be held on **August 6, 2026 at 11:00 a.m. (prevailing Eastern Time)** before The Honorable Brendan L. Shannon, Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, at District of Delaware, at 824 Market Street North, 6th Floor, Wilmington, Delaware 19801, or at such other place (which may be by video conference) and time as the Debtor shall notify all Qualified Bidders and all other parties entitled to attend the Auction.  The Debtor has the right to adjourn or cancel the Auction at or prior to the Auction.

## FILING OBJECTIONS

Sale Objections, Contract Objections, and Adequate Assurance Objections, if any, must (a) be in writing; (b) state, with specificity, the legal and factual bases thereof; (c) be filed with the Court by no later than the applicable deadlines stated above, as applicable; and (d) served so as to be actually received by: (i) counsel to the Debtor, Cole Schotz P.C., 500 Delaware Avenue, Suite 600, Wilmington, DE 19801, Attn: Daniel F.X. Geoghan (dgeoghan@coleschotz.com) and Jacob S. Frumkin (jfrumkin@coleschotz.com); (ii) counsel to the Stalking Horse Bidder and DIP Lender, counsel to the DIP Lender and Stalking Horse Bidder, (a) Clifford Chance US LLP, Two Manhattan West, 375 9th Avenue, New York, New York 10001, Attn: David Feldman (David.Feldman@cliffordchance.com) and Matthew L. Hinker (Matthew.Hinker@cliffordchance.com), (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Sean M. Beach (sbeach@ycst.com); (iii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jon Lipshie (Jon.Lipshie@usdoj.gov); and (iv) counsel to the Official Committee of Unsecured Creditors, Lowenstein Sandler LLP (a) 1000 N. West Street, Suite 1200 Wilmington, Delaware 19801, Attn: Christoper Ward (cward@lowenstein.com) and (b) 1251 Avenue of the Americas, New York, NY 10020, Attn: Gianfranco Finizio (gfinizio@lowenstein.com).

## CONSEQUENCES OF FAILING TO TIMELY
## AND PROPERLY ASSERT AN OBJECTION

*Any party who fails to make a timely and proper Sale Objection on or before the Sale and Contract Objections Deadline in accordance with the Bidding Procedures Order and this Notice shall be forever barred from asserting any Sale Objection, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.*

*Any party who fails to make a timely and proper Contract Objection on or before the Sale Objection Deadline or the Contract Objections Deadline in accordance with the Bidding Procedures Order and this Notice shall be forever barred from asserting any Sale Objection or Contract Objection, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.*

*Any party who fails to make a timely and proper Adequate Assurance Objection on or before the Auction and Adequate Assurance Objections Deadline in accordance with the Bidding Procedures Order and this Notice shall be forever barred from asserting any Adequate Assurance Objection, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.*

## NO SUCCESSOR LIABILITY

*The Sale will be free and clear of, among other things, any claim arising from any conduct of the Debtor prior to the closing of the Sale, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such claim arises out of or relates to events occurring prior to the closing of the Sale. Accordingly, as a result of the Sale, the Successful Bidder will not be a successor to the Debtor by reason of any theory of law or equity, and the Successful Bidder will have no liability, except as expressly*

4

*provided in the Successful Bidder's asset purchase agreement, for any liens, claims, encumbrances and other interests against or in the Debtor under any theory of law, including successor liability theories.*

Dated: _____ __, 2026
      Wilmington, Delaware

**COLE SCHOTZ P.C.**

/s/ DRAFT_____
Patrick J. Reilley (No. 4451)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
preilley@coleschotz.com
mfitzpatrick@coleschotz.com

-and-

Daniel F.X. Geoghan (admitted *pro hac vice*)
Jacob S. Frumkin (admitted *pro hac vice*)
Mark Tsukerman (admitted *pro hac vice*)
Tejal Majethia (admitted *pro hac vice*)
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
dgeoghan@coleschotz.com
jfrumkin@coleschotz.com
mstukerman@coleschotz.com
tmajethia@coleschotz.com

*Counsel for Debtor and*
*Debtor in Possession*

5

## Exhibit 3

**Assumption Notice**

## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SiFi Networks America, LLC, | Case No. 26-10912 (BLS) |
| Debtor.[1] | |

## NOTICE OF POTENTIAL ASSUMPTION OF EXECUTORY
## CONTRACTS OR UNEXPIRED LEASES AND CURE AMOUNTS

**PLEASE TAKE NOTICE** that the above-captioned debtor and debtor in possession (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Court") on June 5, 2026 (the "Petition Date").

**PLEASE TAKE FURTHER NOTICE** that, on June 5, 2026, the Debtor filed *Debtor's Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Approving the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (VI) Approving the Sale of Substantially All of the Debtor's Assets, (VII) Authorizing the Debtor's Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (VIII) Granting Related Relief* [Docket No. [●] (the "Motion")[2]

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2026, the Court entered an order [Docket No. [●]] (the "Bidding Procedures Order") granting certain of the relief sought in the Motion, including, among other things, (i) authorizing and approving sale and bidding procedures (the "Bidding Procedures"), (ii) scheduling certain dates and deadlines in connection with the Sale, including the Bid Deadline, Auction, Sale Hearing, (iii) approving the form and manner of (1) notice of the Auction and Sale Hearing (the "Sale Notice"), (2) notice of the Assumption Procedures (the "Assumption Notice"), and (3) notice of Successful Bidder and Back-Up Bidder (the "Notice of Successful Bidder"), (iv) approving procedures for assuming and assigning executory contracts and unexpired leases and certain related notices, including notice of proposed cure amounts, (v) approving the terms of the Stalking Horse Agreement, including the bid protections, (vi) and granting related relief approving the terms of the Stalking Horse Agreement, including the bid protections.[3]

---

[1] The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990). The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3] To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

**PLEASE TAKE FURTHER NOTICE** that the Bidding Procedures Order, among other things, established procedures for (a) the assumption of certain executory contracts and unexpired leases that the Debtor believes it might seek to assume and assign to the Stalking Horse Bidder or another Successful Bidder in connection with a Sale (collectively, the "Assigned Contracts") and (b) the determination of related Cure Payments (as defined below).  The Debtor is a party to numerous Assigned Contracts and, in accordance with the Bidding Procedures Order, hereby file this notice identifying (x) the Assigned Contracts, which may be assumed and assigned to the Stalking Horse Bidder or another Successful Bidder in connection with a Sale, if one occurs and (y) the proposed amounts, if any, the Debtor believes are owed to the counterparty to the Assigned Contract to cure any defaults or arrears existing under the Assigned Contract (the "Cure Payments"), both as set forth on **Exhibit 1** attached hereto. Other than the Cure Payments listed on **Exhibit 1**, the Debtor is not aware of any amounts due and owing under the Assigned Contracts listed therein.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A CONTRACT OR LEASE THAT MAY BE ASSUMED AND ASSIGNED AS PART OF THE SALE**. *The presence of an Assigned Contract listed on Exhibit 1 attached hereto does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed and assigned as part of the Sale. The Debtor reserves all of its rights, claims and causes of action with respect to the Assigned Contracts listed on Exhibit 1 attached hereto. The assumption and assignment of the contracts and leases on the Assigned Contracts List is not guaranteed and is subject to approval by the Court and the Debtor's or Successful Bidder's right to remove from the Assigned Contracts List.*

Pursuant to the Assumption Procedures, objections to the proposed assumption and assignment of an Assigned Contract (a "Contract Objection"), including any objection relating to the Cure Payment or adequate assurance of the Stalking Horse Bidder's future ability to perform, must (a) be in writing; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (c) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under Bankruptcy Code sections 365(b)(1)(A) and (B) for the applicable Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto; (d) be served: (i) counsel to the Debtor, Cole Schotz P.C., 500 Delaware Avenue, Suite 600, Wilmington, DE 19801, Attn: Daniel F.X. Geoghan (dgeoghan@coleschotz.com) and Jacob S. Frumkin (jfrumkin@coleschotz.com); (ii) counsel to the Stalking Horse Bidder and DIP Lender counsel to the DIP Lender and Stalking Horse Bidder, (a) Clifford Chance US LLP, Two Manhattan West, 375 9th Avenue, New York, New York 10001, Attn: David Feldman (David.Feldman@cliffordchance.com) and Matthew L. Hinker (Matthew.Hinker@cliffordchance.com), (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Sean M. Beach (sbeach@ycst.com); (iii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jon Lipshie (Jon.Lipshie@usdoj.gov); and (iv) counsel to the Official Committee of Unsecured Creditors, Lowenstein Sandler LLP (a) 1000 N. West Street, Suite 1200 Wilmington, Delaware 19801, Attn: Christoper Ward

2

(cward@lowenstein.com) and (b) 1251 Avenue of the Americas, New York, NY 10020, Attn: Gianfranco Finizio (gfinizio@lowenstein.com) (the parties identified in (i) through (iv), collectively, the "Objection Notice Parties"); and (e) be filed with the Clerk of the Court and served by **4:00 p.m., prevailing Eastern Time on the date that is 14 days after service of this Assumption Notice.**

*If a counterparty to a assigned contract files a Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing, such later hearing date that the Debtor determines in its discretion, or such other date determined by the Court and in consultation with the Successful Bidder and the Consultation Parties (subject to the Court's availability). All other objections to the proposed assumption or proposed assumption and assignment of the Debtor's right, title, and interest in, to, and under the Assigned Contracts will be heard at the Sale Hearing.*

**PLEASE TAKE FURTHER NOTICE** that although the Debtor has made a good-faith effort to identify all Assigned Contracts that might be assumed and assigned in connection with a Sale, the Debtor or the Successful Bidder may identify certain other executory contracts that should be assumed and assigned in connection with a Sale. Accordingly, the Debtor has reserved the right up until two (2) business days prior to the closing of any Sale, to (i) add any previously omitted Assigned Contracts to the Assigned Contracts List as contracts that may be assumed and assigned to a Successful Bidder in accordance with the definitive documentation for the Sale, (ii) modify the previously stated Cure Payment associated with any Assigned Contract; and/or (iii) remove any Assigned Contract from the Assigned Contracts List that a Successful Bidder proposes to be assumed and assigned in connection with the Sale.

## OBTAINING ADDITIONAL INFORMATION

Copies of the Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Agreement and all other documents filed with the Court, are available free of charge on the Debtor's case information website, located at https://cases.stretto.com/SiFiNetworks.

## CONSEQUENCES OF FAILING TO TIMELY
## AND PROPERLY ASSERT AN OBJECTION

*UNLESS YOU FILE AN OBJECTION TO THE CURE AMOUNT AND/OR THE ASSUMPTION OR ASSIGNMENT OF YOUR CONTRACT OR LEASE IN ACCORDANCE WITH THE INSTRUCTIONS AND DEADLINES SET FORTH HEREIN, YOU SHALL BE (A) BARRED FROM OBJECTING TO THE CURE AMOUNT SET FORTH ON EXHIBIT 1, (B) ESTOPPED FROM ASSERTING OR CLAIMING ANY CURE AMOUNT AGAINST THE DEBTOR, THE STALKING HORSE BIDDER OR SUCH OTHER SUCCESSFUL BIDDER THAT IS GREATER THAN THE CURE AMOUNT SET FORTH ON EXHIBIT 1, AND (C) DEEMED TO HAVE CONSENTED TO THE ASSUMPTION AND/OR ASSIGNMENT OF YOUR CONTRACT OR LEASE.*

3

Dated: _____ __, 2026
      Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ DRAFT*_____
Patrick J. Reilley (No. 4451)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
preilley@coleschotz.com
mfitzpatrick@coleschotz.com

-and-

Daniel F.X. Geoghan (admitted *pro hac vice*)
Jacob S. Frumkin (admitted *pro hac vice*)
Mark Tsukerman (admitted *pro hac vice*)
Tejal Majethia (admitted *pro hac vice*)
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
dgeoghan@coleschotz.com
jfrumkin@coleschotz.com
mstukerman@coleschotz.com
tmajethia@coleschotz.com

*Counsel for Debtor and*
*Debtor in Possession*

4

**Exhibit 4**

**Notice of Successful Bidder**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SiFi Networks America, LLC, | Case No. 26-10912 (BLS) |
| Debtor.[1] | |

**NOTICE OF SUCCESSFUL BIDDER AND BACK-UP BIDDER
WITH RESPECT TO THE AUCTION OF THE DEBTOR'S ASSETS**

**PLEASE TAKE NOTICE** that, on [●], 2026, the Court entered an order [Docket No. [●]] (the "Bidding Procedures Order") granting certain of the relief sought in the Motion, including, among other things, approving the (a) Stalking Horse Agreement and related bid protections, (b) Bidding Procedures, which establish the key dates and times related to the Sale and the Auction, and (c) Assumption Procedures.

**PLEASE TAKE FURTHER NOTICE** that on **[●]**, 2026, pursuant to the Bidding Procedures Order, the Debtor conducted the Auction with respect to the Assets.

**PLEASE TAKE FURTHER NOTICE** that, at the conclusion of the Auction, the Debtor selected the following Successful Bidder and Back-Up Bidder with respect to the Assets:

| Asset(s) | Successful Bidder | Back-Up Bidder |
|---|---|---|
|  |  |  |
|  |  |  |

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing to consider approval of (i) the Sale, (ii) transfer of the Assets to the Successful Bidder, **free and clear of all liens, claims,  interests, and encumbrances**, in accordance with section 363(f) of the Bankruptcy Code, and (iii) approval of the releases contemplated by the asset purchase agreement, will be held before The Honorable Brendan L. Shannon, Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, at District of Delaware, at 824 Market Street North, 6th Floor, Wilmington, Delaware 19801, or pursuant to the Court's hearing procedures on **August 6, 2026 at 11:00 a.m. (prevailing Eastern Time)**.  The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court or by notice filed on the docket in the Chapter 11 Case.

**PLEASE TAKE FURTHER NOTICE** that any objections (a) to the identity of the Successful Bidder or the Back-Up Bidder, and/or (b) the ability of the Successful Bidder or Back-

---

[1]   The Debtor in this chapter 11 case and the last four digits of its federal tax identification number are SiFi Networks America, LLC (7990).  The Debtor's service address in this chapter 11 case is 103 Foulk Road, Suite 500, Wilmington, DE 19803.

Up Bidder (other than the Stalking Horse Bidder) to provide adequate assurance of future performance to counterparties to executory contracts and unexpired leases contemplated to be assumed and assigned must be filed with the Court and served on the Objection Notice Parties (defined below) so as to be received no later than **July 31, 2026, at 4:00 p.m. prevailing Eastern Time.**

       **PLEASE TAKE FURTHER NOTICE** that the "Objection Notice Parties" are: (i) counsel to the Debtor, Cole Schotz P.C., 500 Delaware Avenue, Suite 600, Wilmington, DE 19801, Attn: Daniel F.X. Geoghan (dgeoghan@coleschotz.com) and Jacob S. Frumkin (jfrumkin@coleschotz.com); (ii) counsel to the Stalking Horse Bidder and DIP Lender, counsel to the DIP Lender and Stalking Horse Bidder, (a) Clifford Chance US LLP, Two Manhattan West, 375 9th Avenue, New York, New York 10001, Attn: David Feldman (David.Feldman@cliffordchance.com) and Matthew L. Hinker (Matthew.Hinker@cliffordchance.com), (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Sean M. Beach (sbeach@ycst.com); (iii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jon Lipshie (Jon.Lipshie@usdoj.gov); and (iv) counsel to the Official Committee of Unsecured Creditors, Lowenstein Sandler LLP (a) 1000 N. West Street, Suite 1200 Wilmington, Delaware 19801, Attn: Christoper Ward (cward@lowenstein.com) and (b) 1251 Avenue of the Americas, New York, NY 10020, Attn: Gianfranco Finizio (gfinizio@lowenstein.com).

       **PLEASE TAKE FURTHER NOTICE** that, at the Sale Hearing, the Debtor will seek Court approval of the Successful Bid, and the assumption and assignment of the Assigned Contracts (as defined in the Bidding Procedures Order) to the Successful Bidder. Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the sale of the Debtor's Assets and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder cannot or refuses to consummate the Sale because of the breach or failure on the part of the Successful Bidder, the Back-Up Bidder will be deemed the new Successful Bidder and the Debtor shall be authorized, but not required, upon approval of the Back-Up Bid following notice and a hearing, to close with the Back-Up Bidder on the Back-Up Bid upon further order of the Court.

       **PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the terms and conditions of the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict, and the Debtor encourages parties in interest to review the Bidding Procedures Order in its entirety. Parties with questions regarding this Notice should contact the Debtor's counsel at the contact information provided herein.

       **PLEASE TAKE FURTHER NOTICE** that parties interested in receiving more information regarding the contemplated sale and/or copies of any related documents may visit the websites maintained by Stretto, Inc., the Debtor's claims and noticing agent, at https://cases.stretto.com/SiFiNetworks.

Dated: _____ \_\_, 2026          **COLE SCHOTZ P.C.**
      Wilmington, Delaware

*/s/ DRAFT*
Patrick J. Reilley (No. 4451)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
preilley@coleschotz.com
mfitzpatrick@coleschotz.com

-and-

Daniel F.X. Geoghan (admitted *pro hac vice*)
Jacob S. Frumkin (admitted *pro hac vice*)
Mark Tsukerman (admitted *pro hac vice*)
Tejal Majethia (admitted *pro hac vice*)
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
dgeoghan@coleschotz.com
jfrumkin@coleschotz.com
mstukerman@coleschotz.com
tmajethia@coleschotz.com

*Counsel for Debtor and*
*Debtor in Possession*

3

**Exhibit 5**

**Stalking Horse Agreement**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of July 9, 2026, is made subject to the conditions set forth herein and is entered into by and between ArcLink Fiber LLC, a Delaware limited liability company ("**Buyer**"), and SiFi Networks America, LLC, a Delaware limited liability company, ("**Seller**"). Buyer and Seller are referred to herein individually as a "**Party**" and collectively as the "**Parties**."  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article XI.

### RECITALS

**WHEREAS**, on June 5, 2026, Seller filed a voluntary petition for relief (the "**Chapter 11 Case**") under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), case number 26-10912 (BLS)  (the "**Bankruptcy Case**"); and

**WHEREAS**, Buyer desires to purchase the Purchased Assets (defined below) from Seller, and Seller desires to sell, assign, and transfer to Buyer the Purchased Assets, in a sale authorized by the Bankruptcy Court free and clear of all Liens (defined below) pursuant to, *inter alia*, sections 105, 363, and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement, subject to entry of a final, non-appealable order in form and substance satisfactory to Buyer (it being understood and agreed that if the Sale Order requires Buyer to assume, pay or otherwise become responsible for any liabilities of Seller that do not constitute Assumed Liabilities as expressly defined herein, then such Sale Order shall not be satisfactory to Buyer) by the Bankruptcy Court approving this Agreement and the transactions contemplated hereby (the "**Sale Order**").

**NOW, THEREFORE**, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

### ARTICLE I

### PURCHASE AND SALE OF THE PURCHASED ASSETS

1.1    Purchase and Sale of the Purchased Assets. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Seller shall sell, assign, transfer and deliver to Buyer (or one or more of its designees), and Buyer (or one or more of its designees) shall purchase, acquire, and accept from Seller, all of Seller's rights, title, and interest in and to the Purchased Assets, free and clear of all Liens (except for Liens supporting the Assumed Liabilities expressly set forth in Schedule 1.3 and Liens expressly set forth in the Sale Order). The "**Purchased Assets**" means all of the following assets of Seller, other than the Excluded Assets (defined below):

(a)    all equipment, furniture and fixtures listed on Schedule 1.1(a);

(b)    all Assumed Contracts or other rights that have been assumed by and

assigned to Buyer pursuant to Section 1.5;

(c)    all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, entitlements, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) in each case related to any Purchased Asset or any of the Assumed Liabilities, and all claims and causes of action of Seller as of the Closing Date related to any Purchased Asset or any of the Assumed Liabilities, including rights of set-off and rights of recoupment, refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Seller against any of the Buyer, the Buyer Affiliates, the Project Companies, and any other Person related to the Go-Forward Business;

(d)    all Avoidance Actions against the Buyer, the Buyer Affiliates, the Project Companies, Persons related to the Go-Forward Business and set forth on Schedule 1.1(d) as will be provided by Buyer to the Consultation Parties (as defined in the Bid Procedures Order) no later than July 27, 2026, (the "**Initial Schedule 1.1(d)**") and which Initial Schedule 1.1(d) shall be reasonably acceptable to the Creditors' Committee (as Schedule 1.1(d) may be amended or modified by Buyer in its sole discretion at any time prior to, on or following the Closing Date by removing (but not adding) an Avoidance Action, but only after consultation with and reasonable advance written notice to Seller and the Creditors' Committee (or, following the closing of the Bankruptcy Case, the effective date of any chapter 11 plan in the Bankruptcy Case, or conversion of the Bankruptcy Case to chapter 7 to any successor, estate representative, or litigation trustee)) (the "**Avoidance Action Schedule**"), it being understood and agreed that any Avoidance Action not specifically identified on the Avoidance Action Schedule or removed from the Avoidance Action Schedule shall constitute an Excluded Asset for all purposes hereunder; *provided*, however, that with respect to any Avoidance Action that is removed from the Avoidance Action Schedule and thereby becomes an Excluded Asset, the applicable party (including Seller, any estate representative, or any litigation trustee, as applicable) shall retain the right to commence and prosecute such Avoidance Action to the extent the applicable statute of limitations (including any tolling, suspension, or extension thereof under applicable Law or any order of the Bankruptcy Court) has not expired as of the date such action is commenced;

(e)    all documents (whether written or electronic) primarily related to any of the other Purchased Assets, including all books and records, financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, customer lists, information and records, data, plans, engineering, reports and recorded knowledge;

(f)    all goodwill and going concern value associated with any of the other Purchased Assets, including all rights under any confidentiality agreements executed by any third party for the benefit of Seller to the extent relating to the Purchased Assets or the Assumed Liabilities (or any portion thereof);

(g)    all personnel files for those Current Employees who are hired or retained by Buyer, except as prohibited by applicable Law;

(h)      all rights of Seller under any non-disclosure and confidentiality, invention assignment, non-compete, non-solicitation, and other restrictive covenant agreements with Current Employees and Former Employees, directors, consultants, independent contractors and agents of Seller, and other third parties to the extent relating to the Purchased Assets or the Assumed Liabilities (or any portion thereof);

(i)      all rights under or pursuant to all warranties, representations, and guarantees made by suppliers, manufacturers, contractors, and any other Person to the extent relating to equipment purchased, products sold, or services provided to Seller and related to any other Purchased Asset or any of the Assumed Liabilities;

(j)      all deposits (including deposits in transit, customer deposits and security deposits (whether maintained in trust, escrow or otherwise) for rent, electricity, telephone, utilities or otherwise, and other prepaid charges and expenses of Seller);

(k)      subject to Section 363(b)(1)(A) of the Bankruptcy Code, all of Seller's telephone numbers, fax numbers, e-mail addresses, websites, URLs, social media accounts and internet domain names, along with all required login information, set forth on Schedule 1.1(k);

(l)      Seller's interest in any existing manufacturer's warranties or guarantees and other similar warranties and guarantees with respect to the Purchased Assets, which by their terms may be transferable to Buyer; and

(m)      all other rights (including any Intellectual Property rights in the foregoing), demands, claims, credits, allowances, rebates, or other refunds and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature, and all advances and prepayments, in each case related to any other Purchased Asset or any of the Assumed Liabilities.

1.2      Excluded Assets. Notwithstanding the foregoing or any other provision of this Agreement to the contrary, the Purchased Assets shall not include the Excluded Assets. Seller is not conveying, assigning, or delivering to Buyer, and Buyer is not purchasing, acquiring, or accepting from Seller, any Excluded Assets. "**Excluded Assets**" means all assets that do not constitute a Purchased Asset, including the following assets, properties and rights:

(a)      all Cash and Cash Equivalents of Seller;

(b)      all Contracts, equipment, furniture and fixtures listed on Schedule 1.2(b);

(c)      all equipment and other assets and items that are owned by a Person other than Seller;

(d)      the bank accounts of Seller;

(e)      all Health and Welfare Plans and Employee Benefit and any assets of any such plans or any right, title, or interest in any of the assets, trusts or other funding vehicle thereof or relating thereto;

3

(f)        any equity securities of Seller;

(g)        retainers held by professionals retained by Seller in the Bankruptcy Case;

(h)        funds in the Professional Fee Escrow Account (as defined in the DIP Order);

(i)        any refunds or reimbursements of any prepaid amounts or charges;

(j)        all Avoidance Actions, other than those expressly set forth on the Avoidance Action Schedule;

(k)        any claim or cause of action that is not a Purchased Asset  pursuant to Section 1.1(c) and 1.1(d);

(l)        all Accounts Receivable as of the Closing Date;

(m)        all rights to any Tax deposits, credits, refunds, drawbacks or rebates of any Seller or any of their Subsidiaries or that any Seller or any of their Subsidiaries may qualify for with respect to the Purchased Assets (except to the extent that any such items relating to Taxes that are treated as Excluded Liabilities);

(n)        any assets of Seller that are rendered unencumbered as a result of a successful Challenge (as defined in the DIP Order);

(o)        all proceeds, products, offspring, and profits related to clauses (i) – (m); and

(p)        any other asset, right, interest or other entitlement that is not a Purchased Asset.

1.3        No Assumption of Liabilities. Effective as of the Closing Date (or, with respect to Assumed Liabilities under Assumed Contracts that are assumed by Buyer after the Closing, such later date of assumption as set forth in Section 1.5), Buyer shall assume from Seller and agree from and after the Closing Date to pay, perform, and discharge when due in accordance with their terms only those Liabilities specifically identified in Schedule 1.3 and Seller shall irrevocably convey, transfer, and assign to Buyer, those Liabilities, without duplication and only to the extent not paid prior to the Closing Date and no other Liabilities (collectively, the "**Assumed Liabilities**").

1.4        Excluded Liabilities. Notwithstanding anything herein to the contrary and other than the Assumed Liabilities, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge, or in any other manner be liable or responsible for any Liabilities of Seller, whether existing on or prior to the Closing Date or arising thereafter, including (a) any break-up or termination fees incurred in connection with Buyer's assumption of the Assumed Contracts, (b) all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Seller or of any of its predecessors in connection with this Agreement or the administration of the Chapter 11 Case (including all fees and expenses of professionals engaged by Seller) and administrative expenses and priority claims accrued through the Closing Date and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement, (ii) the

negotiation, execution and consummation of the DIP Note, and (iii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Seller or of any of its predecessors payable as a result of the consummation of the transactions contemplated by this Agreement, (c) Liabilities with respect to all Employee Benefit Plans and Health and Welfare Plans of Seller, (d) Liabilities with respect to any employees or independent contractors not hired by Buyer, (e) all employment related Liabilities with respect to any Current Employee or Former Employee (including any unpaid bonus, incentive compensation paid time off, severance, retention, payroll taxes, any claim under federal, state or local equivalent of the WARN Act, COBRA liabilities, with respect to any terminated employees or other individual who is a COBRA qualified beneficiary on account of the individual's relation to an employee) with respect to COBRA, including any individual who becomes an "M&A qualified beneficiary" within the meaning of sections 601, et. seq., of ERISA and section 4980B of the Code (f) except with respect to any Transfer Taxes as set forth in Section 9.1, (A) Liabilities for any Taxes (including any applicable withholding Taxes) of Seller attributable to any taxable period or (B) Liabilities for Taxes relating to the Purchased Assets attributable to the Pre-Closing Tax Period (including any Pre-Closing Straddle Taxes), (g) all Liabilities arising with respect to or relating to any of the Excluded Assets, whether before, on or after the Closing Date, (h) all Liabilities of Seller in respect of or relating to any Contract to which any Seller is party or is otherwise bound that are not Assumed Contracts and all Liabilities arising out of the rejection of any Contract that is not an Assumed Contract by Seller, (i) all Liabilities relating to Claims, actions, suits, arbitrations, litigation matters, Proceedings or investigations (in each case whether involving private parties, Governmental Entities, or otherwise) involving, against, or affecting any Seller, Purchased Assets, or any assets or properties of Seller, except as a result of the ownership or operation of any of the Purchased Assets from and after the Closing date and (j) any and all other Liabilities, other than the Assumed Liabilities (collectively, the "**Excluded Liabilities**").

1.5     Assumption and Assignment of Contracts.

(a)     Schedule 1.5 sets forth a list (the "**Assumed Contract List**") of all Contracts to which Seller is a party and which the Parties have agreed will be assumed and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code (each, an "**Assumed Contract**"), together with the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contract necessary to assign such Assumed Contract to Buyer pursuant to Section 365(b)(1)(A) and Section 365(b)(1)(B) of the Bankruptcy Code (such amounts, the "**Cure Amounts**") for each Assumed Contract, if any. Buyer will have the right to amend the Assumed Contract List in its sole and absolute discretion at (i) any time prior to the Closing Date to (A) remove an Assumed Contract from the Assumed Contract List or add any Contract to the Assumed Contract List or (B) modify the Cure Amount if such modified Cure Amount is agreed to by the applicable contractual counterparty, and (ii) at any time after the Closing Date to remove any Contract in the event that after the Closing Date, (A) the Bankruptcy Court determines (or the Parties otherwise agree in writing (email being sufficient)) that the actual Cure Amounts exceed the estimated Cure Amounts, or (B) a timely filed objection to a Cure Amount or to Buyer's assumption and assignment of an Assumed Contract is not resolved. In connection with the serving of the motion to enter the Sale Order and in accordance with the Bid Procedures Order, the Seller shall file with the Bankruptcy Court and serve notice by first class mail on all non-debtor counterparties to all Assumed Contracts

5

(such notice, an "**Assumption Notice**") of the potential assignment of the Assumed Contracts which shall include (i) the proposed Cure Amounts for such Assumed Contract and (ii) an objection deadline for such non-debtor party to object to the proposed Cure Amounts. To the extent Buyer exercises its right under this paragraph to amend or modify the Assumed Contract List from time to time to include additional Assumed Contracts, Seller shall deliver written notices (each, a "**Supplemental Assumption Notice**") to all non-debtor parties to such Assumed Contracts in substantially the same form as the Assumption Notice and in accordance with the Bid Procedures Order. Seller shall provide a copy of the Assumption Notice to Buyer, and at the Closing shall assume and assign to, and Buyer shall accept the assignment of and assume such Assumed Contract or Lease.

(b)     At Buyer's request, and at Buyer's sole cost and expense, Seller shall reasonably cooperate from the date hereof forward with Buyer as reasonably requested by Buyer (i) to allow Buyer to enter into an amendment of any Lease or Assumed Contract upon assumption of such Lease or Assumed Contract by Buyer (and Seller shall reasonably cooperate with Buyer to the extent reasonably requested by Buyer in negotiations with the counterparty thereto), or (ii) to otherwise amend any Lease or Assumed Contract to the extent such amendments would not adversely affect Seller; provided that Seller shall not be required to enter into any such amendment if such amendment would result in an assumption by Seller of such Lease or Assumed Contract, unless such Lease or Assumed Contract will be assigned to Buyer at the time of such assumption.

(c)     The Parties shall use their commercially reasonable efforts, and cooperate with each other to obtain any counterparty or third party consent ("**Consent**") that is required to assume and assign to Buyer any Assumed Contract; provided, however, that none of the Parties or in the case of Buyer, any of Buyer's Affiliates, shall be required to pay any consideration therefor other than filing, recordation or similar fees, which shall be borne by Buyer. To the extent that any such Consent is not obtained by the Closing Date, Seller so long as it is in existence, shall use reasonable best efforts (at Buyer's sole cost) during the term of such Assumed Contract to (i) provide to Buyer the benefits under such Assumed Contract, (ii) cooperate in any reasonable and lawful arrangement, including holding such Assumed Contract in trust for Buyer pending receipt of the required Consent, designed to provide such benefits to Buyer, and (iii) enforce for the account of Buyer any rights of Seller under such Assumed Contract, including the right to elect to terminate such Assumed Contract in accordance with the terms thereof upon the written direction of Buyer. Buyer shall reasonably cooperate with Seller in order to enable Seller to provide to Buyer the benefits contemplated by this Section 1.5(c).

(d)     Seller shall use its reasonable best efforts to obtain one or more orders of the Bankruptcy Court, which order(s) shall be in form and substance reasonably acceptable to Buyer, and shall reflect the terms and conditions set forth herein, to assume and assign the Assumed Contracts to Buyer on the terms set forth in this Section 1.5.

(e)     Notwithstanding the foregoing, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by Seller in accordance with the terms hereof, deemed rejected under Section 365 of the Bankruptcy Code, or terminated by the other party thereto or terminates or expires in accordance with its terms on or prior to the Closing Date and is not continued or otherwise extended prior to or upon assumption and assignment; provided, that Seller shall not

6

reject any Contracts without the prior written consent of Buyer in its sole discretion, or (ii) requires a consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the assumption and assignment by Seller to Buyer of such Contract pursuant to Section 365 of the Bankruptcy Code, and no such consent has been obtained prior to the Closing. In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Seller's rights under such Permit, and no such consent has been obtained prior to the Closing.

1.6    **Designated Purchaser**

(a)    In connection with the Closing, without limitation by the terms of <u>Section 10.5</u>, the Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this <u>Section 1.6</u> and without the consent of the Seller, one (1) or more Affiliates to exercise certain of the Buyer's rights and assume certain of the Assumed Liabilities, including to (i) purchase specified Purchased Assets (including specified Assumed Contracts) and pay the Cure Amounts, as applicable, or (ii) assume specified Assumed Liabilities (any such Affiliate of the Buyer that shall be properly designated by the Buyer in accordance with this <u>Section 1.6</u>, a "**Designated Buyer**"); provided that (a) no such designation would impede or materially delay the Closing or affect the timely receipt of any regulatory approval, and (b) such Designated Buyer complies with procedures set forth in the Bid Procedures Order, <u>provided</u>, <u>however</u>, Buyer shall remain fully liable for the performance of all obligations hereunder notwithstanding such designation. At and after the Closing, the Buyer shall, or shall cause its Designated Buyer(s) to, honor the Buyer's obligations at the Closing. After the Closing, any reference to the Buyer made in this Agreement shall include reference to the appropriate Designated Buyer(s), if any. After the Closing, all obligations of the Buyer and its Designated Buyer(s) under this Agreement shall be several and not joint and the only Party with Liability as to a particular Assumed Liability is the Buyer or the Designated Buyer assuming such obligation at the Closing and no other Buyer or Designated Buyer.

(b)    The designation of a Designated Buyer in accordance with <u>Section 1.6(a)</u> shall be made by the Buyer by way of a written notice to be delivered to the Seller in no event later than two (2) Business Days prior to Closing, which written notice shall (i) contain appropriate information about the Designated Buyer(s), (ii) indicate which Purchased Assets and Assumed Liabilities the Buyer intends such Designated Buyer(s) to purchase or assume, as applicable, hereunder and (iii) include a signed counterpart to this Agreement pursuant to which the Designated Buyer(s) agree to be bound by the terms of this Agreement as it relates to such Designated Buyer(s) and which authorizes the Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder.

**ARTICLE II**

**CONSIDERATION; PAYMENT; CLOSING**

2.1    <u>Consideration</u>.

7

(a)     The aggregate consideration to be paid by Buyer for the purchase of the Purchased Assets (the "**Purchase Price**") shall be a credit bid pursuant to section 363(k) of the Bankruptcy Code (the "**Credit Bid**") of obligations equal to (i) all of the DIP Obligations *plus* (ii) the aggregate principal amount of the Prepetition Note as of the Closing *plus* (iii) cash in the amount equal to $200,000 (the "**Cash Amount**"), and any other accrued and unpaid fees and expenses in respect thereof as of Closing, the aggregate amount of subclauses (i) through (iii) equaling Five Million Eight Hundred and Fifty Three Thousand and Thirty Nine dollars ($5,853,039.00), *plus* (iii) the Assumed Liabilities, *plus* (iv) the Cure Amounts.

(b)     In accordance with Section 2.1(a), Buyer shall satisfy the Purchase Price at Closing as to (1) the amount set forth in clause (i) therein by discharging Seller, and Seller shall be deemed to be discharged, from all or a portion of the DIP Obligations, (2) the amount set forth in clause (ii) thereof by discharging Seller, and Seller shall be deemed to be discharged from, all obligations under the Prepetition Note, and (3) the amounts set forth in clauses (iii) and (iv) therein, by paying the Cash Amount and the Cure Amounts in cash; provided, that the Buyer reserves the right to use cash consideration to satisfy the Purchase Price for the amounts in clauses (i) or (ii).

2.2     Closing Date Payment. At the Closing, subject to Section 7.4 and the satisfaction terms set forth in Section 2.1(b), Buyer shall deliver, or cause to be delivered, to Seller an amount equal to the Cure Amounts and the Cash Amount (the "**Closing Date Payment**") in accordance with Section 2.1(b), being made to Seller in cash by wire transfer of immediately available funds to such bank account(s) as shall be designated by Seller. The Cash Amount shall not be disbursed or otherwise utilized by the Debtor absent the express written consent of the Creditors' Committee, other than $25,0000 of the Cash Amount that may be payable to Stretto, Inc., as the Debtor's claim and noticing agent.

2.3     Closing. Pursuant to the terms and subject to the conditions of this Agreement, the closing of the purchase and sale of the Purchased Assets and all transactions contemplated hereby (the "**Closing**") will take place by telephone conference or other electronic exchange of documents at a time and on the date (the "**Closing Date**") that is the first (1st) Business Day after the date on which all conditions to the obligations of Seller and Buyer to consummate the transactions contemplated hereby set forth in Article VII (other than conditions with respect to actions Seller or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time and place as shall be mutually agreed upon by Seller and Buyer in writing (email being sufficient) prior thereto.

2.4     Closing Deliveries by Seller. At or prior to the Closing, Seller shall deliver to Buyer the following:

(a)     a Bill of Sale, Assignment and Assumption Agreement in substantially the form of Exhibit A (the "**Bill of Sale, Assignment and Assumption Agreement**") with respect to the Purchased Assets and Assumed Liabilities, respectively, duly executed by Seller;

(b)     a copy of the Sale Order, as entered by the Bankruptcy Court;

(c)     an officer's certificate, dated as of the Closing Date, duly executed by an authorized officer of Seller certifying that the conditions set forth in Section 7.2 have been

satisfied;

(d)      a good standing certificate of Seller issued by the appropriate officer of the State of Delaware issued within ten (10) days of the Closing Date;

(e)      a properly completed and duly executed Internal Revenue Service Form W-9 of Seller dated within ten business days of the Closing Date;

(f)      a copy of the properly completed and duly executed IRS Form 8832 previously filed by Seller with the Internal Revenue Service to elect to be treated as a corporation for U.S. federal income tax purposes; and

(g)      any further assurances as required pursuant to this Agreement.

2.5      <u>Closing Deliveries by Buyer</u>. At the Closing, Buyer shall deliver to Seller:

(a)      the Closing Date Payment;

(b)      the Bill of Sale, Assignment and Assumption Agreement, duly executed by Buyer;

(c)      an officer's certificate, dated as of the Closing Date, duly executed by an authorized officer of Buyer certifying that the conditions set forth in <u>Section 7.3</u> have been satisfied; and

(d)      any further assurances as required pursuant to this Agreement.

2.6      <u>Withholding</u>. The Parties shall be entitled to withhold and deduct from the amounts otherwise payable to any recipient pursuant to this Agreement such amounts as may be required to be withheld or deducted under the Code or any other provision of federal, state, local, or foreign Tax Laws and all such amounts withheld or deducted shall be treated for all purposes of this Agreement as having been paid to the Party in respect of which such withholding or deduction was made; provided, however, that, absent a change in Law, Buyer shall not withhold Tax with respect to the Purchase Price so long as Seller has provided an IRS Form W-9 pursuant to <u>Section 2.4(e)</u>. The Parties shall cooperate in good faith to reduce or otherwise eliminate any such withholding obligation to the extent permitted by applicable Law.

2.7      <u>Allocation</u>. The Purchase Price (and any other items treated as consideration for U.S. federal income Tax purposes) shall be allocated among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder or any similar provision of state, local or foreign Law as applicable (the "**Allocation**"). The Allocation shall be delivered by Buyer to Seller within ninety (90) days after the Closing. Seller will have the right to request reasonable changes to the Allocation within thirty (30) days after Buyer's delivery thereof, which requested changes shall be set forth in writing by Seller in reasonable detail. Buyer and Seller shall negotiate in good faith using commercially reasonable efforts to resolve any changes so requested by Seller, and any such changes accepted by the Parties (or any such changes requested by Seller that are affirmatively rejected in writing by Buyer and not disputed further in writing by the Seller after thirty (30) days following the Buyer's receipt thereof) shall be

9

considered final and binding on the Parties. With respect to any changes proposed by the Seller that remain in dispute following such thirty (30) day period, Buyer's draft of the Allocation shall control. Buyer and Seller shall file all Tax Returns (including Internal Revenue Service Form 8594) consistent with the Allocation (taking into account any revisions made by Buyer in response to comments by Seller) absent a change in Law. Neither Buyer nor Seller shall take any position or in the case of Buyer, permit any of Buyer's Affiliates, to take any position inconsistent with the final Allocation in the preparation of financial statements or in the course of any audit by any Tax authority, Tax review or Tax proceeding related to any Tax Returns, unless, and then only to the extent, required by a "determination" as defined in Section 1313 of the Code, provided, however, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Entity based upon or arising out of the Allocation, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging such Allocation. Buyer and Seller shall promptly notify and provide the other with reasonable assistance in the event of an examination, audit, or other proceeding relating to Taxes regarding the Allocation pursuant to this Section 2.7. Notwithstanding any other provisions of this Agreement, this Section 2.7 shall survive the Closing Date without limitation.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows as of the date hereof and as of the Closing Date, subject in all respects to the limitations imposed by Seller's status as a debtor-in-possession under the Bankruptcy Code:

3.1    Organization and Qualification. Seller (a) is a limited liability company duly formed, validly existing, and in good standing under the Laws of the State of Delaware, (b) has all requisite power and authority to own and operate its properties and to conduct its business as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify. Seller does not have any subsidiaries and does not own any equity securities in any other Person.

3.2    Authorization of Agreement. Seller has all requisite power and authority to execute and deliver this Agreement and each Related Document to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby in accordance with the provisions of the Bankruptcy Code, subject to approval by the Bankruptcy Court. All acts or Proceedings required to be taken by Seller to authorize the execution and delivery of this Agreement and the Related Documents, and the performance of Seller's obligations hereunder and thereunder, have been properly taken and will be taken as authorized by the Bankruptcy Court in accordance with the Sale Order. This Agreement has been duly and validly executed and delivered by Seller, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the Related Documents to which Seller is a party will have been duly and validly executed and delivered by Seller. This Agreement constitutes the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to

10

creditors' rights and general principles of equity. Each Related Document to which Seller is or will be a party, when executed and delivered, constitutes or will constitute the valid and legally binding obligations of Seller, enforceable against Seller, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principals of equity.

3.3    Conflicts; Consents. Assuming that requisite Bankruptcy Court approvals are obtained through entry of the Sale Order, and all necessary notices, authorizations, approvals, Decrees, Permits, or consents set forth on Schedule 3.3 are made, given, or obtained (as applicable), the execution, delivery, and performance by Seller of this Agreement and the Related Documents and the consummation by Seller of the transactions contemplated hereby and thereby, do not: (a) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of Seller, (b) violate any Law applicable to Seller or by which any property or asset of Seller is bound, or (c) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Lien on any property or asset of Seller under, any Assumed Contract.

3.4    Title to Purchased Assets; Sufficiency of Purchased Assets. Seller, as of immediately prior to the Closing Date, will have good and valid title to, or, in the case of any leased assets, has good and valid leasehold interests in, each of the Purchased Assets, and will have the power and right to sell, assign, transfer, convey and deliver, as the case may be, to Buyer, all of the Purchased Assets, free and clear of all Liens, subject to entry of the Sale Order. To Seller's Knowledge, the Purchased Assets are in good operating condition and repair, subject to ordinary wear and tear, and are suitable for the purposes for which they are currently used in the Business.

3.5    Compliance with Laws. To Seller's Knowledge, Seller is, and for the prior three (3) years has been, in material compliance with all applicable Laws related to the Business and the ownership and operation of the Purchased Assets, including Tax Laws and there are no outstanding orders with respect to the Business or any of the Purchased Assets.

3.6    Permits. Seller does not hold any Permits related to or required for the ownership or operation of the Business and, to Seller's Knowledge, no material Permits are required for the ownership or operation of the Business.

3.7    Contracts. To Seller's Knowledge, Schedule 3.7 sets forth an accurate list of all material Contracts to which Seller is a party or that are used in or related to the Purchased Assets (and Seller has made available to Buyer true and complete copies of all such Contracts, including all amendments, modifications and supplements thereto). Except for those arising out of the Chapter 11 Case and payment of the Cure Amounts as of the date of this Agreement, to Seller's Knowledge, (a) Seller is not in breach or default of its obligations under any Assumed Contract, (b) no condition exists that with notice or lapse of time or both would constitute a default by Seller or under any such Assumed Contract, and (c) no other party to any such Assumed Contract is in breach or default thereunder.

11

3.8     Intellectual Property.

(a)     Seller does not own any patents, patent applications, trademark registrations, applications for trademark registration, copyright registrations, applications for copyright registration, domain names, or software except as set forth on Schedule 1.1(k).

(b)     To Seller's Knowledge, except for those arising out of the Chapter 11 Case and payment of the Cure Amounts as of the date of this Agreement, Seller is not in breach of any of the terms of any third party license agreement in any way related to any software. All Contracts pursuant to which Seller receives from or grants to any third party rights under Intellectual Property by license, assignment or otherwise are set forth on Schedule 3.8 (other than Contracts relating to unmodified, commercially available off-the-shelf software, non-disclosure agreements entered into in the Ordinary Course, and Contracts where the license of any Intellectual Property Rights is incidental to such Contract).

(c)     To Seller's Knowledge, Seller has not received any written notice, or been subject to any Proceeding, with respect to any alleged infringement, misappropriation or other violation by Seller of any Intellectual Property owned by any other Person.

(d)     To Seller's Knowledge, all Current Employees, Former Employees, independent contractors, and consultants who have been involved in the creation, development or improvement of any material Intellectual Property on behalf of Seller during the course of their employment or engagement have signed and delivered to Seller written agreements including confidentiality and non-disclosure obligations in favor of Seller.

(e)     To Seller's Knowledge, Seller maintains commercially reasonable policies and procedures regarding data security, data privacy, collection of data, data transfer, and the use of data, has commercially reasonable written agreements in place, or otherwise has commercially reasonable safeguards in place, in each case to protect personally identifiable information ("**PII**") and confidential information in Seller's possession or control from unauthorized access by third Persons and to ensure that the operation of Seller's business (including with respect to employee matters) is in compliance in all material respects with all applicable Laws, with all applicable contractual commitments and privacy policies of Seller with respect to PII or privacy, security, or security breach notification requirements, and with any applicable industry standards to which Seller is subject (collectively, "**Data Security Requirements**"). To Seller's Knowledge, Seller, and the conduct of its business, are and have been in compliance with all Data Security Requirements in all material respects. To Seller's Knowledge, there has been no (i) actual, suspected, or alleged (in writing) unauthorized access to or use, acquisition, destruction, damage, loss, corruption, unintended, or improper disclosure, or breaches of the security of any PII or confidential information collected, maintained, or stored by or on behalf of Seller or in Seller's possession or control, or any System, or (ii) assertion, claim, or other Proceeding that has given rise or may give rise to any Liability under applicable Laws or industry regulation in relation to data protection, data security, or data privacy for PII or any other Data Security Requirement. Seller has not been subject to any external investigations or audits concerning any Data Security Requirement.

3.9     Litigation. To Seller's Knowledge, Schedule 3.9 sets forth all Proceedings brought

12

by or against Seller, and there is no other Proceeding pending or, to Seller's Knowledge, threatened before any Governmental Entity against Seller, the Business, any of the Purchased Assets or any of the Assumed Liabilities or that would materially impair Seller's ability to consummate the transactions contemplated hereby or any of the Related Documents. Except as set forth in Schedule 3.9 or the Chapter 11 Case, there are no Orders outstanding against Seller with respect to the Business or any of the Purchased Assets.

3.10    Employees and Employment Matters.

(a)    Seller is not a party to or bound by any collective bargaining agreement or other Contract with any labor union, works council, or other labor organization, and no employees are represented by any labor union, works council, or other labor organization with respect to their employment with Seller. Schedule 3.10(a)(A) sets forth an accurate list of all Current Employees, including each such Current Employee's (i) name, (ii) job title, (iii) hire date, (iv) annual salary or hourly rate (or, if applicable, other compensation rate if not paid by a salary or hourly rate), (v) employment status (*e.g.*, full-time, part-time, or temporary), (vi) work location (including city and state), (vii) status as exempt or non-exempt from overtime pay requirements, (viii) accrued but unused vacation or paid time off, (ix) bonus or commissions paid in 2025 and to date in 2026, (x) leave status (including the type of leave and anticipated date of return), (xi) visa status and (xii) employing entity. Schedule 3.10(a)(B) sets forth an accurate list, as of the date hereof, of the names of each individual independent contractor currently retained by Seller, either in an individual capacity or through a legal entity through which such independent contractor provides services, along with each independent contractor's dates of engagement, description of services provided, fees paid in 2025 and to date in 2026, and location where services are provided. During the last three (3) calendar years, there has been no determination by any Governmental Entity that any independent contractor is an employee of Seller.

(b)    To Seller's Knowledge and except as set forth on Schedule 3.9, Seller is in compliance in all material respects with all Laws related to employment, employment practices, and labor, including all Laws respecting terms and conditions of employment, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), immigration (including the completion of Forms I-9 for all employees and the proper confirmation of employee visas), discrimination, retaliation, harassment, disability rights and benefits, equal opportunity, plant closures and layoffs (including the WARN Act), COBRA, employee trainings and notices, workers' compensation, labor relations, employee leave issues, COVID-19, affirmative action, and unemployment insurance. To Seller's Knowledge, Seller does not have any Liability for any unpaid wages, salaries, wage premiums, commissions, bonuses, fees, or other compensation to its current or former directors, officers, employees, and independent contractors under applicable Law, Contract, or policy.

3.11    Employee Benefit Plans.

(a)    Schedule 3.11(a) lists each Employee Benefit Plan. Any Employee Benefit Plan that is a Health and Welfare Plan is identified on Schedule 3.11(a) with an "*". With respect to each Employee Benefit Plan:

(i).    no Employee Benefit Plan is intended to meet the requirements of a

13

"qualified plan" under Section 401(a) of the Code; and

(ii).    Seller has made available to Buyer copies of the current plan documents for all Employee Benefit Plans.

(b)    To Seller's Knowledge, each Employee Benefit Plan has been established, funded, maintained and administered, in each case, in accordance with its terms and all applicable Laws. There is no pending or, to Seller's Knowledge, threatened, Proceedings relating to any of the Employee Benefit Plans.

(c)    To Seller's Knowledge, oo Employee Benefit Plan is, and Seller does not have any Liability or obligation with respect to any (i) "defined benefit plan" (as defined in Section 3(35) of ERISA) or any other plan that is or was subject to Title IV of ERISA or Sections 412 or 430 of the Code, (ii) "multiemployer plan" (as defined in Section 3(37) of ERISA), (iii) "multiple employer plan" (within the meaning of Section 210 of ERISA or Section 413(c) of the Code), or (iv) "multiple employer welfare arrangement" (as such term is defined in Section 3(40) of ERISA). No Employee Benefit Plan provides for, and Seller has not promised to provide, post-termination or retiree health or welfare benefits to any Person, other than as required by COBRA.

3.12    <u>Real Property</u>. Seller does not own any real property. Except as set forth on Schedule 3.12, Seller is not a party to any Leases, in connection with its ownership or operation of the Business.

3.13    <u>Environmental Matters</u>. Except as set forth on Schedule 3.13, with respect to the Business:

(a)    To Seller's Knowledge Seller has not used, handled, stored, transported, released, disposed of, or arranged for the disposal of, or exposed any Person to, any Hazardous Substance, in each case as has given or would reasonably be expected to give rise to Liability under any Environmental Law; and

(b)    Seller has made available to Buyer true and complete copies of all environmental audits, assessments, and reports in its possession or reasonable control and related to any of the Purchased Assets.

3.14    <u>Tax Matters</u>. To <u>Seller's Knowledge, except as set forth on Schedule 3.14</u>:

(a)    all Tax Returns required to be filed under applicable Law by Seller have been filed and such Tax Returns are true, complete, and correct in all material respects;

(b)    all Taxes required to be paid by Seller have been timely paid, whether or not shown as due on any Tax Return;

(c)    there is not currently in effect any extension or waiver of any statute of limitations of any jurisdiction regarding the assessment or collection of any Tax relating to the Purchased Assets;

14

(d)    Seller is not currently the beneficiary of any extension of time within which to file any Tax Return, other than automatic extensions obtained in the ordinary course of business;

(e)    no assessment, deficiency or adjustment relating to Taxes has been asserted, proposed or threatened with respect to the Purchased Assets. There is no ongoing or pending Tax audit, contest or other Proceeding by any Governmental Entity with respect to any material Taxes or material Tax Returns with respect to the Purchased Assets, and, to the knowledge of Seller, no such Tax audit, contest or other Proceeding relating to Taxes has been threatened; and

(f)    All Taxes for which Seller is or has ever been obligated to withhold from amounts owing to any Person have been fully withheld and timely reported and paid over to the appropriate Governmental Entity in compliance with applicable Law and Seller has complied with all applicable Law pertaining to the valid documentation of any exemptions claimed with respect to sales or use, gross receipts, payroll, or other similar withholding Taxes for which Seller would otherwise be considered liable.

3.15    Foreign Corrupt Practices Act. To Seller's Knowledge, Seller nor Seller's officers, directors (or equivalent), or other authorized representatives or agents acting on their behalf have: (i) violated in any material respect any applicable Laws relating to anti-bribery or anti-corruption (governmental or commercial), including the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act of 2010 and all laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions, or offered, paid, promised to pay, authorized the payment of, received, or solicited anything of value under circumstances such that all or a portion of such thing of value would be offered, given, or promised, directly or indirectly, to any Person to obtain any improper advantage or (ii) made any disclosure, to or been subject to any investigations or inquiries by, a Governmental Entity regarding material non-compliance with any such Laws.

3.16    No TID U.S. Business. To Seller's Knowledge, none of the Purchased Assets are a "TID U.S. business" as defined at 31 C.F.R. § 800.248.

3.17    Brokers. Except as set forth on Schedule 3.17, Seller has not entered into any Contract to pay, and has no Liability for, any fees or commissions or other amounts to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer or any of its Affiliates could become liable or obligated to pay.

3.18    Related Party Transactions. No officer, director, manager or, to Seller's Knowledge, employee or contractor of Seller has any direct or indirect interest in any Assumed Contract or other commitment of the Business (excluding Contracts relating to any such person's employment with the Business) or any Purchased Asset.

3.19    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III or in any of the Related Documents, Buyer acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and Buyer has not relied on, the accuracy or completeness of any express or implied representation or warranty with respect to Seller or the Purchased Assets. Without limiting the foregoing, Buyer acknowledges that the Purchased Assets are being sold "AS IS, WHERE IS" with all faults and

15

without any representation or warranty of any kind, express or implied, except as expressly set forth in this Article III or in any of the Related Documents, and that Seller specifically disclaims any warranty of merchantability, usage, suitability, or fitness for any particular purpose with respect to the Purchased Assets or any part thereof. Buyer acknowledges that other than as specifically provided in this Agreement or in any of the Related Documents, Seller has made no representation, warranty or guaranty, express or implied, oral or written, past, present or future, of, as to, or including: (a) the condition or state of repair of the Purchased Assets; or (b) the quality, nature, adequacy, and physical condition of the Purchased Assets. Buyer hereby expressly waives and renounces its ability to rescind the sale of the Purchased Assets under any applicable law. Seller and Buyer agree that this provision shall survive the execution of this Agreement and the Closing of the sale of the Purchased Assets.

3.20    No Survival of Representations and Warranties. None of the representations or warranties of Seller or Buyer contained in this Agreement or in any certificate or document delivered pursuant hereto shall survive the Closing. Upon the occurrence of the Closing, all such representations and warranties shall terminate and be of no further force or effect, and no Party shall have any liability or obligation after the Closing with respect to any breach of any representation or warranty contained herein.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows as of the date hereof and as of the Closing Date.

4.1    Organization and Qualification. Buyer (a) is an entity duly organized, validly existing and in good standing under the Laws of the State of Delaware and (b) has all requisite power and authority to own and operate its properties and to carry on its business as now conducted.

4.2    Authorization of Agreement. The execution, delivery, and performance of this Agreement and the Related Documents (to which Buyer is or will be a party) by Buyer, and the consummation by Buyer of the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery, or performance of this Agreement and the Related Documents (to which Buyer is or will be a party) by Buyer. This Agreement has been duly and validly executed and delivered by Buyer, and, assuming this Agreement is a valid and binding obligation of Seller, this Agreement constitutes a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

4.3    Conflicts; Consents.

(a)    Assuming that all necessary notices, authorizations, approvals, Decrees, Permits, or consents are made, given, or obtained (as applicable), the execution, delivery, and

16

performance by Buyer of this Agreement and the Related Documents (to which Buyer is or will be a party) and the consummation by Buyer of the transactions contemplated hereby and thereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of Buyer, (ii) violate any Law applicable to Buyer or by which any property or asset of Buyer is bound, or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Lien on any property or asset of Buyer under, Contract; except, in each case, for any such violations, breaches, defaults, or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Buyer to consummate the transactions contemplated hereby and thereby.

(b)    Buyer is not required to file, seek, or obtain any notice, authorization, approval, Decree, Permit, or consent of or with any Governmental Entity in connection with the execution, delivery, and performance by Buyer of this Agreement or the Related Documents (to which Buyer is or will be a party) or the consummation by Buyer of the transactions contemplated hereby and thereby, except where failure to obtain such consent, approval, authorization, or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Buyer to consummate the transactions contemplated hereby and thereby.

4.4    Funding. Buyer has, or will have at the Closing, (i) the legal right to make a credit bid pursuant to Section 363(k) of the Bankruptcy Code in order to pay the Credit Bid portion of the Purchase Price and (ii) sufficient funds in an aggregate amount necessary to pay the Closing Date Payment.

4.5    No Litigation. There are no material Proceedings pending or, to Buyer's actual knowledge, threatened against or affecting Buyer, except where such Proceedings would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Buyer to consummate the transactions contemplated hereby.

4.6    No Broker. Buyer has not entered into any Contract to pay, and has no Liability for, any fees or commissions or other amounts to any broker, finder, or agent with respect to the transactions contemplated hereby for which Seller could become liable or obligated to pay.

4.7    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV, Seller acknowledges and agrees that neither Buyer nor any other Person on behalf of Buyer makes, and Seller has not relied on, the accuracy or completeness of any express or implied representation or warranty with respect to Buyer. Seller and Buyer agree that this provision shall survive the execution of this Agreement and the Closing of the sale of the Purchased Assets.

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1    Bankruptcy Actions.

17

(a)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Seller shall work in good faith to obtain entry by the Bankruptcy Court of the Sale Order by the milestone set forth in the DIP Order for entry of the Sale Order; provided, that, that the Sale Order shall be in form and substance acceptable to Buyer. Seller shall furnish Buyer with a draft of the proposed Sale Order within seven (7) days before filing the proposed Sale Order with the Bankruptcy Court.

(b)    Buyer shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Representatives of Buyer available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code. The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (A) the execution, delivery, and performance by Seller of this Agreement, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all claims, liens, and encumbrances within the meaning of Section 363(f) of the Bankruptcy Code, (C) the assumption and assignment of the Assumed Contracts to Buyer, and (D) the performance by Seller of its obligations under this Agreement, and (ii) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grant Buyer the protections of Section 363(m) of the Bankruptcy Code.

(c)    Representatives of Seller and Buyer shall (i) appear in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated hereby, and (ii) keep the other Party reasonably apprised of the status of material matters related to the transactions contemplated hereby.

(d)    Seller's obligations under this Agreement and in connection with the transactions contemplated hereby and thereby are subject to entry of and, to the extent entered, the Sale Order. Nothing in this Agreement shall require Seller to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to Seller's creditors or the Bankruptcy Court.

(e)    Seller shall give appropriate notice, and provide appropriate opportunity for hearing, to all Persons entitled thereto, of all motions, orders, hearings, and other proceedings relating to this Agreement or any Related Document and the transactions contemplated hereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

(f)    Seller and Buyer shall take all commercially reasonable actions as may be reasonably necessary to cause the entry of the Sale Order, including, to the extent reasonably practicable, furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Buyer agrees that it will promptly take such commercially reasonable actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of (x) providing necessary assurances of performance by Buyer under this Agreement and

18

demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

(g)    If the Bid Procedures Order, Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order, Bid Procedures Order or other such order), and this Agreement has not otherwise been terminated pursuant to Section 8.1, Seller shall immediately notify Buyer of such appeal, petition, or motion and shall use commercially reasonable efforts to defend such appeal, petition, or motion and shall use commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition, or motion.

5.2    Copies of Pleadings. Seller shall consult with Buyer concerning the Sale Order and any other orders of the Bankruptcy Court relating to the transactions contemplated hereby, and the bankruptcy pleadings and proceedings in connection therewith. Except as otherwise expressly provided, to the extent reasonably practicable at least two (2) Business Days prior to filing thereof, Seller shall provide Buyer with drafts of all documents, motions, orders, filings or pleadings that Seller proposes to file with the Bankruptcy Court that relate to the approval of this Agreement, the Sale Order and the consummation of the transactions contemplated hereby and any such documents, motions, orders, filings or pleadings shall be in form and substance acceptable to the Buyer. Seller shall also promptly provide Buyer with copies of all pleadings received by or served by or upon Seller that relate to or, in Seller's judgment, are reasonably expected to affect the transactions provided for in this Agreement and which have not, to the actual knowledge of Seller, otherwise been served on Buyer.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1    Conduct of Seller. During the Interim Period, except (a) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (b) as required by applicable Law, or (c) with the prior written consent of Buyer (which consent shall not be unreasonably withheld), Seller shall:

(a)    operate the business and the Purchased Assets in the Ordinary Course and preserve all business relationships;

(b)    not sell, assign, license, transfer, convey, lease, surrender, relinquish, or otherwise dispose of any of the Purchased Assets;

(c)    not subject any of the Purchased Assets to any new Lien;

(d)    not take or agree to commit to take any action that would make any representation or warranty of Seller inaccurate in any material respect;

19

(e)      maintain, preserve and protect all of the Purchased Assets in the condition in which they exist on the date hereof, except for (i) ordinary wear and tear, and (ii) replacements, modifications, or maintenance in the ordinary course of business;

(f)      not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing, or (ii) that would reasonably be expected to impair the ability of Seller or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(g)      not assume, reject, or assign any Contract that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated hereby, to Buyer;

(h)      not enter into new Contracts other than in the Ordinary Course or amend or voluntarily terminate or cancel any Contracts;

(i)      make all post-petition payments related to Assumed Contracts that become or became due or payable pursuant to the terms thereof;

(j)      comply in all material respects with all material Laws applicable to it or having jurisdiction over its business or any Purchased Asset;

(k)      not, directly or indirectly, cancel, forgive, or compromise any material debt or claim or waive or release any material right of, in each case that constitutes a Purchased Asset;

(l)      not (i) establish, adopt, amend, or terminate any Employee Benefit Plan or any other plan, program, policy, agreement, or arrangement that would be an Employee Benefit Plan if it were in existence as of the date hereof, (ii) increase or decrease the compensation or benefits payable or provided to, or to become payable or be provided to, any Current Employees or Former Employees, (iii) grant, promise, or announce any severance, equity, or equity-based incentive compensation or bonus (including any retention, transaction, or change in control bonus), or (iv) accelerate the time of vesting, funding, or payment of any compensation or benefit under any Employee Benefit Plan or otherwise;

(m)      not negotiate, modify, extend, or enter into any collective bargaining agreement or other Contract with any labor union, works council, or other labor organization or recognize or certify any labor union, labor organization, works council, or group of employees as the bargaining representative for any employees of Seller;

(n)      not implement or announce any employee layoffs, plant closings, reductions in force, furloughs, temporary layoffs, or other such actions that could implicate the WARN Act;

(o)      not hire, engage, terminate (without cause), furlough, or temporarily lay off any employee or independent contractor;

(p)      not cancel, terminate, fail to renew or allow to lapse any insurance policy covering the Purchased Assets;

20

(q)      not make any capital expenditure except as permitted by the budget approved by the Bankruptcy Court;

(r)      not waive or release any non-competition, non-solicitation, non-disclosure, non-interference, non-disparagement, or other restrictive covenant obligation of any Current Employee or Former Employee;

(s)      not disclose any confidential information to any Person other than in the ordinary course of business in circumstances involving reasonable and customary confidentiality restrictions;

(t)      (i) conduct its business in the Ordinary Course, (ii) preserve the existing business organization and keep management of its business intact, and (iii) keep available the services of the Current Employees, and maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Current Employees, and others having business dealings with Seller, to the extent, in each case, reasonably feasible;

(u)      not (i) make, change or revoke any material Tax election (including, for the avoidance of doubt, a Tax election relating to Seller's classification as a corporation for U.S. federal income tax purposes), (ii) change any annual accounting period, (iii) change any material method of accounting for Tax purposes, (iv) settle any claim or assessment in a Tax proceeding in respect of a material amount of Taxes, (v) surrender any right to claim a material refund for Taxes, (vi) other than with respect to automatic or automatically granted extensions, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, or (vii) file (in a manner inconsistent with past practice) or amend any material Tax Return relating to the Purchased Assets; or

(v)      agree or commit to do any of the foregoing.

6.2      Access to Information.

(a)      During the Interim Period, Seller will provide Buyer and its authorized Representatives with reasonable access, upon reasonable advance notice and during regular business hours, to the Purchased Assets; provided, that (i) such access does not unreasonably interfere with the normal operations of Seller, (ii) such access will occur in such a manner as Seller reasonably determine to be appropriate to protect the confidentiality of the transactions contemplated hereby, (iii) all requests for access will be directed to Margie Kaufman or Jarod Wada or such other Person(s) as Seller may designate in writing from time to time, and (iv) nothing herein will require Seller to provide access to, or to disclose any information to, Buyer if such access or disclosure (A) would reasonably be expected to cause significant competitive harm to Seller if the transactions contemplated hereby are not consummated (unless Buyer signs a confidentiality agreement regarding such information), (B) would waive any legal privilege, or (C) would be in violation of applicable Laws or the provisions of any agreement to which Seller is bound; provided, that, in the event that Seller withholds access or information in reliance on the foregoing clause (C), Seller shall provide (to the extent reasonably practicable without waiving or violating the applicable legal privilege or Law) notice to Buyer that such access or information is

21

being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

(b)    Except as otherwise agreed to by Seller in writing, Buyer will not contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, noteholder, or other material business relation of Seller prior to the Closing Date with respect to Seller, its business, or the transactions contemplated hereby without the prior consent of Seller (which consent shall not be unreasonably withheld, conditioned, or delayed) for each such contact.

6.3    Regulatory Approvals.

(a)    Seller will (i) make or cause to be made all filings and submissions required to be made by Seller under any applicable Laws for the consummation of the transactions contemplated hereby, (ii) cooperate with Buyer in exchanging such information and providing such assistance as Buyer may reasonably request in connection with the foregoing, and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings, and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)    Buyer will, and will cause its affiliates to, (i) make or cause to be made all filings and submissions required to be made by Buyer under any applicable Laws for the consummation of the transactions contemplated hereby, (ii) cooperate with Seller in exchanging such information and providing such assistance as Seller may reasonably request in connection with all of the foregoing, and (iii) (A) promptly supply any additional information and documentary material that may be requested in connection with such filings, and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

(c)    Notwithstanding anything in this Agreement to the contrary, Buyer, including its Affiliates, shall not be required, either pursuant to this Section 6.3 or otherwise, to (i) negotiate, commit to or effect, by consent decree, hold separate order or otherwise, the sale, lease, license, divestiture or disposition of any assets, rights, product lines or businesses, (ii) terminate any existing relationships, contractual rights or obligations, (iii) terminate any joint venture or other arrangement, (iv) create any relationship, contractual rights or obligations, (v) effectuate any other change or restructuring, (vi) otherwise take or commit to take any actions, including agreeing to prior approval restrictions, with respect to the businesses, product lines or assets of the Buyer or its respective Affiliates, or (vii) enter into litigation to overturn or challenge any governmental determination or action.

6.4    Reasonable Best Efforts; Cooperation.

(a)    Notwithstanding anything to the contrary in this Agreement, each Party shall use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, or advisable under applicable Law to cause the transactions contemplated hereby to be effected as soon as practicable, in accordance with the terms hereof, and to cooperate with the other Party in connection with any step required to be taken as a part of its obligations hereunder.

22

(b)     The obligations of Seller under this Agreement shall be subject to any approvals or authorizations required from the Bankruptcy Court pursuant to the Bankruptcy Code, Seller's obligations as debtor-in-possession to comply with any order of the Bankruptcy Court, and Seller's duties under the Bankruptcy Code to seek and obtain the highest or otherwise best net value for the Purchased Assets and potentially consummate a transaction for the sale of the Purchased Assets with another party, which in Seller's business judgment would maximize the value of its bankruptcy estate (an "**Alternative Transaction**"). For purposes of clarity, an Alternative Transaction may include (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of Seller, (ii) any merger, consolidation, share exchange or other similar transaction to which Seller is a party that has the effect of transferring, directly or indirectly, all or any portion of the Purchased Assets, or any issuance, sale or transfer of equity interests in, Seller, (iii) any direct or indirect sale of all or any portion of the Purchased Assets, (iv) any issuance, sale or transfer of equity interests in, the Seller or (v) any other transaction (other than a liquidation or a plan of liquidation), including a reorganization (in any jurisdiction, whether domestic, foreign, international or otherwise), that transfers or vests ownership of, economic rights to, or benefits in all or a portion of the Purchased Assets, to any party other than Buyer or any of its Affiliates, in each instance, whether or not such transaction is entered into in connection with any bankruptcy, insolvency, arrangement, proposal, receivership or similar Proceedings.

6.5     Further Assurances. From time to time, as and when requested by either Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated hereby.

6.6     Insurance Matters. Except as set forth below, Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to the Purchased Assets that is maintained by Seller shall cease to provide any coverage with respect to the Purchased Assets and no further coverage shall be available to Buyer or the Purchased Assets under any such policies.

6.7     Employees and Offers of Employment.

(a)     Buyer may, in its sole discretion, offer employment to certain employees of Seller, and Seller shall cooperate with Buyer in connection with such offers of employment.

(b)     Nothing herein shall be construed to require Buyer to hire any employee of Seller, and the hiring of any employees shall not be a term or condition of this Agreement.

(c)     Prior to the Closing, except as required by Law, Buyer shall be permitted to issue communications (including any electronic communication) to any Current Employee without the prior written approval of Seller. Seller agrees to cooperate in good faith in order to facilitate any offers of employment and Seller shall terminate the employment of any employee that accepts an offer of employment with Buyer immediately prior to the commencement of such employment and any such termination costs shall be the sole obligation of Seller.

(d)     Seller agrees that, notwithstanding the terms of any non-competition, non-solicit, non-disclosure, or similar restrictive covenant between Seller and any Current Employee

23

hired by Buyer (the "**RCAs**"), such individual shall be permitted to provide services to Buyer and its Affiliates following the Closing, and Seller will not seek to enforce the terms of any such RCA following the Closing, and Seller shall use commercially reasonable efforts to transfer the benefits of the RCAs to Buyer, which shall be an intended third party beneficiary of the benefits of such RCAs.

(e)     Buyer shall maintain employee records transferred to Buyer hereunder for as long as required by applicable Law, and during that period will afford Seller reasonable access to such records during Buyer's normal business hours. Buyer shall maintain the confidentiality of such records and limit access thereto to the extent required by applicable Law.

(f)     Seller shall retain Liability for, and Buyer shall not acquire or assume, any Liability, claim, or Proceeding related to any Current Employee or Former Employee or current or former independent contractor or any employment, benefit, or related matters of Seller. Seller shall retain liability for, and Buyer shall not acquire or assume any Liability with respect to any Employee Benefit Plan. Buyer shall not be a successor employer under any applicable law.

(g)     Unless agreed to otherwise in writing by Buyer, any employees of Seller hired by Buyer shall be employees "at-will".

(h)     This Section 6.7 shall be binding upon and inure solely to the benefit of each of the Parties to this Agreement; nothing in this Section 6.7 expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature whatever; and no provision of this Section 6.7 will create any third-party beneficiary rights in (i) any Current Employee or Former Employee, or (ii) any current or former employee, officer, director or individual service provider of Seller's Affiliates in respect of continued employment or service or any other matter. This Section 6.7 shall not be considered, or deemed to be, an amendment to or establishment of any Employee Benefit Plan or any other compensation or benefit plan, program, agreement or arrangement. Nothing in this Section 6.7 shall obligate Buyer or any of its Affiliates (i) to continue to employ any Current Employee for any specific period of time following the Closing Date or (ii) limit the right of Buyer or any of its Affiliates to, at any time, change or modify any benefit or compensation plan, program, agreement or arrangement at any time and in any manner.

6.8     Notice of Certain Events. During the Interim Period, Seller shall promptly notify Buyer of, and furnish to Buyer, any information regarding: (a) any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement or any Related Document (including with respect to the transfer of personal information), or that otherwise relates to any written status update prepared by a third party and related to any of the Purchased Assets; (b) any written notice or other communication from any Governmental Entity (other than the Bankruptcy Court) related to or in connection with the transactions contemplated hereby or any Related Document; (c) any material Proceeding initiated, filed, commenced or, to Seller's Knowledge, threatened against or relating any of the Purchased Assets; or (d) the occurrence of any event or condition or the existence of any fact that (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any

24

of the conditions relating to the Closing to be satisfied. Buyer's receipt of information pursuant to this Section 6.8 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement or any other Related Document, and shall not be deemed to amend or supplement the Schedules. Notwithstanding anything to the contrary herein, in no event shall the information provided pursuant to this Section 6.8 be deemed to modify any representation or warranty hereunder or be included as a supplement to the Schedules.

6.9    Accounts Receivable.

(a)    As of the Closing Date, Seller hereby (i) authorizes Buyer to open any and all mail addressed to Seller relating to the Purchased Assets and delivered to Buyer if received on or after the Closing Date, and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks, or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing Date, as the case may be, made payable or endorsed to Seller or Seller's order, for Buyer's own account.

(b)    As of the Closing Date, Seller agrees that any monies, checks, or negotiable instruments received by Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing Date, as the case may be, shall be held in trust by Seller for Buyer's benefit and account, and Seller shall pay over to Buyer or its designee the amount of such payments within five (5) Business Days.

(c)    As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by Buyer after the Closing.

(d)    Notwithstanding anything to the contrary in this Agreement, including this Section 6.9, all Accounts Receivable as of the Closing Date are an Excluded Asset and shall remain with the Debtor's estate.

6.10    Confidentiality.

(a)    Neither Party nor any of such Party's employees, agents, or Representatives and, solely with respect to Buyer, any of Buyer's Affiliates, shall reveal or disclose to any Person any Confidential Information concerning the business or affairs of the other Party that it may have acquired from such Party in the course of pursuing the transactions contemplated hereby without the prior written consent of such Party, other than, with respect to Buyer, Confidential Information relating to the Purchased Assets or the Assumed Liabilities.

(b)    Seller nor any of its employees, agents, or Representatives will disclose to any Person any Confidential Information concerning the Purchased Assets or the Assumed Liabilities that Seller or any of its employees, agents, or Representatives acquired prior to the Closing Date.

(c)    Notwithstanding the foregoing, either Party may disclose any such Confidential Information as follows:  (i) to such Party's affiliates and its or its affiliates' employees, lenders, counsel, or accountants, the actions for which the applicable Party will be

25

responsible, (ii) to comply with any applicable Law or Decree; provided, that prior to making any such disclosure, the Party making the disclosure notifies the other Party of any Proceeding of which it is aware which may result in disclosure and uses commercially reasonable efforts to limit or prevent such disclosure, (iii) to the extent that the Confidential Information is or becomes generally available to the public through no fault of the Party or its affiliates making such disclosure, or (iv) to the extent that the same information becomes available to the Party making such disclosure on a non-confidential basis from a source other than a Party or its affiliates, which source is not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation to the other Party.

6.11    Avoidance Actions. Buyer hereby covenants and agrees not to sue, and to cause each of its Affiliates and successors not to sue, any party in respect of any Avoidance Action that has been included in the Avoidance Action Schedule.

6.12    Preservation of and Access to Books and Records. Buyer shall provide to Seller or any successor, estate representative, or litigation trustee (after reasonable advance notice and during regular business hours) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Business, any of the Purchased Assets or any of the Assumed Liabilities, to the extent necessary to permit Seller to determine any matter relating to their respective rights and obligations hereunder (for example, for purposes of any Tax or accounting audit or any claim or litigation matter) or otherwise related to the Excluded Assets or Excluded Liabilities, for periods prior to the Closing and shall preserve such books and records until the latest of (i) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (ii) the retention period required by applicable Law, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Case and (iv) in the case of books and records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1    Conditions Precedent to the Obligations of Buyer and Seller. The respective obligations of each Party to consummate the transactions contemplated hereby are subject to the satisfaction (or written waiver by each of Seller and Buyer) on or prior to the Closing Date, of each of the following conditions:

(a)    no court or other Governmental Entity has issued, enacted, entered, promulgated, or enforced any Law or Decree restraining, enjoining, or otherwise prohibiting the transactions contemplated hereby;

(b)    the Bankruptcy Court shall have entered the Sale Order on terms acceptable to the Buyer and the Sale Order shall be a Final Order; and

(c)    there shall not be pending or threatened by any Governmental Entity any Proceeding (i) challenging or seeking to restrain, prohibit, alter, or materially delay the consummation of any of the transactions contemplated hereby, or (ii) seeking to obtain from either

26

Party any damages in connection with the transactions contemplated hereby.

The Parties agree that, subject to Section 7.4, all of the Purchased Assets being sold by Seller are being sold as an inseparable package that must be approved as an inseverable whole, and the closing of the sale on all of the Purchased Assets shall occur simultaneously.

7.2     Conditions Precedent to the Obligations of Buyer. The obligations of Buyer to consummate the transactions contemplated hereby are subject to the satisfaction (or written waiver by Buyer in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     as of the date hereof and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1, Section 3.2, Section 3.3, Section 3.4 and Section 3.17 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     Seller shall have performed in all material respects all of the covenants and agreements required to be performed by Seller under this Agreement at or prior to the Closing;

(c)     since the date hereof, no event shall have occurred which has resulted or would reasonably be expected to result in a Material Adverse Effect;

(d)     there shall be no Order of the Bankruptcy Court or any other court of competent jurisdiction prohibiting Buyer from submitting a credit bid pursuant to Section 363(k) of the Bankruptcy Code in satisfaction of the Purchase Price and consummating the transactions contemplated hereby;

(e)     the DIP Order shall have been entered by the Bankruptcy Court on terms and conditions acceptable to the Buyer and the DIP Order shall be a Final Order; and

(f)     Seller shall have delivered, or caused to be delivered, to Buyer all of Seller's deliverables set forth in Section 2.4.

7.3     Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the transactions contemplated hereby are subject to the satisfaction (or written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     as of the date hereof and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2, Section 4.3, and Section 4.6 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause

27

(ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     Buyer shall have performed in all material respects all of the covenants and agreements required to be performed by them under this Agreement at or prior to the Closing;

(c)     Buyer shall have delivered, or caused to be delivered, to Seller all of Buyer's deliverables set forth in Section 2.5; and

(d)     Seller has not determined that the exercise of its fiduciary duties under the Bankruptcy Code requires Seller to pursue an Alternative Transaction.

7.4     Waiver of Conditions. Except in the case of fraud, upon the occurrence of the Closing, any condition set forth herein that was not satisfied as of the Closing Date will be deemed to have been waived for all purposes by the Party having the benefit of such conditions as of and after the Closing Date.

## ARTICLE VIII

## TERMINATION

8.1     Termination of Agreement. This Agreement may be terminated only in accordance with this Article VIII. This Agreement may be terminated at any time prior to the Closing Date:

(a)     by the mutual written consent of the Parties;

(b)     by written notice of either Party, upon the issuance of a Final Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby; provided, that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Final Order was caused by the breach or action or inaction of such Party;

(c)     by Buyer if there shall have been a breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement or any other event or condition shall result in Seller being incapable of satisfying one or more of their representations, warranties, covenants or agreements set forth herein, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) days after written Notice thereof shall have been received by Seller;

(d)     by Seller by giving written notice to Buyer at any time prior to the Closing Date in the event Buyer has breached any material covenant contained in the Sale Order or this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of thirty (30) days after the notice of the breach;

(e)     by Buyer, if the Closing shall not have occurred on or before August 7, 2026 (the "**Outside Date**"); provided, that Buyer shall not be permitted to terminate this Agreement

28

pursuant to this <u>Section 8.1(e)</u> if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of Buyer;

(f)      subject to Section <u>10.17</u>, by Buyer if Seller withdraws or seeks authority to withdraw the Bid Procedures Order or the Sale Order, or announces any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party), other than a plan of reorganization or liquidation or wind-down plan of Seller's estate post-Closing acceptable to the Buyer;

(g)      by either Party, if there shall be any (i) order or other Law or (ii) Governmental Entity that issues any final and non-appealable ruling or order that, in each case (x) prohibits, prevents or enjoins the consummation of the transactions contemplated by this Agreement or otherwise makes the consummation of the transactions contemplated by this Agreement illegal and (y) remains in effect for five (5) Business Days after notice of such order or other Law has been received by Buyer and Seller; provided, that the right to terminate this Agreement under this <u>Section 8.1(g)</u> shall not be available to any Party whose breach of this Agreement shall have been the cause of, or shall have resulted in the order or other Law prohibiting, restraining, or enjoining the transactions contemplated by this Agreement;

(h)      by Buyer, if the Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Chapter 11 Case;

(i)      automatically and without any action or notice by either Party, or Buyer to Seller, immediately upon:

(i). the consummation of an Alternative Transaction; or

(ii).      if Buyer is not selected as the Successful Bidder at the conclusion of the Auction, unless Buyer is designated as "backup bidder" under the Sale Order;

(j)      by Buyer or Seller, if the Bankruptcy Court enters a final, non-appealable order that precludes the consummation of the transactions contemplated hereby on the terms and conditions under this Agreement;

(k)      by written notice of either Party, if all of the conditions set forth in Section 7.2 or 7.3, as applicable, have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, and Buyer or Seller, as applicable, fails to complete the Closing at the time required by <u>Section 2.3</u>;

(l)      by Buyer, if Buyer receives notice that (i) any Contract that is an Assumed Contract has been removed as an Assumed Contract pursuant to <u>Section 1.5(e)</u>, (ii) a contractual counterparty to any Assumed Contract may exercise rights to terminate such Assumed Contract or (iii) any other occurrence, whether due to lapse of time, exercise of right or otherwise, may reasonably render Buyer incapable of receiving the benefits of such Assumed Contract;

29

(m)      by Buyer, upon a termination of the DIP Note or upon a modification of any DIP Order in any material respect without the consent of the requisite DIP Lender;

(n)      by Buyer, if there is an Event of Default (as defined in the DIP Note), the DIP Obligations are accelerated, and the DIP Loan (as defined in the DIP Note) is terminated;

(o)      by Buyer, if (i) for any reason Buyer is not permitted by the Bankruptcy Court, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid the DIP Obligations and/or the Prepetition Secured Indebtedness in payment of all or any portion of the Credit Bid portion of the Purchase Price, or (ii) any Challenge (as defined in the DIP Order) is filed with the Bankruptcy Court to Buyer's right to credit bid the DIP Obligations or the Prepetition Secured Indebtedness pursuant to Section 363(k) of the Bankruptcy Code;

(p)      by Buyer if the Seller files a motion with the Bankruptcy Court seeking any post-Petition Date financing in the Bankruptcy Case (other than the DIP Note) that seeks to displace or prime any of the liens granted under the DIP Note or DIP Order or attach any additional liens to any of the Purchased Assets, without the prior written consent of Buyer; and

(q)      by Buyer, if any order is entered pursuant to section 362 Bankruptcy Code or any other similar provisions to lift the automatic stay or seeks similar relief with respect to any Acquired Assets without the prior written consent of Buyer.

8.2      Effect of Termination. In the event of termination and abandonment by Buyer, on the one hand, or Seller, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party (such written notice shall state the termination provision in this Agreement that such terminating Party is claiming provides a basis for termination of this Agreement), and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by or Liability of either Party (other than with respect to the sections set forth in this Agreement that shall continue in full force and effect in accordance with this Section 8.2 following such termination), except that such termination shall not relieve any Party of any Liability for fraud or willful breach of this Agreement.

8.3      Reserved.

8.4      Effect of Termination or Breach.

(a)      Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve either Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(b)      Except as set forth in Section 8.1(i), no termination of this Agreement pursuant to Section 8.1 shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made. If the transactions contemplated hereby are not consummated: (i) this Agreement shall become null and void and of no further force and effect (except that Section 8.3, this Section 8.4, Article X and Article XI, shall survive any such termination), and (ii) if this Agreement is terminated by Buyer pursuant to a termination right set forth in this Article VIII or by Seller for any reason, Seller shall not be entitled to any damages, losses, or payment from Buyer, and Buyer shall have no further

liability of any kind to Seller, or any third party on account of this Agreement. The Parties hereby agree that it is impossible to determine accurately the amount of damages that Seller would suffer if the transactions contemplated hereby were not consummated as a result of a breach of this Agreement by Buyer or that Buyer would suffer if the transactions contemplated hereby were not consummated as a result of a breach of this Agreement by Seller.

## ARTICLE IX

## TAXES

9.1    <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, deed, fixed asset, stamp, documentary stamp, use, registration, or other similar Taxes and recording charges payable solely by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated hereby (the "**Transfer Taxes**") shall be paid by Buyer. Buyer shall be responsible for filing any Tax Returns related to Transfer Taxes and the Parties shall cooperate to prepare any such Tax Returns.

9.2    <u>Tax Returns and Apportionment</u>.

(a)    Seller will prepare and file, or cause to be prepared and filed, any Tax Return with respect to the Purchased Assets for any taxable period ending on or before the Closing Date with an original due date on or before the Closing Date. Buyer shall prepare and file all Tax Returns relating to the Purchased Assets that have an original due date after the Closing Date including any Tax Return relating to a Taxable period that begins on or before the Closing Date and ends after the Closing Date (a "**Straddle Period**"). Unless otherwise specified in this <u>Section 9.2(a)</u>, Seller shall be solely responsible for any Tax Returns relating to Taxes that are included in or related to the Excluded Liabilities.

(b)    Seller shall bear and be liable for any Taxes attributable to any taxable period ending on or before the Closing Date (a "**Pre-Closing Tax Period**") including any Taxes attributable to the pre-Closing portion of any Straddle Period as determined in accordance with this <u>Section 9.2(b)</u> ("**Pre-Closing Straddle Taxes**"). Except as described in the following sentence, the amount of Pre-Closing Straddle Taxes will be determined based on an interim closing of the books as of the end of the day on the Closing Date. The amount of any real property, personal property and similar *ad valorem* Taxes for a Straddle Period that are Pre-Closing Straddle Taxes will be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period. The amount of Taxes allocable to Seller for the Pre-Closing Tax Period shall be estimated as of the Closing Date and paid over at the Closing to Buyer; <u>provided</u>, <u>however</u>, that final payments with respect to the any such Taxes that are not able to be calculated as of the Closing Date shall be calculated and paid over as soon as practicable after the Closing Date but no later than five (5) business days after determination of the amount of any such Taxes. Notwithstanding anything to the contrary herein, Seller shall bear and be liable for, and Buyer shall have no liability for, any Taxes included in or related to the Excluded Liabilities.

9.3     Cooperation. The Parties shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and Proceedings with respect to any Taxes in respect of the Purchased Assets and the Assumed Liabilities. Pursuant to such cooperation, each Party shall (i) provide the other with such assistance as may reasonably be requested (subject to reimbursement of reasonable out-of-pocket expenses) in connection with the preparation of any Tax Return, audit or other examination by any Governmental Entity or other Proceeding relating to Taxes (in connection with the Purchased Assets), (ii) retain and provide the other Party with any records or other information that may be relevant to such Tax Return, audit or other Proceeding and (iii) inform the other Party of any final determination of any such audit or examination, proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such Tax Return or Tax proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Seller shall abide by all record retention agreements entered into with any Governmental Entity and give Buyer thirty (30) days' written notice prior to transferring, destroying or discarding any records relating to Taxes and if Buyer so requests, shall allow Buyer to take possession of such Tax records.

9.4     Other Tax Matters. Except as specifically set forth in this Agreement, neither Party makes any representations regarding the implications of the transactions contemplated herein on any liability for any Taxes to any Governmental Entity.

### ARTICLE X

### MISCELLANEOUS

10.1     Expenses. Whether or not the Closing takes place, except as otherwise provided herein, all fees, costs, and expenses incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the consummation of the transactions contemplated hereby will be paid by the Party incurring such fees, costs, and expenses.

10.2     Closing Law Firm. The law firm of Clifford Chance US LLP, or such other law firm as Buyer may select in its reasonable discretion (the "**Closing Firm**"), will be authorized to perform the Closing in consultation with bankruptcy counsel for Seller. Buyer will be solely responsible for payment of any fees or costs incurred by or related to the services provided by the Closing Firm.

10.3     Notices. Except as otherwise expressly provided herein, all notices, demands, and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, receipt confirmed, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service, or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address, or

32

street address, as applicable, set forth below, or at such other number, electronic mail address, or street address as such Party may specify by written notice to the other Party.

Notices to Buyer:

ArcLink Fiber LLC
24 Endell Street, London
United Kingdom, WC2H 9HQ
Attn:  Phoebe Smith and Bart Saenen
Email: future@patrizia.ag; SIFITopco@patrizia.ag

with a copy to (which shall not constitute notice):

Clifford Chance US LLP
Attn: Laurens Wilkes; David Feldman; Alexandra Wilde; Matthew Hinker
845 Texas Ave, Suite 2700
Houston, TX 77002
Email: laurens.wilkes@cliffordchance.com; david.feldman@cliffordchance.com; alexandra.wilde@cliffordchance.com; matthew.hinker@cliffordchance.com.

and

Young Conaway Stargatt & Taylor LLP
Attn: Sean M. Beach
Rodney Square
1000 North King Street
Wilmington, DE 19801
Email: sbeach@yvst.com

Notices to Seller:

SiFi Networks America, LLC
Attn: Margie Kaufman, Chief Restructuring Officer
700 Technology Park Drive, Suite 212
Billerica, MA  01821
Email: mkaufman@kcpadvisory.com

with a copy to (which shall not constitute notice):

Cole Schotz P.C.
Attn: James Stefanick; Daniel F. X. Geoghan; Jacob Frumkin
1325 Avenue of the Americas
New York, NY 10019
Email:                          jstefanick@coleschotz.com; dgeoghan@coleschotz.com; jfrumkin@coleschotz.com

10.4    Binding Effect. This Agreement shall be binding upon Buyer and, subject to the entry into and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor case.

10.5    Assignment. This Agreement may not be assigned by any of the Parties, provided, however, that Buyer may assign this Agreement and the rights and obligations hereunder to a Designated Buyer; provided, further, that nothing herein shall be deemed to prohibit Buyer from assigning any of the Purchased Assets, the Assumed Liabilities, or any rights related thereto to any Person after the Closing Date.

10.6    Amendment and Waiver. Any provision of this Agreement or exhibits hereto may be (a) amended only in a writing signed by the Parties, or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.7    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.8    Non-Recourse. This Agreement may only be enforced against, and any Proceeding based upon, arising out of or related to this Agreement may only be brought against, the entities that are expressly named as Parties to this Agreement. Except to the extent named as a Party to this Agreement, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, incorporator, employee, affiliate, agent, or advisor of either Party or any subsidiary of either Party will have any liability (whether in Contract, tort, equity, or otherwise) for any of the representations, warranties, covenants, agreements, or other obligations or liabilities of any of the parties to this Agreement or for any Proceeding based upon, arising out of, or related to this Agreement.

10.9    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.10    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.11    Complete Agreement. This Agreement, together with the Related Documents,

34

contains the entire agreement of the Parties respecting the sale and purchase of the Purchased Assets and the assumption of the Assumed Liabilities and the transactions contemplated hereby and by the Related Documents and supersedes all prior agreements among the Parties respecting the sale and purchase of the Purchased Assets, the assumption of the Assumed Liabilities and the transactions contemplated hereby and thereby.

10.12 <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated hereby. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance, or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions hereby and without that right, neither Party would have entered into this Agreement. The Parties acknowledge and agree that either Party pursuing an injunction or injunctions or other Decree to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Decree. The remedies available to the Parties pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled under this Agreement, and the election to pursue an injunction or specific performance will not restrict, impair, or otherwise limit the Parties from seeking to collect or collecting damages as limited pursuant to this Agreement.

(b)    If, prior to the Outside Date, either Party commences any Proceeding, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by the other Party, the Outside Date will automatically be extended (i) for the period during which such Proceeding is pending, *plus* ten (10) Business Days, or (ii) by such other time period established by the court presiding over such Proceeding, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty of Seller made herein.

10.13 <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Proceeding that may be based upon, arising out of, or related to this Agreement brought by the other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken, (b) in the event the Bankruptcy Case is closed, or if the Bankruptcy Court is unwilling or unable to hear such Proceeding, in the Chancery Court of the State of Delaware (and any state appellate court therefrom within the State of Delaware), or (c) if the Chancery Court of the State of Delaware declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware. Each of the Parties hereby irrevocably submits to the exclusive jurisdiction of such with regard to any such Proceeding arising out of or relating to this Agreement. The Parties irrevocably agree that venue would be proper in any of the courts referenced above and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the

resolution of such Proceeding. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices herein.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, all matters related to this Agreement will be governed by and construed in accordance with the internal Laws of the State of Delaware without regard to conflicts of Law principles.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH PROCEEDING WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE AND UNCONDITIONAL WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    Counterparts. This Agreement may be executed in any number of counterparts, including by means of electronically transmitted portable document format (pdf) signature pages, each of which shall be an original but all of which together shall constitute one and the same instrument.

10.16    Bulk Sales Laws. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens in the Purchased Assets, including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers," or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated hereby.

10.17    Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its directors or officers, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent

36

with their fiduciary obligations. For purposes of clarity, Seller shall retain the right to pursue any Alternative Transaction that, in Seller's business judgment, will maximize the value of its bankruptcy estate.

## ARTICLE XI
## INTERPRETATION AND DEFINITIONS

11.1    References and Rules of Construction. All references in this Agreement to Exhibits, Schedules, Articles, Sections, subsections, clauses and other subdivisions refer to the corresponding Exhibits, Schedules, Articles, Sections, subsections, clauses and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Exhibits, Schedules, Articles, Sections, subsections, clauses and other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision unless expressly so limited. The words "this Article," "this Section," "this subsection," "this clause" and words of similar import refer only to the Article, Section, subsection and clause hereof in which such words occur. The word "including" (in its various forms) means including without limitation. All references to "$" or "dollars" shall be deemed references to United States dollars. For purposes of determining the United States dollar equivalent of any non-United States currency, such currency shall be deemed to have been converted into United States dollars at 12:00 p.m. prevailing Eastern Time on the date on which such amount was paid, incurred, distributed or otherwise determined in non-United States currency at the applicable foreign exchange spot rate for settlement as quoted by Bloomberg on www.bloomberg.com/markets/currencies/fxc.html, or as displayed on another information service of similar repute which publishes that rate of exchange from time to time. Each accounting term not defined herein will have the meaning given to it under GAAP as interpreted as of the date of this Agreement. Unless expressly provided to the contrary, the word "or" is not exclusive and has the meaning represented by the phrase "and/or." Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Exhibits and Schedules referred to herein are attached to and by this reference incorporated herein for all purposes. Reference herein to any federal, state, local or foreign Law shall be deemed to also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise, and reference herein to any agreement, instrument or Law means such agreement, instrument or Law as from time to time amended, modified or supplemented, including, in the case of agreements or instruments, by waiver or consent and, in the case of Laws, by succession of comparable successor Laws. References to a Person are also to its permitted successors and permitted assigns. References to any date shall mean such date in New York, New York. The words "made available to Buyer," "provided to Buyer" or similar phrases shall mean made and remaining available to Buyer or its representatives in the data room prepared by Seller at least three Business Days prior to the date hereof or provided to Buyer or its Representatives in response to requests for materials or information, in each case, prior to the date hereof.

37

11.2    <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the respective meanings set forth below:

"**Accounts Receivable**" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, bill receivables, trade accounts, hold backs, retention, book debts, insurance claims, negotiable instruments, chattel paper (including completed work which has not yet been billed), vendor and supplier rebates and other receivables (including in respect of goods shipped, products sold, licenses granted, services rendered or otherwise and all amounts that may be returned or returnable with respect to letters of credit or other financial collateral drawn down prior to the closing of the transaction) from third parties, together with any unpaid financing charges accrued thereon, in each instance, of Seller, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"**Affiliate**" means, with respect to any Person, any Person that directly or indirectly Controls, is Controlled by or is under common Control with such Person; <u>provided</u>, <u>that</u>, each of APG Asset Management N.V. and PATRIZIA Infrastructure Ltd and their respective affiliates shall be deemed to be Affiliates of the Buyer; and <u>provided</u>, <u>however</u>, with respect to Seller, Buyer and Buyer Affiliates shall not be deemed an Affiliate of Seller for purposes of this Agreement.

"**Agreement**" means this Asset Purchase Agreement, as it may be amended or modified in accordance with the provisions hereof.

"**Allocation**" has the meaning ascribed to such term in <u>Section 2.7</u>.

"**Alternative Transaction**" has the meaning ascribed to such term in <u>Section 6.4(b)</u>.

"**Assumed Contract List**" has the meaning ascribed to such term in <u>Section 1.5(a)</u>.

"**Assumed Contract**" has the meaning ascribed to such term in <u>Section 1.5(a)</u>.

"**Assumed Liabilities**" has the meaning ascribed to such term in <u>Section 1.3</u>.

"**Assumption Notice**" has the meaning ascribed to such term in <u>Section 1.5(a)</u>.

"**Auction**" has the meaning ascribed to such term in the Bid Procedures Order.

"**Avoidance Actions**" means all causes of action, lawsuits, claims, rights of recovery, and other similar rights of Seller arising under Chapter 5 of the Bankruptcy Code.

"**Bankruptcy Case**" has the meaning ascribed to such term in the Recitals.

"**Bankruptcy Code**" has the meaning ascribed to such term in the Recitals.

"**Bid Procedures Order**" means an order of the Bankruptcy Court in substantially the form attached hereto as <u>Exhibit B</u>.

"**Bill of Sale, Assignment and Assumption Agreement**" has the meaning ascribed to such term in <u>Section 2.4(a)</u>.

38

"**Business**" means the ownership, operation and use of the Purchased Assets by Seller, and the conduct of other activities of Seller incidental to the foregoing.

"**Business Day**" means each calendar day except Saturdays, Sundays, and any other day on which banks are required or authorized to close in the State of Delaware or London, England.

"**Buyer**" has the meaning ascribed to such term in the Introduction.

"**Buyer Affiliates**" means PATRIZIA Infrastructure Ltd, APG Asset Management N.V., Future Fiber Networks Midco LLC, SCIF Investor Vehicle LLP, SCIF Delaware LLC, SCIF US HoldCo, LLC, Gaziti Investments Holding B.V., W&W Advisory Ltd., and any of their respective current and former direct shareholders and equity holders, Future Fiber Networks LLC, and any of their respective current and former officers, directors, employees, managers, agents, representatives, funds, and managed accounts.

"**Cash and Cash Equivalents**" means, collectively, all of Seller's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities, and other cash equivalents.

"**Chapter 11 Case**" has the meaning ascribed to such term in the Recitals.

"**Closing Date Payment**" has the meaning ascribed to such term in Section 2.2.

"**Closing Date**" has the meaning ascribed to such term in Section 2.3.

"**Closing Firm**" has the meaning ascribed to such term in Section 10.2.

"**Closing**" has the meaning ascribed to such term in Section 2.3.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidential Information**" means any non-public or proprietary information concerning the businesses and affairs of either Party.

"**Consent**" has the meaning ascribed to such term in Section 1.5(c).

"**Contract**" means any written agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, bid, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission, or commitment that, in each case, is legally-binding.

"**Control**" means the ability to direct the management and policies of a Person, whether through ownership of voting securities or other voting power of such Person or the ability to appoint a majority of the directors or management or otherwise to control the management and policies of a Person. The terms "Controls" and "Controlled by" and other derivatives shall be

39

construed accordingly.

"**Credit Bid**" has the meaning ascribed to such term in Section 2.1.

"**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.

"**Cure Amounts**" has the meaning ascribed to such term in Section 1.5.

"**Current Employees**" means all individuals (including directors, officers, independent contractors, or other individual service providers) employed or engaged by Seller, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"**Data Security Requirements**" has the meaning ascribed to such term in Section 3.8(e).

"**Decree**" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order, or any other order of any Governmental Entity.

"**Designated Buyer**" has the meaning ascribed to such term in Section 1.6.

"**DIP Lender**" means the lender under the DIP Note, in its capacity as such.

"**DIP Note**" means the Delayed Draw Term Loan Note Promissory Note, dated as of [•], by and between the Seller and the DIP Lender, as amended, restated, supplemented or otherwise modified from time to time.

"**DIP Loans**" has the meaning ascribed to the term "Loan" in the DIP Note.

"**DIP Motion"** has meaning ascribed to the term "Motion" in the DIP Order.

"**DIP Obligations**" has the meaning ascribed to the term "Obligations" in the DIP Note.

"**DIP Order**" means the order of the Bankruptcy Court approving the DIP Note, including the "**Interim DIP Order**" and the "**Final DIP Order**" (each as defined in the DIP Motion).

"**Employee Benefit Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), whether or not ERISA is applicable to such plan, and each other bonus, incentive, retention, stock option, stock purchase, restricted stock, equity-based, phantom, retirement, savings, pension, deferred compensation, supplemental retirement, health, welfare, paid leave, employment, compensation, severance and other similar fringe or employee benefit plans, programs or arrangements (whether written or oral, funded or unfunded) currently maintained, sponsored or contributed to by Seller for the benefit of any Current Employee or Former Employee, officer, director, individual contractor, or individual consultant of Seller (or their beneficiaries or dependents) or with respect to which Seller has any current, or would be reasonably expected to have any, liability or obligation (whether actual, contingent, or otherwise), including on behalf of any ERISA Affiliate.

40

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is part of the same controlled group, or under common control with, or part of an affiliated service group that includes Seller within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"**ERISA**" means the United States Employee Retirement Income Security Act of 1974, as amended.

"**Excluded Assets**" has the meaning ascribed to such term in Section 1.2.

"**Excluded Liabilities**" has the meaning ascribed to such term in Section 1.4.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the bankruptcy rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"**Former Employees**" means all individuals (including directors, officers, independent contractors, or other individual service providers) who have been employed or engaged previously by Seller (or any of its predecessors) who are not Current Employees.

"**Go-Forward Business**" means the ownership, operation and/or use of any of the Purchased Assets from and after the Closing, and the conduct of any other activities of Buyer or any of its Affiliates or any Buyer Affiliate related to the Purchased Assets from and after the Closing incidental to the foregoing.

"**Governmental Entity**" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body, or other governmental entity.

"**Hazardous Substance**" means any toxic or hazardous material, substance, or waste regulated or as to which liability or standards of conduct may be imposed under any Environmental Laws.

"**Health and Welfare Plans**" means those Employee Benefit Plans set forth or required to be set forth on Schedule 3.11(a) providing for medical, dental, life, disability, long-term care or other welfare insurance.

"**Intellectual Property**" means any and all rights, title, and interest in or relating to intellectual property or proprietary rights, which may exist or be created under the Laws of any

41

jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions, and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names, and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations, and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, copyrights, database, and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) rights in software (including object code, source code, Systems, tools, firmware, interfaces, and related documentation and materials), data, and databases; (e) inventions (whether or not patentable or reduced to practice) and all improvements thereto, processes, methods, designs, technologies, techniques, protocols, methodologies, formulae, formulations, algorithms, layouts, specifications, discoveries, compositions, industrial models, architectures, drawings, plans, ideas, research and development, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, trade secrets, know-how, and other proprietary confidential information (collectively, "**Trade Secrets**"); and (f) copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"**Interim Period**" means the period between the close of business on the date of this Agreement and the earlier of (x) Closing and (y) the termination of this Agreement.

"**Law**" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, Decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion, or requirement issued, enacted, adopted, promulgated, implemented, or otherwise put into effect by or under the authority of any Governmental Entity.

"**Leases**" means all leases, subleases, licenses, concessions, and other agreements (written or oral) or arrangements pursuant to which Seller holds any real property, together with all amendments, extensions, renewals, guaranties, and other agreements and arrangements with respect thereto, and including the right to all security deposits and other amounts and instruments deposited by or on behalf of Seller thereunder.

"**Liabilities**" means any and all debts, liabilities, commitments and obligations, whether direct or indirect, fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, due or to become due, known or unknown, asserted or not asserted, ascertained or ascertainable.

"**Lien**" means any lien, license, encumbrance, claim, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale, or other title retention agreements and other similar impositions, imperfections, defects of title, or other restrictions on transfer or use.

"**Material Adverse Effect**" means any change, event, effect, development, condition, circumstance, or occurrence (when taken together with all other changes, events, effects,

42

developments, conditions, circumstances, or occurrences), that (a) is materially adverse to the financial condition or results of operations of the Purchased Assets (taken as a whole), or (b) would reasonably be expected to prevent, materially delay or materially impair the ability of Seller to consummate the transactions contemplated hereby or the Related Documents on the terms set forth herein and therein.

"**Ordinary Course**" means the ordinary course of Seller's business with respect to the Purchased Assets; provided, such business is operated consistent in nature, scope and magnitude with Seller's past customs, operations, practices, and procedures.

"**Outside Date**" has the meaning ascribed to such term in Section 8.1(e).

"**Party**" or "**Parties**" has the meaning ascribed to such term in the Introduction.

"**Permit**" means any franchise, approval, permit, license, concessions, order, registration, certificate, variance, consent, exemption, or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"**PII**" has the meaning ascribed to such term in Section 3.8(e).

"**Pre-Closing Tax Period**" has the meaning ascribed to such term in Section 9.2(b).

"**Pre-Closing Straddle Taxes**" has the meaning ascribed to such term in Section 9.2(b).

"**Prepetition Note**" means that certain Secured Promissory Term Note, dated as of May 6, 2026 among Sifi Networks America, LLC, as the borrower and ArcLink Fiber LLC as the noteholder.

"**Proceeding**" means any action, suit, litigation, claim, complaint, demand, charge, arbitration or proceeding (including any civil, criminal, administrative, investigative, enforcement, regulatory or appellate proceeding), hearing, inquiry, audit, examination, mediation, or investigation commenced, brought, conducted or heard by or before, or otherwise involving any court or other Governmental Entity or any arbitrator, whether at Law or in equity.

"**Project Companies**" has the meaning ascribed to such term in the *Declaration of Jacen Dinoff, as Chief Restructuring Officer of the Debtor, in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 11].

"**Purchase Price**" has the meaning ascribed to such term in Section 2.1.

"**Purchased Assets**" has the meaning ascribed to such term in Section 1.1.

"**Related Documents**" means the Bill of Sale, Assignment and Assumption Agreement,

43

and any other agreements, certificates and other instruments delivered, given or contemplated pursuant to this Agreement.

"**Representatives**" shall mean a Person's designees, officers, counsel, accountants, actuaries, financing sources, and other authorized representatives.

"**Sale**" has the meaning set forth in the Bid Procedures Order.

"**Sale Hearing**" means the hearing seeking entry of the Sale Order, which hearing may, with the prior written consent of Buyer which may be withheld in its sole discretion, take the form of a hearing to consider confirmation of Seller's Chapter 11 plan.

"**Sale Motion**" means a motion filed by the Debtor in the Bankruptcy Court, in form and substance acceptable to Buyer, among other things, requesting (a) approval of this Agreement, (b) authorization of the sale of the Purchased Assets to Buyer pursuant to section 363 of the Bankruptcy Code, pursuant to the terms and conditions set forth herein, free and clear of any Liens (other than Permitted Liens), (c) authorization of the assumption by, and assignment to, Buyer of the Assumed Contracts and the Assumed Liabilities pursuant to section 365 of the Bankruptcy Code and (d) authorization of the other transactions contemplated by this Agreement.

"**Sale Order**" has the meaning ascribed to such term in the Recitals.

"**Seller's Knowledge**" means, with respect to Seller, the actual knowledge, without any obligation of inquiry or investigation, of Michael Wyse.

"**Seller**" has the meaning ascribed to such term in the Introduction.

"**Straddle Period**" has the meaning ascribed to such term in Section 9.2(a).

"**Successful Bidder**" has the meaning ascribed to such term by the Bid Procedures Order.

"**Supplemental Assumption Notice**" has the meaning ascribed to such term in Section 1.5(a).

"**Systems**" means servers, software, computer firmware, computer hardware, electronic data processing equipment, websites, databases, interfaces, platforms, circuits, networks, network equipment, peripherals, computer systems, and other computer, communications, and telecommunications devices and equipment, and other information technology systems, and data or information contained therein or transmitted thereby, in each case owned, leased, licensed, or otherwise used or relied on by Seller.

"**Tax Return**" means any return, declaration, report, claim for refund or information, return, or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Tax**" or "**Taxes**" means any United States federal, state, local, or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Code),

44

customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, sales, use, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary, or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether or not disputed.

"**Transfer Taxes**" has the meaning ascribed to such term in Section 9.1.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Laws.

[<em>Signatures on following page</em>]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLER**</u>**:**

SIFI NETWORKS AMERICA, LLC

By: _____

Name: Marjorie Kaufman

Title: Chief Restructuring Officer

<u>**BUYER:**</u>

ARCLINK FIBER LLC

By: _____

Name:

Title:

By: _____

Name:

Title:

[Signature Page to Asset Purchase Agreement]

**Exhibit A**

**Form of Bill of Sale, Assignment and Assumption Agreement**

[Intentionally Omitted]

**Exhibit B**

**Form of Bid Procedures Order**

[Intentionally Omitted]

## Schedule 1.5

### Assumed Contract List

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Master Service Agreement dated as of 12/26/2023 | 123.Net, Inc. 24700 Northwestern Hwy. Fl. 7 Southfield, MI 48075 |
| Service Order # 2539781 dated as of 12/27/2023 | 123.Net, Inc. 24700 Northwestern Hwy. Fl. 7 Southfield, MI 48075 |
| Service Order # 2540390 dated as of 12/27/2023 | 123.Net, Inc. 24700 Northwestern Hwy. Fl. 7 Southfield, MI 48075 |
| Master Service Agreement dated as of 07/31/2024 | Phoenix MSA Holdings LLC d/b/a Evoque Data Center Solutions 3100 Olympus Blvd Suite 510 Coppell, Texas 75019 |
| Service Order #Q-13884 1 dated as of 7/31/2024 | Phoenix MSA Holdings LLC d/b/a Evoque Data Center Solutions 3100 Olympus Blvd Suite 510 Coppell, Texas 75019 |
| Master License and Service Agreement dated as of 9/30/2017 | CoreSite, L.L.C. 1001 17th Street Suite 500 Denver, Colorado 80202 |
| Amendment No 1 to the Master License and Service Agreement dated as of 8/24/2020 | CoreSite, L.L.C. 1001 17th Street Suite 500 Denver, Colorado 80202 |
| Order Form SO-00591345 dated as of 04/6/2018 | CoreSite, L.L.C. 1001 17th Street Suite 500 Denver, Colorado 80202 |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Order Form SO-00618427 dated as of 9/30/2022 | CoreSite, L.L.C. 1001 17th Street Suite 500 Denver, Colorado 80202 |
| Order Form SO-00657785 Renewal (LA1 and LA2) dated as of 8/1/2023 | CoreSite, L.L.C. 1001 17th Street Suite 500 Denver, Colorado 80202 |
| Order Form SO# 2023-108590 dated as of 10/12/2023 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |
| Order Form SO# 2023-114598 dated as of 04/11/2024 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |
| Order Form SO# 2021-77709 dated as of 10/4/2021 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |
| Order Form SO# 2022-98874 dated as of 12/29/2022 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |
| Order Form SO# 2021-72870 dated as of 4/21/2021 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Order Form SO# 2022-98896 dated as of 12/29/2022 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |
| Colocation Services Supplement to the Master Services Agreement dated as of 7/16/2018 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |
| Dark Fiber Services Supplement to Master Services Agreement dated as of 7/16/2018 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |
| Master Service Agreement (Dark Fiber) dated as of 7/16/2018 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |
| Notice of Cancellation dated as of 6/26/2024 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |
| Order Form SO# 2021-79577 dated as of 11/1/2021 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |
| Order Form SO# 2021-80330 dated as of 11/6/2021 | Crown Castle Fiber LLC f/k/a Lightower Fiber Networks II, LLC 80 Central Street Boxborough, MA 01719 |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Lease Order Form + Fiber Connection Schedule dated as of 10/2/2023 | Centurylink Communications, LLC d/b/a Lumen Technologies Group 100 CenturyLink Drive Monroe, LA 71203 |
| Master Service Agreement dated as of 10/02/2023 | Centurylink Communications, LLC d/b/a Lumen Technologies Group 100 CenturyLink Drive Monroe, LA 71203 |
| Order# Form (OMR633106 – DF) dated as of 10/2/2023 | Centurylink Communications, LLC d/b/a Lumen Technologies Group 100 CenturyLink Drive Monroe, LA 71203 |
| Order# Form (DOC-0001547456) dated as of 6/6/2025 | Centurylink Communications, LLC d/b/a Lumen Technologies Group 100 CenturyLink Drive Monroe, LA 71203 |
| SOW and Managed GIS Services Agreement dated as of 12/18/2024 | Specialist Network Operations Ltd. TNS House, Maesbury Road Oswestry, SY10 8NR, UK |
| Service Agreement dated as of 5/18/2022 | Specialist Network Operations Ltd. TNS House, Maesbury Road Oswestry, SY10 8NR, UK |
| Nokia - Agreement of Transfer, Novation and Waiver (Managed Services - SNO) dated as of 9/30/2024 | Specialist Network Operations Ltd. TNS House, Maesbury Road Oswestry, SY10 8NR, UK |
| SOW (Tierpoint Managed Services) dated as of 1/1/2026 | Specialist Network Operations Ltd. TNS House, Maesbury Road Oswestry, SY10 8NR, UK |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Amended and Restated Master Framework Agreement, dated 11/16/2023 | Specialist Network Operations Ltd. TNS House, Maesbury Road Oswestry, SY10 8NR, UK |
| Amendment No.1 to the Amended and Restated Master Framework Agreement dated 11/3/2025 | Specialist Network Operations Ltd. TNS House, Maesbury Road Oswestry, SY10 8NR, UK |
| Nokia - Managed Services Agreement dated 5/1/2015 | Alcatel-Lucent USA Inc 601 Data Drive, Plano, TX 75075 |
| Nokia - Managed Services Agreement Amendment #1 dated as of 7/1/2017 | Alcatel-Lucent USA Inc 601 Data Drive, Plano, TX 75075 |
| Supply and Services Agreement, dated as of 12/22/2022 | Nokia 3201 Olympus Blvd. Dallas, TX 75109 |
| Supply and Services Agreement – Amendment #1 dated as of 12/18/2025 | Nokia 3201 Olympus Blvd. Dallas, TX 75109 |
| Master Services Agreement dated as of 6/2/2020 | TierPoint, LLC 12444 Powerscourt Drive Suite 450 St. Louis, MO 63131 |
| Sales Order #T03180521 dated as of 6/15/2020 | TierPoint, LLC 12444 Powerscourt Drive Suite 450 St. Louis, MO 63131 |
| Sales Order #T06980491 dated as of 4/14/2022 | TierPoint, LLC 12444 Powerscourt Drive Suite 450 St. Louis, MO 63131 |
| Sales Order #002-00-439080 dated as of 1/31/2016 | TierPoint, LLC 12444 Powerscourt Drive Suite 450 St. Louis, MO 63131 |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Service Order #100MBMILWAUKEE dated as of 10/13/2025 | Uniti Wholesale f/k/a Windstream KDL, LLC 2101 River Front Drive, Suite A Little Rock, AR 72202, USA |
| Wholesale Data Services Agreement dated as of 6/19/2019 | Windstream Services, LLC 4001 North Rodney Parham Little Rock, AR 72212 |
| Dark Fiber Lease Agreement (Master Lease Agreement) dated as of 3/16/2022 | Windstream KDL, LLC 4001 North Rodney Parham Little Rock, AR 72212 |
| First Amendment to Dark Fiber Lease Agreement dated as of 4/14/2024 | Windstream KDL, LLC 4001 North Rodney Parham Little Rock, AR 72212 |
| Master Colocation License Agreement dated as of 5/4/2023 | Windstream KDL, LLC 4001 North Rodney Parham Little Rock, AR 72212 |
| License Agreement A-1, dated 5/1/2023 | Windstream KDL, LLC 4001 North Rodney Parham Little Rock, AR 72212 |
| Master Services Agreement dated as of 5/8/2023 | OneNeck IT Solutions LLC d/b/a OneNeck IT Solution LLC 525 Junction Road, Madison, WI 53717 |
| Statement of Work (Order ID #2002-26714) dated as of 5/1/2023 | OneNeck IT Solutions LLC d/b/a OneNeck IT Solution LLC 525 Junction Road, Madison, WI 53717 |
| Client Services Agreement dated as of 9/19/2025 | KMC Solutions USA, LLC 848 N. Rainbow Blvd, Las Vegas, NV 89107 |
| Master Subscription Agreement | CMIC 4850 Keelle St. Toronto, Ontario M3J3K1 |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Appendix #2 to the Original Sales Order dated as of 11/19/2025 | CMIC<br>4850 Keelle St.<br>Toronto, Ontario M3J3K1 |
| Appendix #1 to the Original Sales Order dated as of 3/19/2025 | CMIC<br>4850 Keelle St.<br>Toronto, Ontario M3J3K1 |
| Sales Order (ERP) dated as of 6/19/2024 | CMIC<br>4850 Keelle St.<br>Toronto, Ontario M3J3K1 |
| Concord Commercial Terms of Service, by and between Concord Worldwide, Inc. and SiFi Networks America, LLC | Concord Worldwide, Inc.<br>600 1st Ave, Suite 330, PMB 74378<br>Seattle, Washington 98104<br>United States |
| Order Form dated as of 4/12/2021 | Concord Worldwide, Inc.<br>600 1st Ave, Suite 330, PMB 74378<br>Seattle, Washington 98104<br>United States |
| Order Form (Horizon Upgrade) dated as of 12/31/2025 | Concord Worldwide, Inc.<br>600 1st Ave, Suite 330, PMB 74378<br>Seattle, Washington 98104<br>United States |
| Order Form Q-09297994 (Sales Cloud) dated as of 1/10/2025 | Salesforce, Inc.<br>Salesforce Tower<br>415 Mission Street, 3rd Floor<br>San Francisco, CA 94105<br>United States |
| Alcatel Lucent Flow Down Agreement dated as of 3/13/2019 | SiFi Networks Fullerton, LLC<br>680 Langsdorf Drive, Suite 9<br>Fullerton, CA 92831, USA |
| Escondido, CA Flow Down Agreement dated as of 1/1/2024 | SiFi Networks Escondido LLC<br>103 Foulk Road, Suite 500<br>Wilmington, DE 19803 |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Farmington, MI Flow Down Agreement dated as of 2/1/2024 | SiFi Networks Farmington LLC 103 Foulk Road, Suite 500 Wilmington, DE 19803 |
| Fullerton, CA Flow Down Agreement with SNA, LLC (Coresite) dated as of 3/13/2019 | SiFi Networks Fullerton, LLC 680 Langsdorf Drive, Suite 9 Fullerton, CA 92831, USA |
| Fullerton, CA Flow Down Agreement with SNA, LLC (TierPoint) dated as of 3/13/2019 | SiFi Networks Fullerton, LLC 680 Langsdorf Drive, Suite 9 Fullerton, CA 92831, USA |
| Fullerton, CA Omnibus Amendment to Flow Down Agreement (Executed) dated as of 4/13/2021 | SiFi Networks Fullerton, LLC 680 Langsdorf Drive, Suite 9 Fullerton, CA 92831, USA |
| Kenosha, WI Flow Down Agreement with SNA, LLC (Amendment #1) dated as of 10/13/2025 | SiFi Networks Kenosha LLC 103 Foulk Road, Suite 500 Wilmington, DE 19803 |
| Kenosha, WI Flow Down Agreement with SNA, LLC dated as of 5/1/2023 | SiFi Networks Kenosha LLC 103 Foulk Road, Suite 500 Wilmington, DE 19803 |
| Oceanside, CA Flow Down Agreement dated as of 8/1/2023 | SiFi Networks Oceanside LLC 103 Foulk Road, Suite 500 Wilmington, DE 19803 |
| Palmdale, CA Flow Down Agreement dated as of 8/1/2023 | SiFi Networks Palmdale LLC 103 Foulk Road, Suite 500 Wilmington, DE 19803 |
| Placentia, CA Flow Down Agreement with SFNA (US) dated as of 4/13/2021 | SiFi Networks Placentia LLC 103 Foulk Road, Suite 500 Wilmington, DE 19803 |
| Rancho Cordova, CA Amendment No. 1 to Flow Down Agreement dated as of 5/22/2023 | SiFi Networks Rancho Cordova LLC 103 Foulk Road, Suite 500 Wilmington, DE 19803 |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Rancho Cordova, CA Flow Down Agreement dated as of 2/1/2022 | SiFi Networks Rancho Cordova LLC<br>103 Foulk Road, Suite 500<br>Wilmington, DE 19803 |
| Rockford, IL Flow Down Agreement (Amendment #1) dated as of 10/13/2025 | SiFi Networks Rockford LLC<br>103 Foulk Road, Suite 500<br>Wilmington, DE 19803 |
| Rockford, IL Flow Down Agreement with SNA, LLC dated as of 6/1/2023 | SiFi Networks Rockford LLC<br>103 Foulk Road, Suite 500<br>Wilmington, DE 19803 |
| Simi Valley, CA Flow Down Agreement dated as of 2/24/2022 | SiFi Networks Simi Valley LLC<br>103 Foulk Road, Suite 500<br>Wilmington, DE 19803 |
| Escondido Asset Management Agreement Joinder dated as of 12/21/2023 | SiFi Networks Escondido LLC<br>103 Foulk Road, Suite 500<br>Wilmington, DE 19803<br><br>Future Fiber Networks Midco LLC<br>200 Bellevue Parkway, Suite 210, Wilmington, DE19809 |
| Farmington Asset Management Agreement Joinder dated as of 8/18/2023 | SiFi Networks Farmington LLC<br>103 Foulk Road, Suite 500<br>Wilmington, DE 19803<br><br>Future Fiber Networks Midco LLC<br>200 Bellevue Parkway, Suite 210, Wilmington, DE19809 |
| Rockford Amended and Restated Asset Management Agreement (Amendment No. 1) dated as of 6/20/2023 | SiFi Networks Rockford LLC<br>103 Foulk Road, Suite 500<br>Wilmington, DE 19803<br><br>Future Fiber Networks Midco LLC<br>200 Bellevue Parkway, Suite 210, Wilmington, DE19809 |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Amended and Restated Asset Management Agreement dated as of 5/4/2023 | Future Fiber Networks Midco LLC / Future Fiber Networks LLC 200 Bellevue Parkway, Suite 210, Wilmington State of Delaware 19809 |
| Oceanside Asset Management Agreement Joinder dated as of 7/21/2023 | SiFi Networks Oceanside LLC 103 Foulk Road, Suite 500 Wilmington, DE 19803 Future Fiber Networks Midco LLC 200 Bellevue Parkway, Suite 210, Wilmington, DE 19809 |
| Palmdale Asset Management Agreement Joinder dated as of 7/7/2023 | SiFi Networks Palmdale LLC 103 Foulk Road, Suite 500 Wilmington, DE 19803 Future Fiber Networks Midco LLC 200 Bellevue Parkway, Suite 210, Wilmington, DE 19809 |
| Rockford Asset Management Agreement Joinder dated as of 5/7/2023 | SiFi Networks Rockford LLC 103 Foulk Road, Suite 500 Wilmington, DE 19803 Future Fiber Networks Midco LLC 200 Bellevue Parkway, Suite 210, Wilmington, DE 19809 |
| T-Mobile Framework Agreement dated as of 10/10/2022 | T-Mobile USA, Inc. 12920 SE 38th St, Bellevue, WA 9800 |
| Order No 000563459 dated as of 10/2/2023 | Lumen Technologies Group 100 CenturyLink Drive Monroe, LA 71203 |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Trademark License Agreement dated 8/13/2021 | SNA |
| Statement of Works Agreement dated as of June 4, 2026 (SNO.Cloud Platform Transition and Managed Service) | Specialist Network Operations Ltd. TNS House, Maesbury Road Oswestry, SY10 8NR, UK |
| Quality Assurance & Control Service Agreement dated 6/29/2022 | Specialist Network Operations Ltd. TNS House, Maesbury Road Oswestry, SY10 8NR, UK |
| Letter Agreement re Nokia Novation (with SiFi Networks Escondido LLC; SiFi Networks Farmington LLC; SiFi Networks Oceanside LLC; SiFi Networks Palmdale LLC; SiFi Networks Rockford LLC) dated 10/1/2024 | Specialist Network Operations Ltd. 1525 W. Walnut Hill, Suite 280 Irving, TX 75038 |
| Letter Agreement re Nokia Novation (with SCIF SiFi Networks Fullerton LLC; SCIF SiFi Networks Placentia LLC; SCIF SiFi Networks Simi Valley LLC; SCIF SiFi Networks Rancho Cordova LLC; SCIF SiFi Networks Kenosha LLC) dated 10/1/2024 | Specialist Network Operations Ltd. 1525 W. Walnut Hill, Suite 280 Irving, TX 75038 |
| Order Form #1887323 dated as of 2/1/2022 | Zayo Group, LLC 1821 30th Street, Unit A, Boulder, CO 80301 |
| Order Form #1887328 dated as of 2/1/2022 | Zayo Group, LLC 1821 30th Street, Unit A, Boulder, CO 80301 |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Master Customer Agreement dated as of 1/28/2022 | Zayo Group, LLC 1821 30th Street, Unit A, Boulder, CO 80301 |
| Dark Fiber Customer Schedule dated as of 1/28/2022 | Zayo Group, LLC 1821 30th Street, Unit A, Boulder, CO 80301 |
| Order Form #2232769 dated as of 12/28/2023 | Zayo Group, LLC 1821 30th Street, Unit A, Boulder, CO 80301 |
| Order Form #2301501 dated as of 12/28/2023 | Zayo Group, LLC 1821 30th Street, Unit A, Boulder, CO 80301 |
| Order Form #1841157 dated as of 2/1/2022 | Zayo Group, LLC 1821 30th Street, Unit A, Boulder, CO 80301 |
| Floor Space and Power Agreement dated as of 8/29/2022 | Richmond Telephone Company LLC 1416 State Road Richmond, MA 01254 |
| Master Services Agreement dated as of 5/1/2023 | TSR Solutions, Inc. W67N250 Evergreen Blvd, Cedarburg, WI 53012 |
| Amendment to the Master Services Agreement dated as of 10/13/2025 | TSR Solutions, Inc. W67N250 Evergreen Blvd, Cedarburg, WI 53012 |
| Master Services Agreement dated as of 1/6/2022 | VPLS, Inc. 600 W 7th St. Suite 510 Los Angeles, CA 90017 |

| Description of Contract | Assumption Counterparty (Name and Address) |
|---|---|
| Data Center Service Agreement dat4ed 1/21/2022 | Conscious Capital Data Center, LLC<br>3141 Data Drive<br>Rancho Cordova, CA 95670<br>USA |